**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF TRISTAN | § | |
| GUZMAN, A MINOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-3973 |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM,  D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

In this medical malpractice suit, Wendy Guzman, individually and on behalf of her

son, Tristan Guzman, sued Memorial Hermann Hospital System, d.b.a. Memorial Herman

Southeast Hospital ("Memorial Hermann") in November 2007 in Texas state court.  Guzman

asserted a claim under the Emergency Medical Treatment and Active Labor Act, 28 U.S.C.

§ 1395dd ("EMTALA") based on emergency-room treatment Tristan received at Memorial

Hermann in February 2006.  Memorial Hermann timely removed to this court on the basis

of federal-question jurisdiction.   Guzman has amended her complaint to add state-law

negligence claims against Memorial Hermann; Philip Haynes, M.D., Ph.D.; Memorial

Southeast Emergency Physicians, LLP ("MSEP"); and Emergency Consultants, Inc. ("ECI").

Dr. Haynes was the emergency-room physician who saw Tristan Guzman at Memorial

Hermann.  Dr. Haynes was a partner in MSEP, which is a limited liability partnership of

emergency-room physicians. MSEP, a Michigan LLP registered to do business in Texas, had

a contract with Memorial Hermann to provide emergency physician staffing to the hospital. ECI, a Michigan corporation with its principal place of business in Michigan, had an administrative services agreement with MSEP to provide administrative and support services.

ECI has moved to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, asserting a lack of personal jurisdiction.   (Docket Entry No. 27).   ECI alternatively moved to dismiss under Rule 12(b)(6) for failure to state a claim, asserting that Guzman's claims are  barred by limitations and that Texas law does not recognize the single business enterprise theory as a basis for recovery.   (*Id.*).   After conducting jurisdictional discovery, Guzman responded, (Docket Entry No. 45), ECI replied, (Docket Entry No. 47), and Guzman filed a supplemental response, (Docket Entry No. 48).

Dr. Haynes has filed a "motion challenging the adequacy of plaintiffs' expert report." The motion is filed under Section 74.351 of the Texas Civil Practice & Remedies Code. (Docket Entry No. 20).   Memorial Hermann moved to dismiss Guzman's state-law claims based on the failure to comply with Section 74.351.   (Docket Entry No. 21).   Both motions are directed at the report filed by Joseph Varon, M.D., stating that in his opinion both Dr. Haynes and Memorial Hermann failed to meet the applicable standard of care and were negligent in treating Tristan. (Docket Entry Nos. 20, 21).   Guzman responded, (Docket Entry No. 40).

Based on a careful review of the motions, responses, and replies; the parties' submissions; and the applicable law; this court grants ECI's motion to dismiss for lack of personal jurisdiction and denies the motions challenging Dr. Varon's expert report and

seeking to dismiss based on that report.  The reasons for these rulings are explained below.

## I.  Background

The amended complaint sets out the alleged facts.  On February 12, 2006, Tristan Guzman, then seven years old, was feeling ill.  His parents took him to the emergency room at Memorial Hermann in Houston, Texas.  Dr. Haynes obtained Tristan's medical history, conducted a physical examination, and ordered several laboratory tests, including a white blood cell differential count.  A few hours later, Dr. Haynes diagnosed Tristan with viral syndrome and released him from the hospital.  Dr. Haynes told the Guzmans that Tristan's condition should begin to improve within 24 hours but to return to the emergency room if he was not better.  Dr. Haynes did not prescribe antibiotics when Tristan was released.

The Guzmans brought Tristan back to the Memorial Hermann emergency room the following morning, February 13, 2006.  Dr. Mohammed Siddiqi conducted a physical examination and ordered laboratory tests and a chest x-ray.  These tests showed that Tristan had pneumonia and probable sepsis.  Tristan subsequently experienced severe complications, including a body temperature of 111.2 degrees.  He had to be intubated, packed in ice, and transported by helicopter to Memorial Hermann Children's Hospital.  As a result of septic shock, Tristan suffered injuries to his organs.  Although Tristan's condition improved after spending time in the hospital, he still requires  follow-up medical care and therapy.

Guzman's EMTALA claims against Memorial Hermann include failing to provide an appropriate medical screening examination, failing to stabilize Tristan's condition before discharging him, and failing to provide an appropriate transfer in a timely manner.  Guzman

also asserts a state-law negligence claim against Memorial Hermann for failing to provide adequate procedures for reporting lab results and for recalling patients to the hospital when abnormal lab results are reported.

Guzman alleges that Dr. Haynes was negligent in failing to order a chest x-ray, failing to determine the results of the white blood cell differential count before discharging Tristan from the hospital, discharging Tristan with neither the results of the count nor antibiotics, and failing to arrange for the emergency room staff to report to him the white blood cell differential count as soon as it became available so that he could contact the Guzmans if it was sufficiently abnormal to require additional evaluation or treatment.

Guzman alleges that MSEP is liable for the torts of its partner, Dr. Haynes.  As to ECI, Guzman asserts that it is liable to the same extent as MSEP for the negligence and gross negligence of Haynes.  Guzman bases the claims against ECI on the allegation that it was "operating as a single business enterprise with or alternatively as the alter ego of" MSEP.

ECI has submitted an affidavit by Dr. James Johnson, the CEO and sole stockholder. (Docket Entry No. 28).  The record also contains Dr. Johnson's deposition, (Docket Entry No. 45-2, at 1-32), as well as the administrative service contract between ECI and MSEP. (Docket Entry No. 45-2, at 33-39).  ECI  provides physician groups with nonmedical administrative services and support that include payroll administration, software that provides template forms to document patient care known as the "QualChart System," billing and collection operations, scheduling physicians, and assisting with physician recruiting. Since 1975, ECI has contracted with many physician groups across the country to provide

such services.  Robert Williams, M.D., is the Chairman of ECI's Board of Directors and Thomas Zguris, M.D., is ECI's regional director.  ECI is not registered to do business in Texas; does not own, possess or use property in Texas; does not maintain a mailing address or telephone listing in Texas; does not have a bank account in Texas; does not keep, maintain or store documents in Texas; and does not maintain a registered agent for service of process in Texas.  (Docket Entry No. 28, Affidavit of James Johnson, M.D.).

In early 1998, Johnson learned that Memorial Hermann Hospital System was looking to retain a new emergency physician group.  Johnson traveled to Houston, Texas on several occasions in the spring and summer of 1998 to meet with representatives from Memorial Hermann.  Johnson asserts that he was not representing ECI in these meetings but was acting in his personal capacity "as a businessman looking to create business in Texas,"  (Docket Entry No. 45-2, Johnson Deposition at 22:5-9), but the result of his meetings was an agreement with the Memorial Hermann Hospital System.  Johnson testified in his deposition that Williams and Zguris traveled to Houston to meet with Memorial Hermann on ECI's behalf and that he was also present at some of these meetings.  After these negotiations, ECI submitted a written proposal to the Memorial Hermann Hospital System, which resulted in a verbal agreement that ECI would form physician groups to provide emergency care at five Memorial Hermann Houston-area hospitals.  Johnson formed five separate limited partnerships to staff the emergency rooms at these hospitals.  Each partnership was organized under Michigan law but registered to do business in Texas.  Johnson was the managing partner and controls 99% of the capital and voting rights of each partnership.  The other 1%

was divided among the self-employed emergency room doctors who were partners of each of the limited partnerships.  Each of the partnerships signed a contract with ECI under which it agreed to provide administrative and support services for the partnerships in return for an administrative services fee.  Each of the partnerships also signed an agreement with one of the hospitals in the Memorial Hospital System.  ECI has similar limited partnership arrangements in approximately thirteen states.  (Docket Entry No. 45-2, Johnson Deposition at 54).

On July 2, 1998, MSEP and ECI signed an administrative services contract.  (Docket Entry No. 45-2, at 33-39).  The contract provided that MSEP would pay ECI for services including assistance in physician recruiting, physician scheduling, payroll services, assistance with obtaining and maintaining professional liability insurance, billing and collection services, preparation of financial reports, and a range of consulting services.  ECI was appointed as MSEP's attorney-in-fact to do the acts necessary to carry out the administrative services agreement.  The contract stated that "[t]he responsibility for providing health care shall at all times remain with the self-employed health care providers contracting with the LLP.  All services relating to providing health care to patients shall be in accordance with the independent medical judgment of the self-employed health care providers and shall not be subject to the supervision, direction or control of LLP or ECI."  (Docket Entry No. 45-2, at 39).

As part of its agreement to provide administrative and support services, ECI provided the physician groups such as MSEP with a software system for documenting patient care and

treatment.   The QualChart System software provided "a collection of blank forms," "documentation templates for physicians to select, print, and implement in the exercise of their independent medical judgment."  (Docket Entry No. 28, Affidavit of James Johnson, M.D.,   at ¶ 5).   The system was designed "to help physicians document the patient encounter."  (Docket Entry No. 45-2, at 46).   Johnson testified in his deposition that the QualChart System included "patient pathways" for the physician to choose among, depending on a patient's symptoms.   These pathways were intended to help physicians "make the right diagnosis and treatment that comply with accepted standards of care." (Docket Entry No. 45-2, at 41).   ECI created the QualChart System to "improve documentation" and "allow physicians to rely less on memory for high-risk clinical scenarios,"  (Docket Entry No. 45-2, at 50).  In 1998, when the contracts were put into place, ECI put the computer systems together in Michigan and shipped them to Texas, and an ECI IT employee traveled to Texas to train the physicians on the system.  (Docket Entry No. 45-2, Johnson Deposition at 41).

ECI's regional director, Zguris, was the primary contact between ECI and the LLPs and the Memorial Hermann hospitals.  Zguris made multiple trips to Houston, Texas between 1998 and 2007.   In 2004, 2005, and 2006, he visited Texas at least ten times each year. While in Texas, Zguris visited the hospitals, met with the hospitals's employees, and met with physician members of the LLPs.  Zguris gave oral reports to Johnson about his Texas visits.   Zguris also interviewed physicians seeking to become members of the limited partnerships.  If a candidate was acceptable to Zguris, that doctor would apply for hospital

privileges and interview with the hospital medical director or hospital administrator.  If the hospital approved the doctor, then Johnson, as managing partner of the LLP, would hire the doctor to join the LLP physician group.  The evidence shows that ECI did not recruit physicians in Texas to work with the LLPs.  Instead, ECI would advertise in a national emergency medicine journal and would use nationwide direct mailing.  Any responding physician would interview with ECI but would also have to interview with the local physician group and with the hospital to be hired as a self-employed physician partner with one of the LLP physician groups.

Under the administrative services contracts with MSEP and the other physician limited partnerships, ECI was responsible for creating and maintaining physician work schedules to ensure that the emergency rooms were adequately staffed at all times.  Doctors requested the days and times they wanted to work and ECI put together a monthly emergency room schedule.  ECI mailed or e-mailed these schedules from Michigan to Texas.  If a doctor was sick or otherwise unavailable to work an assigned shift, ECI employees would contact the hospital and make arrangements to switch schedules so that the emergency room was adequately staffed.

ECI provided billing, collection, and accounting services for each of the limited partnerships, including MSEP, through Apollo, a wholly owned ECI subsidiary.  Hospital employees sent emergency room charts from Texas to Apollo in Fort Myers, Florida.  Apollo conducted electronic coding on each chart, then prepared and sent out bills on behalf of the limited partnerships.  Apollo sent the electronic billing data to ECI in Michigan, where ECI

employees entered the data into the limited partnerships's financial records.   ECI's accountant prepared separate financial reports and tax returns for each of the limited partnerships.   ECI and the LLPs filed separate tax returns.

ECI also generated statistical reports that measured physician and physician-group performance in the emergency rooms at the Memorial Hermann hospitals.   These reports included patient waiting-room time, how many patients came to the emergency room per hour, how many patients a particular physician saw per hour, how long it took a doctor to see a patient, patient turnaround time based on diagnosis, and other similar data.   ECI provided these reports to the Memorial Hermann hospitals on a quarterly basis.

ECI had one employee in Texas during the relevant period, a full-time "practice manager" who worked with local insurance companies and managed-care companies to negotiate fee schedules and payments for services.   Johnson described this employee, Christine Harris, as "like an accountant."  (Docket Entry No. 51, Johnson Deposition at 68). Harris lived in Houston but was ECI's practice manager for the state of Texas.  ECI had no other employees in Texas.

ECI maintained a 401K plan that it made available to physician partners.  ECI also permitted physician partners to purchase insurance from the ECI health insurance plan. (Docket Entry No. 45-2, Johnson Deposition at 48).

The record also showed that ECI has been involved in one other piece of litigation in Texas.  One of the physician partners who worked at a different Memorial Hermann hospital than the one at which Dr. Haynes worked and Guzman was treated sued ECI in 2006. The

dispute arose out of the contractual relationship between ECI and that physician partnership. The physician alleged that ECI was interfering with her independent medical judgment in practicing emergency room medicine.  She filed a petition to take depositions in advance of filing a lawsuit to investigate a "potential claim" that ECI was engaging in the  corporate practice of medicine, which Texas law prohibits.  *See* TEX. OCC. CODE § 165.156. ECI filed a petition for a writ of mandamus in Texas state court on January 3, 2007 seeking to quash the deposition on the ground that there was no private cause of action under that Texas statute.

Dr. Johnson described the contractual arrangement between ECI and the physician partnerships and between those partnerships and the Memorial Hermann hospitals as a "system contract" with Memorial Hermann.  (Docket Entry No. 45-2, at 41).  Dr. Johnson would from time-to-time authorize loans from one of the five physician partnerships to another, to adjust for the fact that some of the partnerships served hospitals that saw many more uninsured patients than other hospitals.  (Docket Entry No. 45-2, Johnson Deposition at 84-87).  The loans were not repaid but were treated as expenses.  Guzman points to this transfer of funds as evidence that ECI and the physician partnerships were either a single business enterprise or to support the alter ego theory.

## II.    ECI's Motion to Dismiss for Lack of Personal Jurisdiction

### A.    The Legal Standard

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction

over that defendant and exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution.  *Delgado v. Reef Resort, Ltd.*, 364 F.3d 642, 644 (5th Cir. 2004).  The Texas long-arm statute confers jurisdiction to the limits of due process.  *Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 385 (5th Cir. 2008); *see* TEX. CIV. PRAC. AND REM. CODE ANN. § 17.041–045; *see also Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003).  Due process permits the exercise of personal jurisdiction over a nonresident defendant when the defendant has "minimum contacts" with the forum state and the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice."  *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir.), *cert. denied*, 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994)).

A plaintiff bears the burden of demonstrating facts sufficient to support personal jurisdiction over a nonresident defendant.  That burden is met by a *prima facie* showing; proof by a preponderance of the evidence is not necessary.  *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002); *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).  "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Id.*  "[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor."  *Johnston*, 523 F.3d at 609 (quoting *D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542,

546 (5th Cir. 1985)).

The "minimum contacts" aspect of the analysis can be established through "contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Wilson*, 20 F.3d at 647. A court's exercise of specific jurisdiction is appropriate only when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Gundle Lining Const. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 446 U.S. 408, 414 n.8 (1984); *Religious Tech. Ctr.*, 339 F.3d at 375; *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002)). To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Gundle Lining Const.,* 85 F.3d at 205; *Helicopteros*, 466 U.S. at 414 n.8. Even a single contact can support specific jurisdiction if the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzeqicz*, 471 U.S. 462, 475 (1985). A court may exercise specific jurisdiction when: (1) the nonresident defendant purposely availed itself of the privileges of conducting activities in the forum state; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state. *Freudensprung v. Offshore Tech. Serv.*, 379 F.3d 327 (5th Cir. 2004) (citations omitted). "The non-resident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state." *Ruston Gas*

12

*Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Specific jurisdiction requires a sufficient nexus between the nonresident defendant's contacts with the forum and the cause of action.  *Rittenhouse v. Mabry*, 832 F.2d 1380, 1390 (5th Cir. 1987).

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction.  *Helicopteros*, 466 U.S. at 414-15; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987).  The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction.  *Dalton v. R & W Marine*, 897 F.2d 1359, 1362 (5th Cir. 1990).  "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.'" *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1191 (5th Cir. 1985) (additional citations omitted)).

Guzman argues that this Texas court has jurisdiction over ECI because: (1) the causes of action arise out of and are directly related to ECI's purposeful Texas contacts; (2) MSEP's Texas contacts can be attributed to ECI under an alter ego or single business enterprise theory; and (3) ECI has continuous and systematic contacts with Texas sufficient for general jurisdiction.  Each ground is analyzed below.

**B.     Specific Jurisdiction**

Guzman argues that specific jurisdiction is present because ECI "interjected itself into the business of providing emergency physician staffing in Houston, Texas." Guzman contends that the negligent medical care Dr. Haynes provided Tristan Guzman "arises from or is directly related to" ECI's contacts with Texas in providing staffing of physician partners for the Memorial Hermann Southeast Hospital emergency room. Guzman contends that ECI did not just perform administrative and support services but instead provided MSEP with "physician practice protocols and guidelines, a computer system to aid the physicians, and the very forms on which Tristan Guzman's medical history were recorded by Dr. Haynes." (Docket Entry No. 48, at 4). Guzman argues that ECI is vicariously liable for Dr. Haynes's medical malpractice because ECI had involved itself in the way in which the emergency room doctors, such as Dr. Haynes, practiced medicine. Guzman also argues that ECI is vicariously liable for Dr. Haynes's negligence under the alter ego and single business enterprise doctrines.

Guzman cites *Creech v. Roberts*, 908 F.2d 75 (6th Cir. 1990), a medical malpractice case brought by an Ohio resident in Ohio against an Oklahoma hospital for treatment received in Oklahoma. In that case, the Oklahoma hospital had solicited patients through broadcasts aired in Ohio. Creech, an Ohio resident, went to the Oklahoma hospital in response to the broadcast. *Id.* at 78. A doctor provided by the hospital performed surgery, and Creech sued the doctor and hospital in Ohio for malpractice. *Id.* The court held that the Oklahoma hospital was subject to jurisdiction in Ohio because the hospital's broadcast meant that it had purposefully directed its activities at Ohio residents and the cause of action arose

14

from that contact.  The court concluded that "an action will be deemed not to have arisen from the defendant's contacts with the forum state only when they are unrelated to the operative facts of the controversy."  *Id.* at 80.

Guzman's reliance on *Creech* is misplaced.  In that case, the Oklahoma hospital solicited Ohio residents to visit its facility to receive care.  *Creech*, 908 F.2d at 80.  The court held that Creech's cause of action arose out of the Oklahoma hospital's activities in Ohio because Creech's "exposure to the program brought her into contact" with the Oklahoma hospital.  *Id.*  ECI did not solicit or have any contact with Tristan Guzman or his family that brought him to the emergency room.

Since setting forth the "arise from or relate to" requirement for specific jurisdiction in *Helicopteros*, the Supreme Court has given relatively little guidance as to how closely related a cause of action must be to the defendant's forum contacts for specific jurisdiction to be present.  Some lower courts follow a but-for test, others require that forum contacts be relevant to a necessary element of proof, and some apply a sliding-scale analysis that is between the first two approaches.  *See Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 714 (1st Cir. 1996) (discussing various approaches).  The Fifth Circuit has examined the "arise from or relate to" requirement under a but-for approach in the past.  In *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n. 21 (5th Cir. 1981), the court held that a plane charter "contract [was] a but for causative factor" of a wrongful death tort suit.  But the Circuit has not endorsed this approach as the exclusive test.  More recent case law suggests a narrower approach than the "but-for" test for the relationship between the specific-jurisdiction contacts and the cause of

15

action.  In *Kelly v. Syria Shell Petroleum Dev. B. V.*, 213 F.3d 841, 855-56 (5th Cir. 2000) the court concluded that Syrian companies were not amenable to specific jurisdiction in Texas because the wrongful-death claims of workers killed in Syria were not closely related to the companies' recruiting activities in Texas.  In *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 324 (5th Cir. 1996), the court found no specific jurisdiction over a Mexican trucking company sued in Texas when a truck hit the plaintiff's mother's vehicle on a Mexican highway.

For a nonresident defendant's forum contacts to support specific jurisdiction, Texas courts require a "substantial connection" between those contacts and the "operative facts of the litigation."  *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007). This requirement assesses "the strength of the necessary connection between the defendant, the forum, and the litigation."  *Id.; see also Stroman Realty*, *Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008) (the "proper focus of the personal-jurisdiction analysis is on the 'relationship among the defendant, the forum, and the litigation'") (quoting *Calder v. Jones*, 465 U.S. 783 (1984)).  In *Moki Mac*, the plaintiffs's minor son, from Texas, went on a river-rafting trip in Arizona with Moki Mac, a Utah-based river rafting outfitter.  *Id.* at 573.  The child died on the trip and the parents sued in Texas, alleging negligence on the part of the guides and failure to exercise reasonable care in supervising the child.  The Texas court found that Moki Mac had purposefully availed itself of the privileges and benefits of conducting business in Texas by selling trips to Texas residents; directing marketing efforts to Texas; regularly advertising in Texas; hiring public relations firms to target media groups and tour operators,

16

some of which were located in Texas; soliciting Texas residents through mass and targeted e-mail campaigns; compiling and obtaining a mailing list that included Texas residents; and using particular customers, some located in Texas, to act as de facto trip group leaders. *Id.* at 577-78. The court held, however, that the relationship between these Texas contacts and the operative facts of the litigation – the guides' conduct on the rafting trip and whether they exercised reasonable care in supervising the plaintiffs' son – were "too attenuated to satisfy specific jurisdiction's due-process concerns." *Id.* at 585, 588; *see also Kervin v. Red River Ski Area, Inc.*, 711 F.Supp. 1383, 1389 (E.D. Tex. 1989) (no specific jurisdiction over nonresident ski resort because negligence claim did not arise out of resort's advertising contacts with Texas but was a result of the resort's alleged negligence in failing to maintain safe premises in New Mexico).

Applying these recent precedents leads to the conclusion that ECI's Texas contacts do not provide a basis for exercising specific jurisdiction in this case arising from the alleged negligence of a Texas emergency-room physician. The operative facts of this case involve Dr. Haynes's allegedly negligent emergency-room care of Tristan Guzman. Guzman alleges that Dr. Haynes failed to order a chest x-ray, failed to review the results of the white blood cell differential count, and failed to prescribe antibiotics before discharging Tristan Guzman. ECI's relevant Texas contacts are contracting to perform, and performing, nonmedical administrative and support tasks for MSEP, the partnership to which Dr. Haynes belonged as a self-employed physician partner. ECI did not practice medicine. ECI did not employ Dr. Haynes or any of the physician partners of MSEP. ECI did not supervise or manage the

physicians in their practice of medicine.  The contract between ECI and MSEP stated that the responsibility for providing medical care remains with the individual physicians in accordance with their independent medical judgment.  ECI provided MSEP with nonmedical administrative and support services.  These services were not substantially connected to Tristan Guzman's emergency-room care.

Guzman argues that ECI was involved in the practice of medicine because it provided MSEP and the physician partners with QualChart software, which included forms for documenting patient care.  The purpose of the QualChart system was to provide template forms to "improve documentation" and "allow physicians to rely less on memory for high-risk clinical scenarios."  (Docket Entry No. 45-2, at 50).  Guzman argues that because the forms would have included the patient contact form used to document Tristan's emergency room visit, the fact that ECI provided the form is a sufficient contact for specific personal jurisdiction over ECI.

There is no allegation or evidence in the record that Dr. Haynes's alleged negligent treatment of Tristan Guzman was connected to the QualChart forms that ECI provided as part of its administrative and support services, or to any other aspect of ECI's contacts with Texas.  The record shows that the forms ECI provided the LLPs – including MSEP – as part of the QualChart software included "recommended practice pathways." A "patient pathway" includes descriptions of key events that, if performed by physicians as described, are expected to produce the most desirable outcomes for patients with specific conditions.  Nothing in the patient pathway directs or controls the physician's medical judgment.  Dr.

18

Johnson testified in his deposition that the QualChart software includes a form with a practice pathway for pediatric patients with fever, but there is no allegation or evidence that any such form played any part in this case.  There is no basis to find a substantial connection between Dr. Haynes's alleged negligence and the software or forms ECI sent to Texas.

The relationship between the allegedly negligent medical care in this case and ECI's Texas contacts is "too attenuated to satisfy specific jurisdiction's due-process concerns." Guzman's causes of action do not arise out of ECI's QualChart software or other ECI Texas contact.  Guzman has failed to make a *prima facie* showing of specific jurisdiction based on ECI's Texas contacts.

Guzman also argues that specific jurisdiction can be based on imputing MSEP's contacts to ECI under an alter ego or single business enterprise theory.  Recent Texas case law shows that the relevant inquiry is under the alter ego theory.  Guzman cites several Texas state intermediate appellate decisions applying the single business enterprise theory to examine jurisdictional contacts, including *El Puerto de Liverpool*, *S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V.*, 82 S.W.3d 622 (Tex. App. – Corpus Christi 2002, no pet.), and *N. Am. Van Lines*, *Inc. v. Emmons*, 50 S.W.3d 103, 120 (Tex. App. – Beaumont 2001, no pet.)  In these cases, the courts stated that the factors relevant under the single business enterprise theory include common employees, business names, and offices; centralized accounting; payment of wages to the other corporation's employees; services rendered by employees of one corporation on behalf of another corporation; undocumented transfers of funds between corporations; and an unclear allocation of profits and losses between corporate

19

entities.  However, the Texas Supreme Court recently held that the relevant factors for "jurisdictional veil-piercing" in a case involving a parent and a subsidiary are not those factors associated with the single business enterprise theory but whether the "parent controls the internal business operations and affairs of the subsidiary" and whether the evidence shows "that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice."  *PHC-Minden*, *L.P. v. Kimberly Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007) (noting that single business enterprise is "a theory we have never endorsed").

"[T]ypically, the corporate independence of companies defeats the assertion of jurisdiction over one by using contacts with the other."  *Access Telecom Inc. v. MCI Telecom*, *Inc.*, 197 F.3d 694, 717 (5th Cir. 1999) (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir.1983)).  There is a presumption in favor of corporate separateness. *Dickson Marine Inc. v. Panalpina*, *Inc.*, 179 F.3d 331, 338 (5th Cir. 1999).  However, "it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court. The theory underlying these cases is that, because the two corporations . . . are the same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis."  *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).  The plaintiff has the burden of establishing a *prima facie* case of jurisdiction and must present

20

evidence to establish an alter ego relationship.  *Hargrave*, 710 F.2d at 1160.  "[T]he alter ego test for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for liability."  *Stuart*, 772 F.2d at 1198, n. 12 (internal citations and quotation marks omitted); *The Richards Group*, *Inc. v. Brock*, 2007 WL 700896, at *3 (N.D. Tex. 2007).

The Fifth Circuit has identified a "laundry list" of factors that courts should apply in making an alter ego determination.  *See United States v. Jon-T Chems.*, *Inc.*, 768 F.2d 686, 691-92 (5th Cir. 1985). These factors are: (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters for each entity; (3) the sharing of common officers and directors; (4) the observance of corporate formalities; (5) the maintenance of separate accounting systems; (6) the parent corporation's exercise of complete authority over the general policy of the subsidiary; and (7) the subsidiary's exercise of complete authority over its daily operations.  *Hargrave*, 710 F.2d at 1160.  In *Hargrave*, the court concluded that "100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego between two corporations."  *Id.*  Rather, the plaintiff must present *prima facie* evidence that "[t]he degree of control exercised by the parent [is] greater than that normally associated with common ownership and directorship." *Id.* (citing *Reul v. Sahara Hotel*, 372 F.Supp. 995, 998 (S.D. Tex. 1974)).

Guzman argues that the alter ego test is met because "ECI was involved in every aspect of the management of [MSEP]."  (Docket Entry No. 48, at 4).  She contends that the daily operations of both entities were "clearly intertwined" and that there were "no formal barriers between the entities."  (Docket Entry No. 45, at 17).  Guzman asserts the following

as evidence that MSEP is the alter ego of ECI: Johnson is the CEO and sole shareholder of ECI and was the managing partner and 99% shareholder of MSEP; ECI and MSEP were located at the same address in Michigan; ECI and MSEP shared a centralized accounting system; ECI performed administrative and support services for MSEP; Johnson determined many of MSEP's policies; the contract with Memorial Hermann was "system-wide" and Johnson approved the transfer of funds from one physician limited partnership to another, treating the transfers as "loans" that were not repaid but charged as expenses; the contract between ECI and MSEP favored ECI; and physician partners of MSEP were eligible to purchase health insurance benefits through ECI and could participate in ECI's 401k plan.

The record does not provide a basis for finding that MSEP was the alter ego of ECI. There is no evidence that ECI exercised substantial control over the daily medical practice of the physician partners of MSEP. Rather, the evidence shows that ECI provided administrative and support services and was involved in many nonmedical aspects of MSEP, but did not control the medical practice of MSEP's self-employed physician partners. There is evidence that the corporate formalities of ECI and MSEP were respected. For example, they had separate financial documents and filed separate tax returns. *See*, *e.g.*, *US LED*, *Ltd. v. Nu Power Associates*, *Inc.*, 2008 WL 4838851, at * 6 (S.D. Tex. Nov. 5, 2008) (stock ownership, providing office space and services, sharing employees, and training employees was insufficient to find alter ego as the basis for personal jurisdiction in the absence of evidence that defendant "exercised meaningful, much less 'complete,' control over [company's] daily activities"); *United States ex. rel. v. Johnson Controls*, *Inc.*, No. 04-60146,

22

2005 WL 1630098, at *5 (E.D. Mich. Jul. 07, 2005) (providing administrative services to subsidiary was not a basis for piercing the corporate veil to exercise personal jurisdiction without evidence that the parent directed the subsidiary's day-to-day operations); *Freudensprung*, 379 F.3d at 346 ("[O]ur cases generally demand proof of control by one corporation over the internal business operations and affairs of another corporation to make the other its agent or alter ego, and hence fuse the two together for jurisdictional purposes.") (internal punctuation and citation omitted).

In summary, ECI's Texas contacts are insufficient for specific personal jurisdiction, and MSEP's Texas contacts cannot be imputed to ECI to allow this court to exercise specific personal jurisdiction over ECI.

### C.     General Jurisdiction

Guzman argues that general jurisdiction is present.  She  points to the facts that ECI formed five limited partnerships and registered them to do business in Texas; provided a registered agent for the limited partnerships with the Texas Secretary of State; was appointed as their attorney-in-fact; and provided administrative services to them  in Texas, including sending physician schedules and payroll checks to Texas.  ECI generated physician performance reports that it provided to the Memorial Hermann hospitals in Texas.  ECI sent Zguris to Texas at least ten times each year in 2004, 2005, and 2006.  Zguris interviewed physicians in Texas to assist the limited partnerships with recruiting.  ECI maintained one full-time employee in Texas.  ECI shipped QualChart computer systems to Texas and sent IT employees to Houston to show physicians how to use the systems.  These ECI IT

23

employees returned to Texas to perform maintenance and updates.  ECI provided educational materials to the physician members of the limited partnerships in Texas; invited and paid for Memorial Hermann personnel to travel to Michigan and participate in an ECI seminar; mailed a newsletter titled "Inside ECI" to each of the physician members of the  limited partnerships and to emergency room personnel to "generate goodwill for ECI"; and sent Christmas presents to nonphysician emergency room personnel and administrative personnel at Memorial Hermann.  ECI filed a petition for a writ of mandamus in Texas state court on January 3, 2007, seeking to quash presuit discovery by a Houston physician who was a member of one of the limited partnerships.

ECI relies on *Samuelson v. Honeywell*, 863 F.Supp. 1503 (E.D. Okla. 1994), in which a contract management company that provided hospitals with physician staffing services was held not subject to general jurisdiction in Oklahoma.  The company, National Emergency Services, Inc. ("NES"), was an Illinois corporation with its principal place of business in California.  *Id.* at 1506.  NES was licensed to do business in Oklahoma and had a registered agent in Oklahoma.  *Id.*  NES had, in the past, contracted with three Oklahoma hospitals.  *Id.* When the plaintiff's cause of action arose, these contracts had expired and NES did not have any other Oklahoma contacts.  *Id.*  The court held that NES's Oklahoma contacts were "not the type of continuous and systematic corporate activities sufficient to subject NES to the general personal jurisdiction" of Oklahoma.  *Id.* at 1507.

Although ECI's forum contacts are more extensive than those in *Samuelson*, they do not meet the high bar set by the Supreme Court and the Fifth Circuit for general jurisdiction.

24

In *Helicopteros*, the plaintiffs filed suit in Texas against Helicol, a Colombian corporation, on behalf of four United States citizens killed in the crash of a Helicol helicopter. 466 U.S. at 409, 104 S.Ct. 1868. Helicol had significant contacts with Texas, including sending its pilots to be trained there, negotiating a contract in Texas, accepting checks drawn from a Houston bank, and purchasing most of its helicopter fleet in Texas. *Id.* at 416, 104 S.Ct. 1868. Nevertheless, the Court held these contacts insufficient to establish general jurisdiction over Helicol. *Id.; see also Cent. Freight Lines Inc. v. APA Transp. Corp*., 322 F.3d 376, 381 (5th Cir. 2003) (finding no general jurisdiction even though the defendant routinely arranged and received interline shipments to and from Texas and regularly sent sales people to Texas to develop business, negotiate contracts, and service national accounts); *Wilson*, 20 F.3d at 651 ("Even if [the defendant's] contacts with Texas via his short-lived malpractice insurance arrangement through a Texas law firm and his multi-year pro bono association with the historical society were arguably continuous, we hold that they were not substantial enough to warrant the imposition of general personal jurisdiction over [him]."); *Bearry*, 818 F.2d at 373-76 (holding that the sale of over $250 million of products to seventeen Texas customers over a five-year period did not constitute systematic and continuous contacts with Texas); *cf. Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-448, 72 S.Ct. 413, 96 L.Ed. 485 (1952) (finding general jurisdiction over a Philippine corporation that temporarily relocated to Ohio because the corporation's president resided in Ohio, the corporation's records were kept in Ohio, the board of director's meetings were held in Ohio, accounts were held in Ohio banks, and all key business decisions were made there);

25

*Holt Oil & Gas Corp.*, 801 F.2d at 779 (upholding general jurisdiction over a nonresident defendant who attended college in, owned real estate in, traveled to, and conducted extensive business dealings in the forum state; his contacts evidenced "constant and extensive personal and business connections with [the forum state] throughout [the nonresident defendant's] adult life").

The record does not show that ECI had continuous and systematic contacts with Texas such that this court could exercise general personal jurisdiction. *Helicopteros*, 466 U.S. at 414-15. The contacts are insufficient in both quantity and quality to support general personal jurisdiction against ECI. The record shows that ECI contracted with limited partnerships doing business in Texas providing emergency room physicians to Texas hospitals over a nine-year period. As part of that contract, ECI sent representatives to Texas regularly; had a full-time Texas employee; and sent and received numerous communications and funds to and from Texas. The record shows that ECI had similar arrangements in thirteen states. ECI's involvement with Texas does not rise to the level the courts have insisted upon to find that a nonresident defendant has a reasonable anticipation of being sued in Texas on claims that do not arise from those contacts.

The fact that ECI filed a mandamus action in Texas state court did not subject ECI to general personal jurisdiction in Texas. By submitting to jurisdiction in one case, a party does not thereby consent to jurisdiction for all future suits in that forum, even if they are related. *See Mallinckrodt Med., Inc. v. Sonus Pharmaceuticals, Inc.*, 989 F.Supp. 265, 271 (D.D.C. 1998) ("It would be ludicrous to suggest that [parties] consented to the jurisdiction of this

Court for all time, with respect to all potential competitors, and for all purposes, simply because they once chose to sue . . . here.").

Because ECI lacks minimum contacts with Texas, this court need not determine whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *Southern Copper, Inc. v. Specialalloy*, *Inc.*, 245 F.3d 791, 2000 WL 1910176, at *4 (5th Cir. 2000) (unpublished disposition) (citing *Felch*, 92 F.3d at 329 n.20 ("Because we find that the first due process condition of minimum contacts was not satisfied, we need not address whether the exercise of personal jurisdiction in this case would offend traditional notions of fair play and substantial justice.")); *Baldwin v. Household, Int'l, Inc.*, 36 S.W.3d 273, 277 (Tex. App.–Houston [14th Dist.] 2001, no pet.) (the court would "not reach the 'fair play and substantial justice' analysis" because plaintiff failed to establish defendant's minimum contacts with Texas). Moreover, because this court grants ECI's motion to dismiss, ECI's motions to dismiss Guzman's claims as barred by limitations and to dismiss Guzman's claim based on a single business enterprise theory are denied as moot.

## III.   The Motions Challenging Dr. Varon's Expert Report

Under Texas law, the plaintiff in a medical malpractice action must prove four elements: (1) a physician's duty to comply with a specific standard of care; (2) a breach of the standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App. – Houston [1st Dist.] 2006, pet. denied). The standard of care must be established by expert testimony unless the mode or form of treatment is a matter of common knowledge or is within the experience of a

layman. *Jackson v. Axelrad*, 221 S.W.3d 650, 655 (Tex. 2007).

On May 2, 2008, Guzman provided the defendants with the expert report of Dr. Varon.  Dr. Varon opined that Dr. Haynes's treatment of Tristan Guzman fell below the standard of care, which required Dr. Haynes to order and review the white blood cell differential count test before diagnosing Tristan's condition as viral syndrome.  According to Dr. Varon, the Memorial Hermann laboratory technician who performed the white blood cell differential count was required by the standard of care to ensure that the abnormal result was reviewed by a physician.  Dr. Varon also opined that Memorial Hermann did not have an adequate callback procedure for informing patients of abnormal lab results and calling them back to the emergency department for treatment.

Dr. Haynes and Memorial Hermann challenge the adequacy of Dr. Varon's report, asserting that it does not meet the requirements of the Texas Civil Practice and Remedies Code.  *See* TEX. CIV. PRAC. & REM. CODE § 74.351.  Section 74.351 requires a plaintiff who has initiated "a health care liability claim" to serve on each party "not later than the 120th day after the date the claim was filed . . . one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted."  *Id.* § 74.351(a).  The report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm or damages claimed."  *Id.* § 74.351(r)(6).  Under Texas law, a court must dismiss a medical malpractice

28

action if the expert report "does not represent a good faith effort to comply with the statute's requirements." *Simonson v. Keppard*, 225 S.W.3d 868, 871 (Tex. App. – Dallas 2007, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE § 74.351(l). Dr. Haynes moved for an order directing Guzman to produce an expert report that meets these requirements. Memorial Hermann moved to dismiss with prejudice Guzman's state-law claims for failure to comply with Section 74.351. Both defendants rely on the decisions of Texas state courts to challenge Dr. Varon's qualifications and the content of his expert report.

## A.    The Legal Standard

As a general rule, under the *Erie* doctrine, when a plaintiff asserts a state-law claim in federal court, the federal court applies state substantive law to adjudicate the claims but applies federal procedural law. *See Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 394 (5th Cir. 2003) ("Federal courts apply state substantive law when adjudicating diversity-jurisdiction claims, but in doing so apply federal procedural law to the proceedings.").[1] "Where the state rule reflects a substantive state policy not in conflict with the plain meaning of the federal rule, then the state rule is the rule of decision and should be applied under the terms of the *Erie* decision." *Exxon Corp. v. Burglin*, 42 F.3d 948, 949 (5th Cir. 1995). Federal courts are not bound to follow a state law that is in some sense "substantive" if it is in conflict with the Federal Rules of Civil Procedure. *Burlington N.R.*

_____

[1] The state-law claims in this case are present under supplemental jurisdiction, 28 U.S.C. § 1367, and not diversity jurisdiction. However, the same procedure-substance analysis applies. *See*, *e.g.*, *Garza v. Scott and White Memorial Hospital*, 234 F.R.D. 617, 621 n.1 (W.D. Tex. 2005).

*Co. v. Woods*, 480 U.S. 1, 4, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987). If, when "fairly construed," a particular federal statute or rule is sufficiently broad to cause a "direct collision" with the relevant provision of state law, federal law preempts the operation of the state law. *Id.* at 4-5, 107 S.Ct. 967; *see also Exxon*, 42 F.3d at 950 ("If the [federal] rule speaks to the point in dispute and is valid, it is controlling, and no regard need be paid to contrary state provisions.").

Texas's expert report requirements, as found in Section 74.351, do not apply in federal court. *See*, *e.g.*, *Poindexter v. Bonsukan*, 145 F.Supp.2d 800 (E.D. Tex. 2001) (concluding that federal rules of civil procedure apply to expert reports, not Texas rules, because there is a direct collision between Section 74.351 and Federal Rules 26 and 37); *Garza*, 234 F.R.D. at 622; *Brown v. Brooks County Det. Ctr.*, Civ. A. Nos. C-04-329, C-04-375, 2005 WL 1515466 (S.D. Tex. June 23, 2005); *Nelson v. Myrick*, Civ. A. No. G:04-0828, 2005 WL 723459 (N.D. Tex. Mar. 29, 2005); *McDaniel v. United States*, Civ. A. No. SA-04-CA-0314, 2004 WL 2616305 (W.D. Tex. Nov. 16, 2004); *but see Cruz v. Chang*, 400 F.Supp.2d 906 (W.D.Tex. 2005) (the service of expert reports required by section 74.351 "is not displaced by federal rule and is . . . [a] part of a comprehensive scheme governing plaintiff's substantive right"). The Federal Rules of Civil Procedure apply to determine whether Dr. Varon's expert report is sufficient.

Rule 26(a)(2) of the Federal Rules of Civil Procedure provides that "a party must disclose to other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705." FED. R. CIV. P. 26(a)(2). Rule

26(a)(2)(B) requires that "this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." The Rule sets out the requirements for the contents of the report:

> (I) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the data or other information considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

FED. R. CIV. P. 26(a)(2)(B). The purpose is "to provide information on expert testimony sufficiently in advance of trial [so] that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." FED. R. CIV. P. 26 Advisory Committee's Note (1993 Amendments). When a party fails to comply with the requirements of Rule 26, the court may exclude the witness or report as evidence at trial, at a hearing, or on a motion, and may "impose other appropriate sanctions." FED.R.CIV.P. 37(c)(1).

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence Rule 702. *Edwards v. Sears*, *Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975);

*see also Advocare Intern. L.P. v. Horizon Laboratories, Inc.*, Civ. A. No. 3:04-cv-1988-H, 2006 WL 176573, at *1 (N.D. Tex. Jan. 24, 2006) (decisions of Texas state courts are inapposite because "the admissibility of expert testimony in a federal trial is governed by federal law"); 29 C. WRIGHT & V. GOLD, FEDERAL PRACTICE & PROCEDURE § 6263 ("Rule 702 governs the admissibility of expert witness testimony even in cases where state substantive law controls under *Erie*.").  Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  As a threshold matter, the trial judge must determine whether the proffered witness is qualified to give the expert opinion he seeks to express.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, training, or education.  FED. R. EVID. 702.  The standard for qualifying expert witnesses is fairly liberal; the witness need not have specialized expertise in the area directly pertinent to the issue in question if the witness has qualifications in the general field related to the subject matter in question.  4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.04(1)(a) (Joseph M. McLaughlin, ed., 2d ed. 2005); *see also United States*

32

*v. Marler*, 614 F.2d 47, 50 (5th Cir. 1980).  The court must determine whether the proposed expert's training or experience are sufficiently related to the issues and evidence before the court that the expert's testimony will assist the trier of fact.  *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562-63 (5th Cir. 2004).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible.  *Moore v. Ashland Chem.*, *Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).  The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]."  *Skidmore v. Precision Printing & Packaging*, *Inc.*, 188 F.3d 606, 617 (5th Cir.1999) (quoting *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786).  The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.  The court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).  In making its reliability determination, the court should not decide the validity of the expert's conclusions, but instead consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594-95, 113 S.Ct. 2786; *Watkins v. Telsmith*, *Inc.*, 121 F.3d 984, 989

(5th Cir. 1997); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001).

### B.       Analysis

Dr. Varon's report meets some, but not all, of  the Rule 26(a)(2) requirements.  The report sets forth his qualifications, a complete statement of all his opinions, the basis and the reasons for those opinions (the standards of care and the reasons Dr. Varon believed those standards were breached), and the data considered in forming the opinions (including Tristan Guzman's medical records, depositions, laboratory data).  There is no evidence in the record that the defendants have been provided with a list of Dr. Varon's publications, a list of other cases in which he has testified as an expert, or his compensation in this case.  However, Guzman may supplement Dr. Varon's report under Rule 26(e)(2) to include this information.

Dr. Haynes and Memorial Hermann argue that Dr. Varon is not qualified to testify about the standard of care in emergency medicine.  Memorial Hermann also argues that Dr. Varon is not qualified to testify about the standard of care for laboratory technicians transmitting test results or about hospital policies and procedures on communicating laboratory results to physicians and patients.  Dr. Haynes and Memorial Hermann contend that Dr. Varon's report is deficient because it does not sufficiently define the applicable standard of care and gives conclusory opinions on causation.

Dr. Varon is qualified under Rule 702 to testify about the standard of care in emergency medicine.  Dr. Varon is a board certified physician in internal medicine with subspecialties in pulmonary medicine and critical care medicine.  He is currently licensed to practice medicine in the state of Texas and is on the active medical staff at St. Luke's

Episcopal Hospital in Houston, Texas.  He treats  roughly 10 patients a day who have bacteremia or sepsis.  Over the course of his career, he has treated thousands of patients with sepsis.  Dr. Varon also serves as one of the attending physicians for St. Luke's emergency room patients whose primary doctor does not have medical staff privileges at St. Luke's.  In that capacity, he works in the emergency department on a daily basis.  Dr. Varon has medical staff privileges at several hospitals in the Houston, Texas area and in other cities.  He served as a staff emergency medicine physician at Methodist Hospital in Houston, Texas from 1995 to 2001.  Dr. Varon is currently an editor of the *Journal of Emergency Medicine* in the field of critical care medicine.  He has published several papers and book chapters concerning the evaluation and treatment of patients with sepsis.  Dr. Varon has given numerous presentations and lectures concerning emergency medicine and sepsis, the matters at issue in this case.

With respect to laboratory testing, Dr. Varon's report states that he is "familiar with the manner in which laboratories in hospitals interact with the emergency departments of hospitals and provide results to the physicians and nurses in the emergency department." (Docket Entry No. 20, Ex. A).  He has medical staff privileges at Memorial Hermann.  As a result, he is "familiar with in the manner in which the Memorial Hermann [laboratory] system works" and familiar with "the computerized hospital information system at Memorial Hermann."  (Docket Entry No. 39).  Given his experience working in hospital emergency departments and communicating with laboratory technicians, Dr. Varon is qualified to testify regarding the standard of care for communicating laboratory test results to emergency room

35

doctors and the standard of care for hospital policies and procedures regarding communicating laboratory results to patients.

Dr. Varon's expert opinion is admissible under Rule 702.  The defendants do not challenge his methodology.  Dr. Varon reviewed Tristan Guzman's medical records, an MRI report, and the neuropsychological report by Kevin Krull, Ph.D., at Texas Children's Hospital.  He also reviewed the depositions of Dr. Haynes, Frank Blain, R.N., April Ganz, R.N., Suzette Dalmeida, and Wendy Guzman.  Dr. Varon based his opinion on his review of these materials and his training and experience.  The defendants' motions challenging Dr. Varon and seeking to exclude Dr. Varon's testimony and to dismiss the state-law negligence claims are denied.

## IV.   Conclusion

ECI's motion to dismiss for lack of personal jurisdiction is granted.  ECI's motions to dismiss Guzman's claims as barred by limitations and to dismiss Guzman's single business enterprise claim are denied as moot.  Dr. Haynes's motion challenging Guzman's expert report is denied.  Memorial Hermann's motion to dismiss Guzman's state-law claims for failing to comply with the Texas rule on expert reports is denied.

SIGNED on December 17, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge