IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF TRISTAN | § | |
| GUZMAN, A MINOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-3973 |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM,  D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

The plaintiff, Wendy Guzman, individually and on behalf of her son, Tristan Guzman, sued Memorial Hermann Hospital System, d.b.a. Memorial Herman Southeast Hospital ("Memorial Hermann") in November 2007 in Texas state court.  Guzman asserted a claim under the Emergency Medical Treatment and Active Labor Act, 28 U.S.C. § 1395dd ("EMTALA"), based on emergency-room treatment Tristan received at Memorial Hermann in February 2006.  Memorial Hermann timely removed to this court on the basis of federal-question jurisdiction.  Guzman amended her complaint to add state-law negligence claims against Memorial Hermann, Philip Haynes, M.D., Ph.D., Memorial Southeast Emergency Physicians, LLP ("MSEP"), and Emergency Consultants, Inc. ("ECI").  Dr. Haynes, the emergency-room physician who saw Tristan Guzman at Memorial Hermann, was a partner in MSEP, a limited liability partnership of emergency-room physicians.  ECI, a Michigan corporation with its principal place of business in Michigan, had an administrative services

agreement with MSEP to provide emergency room administrative and support services to different hospitals, including Memorial Hermann.  On December 17, 2008, this court granted ECI's motion to dismiss for lack of personal jurisdiction.  (Docket Entry No. 53).

This memorandum and opinion addresses a motion to compel and a responsive motion for protective order.  Guzman has moved to compel Memorial Hermann to produce documents relating to its post-incident peer review of Tristan Guzman's February 12, 2006 emergency-room care.  (Docket Entry No. 73).  Memorial Hermann responded, (Docket Entry No. 74), and moved for a protective order, (Docket Entry No. 75).  Memorial Hermann asserts that the peer review documents are confidential and privileged under the Texas Occupations Code, § 160.007, the Texas Health and Safety Code, § 161.032, and the federal Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11101, *et seq.* Guzman filed a reply, (Docket Entry No. 77), and a supplemental reply, (Docket Entry No. 78).

Based on a careful review of the motion to compel and for protection, the responses, and replies, the parties' submissions, and the applicable law, this court concludes, based on its *in camera* review of the peer review documents, that the documents are relevant only to the state-law claims.  As a result, this court applies the state privilege law that protects such documents from admissibility or discovery.  Guzman's motion to compel is denied. Memorial Hermann's motion for a protective order is granted.

The reasons for these rulings are explained in detail below.

## I.    Background

On February 12, 2006, Tristan Guzman, then seven years old, was feeling ill. His parents took him to the emergency room at Memorial Hermann in Houston, Texas. Dr. Haynes obtained Tristan's medical history, conducted a physical examination, and ordered several laboratory tests, including a complete blood count (CBC). A CBC also calls for a white blood cell differential test, which examines and classifies 100 white blood cells. One of the classifications is a band count; a high band count indicates that a patient is fighting off infection. At approximately 9:10 a.m., the results of the CBC were made available on the hospital's computer. After reviewing the CBC results, Dr. Haynes diagnosed Tristan with viral syndrome and released him from the hospital at approximately 10:15 a.m. Dr. Haynes told the Guzmans that Tristan's condition should begin to improve within 24 hours but to return to the emergency room if he was not better. Although the results of the white blood cell differential test, including the band count, were available on the hospital's computer at approximately 9:35 a.m., Dr. Haynes did not review those results before discharging Tristan. Dr. Haynes did not prescribe antibiotics when Tristan was released.

The Guzmans brought Tristan back to the Memorial Hermann emergency room the following morning, February 13, 2006. Dr. Mohammed Siddiqi conducted a physical examination and ordered laboratory tests and a chest x-ray. These tests showed that Tristan had pneumonia and probable sepsis. Tristan's condition worsened. Dr. Siddiqui decided that the child needed to be intubated to protect his airway and respiratory system. Tristan experienced a severe allergic reaction to one of the medications used for the intubation. This allergic reaction, called malignant hypothermia, caused his body temperature to reach 111.2

3

degrees.  He had to be packed in ice and transported by helicopter to Memorial Hermann Children's Hospital.  As a result of septic shock, Tristan suffered injuries to his organs. Although Tristan's condition improved after spending time in the hospital, he still requires follow-up medical care and therapy.

In the amended complaint, Guzman's EMTALA claims against Memorial Hermann include failing to provide an appropriate medical screening examination, failing to stabilize Tristan's condition before discharging him, and failing to provide an appropriate transfer in a timely manner.  Guzman argues that Tristan did not receive an appropriate medical screening because Dr. Haynes "never reviewed [the white blood cell differential test] as part of Tristan's medical screening."  (Docket Entry No. 77, at 2).  Guzman also asserts a state-law negligence claim against Memorial Hermann for failing to properly train emergency room staff to recall discharged patients when abnormal lab results are reported, failing to provide adequate procedures for reporting lab results and recalling patients to the hospital when abnormal lab results are reported, and for failing to timely report Tristan's abnormal lab results to the emergency room.  Guzman also asserts a state-law negligence claim against Dr. Haynes for failing to order a chest x-ray, failing to determine the results of the white blood cell differential count before discharging Tristan from the hospital, discharging Tristan with neither the results of the count nor antibiotics, and failing to arrange for the emergency room staff to report to him the white blood cell differential count as soon as it became available so that he could contact the Guzmans if it was sufficiently abnormal to require additional evaluation or treatment.

4

The issue addressed in this opinion is whether Memorial Hermann must produce the post-incident peer review conducted into the emergency room care that Tristan received. Memorial Hermann submitted the documents to this court for *in camera* review.

## II.    Whether Federal Or State Privilege Law Applies

Memorial Hermann asserts that the medical peer review documents Guzman seeks are privileged under Texas law as well as the HCQIA.  Guzman does not dispute that the documents are privileged under Texas law but argues that federal, not Texas, privilege law applies.  Guzman argues that the HCQIA did not create a medical peer review privilege and that there is no medical peer review privilege under federal law.

Rule 501 of the Federal Rules of Evidence governs a privilege claim in federal court. Under that rule, the federal common law of privilege generally applies to cases in federal court.  But the rule also states that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law."  FED. R. EVID. 501.  It is well established that federal privilege law governs in a federal question case involving only federal law and that state privilege law applies in a diversity case involving only state law.  *See Gilbreath v. Guadalupe Hosp. Found., Inc.*, 5 F.3d 785, 791 (5th Cir. 1993) (applying federal privilege law in federal question case); *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 299 n.26 (5th Cir. 2005) (applying state privilege law in diversity case).  When state-law claims are present in a federal-question case under the federal court's supplemental jurisdiction, however, "it is

5

not immediately clear what law should apply." *Garza v. Scott and White Memorial Hospital*, 234 F.R.D. 617, 625 (W.D. Tex. 2005). Neither the Supreme Court nor the Fifth Circuit has resolved this issue. The Supreme Court recognized the problem but declined to decide the appropriate rule. *Jaffee v. Redmond*, 518 U.S. 1, 17 n.15, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (declining to decide "the proper rule in cases . . . in which both the federal and state claims are asserted in federal court and relevant evidence would be privileged under state law but not under federal law").[1]

Resolving the state-or-federal privilege law question in this case is important because the federal and state law on medical peer review documents conflict. If federal privilege law applies, the peer review documents are not privileged. Courts have repeatedly held that the HCQIA did not create a federal privilege protecting medical peer review records from

---

[1] The Fifth Circuit has not addressed the precise question of what privilege law should apply in such a case, but did address a related issue in a civil rights case under 42 U.S.C. § 1983 that also raised state law claims. *American Civil Liberties Union of Mississippi*, *Inc. v. Finch*, 638 F.2d 1336 (5th Cir. 1981). In *Finch*, the plaintiffs sued a state agency alleging violations of their constitutional rights. The agency asserted that its records were protected by a state law privilege. The court recognized that when a litigant asserts a privilege "not existent in the common law but enacted by the (state) legislature based on unique considerations of government policy," federal courts may recognize the state law privilege as a matter of comity after weighing the policies behind the privilege against the policies favoring disclosure. *Id.* at 1343. The court held that because there is a "'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged," the federal interest in evaluating the privilege independent of state law in a § 1983 case is "particularly strong." *Id.* The court declined to recognize the state law privilege. *Id.* Accordingly, *Finch* counsels that where the privilege asserted is "not existent in the common law," federal courts should take into account the strength of the federal interest in determining what weight to give state privilege law. But *Finch* does not resolve the question of what privilege law should apply in all federal-question cases with supplemental state-law claims.

discovery and court subpoena. *See Atteberry v. Longmont United* Hosp., 221 F.R.D. 644, 647 (D. Colo. 2004); *Poliner v. Texas Health Systems*, 201 F.R.D. 437, 438 (N.D. Tex. 2001); *United States v. QHG of Indiana*, *Inc.*, 1998 WL 1756728, at *7 (N.D. Ind. Oct. 8, 1998); *Syposs v. United States*, 179 F.R.D. 406, 410 (W.D.N.Y. 1998); *Robertson v. Neuromedical Center*, 169 F.R.D. 80, 83 (M.D. La. 1996). Federal courts agree that although all fifty states and the District of Columbia recognize a medical peer review privilege, federal common law does not. *See*, *e.g.*, *Adkins v. Christie*, 488 F.3d 1324, 1329-30 (11th Cir. 2007); *Virmani v. Novant Health*, *Inc.*, 259 F.3d 284, 289 (4th Cir. 2001); *Memorial Hospital v. Shadur*, 664 F.2d 1058, 1063 (7th Cir. 1981); *Ray v. Pinnacle Health Hospitals*, 2008 WL 2168899, at *1 (M.D. Pa. May 22, 2008) (noting that no federal court has recognized a federal medical peer review privilege); *Nilavar v. Mercy Health System-Western Ohio*, 210 F.R.D. 597, 605 (S.D. Ohio 2002) (holding that a physician peer review privilege does not exist in the federal common law); *Syposs*, 179 F.R.D. at 411-12 ("Medical peer reviews do not enjoy the historical or statutory support upon which other privileges have been recognized in federal law, and the Hospitals have failed to provide any reason to believe some physicians would not provide candid appraisals of their peers absent the asserted privilege."); *see also University of Pa. v. E.E.O.C.*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (concluding that a peer review privilege, in the academic context, has no historical basis in the common law of the federal courts). *But see Weekoty v. United States*, 30 F.Supp.2d 1343, 1347-48 (D. N.M. 1998) (recognizing a self-critical analysis privilege in the limited context of morbidity and mortality conferences conducted by

physicians).  If, however, state privilege law applies, the peer review documents at issue are privileged under Texas law.  Under TEX. OCC. CODE § 160.002, a medical peer review committee is a health care entity's committee authorized to evaluate the quality of medical care or the competence of physicians; under TEX. OCC. CODE § 161.007(a), the records and proceedings of a medical peer review committee are confidential and privileged.  *See In re Living Centers of Texas*, 175 S.W.3d 253, 259 (Tex. 2005) (recognizing that the purpose of the medical peer review privilege is to protect the evaluative process, which can result in improved patient safety, health care quality, and outcomes).

The problem of how to apply Rule 501 to cases in which both federal and state claims are raised has been long recognized as one left for the courts to resolve.[2]  In cases in which

---

[2]A Senate Judiciary Committee report stated:

> Another problem not entirely avoidable is the complexity or difficulty the rule introduces in the trial of a Federal case containing a combination of Federal and State claims and defenses; e.g., an action involving Federal antitrust and State unfair competition claims.  Two different bodies of privilege law would need to be consulted.  It may even develop that the same witness testimony might be relevant on both counts and privileged as to one but not the other.

S. Rep. No. 93-1277, p. 12.  To resolve the problem, the Committee stated that "[i]t is also intended that the Federal law of privileges should be applied with respect to pendant State law claims when they arise in a Federal question case."  *Id.*  This comment, however, was made in support of the Senate's version of Rule 501, which was rejected in conference.  *See Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 458-59 (N.D. Cal. 1978) (stating that "the Senate Judiciary Committee's statement provides no evidence of congressional intent with respect to FRE 501 as it was ultimately enacted"); *Hansen v. Allen Mem'l Hosp.*, 141 F.R.D. 115, 120-21 (S.D. Iowa 1992) (suggesting that the legislative history of FRE 501 cannot resolve the problem of "conflicting federal and state privilege law in the context of

there are federal and state claims, the evidence at issue is relevant to both, and the privilege rules conflict, courts have generally applied federal privilege law, especially if federal law makes the evidence admissible and state law prevents admission.  *See*, *e.g.*, *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005) (citations omitted) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege applies."); *Virmani*, 259 F.3d at 287 n.3 ("We agree with our sister circuits that in a case involving both federal and [pendent] state law claims, the federal law of privilege applies."); *Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000); (finding that Rule 501 directs the courts to apply federal privilege law if the material is relevant to both federal and state claims); *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 104 (3d Cir. 1982) (same); *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992) (holding that "the existence of pendent state law claims does not relieve us of our obligation to apply the federal law of privilege"); *Hancock v. Hobbs*, 967 F.2d 462, 466 (11th Cir. 1992) (noting that "when the federal and state laws of privilege are in conflict," courts "have uniformly held that the federal law of privilege governs even where the evidence sought [in discovery] might be relevant to a pendent state claim"); *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (holding that when the evidence sought "is relevant to both the federal and [pendent] state claims," courts "consistently have held that the asserted privileges are governed by the principles of

---

pendent state-law claims").  Because "Congressional intent is unclear. . . . courts will have to decide the issue for themselves."  Wright & Miller, 23 Fed. Prac. & Proc. Evid. § 5434 (1980).

9

federal law"); *Memorial Hospital*, 664 F.2d at 1061 n. 3 (holding that federal privilege law applied in a federal question case with pendent state-law claims when the evidence was relevant to both the federal and state claims); *Robertson*, 169 F.R.D. at 82 (holding that federal privilege law applied in ADA case with supplemental state-law claims when the "information and documents requested would be relevant to both federal and state claims"); *but see Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995) (applying state privilege law to a state cause of action in a case with both federal and state claims because Rule 501 requires applying state privilege law when state law supplies the rule of decision for a claim or defense).

If the documents at issue are relevant to both federal and state claims but the privilege rules are inconsistent, federal courts have held that applying the state rule "could undermine the federal evidentiary interest – either by barring disclosure of a document that federal law permits a party to see, or by requiring the disclosure of a document that federal law protects from prying eyes." *In Re Sealed Case*, 381 F.3d 1205, 1213 (D.C. Cir. 2004). The courts have held that "'it would be meaningless to hold the communication privileged for one set of claims and not for the other,'" *id.* (quoting *Memorial Hospital*, 664 F.2d at 1061 n.3), and that applying two sets of privilege rules to the same evidence could be "unworkable," *Pearson*, 211 F.3d at 66 (quoting *Wm. T. Thompson Co.*, 671 F.2d at 104). In many of the cases involving overlapping state and federal claims in which the evidence sought is relevant to both, the courts applying federal privilege law have noted that the primary claim was federal and strong federal interests were involved. *See*, *e.g.*, *Memorial Hospital*, 664 F.2d

at 1061 (federal privilege law applied because the "principal claim" was federal and thus state law did not supply the rule of decision); *Robertson*, 169 F.R.D. at 82 (noting that "the strength of the federal interests here cannot be denied" and that federal privilege law should not be "set aside simply because of the existence of pendent state law claims in primarily a federal question case").

Many of the courts applying federal privilege law, however, have noted that different considerations apply if the evidence was relevant to the state-law claims but irrelevant to the federal claims.  *See Pearson*, 211 F.3d at 66 n.8 ("Here, as in *Thompson*, the disputed discovery material is relevant to both the state and federal claims. We thus need not reach the question of whether material that went only to the state claims would be controlled by federal law simply because distinct federal claims had also been raised.").  In a federal-question case with state-law claims over which the court has supplemental jurisdiction, if the evidence sought is relevant only to the state-law claims, several courts have held that state privilege law applies.  *See Garza*, 234 F.R.D. at 625 (holding that state privilege law applied in an FTCA case with pendent state-law claims when the plaintiffs had made no showing that the documents sought were relevant to the FTCA claims and the court determined that the evidence could only be relevant to the state-law claims); *Lego v. Stratos Lightwave*, *Inc.*, 224 F.R.D. 576, 578 (S.D.N.Y. 2004) ("To the extent, however, that the discovery requested in this case is relevant only to state claims and defenses, privilege is determined by the applicable state law."); *Freeman v. Fairman*, 917 F.Supp. 586, 588 (N.D. Ill. 1996) (applying state privilege law to evidence that was relevant only to the pendent state claim); *Evanko v.*

11

*Elec. Sys. Assoc.*, *Inc.*, No. 91 Civ. 2851, 1993 WL 14458, at *1 (S.D.N.Y. Jan. 8, 1993) (holding that discovery of medical records relevant only to pendent state claim of emotional distress was governed by the state's physician-patient privilege); *Thorne v. Universal Properties*, *Inc.*, 1987 WL 7683, at *1 n.1 (E.D.Pa. March 10, 1987) ("In the case before us, the alleged emotional distress is relevant only to the pendent state law claims; state law thus applies to questions of privilege."); *Shaklee Corp. v. Gunnell*, 110 F.R.D. 190, 192 (N.D. Cal. 1986) (applying state privilege law when the evidence affected only the state claims); *see also Platypus Wear*, *Inc. v. K.D. Co.*, *Inc.*, 905 F.Supp. 808, 811 (S.D.Cal. 1995) (holding that state privilege law applied to state-law claims in a diversity case involving a federal counterclaim when the evidence sought was relevant only to the state law theories of liability and the plaintiff had advanced no theory under which the evidence could be relevant to the federal claim); 2 SALTZBURG, MARTIN & CAPRA, FEDERAL RULES OF EVIDENCE MANUAL, § 501.02[1] (8th ed. 2002) (concluding that state privilege law should apply in a "case where the state privilege protects substantial state interests, and where the interests supporting the Federal rule are not especially serious or sensitive").

Courts applying a claim-by-claim relevance approach find that it is faithful to Rule 501, which directs that state privilege law applies if state law provides the rule of decision for a claim or defense. If the evidence at issue is not relevant to the federal claim, but only to the state law claim, state law provides the rule of decision and state privilege law applies. The court in *Garza* had "no difficulty with the general proposition that federal privilege law should trump application of state law when a particular piece of evidence is relevant to both

state and federal claims." 234 F.R.D. at 625. But the evidence the plaintiff sought in *Garza,* a doctor's personnel file, was not relevant to the plaintiff's FTCA claim against the United States. *Id.* The court determined that the "sole purpose" for seeking to compel production of this file was "to establish a negligent credentialing claim" against the defendant hospital, which was "undoubtedly a state law claim." *Id.* Similarly, in *Platypus*, a diversity case with a federal question counterclaim, the plaintiff subpoenaed the defendant's former accountant to give testimony that would help plaintiff prove alter ego as a basis for liability on his state-law claims. 905 F.Supp. at 809. The court recognized that in cases like *Wm. T. Thompson Co.*, it had been impossible to apply both state and federal privileges because the evidence was relevant to both state and federal claims. *Id.* at 811. In *Platypus*, by contrast, the evidence sought was not relevant to the federal counterclaim but only to the state-law claim. The court concluded that it could apply the state privilege law to the state-law claim and "would not be forced to apply two different privilege rules to the *same* evidence." *Id.* (emphasis in original). A bright-line rule that federal privilege law applied to any case with a federal claim was "neither appropriate nor necessary," *id.* at 812, because the need for consistency and uniformity present when evidence is relevant to both federal and state claims "cannot be used to justify ignoring the express language of Rule 501 where evidence can be relevant *only* to state law claims." *Id.* (emphasis in original).

The court in *Freeman* distinguished the cases holding that federal privilege law applied to state-law claims in a federal-question case. In *Freeman*, an inmate died while in state custody. 917 F.Supp. at 587. The plaintiff, individually and on behalf of the inmate's

13

estate, brought a federal civil rights action and pendent state-law claims for wrongful death and loss of society. *Id.* The plaintiff moved to compel production of a morbidity and mortality conference report on the inmate's death. *Id.* The court cited *Memorial Hospital v. Shadur*, 664 F.2d 1058 (7th Cir. 1981), in which the Seventh Circuit concluded that federal privilege law applied in a federal question case despite the existence of pendent state-law claims. *Id.* at 588. The *Freeman* court distinguished *Memorial Hospital* on the basis that in that case, the peer review documents sought were highly relevant to the plaintiff's federal antitrust claim challenging the peer review process as a restraint on trade. In *Freeman*, by contrast, there was "no federal claim to which the records sought would be relevant." *Id.* Because the only claims to which the report would be relevant were state-law claims, the court applied state privilege law, which protected the report from production. *Id.*

A few courts have held that federal privilege law applies even if the evidence at issue is relevant only to the supplemental state-law claims in a federal-question case. *See*, *e.g.*, *Burrows v. Redbud Community Hospital Dist.*, 187 F.R.D. 606, 610-11 (N.D. Cal. 1998) (concluding that federal privilege law applied to require production of peer review documents in an EMTALA case with pendent state-law claims for medical malpractice and spoliation, even if the peer review documents were relevant only to the state-law claims, because "state law claims that are pendent to federal question cases are governed by federal privilege law"); *Smith v. Smith*, 154 F.R.D. 661, 671 (N.D. Tex. 1994) (stating in dicta that even if documents subject to a state-law mediation privilege were relevant only to the pendent state claim, the federal law of privilege would "supersede[] any contrary state law");

14

*Doe v. Special Investigations Agency*, *Inc.*, 779 F.Supp. 21, 23 (E.D. Pa. 1991) (holding that federal privilege law applied in a federal question case with pendent state-law claims even though the evidence sought was only relevant to the state-law claims). These cases are either distinguishable or unpersuasive. In *Doe,* for example, the court stated that it was bound by circuit authority and declined to distinguish the general rule applying federal privilege law on the ground that the evidence sought was only relevant to the state-law claims. 779 F.Supp. at 23. The *Doe* court concluded that the Third Circuit in *Wm. T. Thompson Co.* made "no such distinction" and would be unlikely to do so if confronted with a case in which the evidence was only relevant to the state-law claims because "there are sound policy reasons for maintaining a bright line rule" in favor of applying federal privilege law in all federal question cases with supplemental state-law claims, namely consistency and uniformity. *Id.* There is no binding authority in the Fifth Circuit addressing what privilege law applies in a federal question case with supplemental state-law claims. In *Burrows* and *Smith*, the conclusion that federal privilege law would apply regardless of relevance was supported by cases involving evidence that was relevant to both the federal and state-law claims. Moreover, as the court noted in *Platypus*, the concerns about applying separate sets of privilege laws to the same evidence are not present when the evidence is only relevant to state-law claims.

Applying the approach adopted by the majority of courts considering the issue, if the peer review documents at issue are not relevant to Guzman's EMTALA claim, but only to her Texas-law negligence claim, then Texas privilege law applies and the documents are

15

privileged.  If the peer review documents are relevant to the federal as well as the state claim, then federal privilege law governs and the documents at issue are not privileged.

## III.    The Relevance of Peer-Review Documents to the EMTALA claim

Memorial Hermann acknowledges that the peer review documents at issue, a "root cause analysis," are relevant to Guzman's medical malpractice claim under Texas law.  But Memorial Hermann asserts that the root cause analysis is not relevant to Guzman's federal claim under EMTALA because it is not a medical malpractice statute.  Guzman argues that the root cause analysis is relevant to her EMTALA claim because it will provide "the standard of care to which the Hospital adheres" in providing an appropriate medical screening as required by EMTALA.  (Docket Entry No. 77, at  5).

EMTALA neither establishes a federal medical malpractice cause of action nor a nationalized standard of medical care.  *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998).  A hospital does not violate EMTALA by failing to detect or by misdiagnosing an emergency condition.  *See id.* at 332-323; *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002) (recognizing that EMTALA is not intended to be a federal malpractice action).  Congress enacted EMTALA "to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay," not to guarantee proper emergency medical care.  *Marshall*, 134 F.3d at 322.

EMTALA requires hospitals to provide an appropriate medical screening to any person who enters the emergency room. 42 U.S.C. § 1395dd(a).  An appropriate medical screening is determined "by whether it was performed equitably in comparison to other

16

patients with similar symptoms," not "by its proficiency in accurately diagnosing the patient's illness." *Marshall*, 134 F.3d at 322. The plaintiff must show that the hospital treated him differently from other patients with similar symptoms. *See id.* at 324. If the hospital has actual knowledge of an individual's emergency medical condition, it must provide either "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or for transfer of the individual to another medical facility . . . ." 42 U.S.C. §§ 1395dd(b)(1)(A) & (B). Under EMTALA, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . ." *Id.* at § 1395dd(e)(3)(A). The Fifth Circuit has defined "to stabilize" as "[t]reatment that medical experts agree would prevent the threatening and severe consequence of the patient's emergency medical condition while in transit." *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991).

Even if the treating doctor made a misdiagnosis that could subject him to liability in a medical malpractice action under state law, the hospital is not liable under EMTALA if it provided an appropriate medical screening. *See*, *e.g.*, *Marshall*, 134 F.3d at 322 (citing *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995) (holding "[t]he hospital's failure to detect the decedent's alleged suicidal tendency may be actionable under state medical malpractice law, but not under the EMTALA.")); *Barber v. Hosp. Corp. of Am.*,

17

977 F.2d 872, 879-80 (4th Cir. 1992) ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.").

Courts confronting this issue have held that medical peer review materials are not relevant to an EMTALA claim. In *Moses v. Providence Hospital and Medical Centers*, *Inc.*, 2007 WL 1806376 (E.D. Mich. June 22, 2007), the court held that because EMTALA is not a malpractice statute, peer review materials "which may include a post-mortem conference designed to address whether staff should have known of some underlying condition or should have diagnosed something different may be relevant to a malpractice claim, but not to the EMTALA claim." *Id.* at *3. The court concluded that whether the hospital performed an appropriate screening can be assessed by looking at medical records and taking depositions. *Id.* In *Hewett v. Inland Hospital*, C.A. No. 98-206-B (D. Me. 1999) (FastCase), an EMTALA plaintiff moved to compel the defendant hospital to answer an interrogatory that asked whether it had "taken any action in regard to the rights and privileges" of the treating doctor. Recognizing that EMTALA is not a medical malpractice statute, the court held that "standard of care issues are irrelevant in this action." *Id.* at *4. The court concluded that whether actions were taken against the doctor outside the emergency room context was irrelevant, but whether "actions were taken against the treating doctor because of his failure to properly screen patients in the emergency room [could] lead to relevant evidence." *Id.* The court limited the plaintiff's interrogatory to whether the hospital had taken action against

the treating doctor "with respect to his ability to properly screen and stabilize patients in the emergency room."  *Id.* at *4-5.

In the present case, Guzman alleges that Memorial Hermann failed to provide an appropriate medical screening because Dr. Haynes did not review the results of the white blood cell differential count before discharging Tristan from the hospital.  Guzman cites *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994), for the proposition that attributing the incident at issue to the malpractice of a physician is relevant to an EMTALA claim.  Guzman argues that "a fact finding by a peer review committee that Dr. Haynes was negligent is clearly relevant to the EMTALA case under *Power*."  (Docket Entry No. 78, at 2).

Guzman's reliance on *Power* is misplaced.  In that case, the court concluded that although allowing a plaintiff to prove that a hospital did not meet its own standard of care "potentially blurs the line somewhat between a malpractice claim and an EMTALA claim, they are still distinct causes of action."  42 F.3d at 858.  The court noted the following example:

> Consider a situation in which a hospital adheres to a standard requiring tests A, B, and C as part of an appropriate emergency room medical screening. In many instances, this standard will also be the malpractice standard of care. Thus, failure to perform test C, for example, would violate both EMTALA and the standard of care applicable in a malpractice claim.  But if tests A, B, and C are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be.  In short, the issue is not whether the Hospital's treatment was adequate as measured against a malpractice standard of care, . . . but rather

19

> whether the claimant received the same screening examination
> regularly provided to other patients in similar circumstances.

*Id.* at 859.

In this case, failing to review the results of the white blood cell differential count may be a violation of the standard of care for a medical malpractice claim, but it is not an EMTALA violation.  An EMTALA violation depends on whether Tristan was treated "equitably in comparison to other patients with similar symptoms."  *Marshall*, 134 F.3d at 322.  Whether Memorial Hermann provided an appropriate screening is not determined by proof of Dr. Haynes's alleged negligence on February 12, 2006.  Whether the treating doctors for other Memorial Hermann emergency room patients with symptoms similar to Tristan's did or did not review the white blood cell differential count before discharge as part of Memorial Hermann's emergency room policy can be determined by medical records, deposition testimony, and Memorial Hermann's policies and procedures.

This court's *in camera* review reveals that the peer review documents Guzman seeks are not relevant to the EMTALA claim.  The root cause analysis is not relevant to determining Memorial Hermann's standard for an appropriate medical screening for patients who present with symptoms similar to Tristan's.  The root cause analysis does not examine whether Dr. Haynes performed an appropriate medical screening under Memorial Hermann's policies.  The documents only address "whether [Memorial Hermann] staff should have known of some underlying condition or should have diagnosed something different" and are only relevant to a negligence or medical malpractice claim.

20

Because the peer review documents are relevant only to the state-law negligence claims and not the federal EMTALA claim, state privilege law applies.  Under that privilege law, the documents are privileged and their production cannot be compelled.

**IV.    Conclusion**

Guzman's motion to compel is denied.  Memorial Hermann's motion for a protective order is granted.

SIGNED on February 20, 2009, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge