## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF T. | § | |
| GUZMAN, A MINOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-3973 |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM,  D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND OPINION

This case arises out of medical care provided to a child in a hospital emergency room in February 2006.  Wendy Guzman, individually and on behalf of her minor son, sued Memorial Hermann Hospital System, d.b.a. Memorial Herman Southeast Hospital ("Memorial Hermann") in November 2007.  Guzman filed this suit in Texas state court, asserting a claim under the Emergency Medical Treatment and Active Labor Act, 28 U.S.C. § 1395dd ("EMTALA").  Memorial Hermann timely removed to this court on the basis of federal-question jurisdiction.  Guzman amended her complaint to add state-law negligence claims against Memorial Hermann, Philip Haynes, M.D., Ph.D., Memorial Southeast Emergency Physicians, LLP ("MSEP"), and Emergency Consultants, Inc. ("ECI").

Dr. Haynes was the emergency-room physician who saw the child at Memorial Hermann.  Dr. Haynes was a partner in MSEP, a limited liability partnership of emergency-

room physicians.  MSEP is a Michigan LLP registered to do business in Texas.  MSEP had a contract with Memorial Hermann to provide emergency-physician staffing to the hospital. ECI, a Michigan corporation with its principal place of business in Michigan, had an administrative services agreement with MSEP to provide administrative and support services. On December 17, 2008, this court granted ECI's motion to dismiss for lack of personal jurisdiction.  (Docket Entry No. 53).

Guzman has moved for partial summary judgment on the issue of whether Dr. Haynes may rely on Texas Civil Practice & Remedies Code § 74.153.  Under this statute, the plaintiff in a medical malpractice case involving emergency medical care must prove that the medical-care providers acted with "willful[1] and wanton negligence," as opposed to the traditional medical malpractice negligence standard.  (Docket Entry No. 52).  Guzman asserts that the undisputed facts show that the care provided to her son was not "emergency" care as defined by § 74.153.  Alternatively, Guzman asserts that the term "willful and wanton negligence" is unconstitutionally vague.  Dr. Haynes and MSEP responded,[2] (Docket Entry No. 55), Guzman replied, (Docket Entry No. 56), Dr. Haynes and MSEP filed a surreply, (Docket Entry No. 65), and Guzman responded to the surreply, (Docket Entry No. 66).

---

[1] Section 74.153 uses the spelling "wilful."  Many of the cases interpreting the term use the spelling "willful."  "Willful" is the preferred American spelling.  BRYAN A. GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE § 12.2, at 243 (2002); *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2616, 2617 (1993). Except in direct quotations, this court uses the spelling "willful."

[2] ECI, though previously dismissed as a defendant, also joined in the response to Guzman's motion "[o]ut of an abundance of caution."  (Docket Entry No. 56, at 1 n.1).

2

Based on a careful review of the motion, responses, and replies, the parties' submissions, and the applicable law, this court grants Guzman's motion for partial summary judgment. The reasons for this ruling are explained below.

## I. Background

The relevant facts are detailed in this court's prior memoranda and opinions and only summarized here. Briefly, on February 12, 2006, Guzman's son, then seven years old, was feeling ill. His parents took him to the emergency room at Memorial Hermann in Houston, Texas. Dr. Haynes obtained the child's medical history and did a physical examination. Dr. Haynes learned that the child had been coughing and vomiting and was complaining of nausea. Dr. Haynes testified in his deposition that he concluded that the child was "clinically stable, his saturation on room air was normal. He had clear breath sounds bilaterally, had no retractions, was in no respiratory distress." Dr. Haynes testified that the emergency room staff gave the child a "fluid challenge by mouth to make sure that he was no longer vomiting." (Docket Entry No. 52, Ex. B., Deposition of Philip Haynes, M.D., at 23:21-24:9). Dr. Haynes ordered several laboratory tests, including a complete blood count (CBC). A CBC calls for a white blood cell differential test, which examines and classifies 100 white blood cells. One of the classifications is a band count. A high band count indicates that a patient is fighting off infection. At approximately 9:10 a.m., the results of the CBC were made available on the hospital's computer, but not the white blood cell differential test results. After reviewing the CBC results, Dr. Haynes diagnosed viral syndrome. Because Dr. Haynes believed the child to be "stable for discharge," (*id.* at 20), he was released from

the hospital at approximately 10:15 a.m.  Dr. Haynes told the Guzmans that their son's condition should begin to improve within 24 hours but to return to the emergency room if he was not better.

The results of the white blood cell differential test, including the band count, were available on the hospital's computer at approximately 9:35 a.m.  Dr. Haynes did not review these results before discharging the child and did not know that the band count was extremely high, indicating a bacterial infection.  Dr. Haynes did not prescribe antibiotics when the child was released.

The Guzmans brought their son back to the Memorial Hermann emergency room the following morning, February 13, 2006.  Dr. Mohammed Siddiqi did a physical examination and ordered laboratory tests and a chest x-ray.  These tests showed pneumonia and probable sepsis.  The child's condition worsened in the emergency room.  Dr. Siddiqi decided that he needed to be intubated to protect his airway and respiratory system.  The child had a severe allergic reaction to one of the medications used for the intubation.  This allergic reaction, called malignant hypothermia, caused his body temperature to reach 111.2 degrees.  He had to be packed in ice and transported by helicopter to Memorial Hermann Children's Hospital. The septic shock caused injuries to the child's organs.  Although the child's condition improved after spending time in the hospital, he still requires follow-up medical care and therapy.

Guzman's EMTALA claims against Memorial Hermann include failing to provide an appropriate medical screening examination the first day she brought her son to the hospital,

4

failing to stabilize her son's condition before discharging him that day, and failing to provide an appropriate transfer in a timely manner.  Guzman also asserts a state-law negligence claim against Memorial Hermann for failing to provide adequate procedures for reporting lab results and for recalling patients to the hospital when abnormal lab results are reported.

Guzman's allegations against Dr. Haynes are that he was negligent in failing to order a chest x-ray and in failing to determine the results of the white blood cell differential count before discharging the child from the hospital, discharging him with neither the results of the count nor antibiotics, and failing to arrange for the emergency room staff to report the white blood cell differential count as soon as it became available so that Dr. Haynes could contact the Guzmans if the count was sufficiently abnormal as to require additional evaluation or treatment.  Guzman alleges that MSEP is liable for the torts of its partner, Dr. Haynes.

Dr. Haynes and MSEP have pleaded the limitations on liability found in Chapter 74 of the Texas Civil Practice & Remedies Code.  Section 74.153 is titled "Standard of Proof in Cases Involving Emergency Medical Care" and provides as follows:

> In a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department . . . the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with *wilful and wanton negligence*, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

5

Tex. Civ. Prac. & Rem. Code. § 74.153 (emphasis added).  Guzman argues that as a matter of law, the willful and wanton negligence standard under § 74.153 does not apply here because the child did not receive "emergency medical care" as defined under that statute or because the willful and wanton negligence standard is unconstitutionally vague.  Dr. Haynes and MSEP argue that the record raises disputed fact issues material to determining whether the care provided to Guzman's son was emergency medical care under § 74.153.  Dr. Haynes and MSEP also argue that willful and wanton negligence is not unconstitutionally vague because "any person of reasonable intelligence can determine whether negligence is willful or wanton."  (Docket Entry No. 55, at 7).

## II.     The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "'An

6

issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted).  "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

7

III.    Analysis

    A.    Does the "Willful and Wanton Negligence" Standard Apply?

        1.    The Parties' Contentions

Section 74.001 of the Texas Civil Practice and Remedies Code defines "emergency medical care" as:

> [B]ona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(7).

Guzman argues that Dr. Haynes and MSEP cannot rely on the willful and wanton negligence standard because Dr. Haynes admitted in his answer to the complaint that Guzman's son "appeared to be stable from the first time he encountered [the child] in the emergency room until his discharge" and testified in his deposition that Guzman's son appeared to be stable. The emergency department nurses gave similar testimony. Guzman argues that these facts show that Dr. Haynes did not provide emergency care under § 74.153. Guzman argues that this case is no different than a routine patient appearing at a doctor's office with nonemergency symptoms and that the burden to show "willful and wanton negligence" should not apply merely because the patient was seen in an emergency

8

department.  Guzman contends that there are no facts showing that Dr. Haynes was in a rush to treat an emergency or life-threatening condition.  According to Guzman, Dr. Haynes should not be entitled to the protection of the willful and wanton negligence standard because he never perceived the patient to be unstable and never treated him as if he were unstable.

Guzman also argues that Dr. Haynes has taken "two completely inconsistent factual positions" by asserting that the care he provided to the child was "emergency medical care" as defined by § 74.001 and by testifying that the child was "stable" while he was in the emergency room.  Citing *New Hampshire v. Maine*, 532 U.S. 742 (2001), Guzman argues that Dr. Haynes is judicially estopped from relying on the willful and wanton negligence standard because of these inconsistent positions.  (Docket Entry No. 56, at 2).

Dr. Haynes disputes that he has taken inconsistent positions.  He contends that his position has always been that the child appeared stable.  According to Dr. Haynes and MSEP, this position is not inconsistent with arguing that "willful and wanton negligence" applies because § 74.001 does not define "emergency medical care" based on the patient's appearance or the physician's perception of the patient's appearance.  Dr. Haynes and MSEP argue that whether the child was stable and whether the care he received was "emergency medical care" as defined by § 74.001 are fact questions precluding summary judgment.

Dr. Haynes and MSEP argue that Guzman's allegations and expert reports also create a fact question on whether the willful and wanton negligence standard applies.  They point to Guzman's EMTALA allegation that Memorial Hermann had actual knowledge of an emergency medical condition and failed to stabilize the child before discharge.  One of

9

Guzman's expert witnesses, Dr. Joseph Varon, stated in his report that the band count on February 12, 2006 was a "'panic value' and represent[ed] a life-threatening emergency medical condition requiring further evaluation and treatment." (Docket Entry No. 55, Ex. 2). Dr. Varon opined that Memorial Hermann "failed to stabilize [the child] prior to discharge" because "[h]e was given no medication for his infectious condition, and there was no documentation that his vital signs were ever rechecked before discharge." (*Id.*). Dr. Stephen Hayden, another expert, stated in his report that Dr. Haynes's "failure . . . to review and evaluate the results of the white cell differential was the direct and foreseeable cause of [the patient] being discharged from the emergency department with a diagnosis of viral syndrome, when he in fact had a documented bandemia strongly indicating a fulminating bacterial infectious source of his disease." (*Id.*, Ex. 3). According to Dr. Haynes and MSEP, the record raises a fact issue as to whether the child was stable and whether he received emergency medical care under § 74.001.

### 2.    Analysis

Guzman's judicial estoppel argument fails. "Judicial estoppel is an equitable doctrine that 'prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.'" *Hopkins v. Cornerstone America*, 545 F.3d 338, 347 (5th Cir. 2008) (quoting *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003)).[3] Judicial estoppel serves the policies of "preventing internal

_____

[3] The Fifth Circuit has generally considered judicial estoppel a matter of federal procedure and has applied federal law. *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391,

inconsistency, precluding litigants from 'playing fast and loose' with the courts, and

prohibiting parties from deliberately changing positions according to the exigencies of the

moment." *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993).  The doctrine

"protects the essential integrity of the judicial process" by reducing the "risk of inconsistent

court determinations." *New Hampshire v. Maine*, 532 U.S. 742, 750-51, 121 S.Ct. 1808, 149

L.Ed.2d 968 (2001) (internal quotations omitted).  The factors courts use in deciding whether

judicial estoppel applies include: (1) whether the party's later position is clearly inconsistent

with its earlier position; (2) whether the party has succeeded in persuading a court to accept

that party's earlier position; and (3) whether the party seeking to assert an inconsistent

position would derive an unfair advantage or impose an unfair detriment on the opposing

party if not estopped. *New Hampshire v. Maine*, 534 U.S. at 750-51; *Hopkins*, 545 F.3d at

---

395 (5th Cir. 2003).  "[F]ederal law should apply [to questions of judicial estoppel] because
a federal court should have the ability to 'protect itself from manipulation' and this ability
should not vary in a diversity action because it is a matter of federal procedure and not a
substantive concern." *Id.* (internal citations omitted); *but see United States ex rel. Am. Bank
v. C.I.T. Constr., Inc.*, 944 F.2d 253, 258 n.7 (5th Cir.1991) (holding that when federal issue
is decided, federal law of judicial estoppel is applied, but that when nonfederal issue is
decided, state law formulation should be used).  If, however, state law applies, the result does
not differ.  Under Texas law, the doctrine of judicial estoppel does not apply to contradictory
positions taken in the same proceeding.  *See Pleasant Glade Assembly of God v. Schubert*,
264 S.W.3d 1, 8 (Tex. 2008) ("Contradictory positions taken in the same proceeding may
raise issues of judicial admission but do not invoke the doctrine of judicial estoppel."); *It's
The Berrys*, *LLC v. Edom Corner*, *LLC*, 271 S.W.3d 765, 772 (Tex.App.– Amarillo 2008, no
pet.) (judicial estoppel did not apply to inconsistent positions taken in mandamus action and
on appeal because mandamus action was part of the case and not prior proceeding); *Galley
v. Apollo Associated Services*, *Ltd.*, 177 S.W.3d 523 (Tex.App.-Houston [1st Dist.] 2005, no
pet.) ("Judicial estoppel does not apply to contradictory positions taken in the same
proceeding; instead, judicial estoppel may apply only in a subsequent action.") (citing *Long
v. Knox*, 155 Tex. 581, 291 S.W.2d 292, 295 (1956)).

347.  These factors do not apply here.  Even assuming that Dr. Haynes's position that the patient received emergency care is inconsistent with his pleadings and deposition testimony that the patient appeared stable, this court has not "accepted" Dr. Haynes's position about the child's condition on February 12, 2006.  Judicial estoppel requires that the court actually accept the party's earlier position, "either as a preliminary matter or as part of a final disposition."  *See*, *e.g.*, *In re Superior Crewboats*, *Inc.*, 374 F.3d 330, 335 (5th Cir. 2004) (finding that the bankruptcy court accepted the party's previous position by issuing a "no asset" discharge); *New Hampshire v. Maine*, 532 U.S. at 750-51 ("Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.") (internal citations and quotations omitted).  Allowing Dr. Haynes and MSEP to argue both that the child appeared stable and at the same time that the § 74.153 standard applies neither unfairly advantages them nor unfairly disadvantages Guzman.  Dr. Haynes and MSEP are not judicially estopped from arguing that the willful and wanton negligence standard found in § 74.153 applies to this case.

The facts of this case are unusual.  Dr. Haynes testified that the child "appeared stable," which provides the basis for Guzman's argument that the care her son received was not "emergency" care under § 74.153.  Guzman has alleged an EMTALA claim and has submitted expert evidence that her son had an emergency medical condition and was not in fact stable.  This allegation and evidence provide the basis for the defendants' argument that the care provided was "emergency" care under § 74.153.  The parties have not cited, and this

12

court has not found, a case addressing whether the willful and wanton negligence standard of § 74.153 applies when the doctor perceived the patient as stable but the patient allegedly suffered from an emergency medical condition that the doctor did not detect.

Cases interpreting two federal statutes that define "emergency medical condition" with language nearly identical to that of § 74.001(a)(7) provide guidance on when a doctor has provided "emergency medical care" under § 74.153.  Under Medicaid, the federal government will not pay a state for medical care provided to an illegal alien unless the care is to treat an "emergency medical condition."  *See* 42 U.S.C. 1396(b)(v).  The statute defines "emergency medical condition" as "a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in- (A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part."  42 U.S.C. § 1396b(v)(3).  In *Greenery Rehabilitation Group v. Hammon*, 150 F.3d 226 (2d Cir. 1998), the Second Circuit explained this language as follows:

> In the medical context, an "emergency" is generally defined as "a sudden bodily alteration such as is likely to require immediate medical attention."  The emphasis is on severity, temporality and urgency. . . . An "acute" symptom is a symptom "characterized by sharpness or severity . . . having a sudden onset, sharp rise, and short course . . . ." Moreover, as a verb, "manifest" means "to show plainly."  In § 1396b(v)(3) this verb is used in the present progressive tense to explain that the "emergency medical condition" must be revealing itself through acute symptoms.

*Id.* at 232 (internal citations omitted).  EMTALA[4] also defines an "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . ."  42 U.S.C. § 1395dd(e)(1)(A).  The case of *Urban By and Through Urban v. King*, 43 F.3d 523 (10th Cir. 1994), explains the statutory definition.  In that case, the plaintiff was pregnant with twins and had been diagnosed as having a high-risk pregnancy.  She went to the hospital for a routine stress test.  The test was nonreactive, meaning that it showed no fetal movement, but the fetal heart tones were in the 150s for each twin and the plaintiff's vital signs were normal.  The nurse who conducted the test, after consulting with a doctor but without informing the plaintiff of the results, instructed her to come back the next morning for another stress test.  During the repeat test, a different nurse realized that something was wrong and called a different doctor, who ordered a biophysical profile.  The profile revealed

---

[4] EMTALA requires hospitals to provide an appropriate medical screening to any person who enters the emergency room. 42 U.S.C. § 1395dd(a).  An appropriate medical screening is determined "by whether it was performed equitably in comparison to other patients with similar symptoms," not "by its proficiency in accurately diagnosing the patient's illness." *Marshall v. East Carroll Parish Hosp*, 134 F.3d 319, 322 (5th Cir. 1998). The plaintiff must show that the hospital treated him differently from other patients with similar symptoms. *See id.* at 324.  If the hospital has actual knowledge of an individual's emergency medical condition, it must provide either "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or for transfer of the individual to another medical facility . . . ."  42 U.S.C. §§ 1395dd(b)(1)(A) & (B).

14

no movement or breathing in either fetus and the absence of a fetal heart rate in one of the fetuses. One baby was delivered stillborn and the other was born with brain damage. The plaintiff sued, alleging that the hospital violated EMTALA's requirement to stabilize an emergency medical condition by sending her home after the first nonreactive stress test. Relying on the statutory definition, the court concluded that "an emergency medical condition had not manifested itself. She was not in pain, and she had not displayed acute symptoms of severity at the time she was sent home from the obstetrics department." *Id.* at 526. There was no "manifestation of acute symptoms so the hospital would know of the condition." *Id.*

These cases are consistent with the common understanding of the terms. "Emergency" is defined as "[a] sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action without time for full deliberation." BLACK'S LAW DICTIONARY 523 (6th ed. 1990); *see also* STEDMAN'S MEDICAL DICTIONARY 582 (27th ed. 2000) ("[a] patient's condition requiring immediate treatment); DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 584 (29th ed. 2000) ("an unlooked for or sudden occasion; an accident; an urgent or pressing need"); MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY 207-08 (1986) ("an unforeseen combination of circumstances or the resulting state that calls for immediate action").

In this case, the undisputed facts in the record show that on February 12, 2006, the

15

only indication that Guzman's son had a severe condition that urgently required medical care was one part of one laboratory test.  It was only the band count result from the CBC Dr. Haynes ordered that showed an underlying severe bacterial infection.  It is undisputed that Dr. Haynes did not know this lab result when he discharged the child.  Dr. Haynes took history and did a physical examination, which revealed fever, nausea, vomiting, cough, and abdominal pain.  Dr. Haynes concluded that the child was not in acute distress.  He had no difficulty in breathing and had normal blood gases, and had stopped vomiting.  Nothing in the history, examination, and the CBC (absent the band count) showed that the absence of immediate additional medical treatment would put the patient's health in "serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." The symptoms presented were typical of patients with a routine viral syndrome or routine bacterial infection.  They did not "show plainly" the existence of an emergency medical condition.  The child's alleged emergency medical condition was the underlying severe bacterial infection, which was evidenced by the high band count that Dr. Haynes did not see. The undisputed facts in the record show that, as a matter of law, the care Dr. Haynes provided was not "bona fide emergency services provided after the sudden onset" of an emergency medical condition.  Dr. Haynes did not treat the child as requiring emergency medical care.  Dr. Haynes had the opportunity and time to speak with the parents about their son's medical history and symptoms.  Dr. Haynes interviewed the child and conducted a physical exam.  The information he received from the history, the interview, and the examination did not lead Dr. Haynes to believe that the child was suffering from an

emergency medical condition.  Dr. Haynes testified that when he diagnosed a viral syndrome and decided to send the Guzman's son home, the child was "in no respiratory distress . . . no longer vomiting . . . no longer hurting anywhere . . . and [] was comfortable going home." (Docket Entry No. 52, Ex. B, Deposition of Philip Haynes, M.D., at 24:6-14).  There are no facts showing that Dr. Haynes's encounters with the child on February 12, 2006 were perceived as or treated as emergencies.  The  record shows that Dr. Haynes's actions were not taken in response to "an unforeseen combination of circumstances that call[ed] for immediate action without time for full deliberation."  Because Dr. Haynes did not provide "emergency medical care," he and MSEP may not rely on the willful and wanton negligence standard found in § 74.153.

The legislative history of § 74.153 supports this result.  The willful and wanton negligence standard was intended to offer doctors protection from liability for decisions made and actions taken during sudden emergency situations with no time for deliberation and no time to learn about the patient's history.  The Texas House Committee Chairman stated that "it is the intent of this legislation that emergency situations where you do not have a prior relationship with the patient is the one given the protection.  If you have a prior relationship with a patient, and you know about their medical history and their background you should not be given the protection to the same extent as someone who just shows up in the emergency room."  Tx. H.R. Jour., 2003 Reg. Sess. No. 84. (Statement of Representative Nixon).

Section 74.154(a), which requires that the court give certain jury instructions in cases

17

involving emergency medical care as defined by § 74.001(a)(7), also sheds light on the types of situations that the legislature intended to address with the willful and wanton negligence standard. The jury is to consider, in determining whether the doctor or health care provider is liable, the following factors, along with all other relevant considerations:

> (1)    whether the person providing care did or did not have the patient's medical history or was able or unable to obtain a full medical history, including the knowledge of preexisting medical conditions, allergies, and medications;

> (2)    the presence or lack of a preexisting physician-patient relationship or health care provider-patient relationship;

> (3)    the circumstances constituting the emergency; and

> (4)    the circumstances surrounding the delivery of the emergency medical care.

TEX. CIV. PRAC. & REM. CODE § 74.154(a).[5]

Although Dr. Haynes did not have a prior relationship with the patient, he did have the opportunity to receive his medical history and interview him before conducting a physical examination and ordering laboratory tests. The record shows no "circumstances constituting [an] emergency." The record shows that Dr. Haynes and the staff did not treat the patient as requiring emergency care under § 74.153 and did not provide such care. As a matter of law, the facts of this case do not present the situation that § 74.153 was intended to address.

---

[5] The requirement that the court deliver these jury instructions is obviated if the care or treatment at issue occurs after the patient is stabilized, is unrelated to the original medical emergency, or is related to an emergency caused in whole or in part by the negligence of the defendant. *Id.*, § 74.154(b).

The parties' dispute over whether the patient was "stable" does not raise a disputed fact issue material to determining whether the care provided by Dr. Haynes was emergency medical care.  Under § 74.153, the willful and wanton negligence standard does not apply to care rendered "*after* the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency."  TEX. CIV. PRAC. & REM. CODE § 74.153 (emphasis added).  The willful and wanton negligence standard applies to actions taken to treat a patient who has presented with an emergency medical condition.  The standard ceases to apply once the doctor's treatment for an emergency medical condition has stabilized the patient.  At that point, there is no longer a medical emergency.  If a doctor takes actions to treat an emergency medical condition that has manifested itself as such, a fact issue may arise as to whether and when the patient was stabilized and when the willful and wanton negligence standard no longer applied.  But no such fact issue arises when, as here, the medical condition did not manifest itself with "acute symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part."  Dr. Haynes did not treat the patient as requiring emergency care to begin with and did not take action to "stabilize" an emergency medical condition.  There is no issue as to when the emergency care – and the willful and wanton negligence standard – stopped because such care was not provided to begin with.

Guzman's EMTALA allegations do not alter the analysis.  Guzman's expert's

opinions that the child was suffering from an emergency medical condition do not create a fact issue as to whether the willful and wanton negligence standard applies to Dr. Haynes. Guzman alleged that Memorial Hermann, not Dr. Haynes, had actual knowledge of the emergency medical condition. Guzman's EMTALA allegation and evidence that Memorial Hermann failed to stabilize an emergency medical condition of which *it was aware* do not create a fact issue as to whether *Dr. Haynes* provided the patient "bona fide emergency services" for the purposes of § 74.153. Other than the band count test result, there was no manifestation of an emergency medical condition that created the need to protect the doctor from the treatment decisions made in an emergency. Dr. Haynes was unaware of the band count, did not perceive or treat the patient as requiring emergency care, and did not provide emergency medical care as defined by § 74.001(a)(7). The willful and wanton negligence standard is inapplicable here.

### B.     Is "Willful and Wanton Negligence" Unconstitutionally Vague?

#### 1.     The Parties' Contentions

Guzman also argues that § 74.153 is unconstitutionally vague as applied to this case because the terms "willful," "wanton," or "willful and wanton" are not defined in that statute "or any other statute related to medical practice." (Docket Entry No. 52, at 9). Although this court has found that § 74.153 does not apply, there is no basis to find it unconstitutionally vague. Guzman cites *Screws v. United States*, 325 U.S. 91 (1945), for the proposition that "'willful' is a word of many meanings, its construction often being influenced by its context." *Id.* at 101. Guzman points to Black's Law Dictionary, which contains multiple

definitions for "willful" as well as "wanton."  The term "wanton" includes "reckless," "heedless," "malicious," and acts done "in reckless disregard for the rights of others." BLACK'S LAW DICTIONARY 1418-1419 (5th ed. 1979).  Guzman acknowledges that Texas law provides guidance on the meaning of the term "willful *or* wanton negligence," but she argues that "willful *and* wanton negligence" presumably requires "more proof" and § 74.153 does not specify the additional proof required.  (Docket Entry No. 53, at 9).  Guzman argues that the Texas statutory definitions of malice and gross negligence compound the vagueness problem.  "Malice" is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant."  TEX. CIV. PRAC. & REM. CODE § 41.001(7).  "Gross negligence" is defined as an act or omission "(a) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (b) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others."  TEX. CIV. PRAC. & REM. CODE § 41.001(11).  Guzman contends that it is unclear where "willful and wanton negligence" falls on the continuum of fault and whether "willful and wanton negligence" is a more or less onerous standard than malice and gross negligence.

Dr. Haynes and MSEP argue that the willful and wanton negligence standard has been explained by Texas courts and that "any person of reasonable intelligence can determine whether negligence is willful or wanton."  (Docket Entry No. 55, at 7).  The defendants point to the Texas Pattern Jury Charges, which have long included a definition for "willful or

wanton negligence." Tex. Pattern Jury Charge 51.18A, 51.18B.  Dr. Haynes and MSEP also point to the legislative history of § 74.153, arguing that it shows that "willful and wanton negligence" is "basically a gross negligence standard with no requirement to prove intent." (Docket Entry No. 55, at 8).

### 2.    Analysis

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (collecting authority).  "A statute is unconstitutionally vague if it does not give 'a person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"  *Groome Resources*, *Ltd. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000) (quoting *United States v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997)).  "The void-for-vagueness doctrine has been primarily employed to strike down criminal laws."  *Id.* (citing *Okpalobi v. Foster*, 190 F.3d 337, 358 n. 10 (5th Cir. 1999)).  "In the civil context, 'the statute must be so vague and indefinite as really to be no rule at all.'"  *Id.* (quoting *Boutilier v. INS*, 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967)); *see also Fernandes v. Limmer*, 663 F.2d 619, 636 (5th Cir. 1981) ("'We can never expect mathematical certainty from our language.' The minimal ambiguity presented in [the challenged statutes] is well within constitutional limits." (quoting *ISKCON v. Eaves*, 601 F.2d 809, 830 (5th Cir. 1979))).

In determining whether a statute is unconstitutionally vague, courts look to whether the statute "provide[s] definite standards for those who apply them."  *Beckerman v. Tupelo*,

664 F.2d 502, 511 (5th Cir. 1981).  Such standards may be found on the face of a statute or in other authority that has defined the terms.  *See*, *e.g.*, *J & B Entm't v. City of Jackson*, 152 F.3d 362, 368 (5th Cir. 1998) (rejecting a void-for-vagueness challenge by noting that the language at issue – "serious literary, artistic, scientific, or political value" – has been interpreted by many courts since it was introduced by the Supreme Court in its test for "obscenity").

The willful and wanton negligence standard set forth in § 74.153 of the Texas Civil Practice and Remedies Code is not so vague or indefinite that it provides "no rule at all." The statute does not define "willful and wanton negligence," but § 74.001(b) of the Code states that "[a]ny legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common law."  Other Texas statutes, cases, and pattern jury instructions, as well as the legislative history of § 74.153 provide guidance on the meaning.

The "Good Samaritan Statute," TEX. CIV. PRAC. & REM. CODE § 74.152,[6] provides that "[p]ersons not licensed or certified in the healing arts who in good faith" render emergency medical care are not liable unless their acts are "wilfully or wantonly negligent." Texas courts have found that this standard is essentially gross negligence.  In *Wheeler v. Yettie Kersting Memorial Hosp.*, 866 S.W.2d 32, 50 n.25 (Tex. App. – Houston [1st Dist.] 1993, no writ), the defendants argued that they were not liable under the "Good Samaritan

---

[6] Effective September 1, 2003, the former § 74.002 was amended and renumbered as Section 74.152.

Statute."  The court explained that "'[h]eedless and reckless disregard,' sometimes termed 'willful act or omission' or 'willful and wanton disregard,' means 'that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it. It is synonymous with 'gross negligence.'''"  *Id.* (citations omitted).  Another Texas court examining the "Good Samaritan Statute" concluded that "willful or wanton negligence" is "inherently contradictory in that negligence does not include the element of intent, whereas conduct defined as willful and wanton incorporates some measure of intent."  *Hernandez v. Lukefahr*, 879 S.W.2d 137, 141-42 (Tex.App.-Hous. [14 Dist.] 1994, no writ) (citing cases). But the court recognized that "[d]espite the apparent incongruity, it is obvious the legislature meant to exclude outrageous acts rising to the level of conscious indifference."  *Id.* (citing *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 916-20 n. 25 (Tex. 1981) (describing willful and wanton disregard as "entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons affected by it")); *see also Dunlap v. Young*, 187 S.W.3d 828, 836 (Tex.App.– Texarkana 2006, no pet.) (equating "willful or wanton negligence" with gross negligence).

The Texas Pattern Jury Charges define "willful or wanton negligence" as "more than momentary thoughtlessness, inadvertence or error of judgment.  It means such an entire want of care as to establish that the act or omission complained of was the result of actual conscious indifference to the rights, safety or welfare of the person affected by it."  Comm. on Pattern Jury Charges, State Bar of Texas, Pattern Jury Charges: Malpractice, Premises,

24

Products PJC 51.19B, 51.19C (2003).  This standard has been applied in the Texas cases involving the Good Samaritan Statute.  The "gross negligence" standard is familiar and has been applied by Texas courts and juries for years.

The difference between "willful *and* wanton negligence" and "willful *or* wanton negligence" is obvious on its face: one is conjunctive and one is disjunctive.  Willful and wanton requires both; willful or wanton requires one or the other.  "Willful" means deliberate, intentional.  "Wanton"means merciless, inhumane, without check or limitation. As modifiers of "negligence," the difference between "willful or wanton" and "willful and wanton" is difficult to discern.  Negligence could not be "willful" without being "wanton." The difference between "or" and "and" does not make the latter standard so vague that it is really no rule at all.

The legislative history of § 74.153 makes clear that the Texas legislature did not intend to significantly alter or increase the burden of proof by stating the standard in terms of "willful and wanton negligence."  One state senator noted that the "existing law on immunity for emergency care says that someone is liable if they are "willfully or wantonly negligent,' and the new provision speaks of 'willful and wanton negligence.'"  The senator asked "Is there any change to the standard?"  TX. Sen. Journal, 2003 Reg. Sess. No. 84. (Statement of Senator Hinojosa).  The committee chairman responded, "No, the standard is the same. Both willful and wanton negligence are covered, but this is basically a gross negligence standard.  You don't have to prove intent."  TX. Sen. Journal, 2003 Reg. Sess. No. 84 (statement of Senator Ratliff).

It is clear that the willful and wanton negligence standard of § 74.153 requires, at a minimum, the same level of proof as gross negligence.   Mathematical precision indicating where, if at all, "willful and wanton negligence" falls along the spectrum between gross negligence and malice is not required.   Courts and juries have sufficient guidance from the "willful or wanton negligence" standard and the gross negligence standard to guide their determinations as to the level of proof required in a case involving § 74.153.

## IV.    Conclusion

Guzman's motion for partial summary judgment is granted.   Dr. Haynes and MSEP may not rely on the willful and wanton negligence standard found in § 74.153 of the Texas Civil Practice and Remedies Code.

SIGNED on March 23, 2009, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge