# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY AND AS NEXT FRIEND OF T., A MINOR | § § § § | |
| v. | § § | C.A. No. 07-03973 |
| MEMORIAL HERMANN HOSPITAL SYSTEM, D/B/A MEMORIAL HERMANN SOUTHEAST HOSPITAL | § § § § | |

## DEFENDANT MEMORIAL HERMANN SOUTHEAST'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER RULE 56(c)

Respectfully submitted,

**SMYSER KAPLAN & VESELKA, L.L.P.**

_____
Craig Smyser
State Bar No. 18777575
Christina A. Bryan
State Bar No. 03264000

700 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 221-2300
Telecopier: (713) 221-2320
ATTORNEYS FOR DEFENDANT
MEMORIAL HERMANN HOSPITAL
SYSTEM D/B/A MEMORIAL HERMANN
SOUTHEAST HOSPITAL

# TABLE OF CONTENTS

Page

1. Nature and Stage of Proceedings ........................................................................1

2. Issues to be Addressed by the Court. .................................................................2

3. Legal Standard ...................................................................................................2

4. Undisputed Facts................................................................................................3

5. Argument and Authorities...................................................................................5

    A. Summary Judgment Should Be Granted On All Of Plaintiffs' EMTALA Claims Because They Allege Only Medical Negligence Framed As EMTALA Claims................................................................................5

    B. Summary Judgment Should Be Granted On All The Screening Claims Because The Disparate Treatment Allegations Assert Negligence Or Are Immaterial To Whether An Emergency Medical Condition Existed.................................................................................................9

        1. Summary Judgment Should Be Granted On The Claims For Failure To Review The White Cell Differential Results And For Discharge Without Ruling Out A Bacterial Infection Because They Assert Only Negligent, Not Discriminatory Care. .....................................10

        2. Summary Judgment Should Be Granted On The Claim Of Disparate Treatment For Failure To Follow Nursing Triage Guidelines Because: (a) No Evidence Demonstrates The Guidelines Are the Hospital's Medical Screening Policy, Or That The Medical Screening Exam Materially Failed To Comply With The Triage Guidelines; (b) The Allegation Merely Asserts A Negligence Claim; and (c) MHSE Complied With Its Actual Medical Screening Policy......................................14

            a. No evidence demonstrates the Triage Guidelines are a medical screening procedure or that the screening exam *materially* failed to comply with the Triage Guidelines. .......14

            b. Failure to perform a voided urinalysis is a negligence claim.................................................................................18

            c. MHSE complied with its actual medical screening policy...18

    3.  Summary Judgment Should Be Granted On The Claim Of
        Disparate Treatment For Failure To Follow The After Care
        Policy Because There Is No Evidence The Policy Is Material
        To The Determination Of An Emergency Medical Condition
        Or That The Policy Was Not Followed ........................................21

    4.  Summary Judgment Should Be Granted On The Disparate
        Treatment Claim For Alleged Deviation From Various Policies
        Regarding Assessment And Documentation Because The Alleged
        Violations Are Negligence Claims And Constitute *De Minimus*
        And Irrelevant Deviations From Hospital Policy That Cannot
        Support An EMTALA Cause Of Action. .....................................22

    C.  The Stabilization Claim Fails As A Matter Of Law Because
        Dr. Haynes Perceived T. To Be Stable For Discharge And
        Had No Duty To Stabilize Conditions He Failed To Diagnose.....25

    D.  The Transfer Claim Fails As A Matter Of Law Because It
        Presents Nothing More Than A Negligence Claim And No
        Evidence Demonstrates A Violation Of EMTALA.......................28

    6.  Conclusion .......................................................................................31

## EXHIBITS

Exhibit A – Memorial Hermann Southeast Hospital medical records of T. Guzman produced in this litigation.

Exhibit B - excerpts of the Memorial Hermann Life Flight records produced in this litigation.

Exhibit C - a true and correct copy of a Memorial Hermann Hospital System Policy produced in this litigation.

Exhibit D - a true and correct copy of a Memorial Hermann Hospital System Policy produced in this litigation.

Exhibit E - a true and correct copy of a Memorial Hermann Hospital System Policy produced in this litigation.

Exhibit F - a true and correct copy of a Memorial Hermann Hospital System Policy produced in this litigation.

Exhibit G – a true and correct copy of the Memorial Hermann Hospital System Triage Guidelines produced in this litigation.

Exhibit H - a true and correct copy of a Memorial Hermann Hospital System Policy produced in this litigation.

Exhibit I - excerpts and the court reporter's certificate of the deposition of Frank Blain, taken in the course of this litigation on February 4, 2008.

Exhibit J - excerpts and the court reporter's certificate of the deposition of Suzette Dalmeida, taken in the course of this litigation on January 30, 2008.

Exhibit K - excerpts and the court reporter's certificate of the deposition of Tom Flanagan, taken in the course of this litigation on January 12, 2009.

Exhibit L - excerpts and the court reporter's certificate of the deposition of April Ganz, taken in the course of this litigation on January 30, 2008.

Exhibit M - excerpts and the court reporter's certificate of the deposition of Wendy Guzman, taken in the course of this litigation on January 9, 2008.

Exhibit N - excerpts and the court reporter's certificate of the deposition of Dr. Phillip Haynes, taken in the course of this litigation on January 18, 2008.

Exhibit O - excerpts and the court reporter's certificate of the deposition of Tammy McCrumb, taken in the course of this litigation on March 12, 2009.

Exhibit P - excerpts and the court reporter's certificate of the deposition of Mohammed I. Siddiqqi, M.D., taken in the course of this litigation on March 26, 2009.

# TABLE OF AUTHORITIES

## RULES AND STATUTES

Emergency Medical Treatment and Active Labor Act (EMTALA),
 42 U.S.C.A. §1395dd.................................................................................. passim
 42 U.S.C.A. §1395dd(b)(1)...................................................................................... 25
 42 U.S.C.A. §1395dd(c)(2)....................................................................................... 31
Fed. R. Civ. P. 56(c) ......................................................................................................... 2

## CASES

*Anderson v. Liberty Lobby,*
 477 U.S. 242, (1986).................................................................................................. 2, 3
*Baber v. Hosp. Corp. of America,*
 977 F.2d 872, (4th cir. 1992) ......................................................................... 3, 9, 19, 25
*Battle v. Memorial Hospital at Gulfport,*
 228 F.3d 544, (5th Cir. 2000).......................................................................... 6, 9, 25
*Bauman v. Tenet Health System Hospitals, Inc.,*
 2000 WL 1219151 (E.D. La. 2000) ......................................................................... 5
*Bauman v. Tenet Healthsystem Hospitals, Inc.,*
 2002 WL 58486, *4-5 (E.D. La.)............................................................................ 14
*Bergwall v. MGH Services, Inc.,*
 243 F.Sup.2d 364, (D.Md. 2002)................................................................ 13, 14, 16
*Bryan v. Rectors & Visitors,*
 95 F.3d 349, (4th Cir. 1996) ...................................................................................... 5
*Bryant v. Adventist Health System/West,*
 289 F.3d 1162, 1166-67 (9th Cir. 2002) .............................................................. 27, 28
*Celotex Corp. v. Catrett,*
 477 U.S.317, (1986).................................................................................................... 3
*DIRECTV, Inc. v. Robson,*
 420 F.3d 532, (5th cir. 2005) ..................................................................................... 3
*Dollard v. Allen,*
 260 F.Supp. 1127 (D.Wyo. 2003)............................................................................ 26
*Eberhardt v. City of Los Angeles,*
 62 F.3d 1253, (9th Cir. 1995) .................................................................................... 7
*Feigherey v. York Hospital,*
 59 F.Supp.2d 96, 106 n. 10 (D. Maine 1999) ........................................ 10, 21, 23, 24
*Garret v. Detroit Medical Center,*
 2007 WL 789023 (E.D. Mich.) *1, 3, 6 ................................................................. 13
*Gatewood v. Washington Healthcare Corp.,*
 933 F.2d 1037, (D.C. Cir. 1991)............................................................................ 3, 7
*Harris v. Health & Hosp. Corp.,*
 852 F.Supp. 701, (S.D. Ind. 1994)........................................................................... 27
*Harris v. Health & Hosp. Corp.,*
 852 F.Supp. at 704 ................................................................................................... 28

*Hoffman v. Tonnemacher,*
  425 F. Supp. 1120, (E.D. Cal. 2006)..................................................... 23, 26, 27, 28
*Holcomb v. Monahan,*
  30 F.3d 116, (11th cir. 1994) ............................................................................ 3, 7
*Hunt ex rel Hunt v. Lincoln County Memorial Hosp.,*
  317 F.3d 891, (8th Cir. 2003) ................................................................................ 12
*Hutchinson v. Greater Southeast Community Hospital,*
  793 F.Supp. 6, 10 (D.D.C. 1992) ........................................................................... 21
*Jackson v. East Bay Hosp.,*
  246 F.3d 1248, 1255-56 (9th cir. 2001) .............................................................. 3, 11
*Marshall v East Carroll Parish Hosp.Serv. Dist.,*
  134 F.3d 319, (5th cir. 1998) ......................................................................... passim
*Repp v. Anadarko Mun. Hosp.*
  43 F.3d 519, (10th cir. 1994) ...................................................................... 3, 7, 23
*St. Anthony Hosp. v. United States Dept. of Health and Human Services,*
  309 F.3d 680, (10th Cir. 2002) ............................................................................... 5
*Summers v. Baptist Medical Ctr. Arkadelphia,*
  91 F.3d 1132, (8th Cir. 1996) ..................................................... 7, 8, 9, 12, 18
*Vickers v. Nash General Hosp., Inc.,*
  78 F.3d 139,145 n. 3 (4th Cir. 1996) ............................................................. passim
*Weeks Marine, Inc. v. Fireman's Fund Ins. Co.,*
  340 F.3d 233, (5th Cir. 2003)) ............................................................................... 3


**Other Authorities**
BLACK'S LAW DICTIONARY 470 (6th ed. 1990) ............................................................ 7

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF T., A | § | |
| MINOR | § | |
| | § | |
| v. | § | C.A. No. 07-03973 |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM, D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL | § | |

## DEFENDANT MEMORIAL HERMANN SOUTHEAST'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER RULE 56(c)

Defendant Memorial Hermann Hospital Southeast (MHSE) respectfully submits this Rule 56(c) Motion For Summary Judgment. MHSE is entitled to summary judgment on Plaintiffs' EMTALA claims because:

- Plaintiffs' allegations present nothing more than negligence accusations disguised as EMTALA claims in an attempt to create hospital liability for physician misdiagnosis;

- Plaintiffs cannot convert negligence allegations into disparate treatment that violates EMTALA's medical screening requirements;

- Plaintiffs cannot convert negligence allegations into violations of EMTALA's stabilization and transfer requirements; and

- If Plaintiffs' allegations support a cognizable EMTALA claim, then every emergency room misdiagnosis or failure to comply with a policy can be prosecuted under EMTALA.

## 1. NATURE AND STAGE OF PROCEEDINGS

MHSE seeks partial summary judgment on Plaintiffs' EMTALA claims in this case. All parties and fact witnesses have been deposed. Expert witness depositions are in the process of being scheduled.

## 2. ISSUES TO BE ADDRESSED BY THE COURT

Plaintiffs contend EMTALA was violated because a portion of the complete blood count was not reviewed, no urinalysis was performed and various charting and assessment errors occurred. If Plaintiffs are correct, every patient complaining of nausea/vomiting and subjective but undocumented fever requires a full blood workup and urinalysis in order to comply with a federal anti-dumping statute. If that is the law, our healthcare system's already sky-high costs will explode exponentially. It simply cannot be that a federal anti-dumping statute requires every potential condition to be ruled out by expensive tests, even when the physician does not believe the patient's symptoms warrant the tests.

The Court must decide whether to grant judgment as a matter of law on each of Plaintiffs' three EMTALA claims for (a) inappropriate medical screening, (b) failure to stabilize and (c) inappropriate transfer. The medical screening claim fails as a matter of law because the allegations consist only of medical negligence allegations that cannot state an EMTALA cause of action and Plaintiffs have not demonstrated any evidence of "dumping" or material disparate treatment. The failure to stabilize claim fails as a matter of law because EMTALA does not impose a duty to stabilize an undiagnosed medical condition. The transfer claim fails as a matter of law because it presents only a negligence claim and Plaintiffs have not demonstrated that the transfer violated EMTALA.

## 3. LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The summary judgment movant may satisfy its burden by "showing--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp. v. Catrett*, 477 U.S.317, 325 (1986). The existence of factual disputes that are not material to the elements of a claim will not preclude summary judgment. *Anderson*, 477 U.S. 247. "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th cir. 2005)(quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).

Summary judgment is proper when EMTALA claims are, in actuality, medical negligence claims. *See Marshall v East Carroll Parish Hosp.Serv. Dist.*, 134 F.3d 319, 325 (5th cir. 1998); *Baber v. Hosp. Corp. of America*, 977 F.2d 872, 880 (4th cir. 1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991); *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1255-56 (9th cir. 2001); *Repp v. Anadarko Mun. Hosp.* 43 F.3d 519, 523 (10th cir. 1994); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th cir. 1994).

### 4. <u>UNDISPUTED FACTS</u>

T. came to the MHSE emergency room on February 12, 2006 seeking emergency medical care and with a chief complaint of nausea and vomiting. (Second Am. Complt., ¶ 3. At triage, he did not have a temperature, and while his mother reported that he had been running a fever, she did not record a temperature with a thermometer. (Second Am. Complt. ¶ 3; Guzman depo., p. 21:1-5). The triage nurse recorded his heart rate as 145 and properly categorized him as "emergent, Level 2" based on his elevated heart rate or pulse. (MHSE-013; MHSE-07; Ganz depo., pp. 25-30). The Memorial Hermann Healthcare System medical screening policy required all patients triaged as Level 2 Emergent or with vital signs outside a certain range to be seen by a physician as opposed to a mid level provider. (MHSE-TG-00139-142 ; Flanagan depo., p. 20:7-13) In accordance with that policy, T. was seen by a physician, Dr. Haynes. (MHSE-09). Dr. Haynes took a history and performed a physical exam and determined T. to be stable. (Haynes depo., p. 91:1-5). Dr. Haynes then ordered laboratory tests, including a complete blood count

3

(CBC) and a basic metabolic panel (BMP). (MHSE-011; MHSE-014). The order for a CBC at MHSE automatically includes a white blood cell differential, which is a subtest of the CBC. (Haynes depo., p. 19:16-20). Dr. Haynes also ordered intravenous (IV) fluids and an oral fluid challenge. (MHSE-011).

Later that morning, T.'s pulse or heart rate had decreased to within normal range. (MHSE-014). Dr. Haynes believed T.'s initial elevated heart rate was either the result of an albuterol inhaler treatment or slight dehydration from vomiting. (Haynes depo., p. 93:20 - p. 94:22). Knowing he had not seen the white blood cell differential subset of the CBC, Dr. Haynes diagnosed him with a viral syndrome and discharged him home. (MHSE-010; Haynes depo., p. 23:12-16). Dr. Haynes based his decision to discharge T. on the entire clinical scenario, including his diagnosis of viral syndrome, his past experience and his opinion that T. was stable for discharge. (Haynes depo., pp. 23-24; p. 43:5-25). Dr. Haynes and the nurses believed that T. was stable the entire time he was in the emergency room. (Response To Request for Admissions Nos. 1-2; MHSE-014; Haynes depo., p. 20:3-10; Ganz depo., p. 80:5-8; Blain depo., p. 56:9-11).

T. returned to the emergency room on February 13, 2006. (MHSE-043) Again, in accordance with MHSE triage guidelines and MHH policy, he was triaged as "Level 2 emergent" and was placed in an exam room and evaluated by Dr. Siddiqi. (MHSE-043; MHSE-035). At some point that morning Dr. Siddiqi decided to transfer T. to Children's Memorial Hermann Hospital for a higher level of care. (Second Am. Complt, ¶4.5; MHSE-046). After the initial transfer had been accepted, Dr. Siddiqi determined that T. needed to be intubated and would need to be transferred to an intensive care unit as opposed to a regular hospital floor. (MHSE-045; McCrumb depo., p. 90:5-15; MHLF-006). The receiving physician at Children's Memorial Hermann accepted the transfer to the pediatric intensive care unit (PICU) and instructed Dr.

Siddiqi to have T. transferred by the pediatric transport team that was currently on its way to Beaumont. (MHLF-06). Dr. Siddiqi agreed to wait for the pediatric transport team. (MHLF-006; MHSE-045). While still waiting for the pediatric transport team to arrive, Nurse Tammy McCrumb noted T.'s temperature to be 108.2. (MHSE-043). Cooling blankets and ice packs were applied while T. was transferred via Life Flight. (MHSE-046; MHLF-006).

## 5. ARGUMENT AND AUTHORITIES

### A. SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL OF PLAINTIFFS' EMTALA CLAIMS BECAUSE THEY ALLEGE ONLY MEDICAL NEGLIGENCE FRAMED AS EMTALA CLAIMS

The Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C.A. §1395dd, was enacted to prevent the practice of "patient dumping" or refusing to treat patients who came to the emergency room for treatment but had no insurance coverage or could not pay for their care. *See Marshall v. East Carroll Parrish Hosp. Serv. District*, 134 F.3rd 319, 322 (5th Cir. 1998)("EMTALA was enacted to prevent 'patient dumping', which is the practice of refusing to treat patients who are unable to pay."); *Bauman v. Tenet Health System Hospitals, Inc.*, 2000 WL 1219151, *3 (E.D. La. 2000)("EMTALA targets the evil of 'patient dumping'"); *St. Anthony Hosp. v. United States Dept. of Health and Human Services*, 309 F.3d 680, 694 (10th Cir. 2002)("[EMTLA's] core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat.")(quoting *Bryan v. Rectors & Visitors of University of Virginia*, 95 F.3d 349, 351 (4th Cir. 1996). In order to prevent patient dumping, EMTALA imposes on participating hospitals (1) the duty to perform an appropriate medical screening exam to determine the presence or absence of an emergency medical condition, (2) the duty to stabilize a known emergency medical condition, and (3) restrictions on transfer of an unstabilized

5

individual to another medical facility. *Battle v. Memorial Hospital at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000).

Plaintiffs contend that MHSE violated all three duties imposed by EMTALA because MHSE (1) "failed to provide an appropriate medical screening exam in accordance with customary and usual screening that the hospital would provide to a similarly situated patient" (Second Am. Complt. ¶ 4.3); (2) failed to stabilize an alleged emergency medical condition of which it had actual knowledge (Second Am. Complt. ¶ 4.4.1); and (3) "failed to coordinate the transfer in an appropriate and timely manner." (Second Am. Complt. ¶ 4.5).[1] The essence of all of these allegations is negligence: negligence in failing to examine the results of the white blood cell differential, negligence in the exercise of clinical judgment which led the physician to believe T. suffered from a viral syndrome and to the decision not to order a chest x-ray or urinalysis, negligence in failing to make the correct diagnosis and to treat the true condition properly, and negligence in the amount of time it took to accomplish the transfer. The real thrust of Plaintiffs' EMTALA lawsuit is not that T. was discriminated against, but that Dr. Haynes misdiagnosed T. on February 12 and MHSE took too long to transfer him on February 13. In an attempt to turn those ordinary negligence claims into an EMTALA cause of action, Plaintiffs framed their negligence allegations as EMTALA claims for disparate treatment in the medical screening exam, failure to stabilize and failure to provide an appropriate transfer. EMTALA violations cannot be manufactured by describing negligent acts in EMTALA language. *See Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139,145 n. 3 (4th Cir. 1996) ("[M]echanical invocation of the phrase "disparate treatment" does not convert appellant's allegations of misdiagnosis into a valid claim under EMTALA....").

---

[1] These contentions will be referred to as the screening claim, the stabilization claim and the transfer claim, respectively.

6

EMTALA certainly does not create a cause of action for negligent diagnosis or treatment by a physician: "a treating physician's failure to appreciate the extent of the patient's injury or illness, *as well as a subsequent failure to order an additional diagnostic procedure*, may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening." *Marshall,* 134 F.3d at 323 (emphasis added)(citing *Vickers* @78 F.3d at 143-44); *see also Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991); *Summers v. Baptist Medical Ctr. Arkadelphia*, 91 F.3d 1132, 1139 (8th Cir. 1996); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995); *Repp v. Anadarko Mun. Hosp.* 43 F.3d 519, 522 (10th cir. 1994); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994). Summary judgment should be granted on Plaintiffs' EMTALA claims because at the core they allege negligence that cannot support an EMTALA claim. *See, Marshall*, 134 F.3d at 323.

Because EMTALA does not create a cause of action for negligence, a plaintiff must show "[s]omething more or different than negligence" to state an EMTALA claim, "but what is that something?" *Summers*, 91 F.3d at 1138; *see also Marshall*, 134 F.3d at 323; *Gatewood*, 933 F.2d at 1041. Many circuits, including the Fifth Circuit, have required the plaintiff to show differential or "disparate treatment" as proof of discriminatory treatment that violates EMTALA. *See Summers,* 91 F.3d at 1138. (EMTALA requires showing of lack of uniform treatment or disparate impact); *Marshall*, 134 F.3d at 323 (EMTALA requires showing that hospital treated plaintiff differently); *Vickers*, 78 F.3d at 144 (EMTALA requires showing of disparate treatment). The term "disparate treatment" has been well defined in the employment context as "differential treatment...on the basis of race, color, religion, sex, national origin, handicap or veteran's status." *See* BLACK'S LAW DICTIONARY 470 (6th ed. 1990). Despite the Plaintiffs' arguments to the contrary, "disparate treatment" does not mean simply different treatment.

*Summers*, 91 F.3d at 1138 (something more than different or negligent treatment must be proved to support an ETMALA violation). If merely different treatment sufficed to state an EMTALA claim, every negligence case, every misdiagnosis case and every case in which any policy or procedure was not followed to the "T" could be prosecuted under EMTALA. *See Summers*, 91 F.3d at 1138 (Medical negligence cannot form the basis of a disparate treatment allegation because "[i]t would almost always be possible to characterize negligence in the screening process as non-uniform treatment..."). Allowing merely different, as opposed to discriminatory, treatment to violate EMTALA completely precludes a physician from exercising her judgment. For example, if two patients complained of vomiting, but the physician, in her clinical judgment, believed that one had the flu while the other had an intestinal blockage, the prohibition on different treatment advocated by the Plaintiffs would require the physician to perform the same diagnostic tests on both patients. EMTALA imposes a limited screening requirement not an obligation to perform the same diagnostic workup on every patient complaining of vomiting.

EMTALA does not prohibit differential treatment that results from negligence or an error in medical judgment. *Id.* In *Summers*, the patient complained of snapping and popping noises in his chest after a fall from a significant height. The plaintiff did not receive a chest x-ray, despite the hospital's own admission that patients complaining of those symptoms usually would be given a chest x-ray. *Id.* at 1138. The plaintiff argued that he had met the disparate treatment requirement because the hospital admitted that he was treated differently than other patients exhibiting his same symptoms. The Eighth Circuit held the allegations could not support a disparate treatment claim:

> The important point for us is that the very respect in which the plaintiff's screening is said to be non-uniform--failure to order a chest x-ray for a patient complaining of popping noises in his chest--is nothing more than an accusation of negligence. ...This may have been medical malpractice, but if it is also an

EMTALA violation, that statute has been converted into a federal cause of action for a vast range of claims of medical negligence. It would almost always be possible to characterize negligence in the screening process as non-uniform treatment, because any hospital's screening process will presumably include a non-negligent response to symptoms or complaints presented by a patient.

*Summers*, 91 F.3d at 1138-39.

While evidence of a failure to follow hospital screening procedures that does not result from negligent or faulty screening could constitute evidence of disparate or discriminatory treatment, the only factual scenario in which the Fifth Circuit has held that a deviation from a written policy created a disputed issue of fact regarding disparate treatment was one that included other evidence of discrimination, namely that the patient "was Black, poor, uninsured and presented at the emergency room during the Christmas holidays." *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 558 (5th Cir. 2000). Absent evidence of patient dumping, discrimination, a refusal to treat, or a material departure from hospital screening policies that is not the result of negligence or the exercise of medical judgment, negligence allegations cannot support an EMTALA claim. *See, Id.*; *Marshall*, 134 F.3d at 323; *Vickers*, 78 F.3d at 142-143; *Baber*, 977 F.2d at 880-881; *Summers*, 91 F.3d at 1139. If the essence of the EMTALA allegations criticizes a failure to properly diagnose the patient's condition, those allegations, no matter whether they are artfully framed as EMTALA allegations, cannot support an EMTALA cause of action. *See, Id.* Allowing a misdiagnosis to support an EMTALA disparate screening exam claim "would obliterate any distinction between claims of malpractice under state law and actions under EMTALA." *Vickers*, 78 F.3d at 143.

> **B.    SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL THE SCREENING CLAIMS BECAUSE THE DISPARATE TREATMENT ALLEGATIONS ASSERT NEGLIGENCE OR ARE IMMATERIAL TO WHETHER AN EMERGENCY MEDICAL CONDITION EXISTED**

Plaintiffs contend the hospital failed to provide an appropriate medical screening exam because T. was treated disparately. Plaintiffs argue all of the following conduct constitutes discriminatory or disparate treatment:

- Failure to review all laboratory information before discharge (Second Am. Complt., ¶ 4.3.5);

- Failure to rule out a bacterial source of infection or administer antibiotics before discharge (Second Am. Complt., ¶ 4.3.6,);

- Failure to follow the nausea/vomiting protocol contained in the "Triage Guidelines" which requires "the patient to be treated with fever protocol, and to have a saline lock initiated, a CBC performed, and a BMP performed ... and a voided urinalysis performed" (Second Am. Complt., ¶¶ 4.3.1);

- Failure to follow the hospital aftercare and follow up policy (Second Am. Complt., ¶ 4.3.4); and

- Failure to follow monitoring, reassessment and documentation policies (Second Am. Complt., ¶¶ 4.3.2-4.3.3).

These allegations of disparate treatment really assert negligence and cannot support an EMTALA claim. In addition, many of the alleged violations criticize the care rendered after the determination of the presence or absence of an emergency medical condition and therefore are completely immaterial to the medical screening exam. Because the alleged policy violations are immaterial to the determination of the existence of an emergency medical condition manifested by acute and severe symptoms, they do not present a material issue of disputed fact that precludes summary judgment on the medical screening claim. *See Feigherey v. York Hospital,* 59 F.Supp.2d 96, 106 n. 10 (D. Maine 1999).

> **(1) Summary judgment should be granted on the claims for failure to review the white cell differential results and for discharge without ruling out a bacterial infection because they assert only negligent, not discriminatory care.**

EMTALA's screening obligation requires only that the hospital provide an appropriate medical screening exam to determine whether or not an emergency medical condition exists. 42 U.S.C.A. § 1395dd(a). An "emergency medical condition" is defined as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual ... in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part....

42 U.S.C. § 1395dd(e)(1)(A). Thus, EMTALA only requires hospitals to provide an appropriate medical screening exam that uncovers medical conditions manifested by acute and severe symptoms. *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1256 (9th Cir. 2001). (The "touchstone" for whether a screening provided to a patient is appropriate is "whether the procedure is designed to identify an emergency medical condition that is manifested by acute and severe symptoms."). This Court has previously found that Dr. Haynes performed an examination and found no emergency medical condition manifested by acute and severe symptoms existed:

> Dr. Haynes took a history and did a physical examination, which revealed fever, nausea, vomiting, cough, and abdominal pain. Dr. Haynes concluded the child was not in acute distress. He had no difficulty in breathing had normal blood gases, and had stopped vomiting. Nothing in the history, examination, and the CBC (absent the band count) showed that the absence of immediate additional medical treatment would put the patient's health in 'serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or party.' The symptoms presented were typical of patients with a routine viral syndrome or routine bacterial infection. ...The information received from the history, the interview, and the examination did not lead Dr. Haynes to believe that the child was suffering from an emergency medical condition.

(Docket Entry No. 92, Memorandum & Opinion, March 23, 2009, at 16-17).

When Dr. Haynes performed the medical screening exam on T. to determine the existence of an emergency medical condition manifested by acute and severe symptoms, EMTALA required him to perform the same type of screening exam on T. as he would on a patient he believed to be "similarly situated" or to have the same condition. *See Hunt ex rel*

*Hunt v. Lincoln County Memorial Hosp.*, 317 F.3d 891, 894 (8th Cir. 2003)("The emergency-room physician is required by EMTALA to screen and treat the patient for those conditions the physician perceives the patient to have.")(citing *Summers*, 91 F.3d at 1139). It is undisputed that Dr. Haynes perceived T. at all times to be suffering from a viral syndrome:

> A:     I basically...felt that he was a viral syndrome. He appeared a little dehydrated because he had been throwing up. His heart rate was—a little fast. I wasn't sure if that was from the albuterol that his mother had given him because that can increase your heart rate. Or if that was just—it might be a sign of early dehydration. So I thought we'd administer some IV fluid to him and then make sure he could take fluids by mouth. And so part of the drawing blood work, we'll—we'll, you know, send the CBC and a—and a BMP to just evaluate his hydration status and—and kind of just look at his white cell count to see if it's really high or really low.
>
> Q:     Okay. And consequently, you were thinking from your initial patient encounter before you got any lab work at all back it was probably viral.
>
> A:     Correct.

(Haynes depo., p. 93:20 – p. 94:22). There is no evidence that Dr. Haynes provided a medical screening exam for T. that differed from the medical screening exam he would perform on any other patient he perceived to have a viral syndrome. Dr. Haynes testified that he did not treat T. any differently than he would have treated any other patient with similar symptoms. (Haynes depo., p. 146:5-7). Dr. Haynes also testified that he has no set routine as to whether he reviews all lab results before discharging patients and whether he reviews lab results before discharging a patient varies on a case by case basis. (Haynes depo., p. 153:4-14; p. 155:21-156:6; p. 159: 10-21).

The allegation that T. received disparate treatment because he was discharged without ruling out a possible bacterial infection (because Dr. Haynes failed to review the white cell differential) and without receiving antibiotics ignores the undisputed fact that Dr. Haynes perceived and diagnosed T. as having a viral syndrome. The *Vickers* court aptly described the logical flaw in the Plaintiffs' argument that a physician's failure to discover or test for the

condition the patient suffered from can be re-cast as a claim of disparate treatment in the medical screening exam:

> The flaw in this reasoning is its failure to take the actual diagnosis as a given. EMTALA is implicated only when individuals who are *perceived* to have the same condition receive disparate treatment; it is not implicated whenever individuals who turn out *in fact* to have had the same condition receive disparate treatment. The Act would otherwise become indistinguishable from state malpractice law. As a result, when an exercise in medical judgment produces a given diagnosis, the decision to prescribe a treatment responding to the diagnosis cannot form the basis of an EMTALA claim of inappropriate screening.

*Vickers*, 78 F.3d at 144 (citations omitted). Like the plaintiff in *Vickers*, Plaintiffs fail to take Dr. Haynes's perception that T. suffered from a viral syndrome as a given and ignore the basic principle that a negligent diagnosis is within the exclusive province of medical malpractice law. *See Id.* at 143. Like the plaintiff in *Vickers*, Plaintiffs in hindsight assume that Dr. Haynes should have reviewed the white cell differential, diagnosed T. as having pneumonia, and then treated him for pneumonia. Like the *Vickers* case, the allegations in this case center on Dr. Haynes' medical judgment and cannot form the basis of an EMTALA claim. *See Vickers*, 78 F.3d at 144 (EMTALA claims dismissed because the failure to order testing for intracranial injury was the exercise of medical judgment).

The failure to review the white cell differential does not violate EMTALA either. *See Bergwall v. MGH Services, Inc.,* 243 F.Sup.2d 364, 371 (D.Md. 2002)(Allegations that failure to perform ancillary diagnostic procedures and failure to inform physicians of test results could not support an EMTALA claim). When viewed through the prism of Dr. Haynes's perception, as EMTALA requires, his confidence in discharging T. without referring to the white cell differential subtest, (when the total white blood cell count was normal), may have been premature or negligent, but certainly wasn't discriminatory. *See Garret v. Detroit Medical Center,* 2007 WL 789023 (E.D. Mich.) *1, 3, 6 (No EMTALA claim even though physician

decided to transfer patient before lab tests were completed). There is no evidence that the white cell differential was needed to determine the presence or absence of an emergency medical condition. Like the claims of failure to perform and review the appropriate test in *Bergwall,* the failure to review the white cell differential or to perform other tests questions the "quality of the care rendered and thus falls outside EMTALA's scope." *Bergwall,* 243 F.Supp.2d at 371 ("Any further inquiry into the [routine tests that were ordered but not performed or the results of which were not communicated] would go to the quality of care rendered ant thus fall outside EMTALA's scope."). At most, Dr. Haynes can be charged with negligence in diagnosing and treating T. *See Id.* ("The short of the matter is that [the] alleged failure to diagnose cannot form the basis of an EMTALA claim."). Therefore, MHSE is entitled to summary judgment on these allegations. *See Bauman v. Tenet Healthsystem Hospitals, Inc.,* 2002 WL 58486, *5 (E.D. La.) (Hospital entitled to summary judgment where treating physician testified that she gave same screening exam she would have offered another patient in a similar condition with similar symptoms) (citing *Marshall v. East Carroll Parish Hosp.,* 134 F.3d 319, 323 (5th Cir. 1998)).

> **(2)    Summary judgment should be granted on the claim of disparate treatment for failure to follow Nursing Triage Guidelines because: (a) no evidence demonstrates the Guidelines are the hospital's medical screening policy, or that the medical screening exam materially failed to comply with the Triage Guidelines; (b) the allegation merely asserts a negligence claim; and (c) MHSE complied with its actual medical screening policy.**

> > **(a)    No evidence demonstrates the Triage Guidelines are a medical screening procedure or that the screening exam *materially* failed to comply with the Triage Guidelines.**

Plaintiffs contend MHSE provided an inappropriate medical screening exam because it treated T. disparately by failing to follow "Emergency Center Triage Guidelines" (Second Am. Complt., ¶ 4.3.1). The Triage Guidelines are not a mandatory hospital screening procedure, but

rather, are protocols developed to expedite patient flow when there will be a delay before the patient is seen by the physician.[2] (McCrumb depo., p. 45-46:1; McCrumb depo., pp. 42, 45-46, 49:20-23). The Triage Guidelines themselves explicitly state that they were developed to expedite patient flow. (MHSE-TG-0287). The Triage Guidelines were not implemented and are inapplicable in this case because there was no delay for Dr. Haynes to see T. on February 12, 2006. T. was triaged at 7:42 and seen by Dr. Haynes at 8:00. (MHSE-013; MHSE-09).

The Triage Guidelines allow a nurse, when there will be a delay to see the physician, to exercise his own judgment to initiate certain procedures or give certain medications to a child between ages 2 months to 18 years complaining of nausea and vomiting. (McCrumb depo., 45:1-46:1) If there had been a delay to see the physician, the nurse could have taken the following steps: If, in his judgment, T. appeared toxic, to be suffering from dehydration, or had abnormal vital signs, he should have notified the physician. (MHSE-TG-0288). He could not have implemented the protocol for pediatric fever, because T. did not present with a fever and the protocol applies to fevers of 101° F or higher.[3] (MHSE-TG-0288). In the event there had been a delay, he could have exercised his judgment as to whether to order tests allowed by the protocol--a saline lock, CBC and BMP (the nurse must in his judgment believe the patient to be significantly dehydrated to implement these measures) and voided urinalysis. The only

---

[2] Q:  And is the idea that if the physician is tied up and can't come see the patient right away, that the nurse can initiate the required work-up so that the data will be there as soon as possible for the physician to review to make his judgments and diagnosis about the patient?

A:  Based on that nurse's clinical judgment, if they feel that they should initiate the protocols, yes, they are there for the nurse to do so. . . . I have initiated protocols on abdominal pain patients, on patients complaining of shortness of breath, on patients-pregnant patients with vaginal bleeding. Those are the primary ones that we obtain protocols on.

Q:  Stroke patients?

A:  Stroke patients, yes, sir.

(McCrumb depo., p. 45-46:1).

[3] The pediatric fever protocol did not apply to T. because he did not present with fever and his mother reported only subjective fever, without any evidence of a documented fever. (Haynes depo., p. 92:19- p. 93:5).

treatment authorized by the nausea vomiting protocol of the Triage Guidelines that T. did not receive is a voided urinalysis. (MHSE-TG-0288).

Plaintiffs' contention that Dr. Haynes treated T. disparately by failing to order a urinalysis does not allege a viable screening claim because it "ignores the distinction between the initial screening examination designed to determine the presence or absence of an emergency medical condition, the focus of EMTALA, and the correctness of [the further evaluation and treatment] that follows from the screening." *Vickers,* 78 F.3d at 143; *Bergwall* at 373(Tests on preprinted "Routine Cardiac Order" were irrelevant to medical screening exam claim because the routine orders were not part of ERs screening procedure and were ordered once an emergent condition was determined to exist, not during medical screening.) By 8:30 a.m., Dr. Haynes had performed a medical screening exam, found T. to be stable (not suffering from an emergency medical condition), and believed him to be suffering from a viral syndrome. (Haynes depo., p. 93:20 - p. 94:22; p. 91:1-5). That initial medical screening exam was complete by 8:45 a.m. (MHSE-0014). Dr. Haynes did not perceive T. to demonstrate any signs of a urinary tract infection and therefore, in the exercise of his medical judgment, did not order a urinalysis. (Haynes depo., p. 111:8-9). However, he did, as part of the further evaluation and treatment he provided after the initial screening exam, order a CBC, BMP and the administration of IV fluids. Any negligent conduct by Dr. Haynes occurred during further evaluation and treatment and not when he was performing a medical screening exam to determine whether T. suffered from an emergent condition. *See, Bergwall*, 243 F.Supp.2d at 373. The allegation of disparate treatment for failure to order a urinalysis ignores the distinction between a medical screening exam, as opposed to diagnosis and treatment, and that Dr. Haynes determined by 8:30 a.m. that T. did not suffer from an emergency medical condition. (Haynes depo., p. 91:15: 93:20 – 94:22).

Even if the nursing Triage Guidelines could be considered a hospital screening procedure by which the screening exam should be measured, the hospital "followed the essential elements" of the Triage Guidelines (MHSE-TG-288-89) by performing a saline lock, CBC and BMP. *See Feighery*, 59 F.Supp.2d at 108. Dr. Haynes testified that T. did not have any symptoms consistent with a urinary tract infection and that he did not intend to include UTI as part of the differential diagnosis, but intended to include URI, or upper respiratory tract infection. (Haynes depo., p. 111:3-12). Dr. Haynes's failure to perform a urinalysis resulted from the exercise of his clinical judgment that T. did not suffer from a urinary tract infection, not from discriminatory treatment.[4]

A voided urinalysis is not material to determining the presence or absence of an emergency medical condition and is therefore immaterial to the medical screening claim. Dr. Haynes determined T.'s stability, or the absence of an emergency medical condition, by taking a history, performing a physical exam, and assessing T.'s vital signs and clinical appearance. (Haynes depo., p. 96:14–97:5). This Court has already found Dr. Haynes did not perceive T. to have an emergency medical condition. (Docket Entry No. 92, Memorandum and Opinion, March 23, 2009 p. 16-17). T. did not present acute and severe symptoms of a urinary tract infection that would require a physician to perform a urinalysis as part of a medical screening exam. There is no evidence that the failure to perform a urinalysis, when in the physician's judgment the patient did not display any symptoms, much less acute and severe symptoms, of a urinary tract infection, constitutes disparate treatment that can support an EMTALA claim. Thus, MHSE is entitled to summary judgment on the medical screening claim. *See Feighery,* 59

---

[4]   In fact, there is no evidence that T. did suffer from a urinary tract infection.

F.Supp.2d at 108. (granting summary judgment on EMTALA claims where physician followed the essential elements of the screening procedures); *Vickers*, 78 F.3d at (dismissing EMTALA claims because decisions based on medical judgment fall outside EMTALA).

### (b) Failure to perform a voided urinalysis is a negligence claim

Like the Plaintiffs' other allegations, the allegation that the failure to perform a voided urinalysis violated EMTALA at best poses a negligence issue. Even if T. had suffered from a urinary tract infection, the failure to order the urinalysis cannot support a claim for inappropriate screening under ETMALA. "[A] treating physician's failure to appreciate the extent of the patient's injury or illness as well as a subsequent failure to order an additional diagnostic procedure may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening." *Marshall,* 134 F.3d at 323 (citing *Summers*, 91 F.3d at 1138-39 ("faulty screening does not violate EMTALA".) and *Vickers*, 78 F.3d at 143-44 (EMTALA "does not impose any duty on a hospital requiring that the screening result in a correct diagnosis")).

### (c) MHSE Complied With Its Actual Medical Screening Policy

While the Triage Guidelines do not represent MHSE's medical screening policy, MHSE does have a medical screening policy entitled "Medical Screening Criteria To Timely Identify Patients Not Presenting With An Emergency Medical Condition." (MHSE-TG-0139). The policy states "the criteria are to be used as a guideline for screening purposes for non-physician medical personnel authorized to perform a Medical Screening Exam" or MSE. (MHSE-TG-0139 at ¶ 1.1.1) These medical screening guidelines represent a single screening procedure designed to identify the *absence* of critical conditions so that those patients can be "screened out" as not having an emergency medical condition, a procedure which is consistent with

EMTALA. *See Baber* at 879 n. 6 ("[A] hospital may develop one general procedure for screening all patients..."). The screening procedures are material to determining the absence of an emergency medical condition as required by EMTALA and set forth vital sign categories to delineate between patients that do not have an emergency medical condition and patients that might have an emergency medical condition. The screening policy also describes the required content of a screening exam performed by a non-physician. (Flanagan depo., p. 91:17-92:16) While these medical screening guidelines do not apply to physicians because Texas law prohibits a hospital from practicing medicine, they do represent the hospital's medical screening policy for "screening out" patients that are presumed not to have an emergency medical condition, and the elements of a screening exam to be performed by a physician assistant or nurse practitioner. (Flanagan depo., p. 95:2-9). Any patients that are not "screened out" are "screened in" and seen by a physician for a medical screening exam. (Flanagan depo., p. 15:9-25, pp. 19-21). No hospital policy requires that certain patients or symptoms be given certain exams or laboratory tests. *Id.*

At triage, T. had a heart rate of 145 and was categorized as "Level 2-emergent" in accordance with the MHSE triage policy for a patient under age 8 with a heart rate of greater than 140. (MHSE-TG-0119;MHSE-07; MHSE-013; Ganz depo., pp. 25-30). Based on his heart rate, T. was "screened in," in accordance with the MHSE medical screening policy as needing to be seen and given a medical screening exam by a physician. (MHSE-TG-0141 §3.3.3; Flanagan depo., pp. 79-81). Although written for non-physicians and not binding on Dr. Haynes, the medical screening policy evidences a routine medical screening exam at Memorial Hermann emergency rooms. (Flanagan depo., p. 91:17-92:16). The policy states that a medical screening exam consists of an assessment of the chief complaint, the patient's history, vital signs, mental

status, skin, ability to walk, a focused physical exam of the appropriate organ system, such as the gastrointestinal system for complaints of nausea and vomiting, and general appearance. (MHSE-TG-0140). It is undisputed that the medical screening exam performed by Dr. Haynes addressed these items. In addition, T. was processed exactly as any other patient presenting to a Memorial Hermann Emergency rooms. According to Tom Flanagan, Director of Emergency Services for the Memorial Hermann Hospital System in 2006,

> [A]ll of our patients follow the same process. ...They come to triage, they are triaged and sorted. They are acuitized. And based upon that, whether they are screened in or they're screened out—if they're screened in and they're in a room, the nurse comes in and does an assessment, the doctor comes in and does an exam. Based upon the physician orders, those orders are carried out. Based upon the results of those orders, the decision is made whether to admit or discharge. And then based on those orders, the nurse follows through and either discharges them out with instructions or admits them up into the house."

(Flanagan depo., pp. 93-94).

There is no gross failure to comply with hospital screening procedures as there was in *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1193 (1st Cir. 1995). In that case, the hospital's failure to comply with its own policy to create a medical record and document the patient's vital signs and refer critical patients to a physician immediately reflected a failure to comply with its policy that rose to the level of discrimination or disparate treatment. *Id.* If T. had not been triaged properly, or seen a physician within a reasonable time, or had any vital signs or examinations documented, those failures to comply with MHSE's medical screening or triage policies could represent an EMTALA violation. *See Id.* That's not what happened here. Dr. Haynes completed his medical screening exam by 8:45 a.m., before any of the laboratory test results were available, and found T. to be stable. (MHSE-014; Haynes depo., p. 91:1-5). Whether Dr. Haynes reviewed the results of the white cell differential is not material to the screening claim because neither Dr. Haynes, Dr. Siddiqi, nor any MHSE policy, includes a white

cell differential test as part of the medical screening exam. (Haynes depo., p. 151:9-18; Siddiqi depo., p. 158:22–p. 160:25). MHSE is entitled to summary judgment on the screening claim because absolutely no evidence shows that MHSE failed to comply with its screening policy. *See, Hutchinson v. Greater Southeast Community Hospital*, 793 F.Supp. 6, 10 (D.D.C. 1992)(granting summary judgment where general screen in and screen out policy was followed and no screening policy requiring specific diagnostic tests existed.)

> **(3)** **Summary judgment should be granted on the claim of disparate treatment for failure to follow the after care policy because there is no evidence the policy is material to the determination of an emergency medical condition or that the policy was not followed**

Plaintiffs make a preposterous argument that T. was treated disparately because the aftercare and follow up policy was not followed (Second Am. Complt., ¶ 4.3.4). This contention further evidences Plaintiffs' attempts to bootstrap a failure to diagnose claim into an EMTALA claim. The aftercare and follow up policy is not material to the EMTALA screening claim. *See Feighery v. York Hosp.*, 59 F.Supp.2d at 106 n. 10 (policies that are not used to determine whether a patient suffers from an emergency medical condition are not material to a screening claim and cannot support an EMTALA claim). The aftercare and follow up policy applies when "the physician determines a need for change in follow up care and treatment in regards to final diagnostic results (to include culture and x-ray reports) after the patient has been discharged." (MHSE-TG-0303-305). There is no evidence Dr. Haynes ever determined a need for change in follow up care and treatment. According to the plain language of the policy, the only laboratory results that are reviewed for follow up are "culture/sensitivity results," which take 24 to 72 hours to obtain, and "next day confirmed" readings of radiology tests in which the radiologist makes recommended follow up. (MHSE-TG-304). Neither of those situations occurred in this case.

The testimony of Nurse Ganz and Nurse McCrumb erases any doubt as to whether this policy applied to the facts of this case. Nurse Ganz testified that the hospital reviews only lab results it knows require up to three days to complete and will not be available at the time of discharge from the emergency room, such as cultures on blood, urine, or sexually transmitted diseases. (Ganz depo., pp. 69-71)("We just get the results we know there is no possible way the doctor could have seen and show them to a doctor."). Nurse McCrumb testified that she has never been asked to monitor labs on a patient after discharge and that she has never seen a form used in the emergency department for a physician to request a follow up on lab work other than a culture or radiology final read. (McCrumb depo., p. 72:13 – 74:7). This policy simply does not apply to the facts of this case. Plaintiffs' contention that this policy was not complied with and that the failure to comply evidences disparate treatment in a medical screening exam is specious. Plaintiffs cannot create an EMTALA disparate treatment claim simply by picking out hospital policies and procedures, claiming the policies were not followed, and that the failure to follow the policy constitutes disparate treatment. To allow those contentions to support an EMTALA claim is to allow every deviation from any hospital policy to create a cause of action under EMTALA. That was not the intent of the statute. *Marshall*, 134 F.3d at 322.

> **(4)** **Summary judgment should be granted on the disparate treatment claim for the alleged deviation from various policies regarding assessment and documentation because the alleged violations are negligence claims and constitute *de minimus* and irrelevant deviations from hospital policy that cannot support an EMTALA cause of action**

Plaintiffs contend the medical screening exam given T. was discriminatory or disparate because the nurses failed to follow policies and procedures for monitoring and documenting vital signs (Second Am. Complt., ¶ 4.3.2) and for "having vital signs reassessed and monitored every

two hours" (Second Am. Complt., ¶ 4.3.3). Even if these accusations of disparate treatment were not merely negligence allegations masquerading as EMTALA violations, the alleged failure to follow the documentation and assessment policies at most demonstrates *de minimus* policy violations that fail to state a viable EMTALA claim. *See Hoffman v. Tonnemacher*, 425 F. Supp. 1120, 1131 (E.D. Cal. 2006)("[A] *de minimus* deviation from a hospital's standard screening policy is insufficient to establish a violation of EMTALA.")(citing *Repp at 523; Feighery*, 59 F.Supp. 2d at 107 ("The EMTALA's screening requirement 'does not mean that any slight deviation by a hospital from its standard screening policy violates [the statute.] Mere *de minimus* variations do not amount to a violation of hospital policy.'")(quoting *Repp*, 43 F.3d at 523)). In addition, Plaintiffs cannot prove the failure to follow a documentation or reassessment policy caused T.'s injury.[5]

Plaintiffs can present no evidence that the monitoring and documentation of vital signs was materially different from that given to other patients. Tammy McCrumb testified in her deposition that while the written guidelines state that all vital signs should be documented one hour prior to discharge, that does not always happen and that some nurses may only document certain vital signs depending on the patient's complaint.[6] (McCrumb depo., p. 35:4-25).

---

[5] Plaintiffs cannot prove causation as to any of the EMTALA claims.

[6]
Q: What is your understanding of the policy of the emergency department at Memorial Southeast about vital signs prior to discharge?
A: That the guidelines are for them to be taken within one hour of the patient being discharged.
Q: Okay. And what are the guidelines with regard to the documentation of the vital signs? The discharge vital signs?
A: I mean, I would think that they would be documented. But specifically, you know, I mean, most patients are on the monitor and the nurse may not-I mean, they may be taken, but they may not be remembered to-you know, to be documented after the fact.
Q: And when it says to take vital signs, would vital signs include all of those things that are contained under the topic vital signs that we discussed, the time, the blood pressure, the pulse the respiration, the temperature, the pulse ox and the pain?
A: Some nurses may not document or obtain all of the vital signs, you know, dependent upon what the patients are in the emergency for-what they are in the emergency room for, you know based on their complaint.
(McCrumb depo., p. 35:4-25).

T. had no fever when he presented to the emergency room. (Haynes depo., p. 92:18 – p. 93:3). The only vital sign that was out of the normal range for a boy his age was his heart rate. His heart rate was monitored and documented to be within the normal range at 9:48, within one hour of discharge. (MHSE-014).

As for Plaintiffs' contention that the policy for reassessing vital signs every two hours was not followed, the hospital policy states that patients should be reassessed every four hours. (MHSE-TG-0124-26 ¶ 3.3.1). A different hospital policy states that care in the emergency center shall be based on the "Emergency Nurses' Associated Standards of Emergency Nursing Practice" but does not specifically require vital signs to be reassessed every two hours. (MHSE-TG-0127). Nurse McCrumb testified that the "guidelines are roughly every two hours for vital signs to be taken." (McCrumb depo., p. 32:19-22). T. was in the emergency room for approximately two and one-half hours. He was triaged at 7:45, examined by the primary nurse at 7:55, examine by Dr. Haynes at 8:00, and discharged at approximately 10:17. (MHSE-013-14). Failing to document a reassessment under these facts does not demonstrate a material deviation from policy and cannot support an EMTALA claim. Like the other allegations of disparate treatment, this contention attempts to trump up an EMTALA violation where none exists.

In short, the medical screening claim fails as a matter of law. The allegations represent negligence claims and fail to demonstrate materially disparate or discriminatory treatment. *See, Vickers,* 78 F.3d at 143.) Several of the disparate treatment allegations concern violations of policies that are immaterial to the determination of an emergency medical condition or allege only *de minimus* violations of policies. These types of allegations cannot, as a matter of law, support an EMTALA claim and summary judgment should be granted on Plaintiffs' medical screening claim. *See id.; Feighery,* 59 F. Supp. 2d at 107.

**C. THE STABILIZATION CLAIM FAILS AS A MATTER OF LAW BECAUSE DR. HAYNES PERCEIVED T. TO BE STABLE FOR DISCHARGE AND HAD NO DUTY UNDER EMTALA TO STABILIZE CONDITIONS HE FAILED TO DIAGNOSE.**

Plaintiffs' contend that MHSE violated EMTALA's stabilization requirement by failing to further evaluate and treat T.'s infectious condition prior to his discharge from the hospital, including failing to conduct further testing to evaluate for bacterial infection, failure to perform a chest x-ray, failure to perform a urinalysis, and/or failure to administer antibiotics. (Second Am. Complt. ¶4.4-4.4.2). Plaintiffs' stabilization claim fails as a matter of law because it fails to take the actual diagnosis of viral syndrome as a given, and fails to accept Dr. Haynes' undisputed testimony that he believed T. to be stable, and therefore not to have an emergency medical condition, at the time of discharge. *See Vickers*, 78 F.3d at 145 (EMTALA stabilization requirement "takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect.").

EMTALA imposes the duty to stabilize only when the physician diagnoses an emergency medical condition. 42 U.S.C.A. § 1395dd(b)(1)("If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide ... for such further medical examination and such treatment as may be required to stabilize the medical condition...."). "Thus the plain language of the statute dictates a standard requiring actual knowledge of the emergency medical condition by the hospital staff." *Baber v. Hospital Corp. of America*, 977 F.2d 872, 883 (4th Cir. 1992) (citations omitted). MHSE cannot be held liable for a failure to stabilize a condition that Dr. Haynes did not diagnose. *See Marshall,* 134 F.3d at 324-25, (Duty to stabilize does not arise until patient's condition is detected); *Battle*, 228 F.3d at 558 (no duty to stabilize arises unless the hospital has actual knowledge of an unstabilized medical emergency); *Vickers*, 78 F.3d at 145 (EMTALA does not

hold a hospital liable for failing to stabilize a condition the physician did not perceive.); *Dollard v. Allen*, 260 F.Supp. 1127 (D.Wyo. 2003) (no duty to stabilize emergency neurologic disorder that physician failed to diagnose). EMTALA imposes a duty to stabilize only the condition Dr. Haynes diagnosed, not a condition hindsight reveals T. actually had. *See Hoffman*, 425 F.Supp. at 1131-32 ("The duty to stabilize is determined in reference to diagnosis, not in hindsight for what [the patient] turned out to have.")

It is undisputed that Dr. Haynes diagnosed a viral syndrome. (MHSE-018; Second Am. Complt. ¶ 3, p. 4). This Court has previously found "that Dr. Haynes did not believe T. was suffering from an emergency medical condition." (Docket Entry No. 92, Memorandum and Opinion, March 23, 2009 p. 16-17). It is also undisputed that Dr. Haynes treated and stabilized the viral syndrome he diagnosed. For example, he believed that T.'s initial elevated heart rate was either the result of having been given an albuterol inhaler treatment by his mother prior to coming to the emergency room or the result of slight dehydration from having vomited several times during the preceding night. (Haynes depo., p. 94:4-17). To treat T.'s elevated heart rate, Dr. Haynes ordered intravenous or IV fluids. (*Id.;* MHSE-011.) By 9:48 Tristan's pulse or heart rate had decreased from 145 to 105-110, a normal range. (MHSE-014). Dr. Haynes re-assessed T. at 10:13 and based on the entire clinical scenario, including his diagnosis of viral syndrome, Dr. Haynes believed that T. was stable for discharge. (MHSE-010; Response To Request for Admissions Nos. 1-2; MHSE-014; Haynes depo., p. 20:3-10; p. 148:7-13)

Plaintiffs have presented no evidence that T. was unstable, in relation to a diagnosis of viral syndrome, at the time of discharge or that Dr. Haynes knew he had an emergency medical condition at the time of discharge. Therefore, summary judgment on the Plaintiffs' stabilization claim is appropriate. *See Hoffman*, 425 F.Supp.2d at 1142 ("Because [plaintiff] has not

presented evidence that, at the time of discharge, [he] was unstable in relation to a diagnosis of

likely viral bronchitis, or that [the physician] had actual knowledge or actual detection of an

emergency medical condition, summary judgment in favor of [defendant] on the stabilization

claim is appropriate."). "Whether in fact [T.] was suffering from an emergency medical

condition" at the time of discharge "is irrelevant to the stabilization claim." *See Harris v.*

*Health & Hosp. Corp.*, 852 F.Supp. 701, 702 (S.D. Ind. 1994).

In an attempt to manufacture a stabilization claim, Plaintiffs contend Dr. Haynes's

knowledge of T.'s *symptoms* and the hospital laboratory's knowledge of the results of the white

blood cell differential test are imputed to the hospital to create actual knowledge by the hospital

of an emergency medical condition different from that diagnosed by Dr. Haynes. (Second Am.

Complt. ¶4.4.1) While clever, this argument must fail: it is no different from claims that a duty

to stabilize existed when the true medical condition is apparent but missed by the physician.[7]

The Ninth Circuit held that a lung abscess that appeared on an x-ray but was missed by the

physician could not support a failure to stabilize claim. *See Bryant v. Adventist Health*

*System/West*, 289 F.3d 1162, 1166-67 (9th Cir. 2002). In *Hoffman v. Tonnemacher* the court

granted summary judgment on the plaintiff's stabilization claim because, even though the

physician missed the emergency medical condition and diagnosed a viral infection, he treated

and stabilized the only condition he diagnosed. *See, Hoffman*, 425 F.Supp.2d at 1140. In this

case as in *Hoffman*, even if Plaintiffs could prove "[t]hat [Dr. Haynes] suspected pneumonia, that

he could not rule out a bacterial process, or that he should have assumed a bacterial process,"

---

[7] Furthermore, for EMTALA purposes, MHSE can act only through its *medical staff*. The laboratory 's knowledge of a particular test result is irrelevant since lab technicians do not examine the patient, do not interpret test results and do not diagnose patients. (See Dalmeida depo., p. 36:18- p. 37:12; p. 5:16-20). The physicians and qualified medical providers (physician assistants and nurse practitioners) are the medical staff and must have actual knowledge of the patient's condition before the duty to stabilize the condition arises. *See Bryant*, 289 F.3d at 1166-67 ("If the hospital's *medical staff* determines that there is an emergency medical condition, then, ...the staff must stabilize the patient...")(emphasis added).

that evidence would not prove actual knowledge of those conditions sufficient to support an EMTALA claim. *See id.* Whether Dr. Haynes *should have known* of the potential bacterial infection because he knew he had not reviewed the results of the white blood cell differential test, as opposed to what he *did know,* is a negligence issue. *See Bryant,* 289 F.3d at, 1166-67 (Plaintiff's claim that physician should have known of abscess because it was evident on x-ray was a negligence claim and not relevant to EMTALA); *Hoffman,* 425 F.Supp.2d at 1142 (Actual detection of the condition is required for a stabilization claim, and no stabilization claim could be made despite physician's testimony that he diagnosed viral bronchitis but could not rule out a bacterial illness); *Harris,* 852 F.Supp. at 704 (EMTALA is concerned only with the subjective standard of what the physician determined the patient's condition to be).

EMTALA is not concerned with whether knowledge can be imputed to Dr. Haynes because he *could have* obtained the information absent negligence, but only about what Dr. Haynes *actually knew.* No evidence demonstrates that Dr. Haynes perceived T. to have a bacterial infection or pneumonia. Thus, the stabilization claim is outside the scope of EMTALA and summary judgment should be granted. *See Bryant,* 289 F.3d at 1166. (affirming summary judgment on EMTALA stabilization claim where it was undisputed that physician did not detect patient's true condition before discharge); *Marshall,* 134 F.3d at 324 (citing cases for the proposition that EMTALA does not impose a duty to stabilize a condition of which the physician is unaware).

D. **THE TRANSFER CLAIM FAILS AS A MATTER OF LAW BECAUSE IT PRESENTS NOTHING MORE THAN A NEGLIGENCE CLAIM AND NO EVIDENCE DEMONSTRATES A VIOLATION OF EMTALA**

Plaintiffs contend MHSE violated EMTALA by failing to coordinate the transfer of T. from MHSE to Children's Memorial Hermann Hospital in an appropriate and timely manner which resulted in an extensive delay, and in turn, caused damage to T. (Second Am. Complt. ¶¶4.5-4.6). Yet again, Plaintiffs attempt to disguise a negligence cause of action as an EMTALA violation. An EMTALA appropriate transfer requires:

(A) The transferring hospital to provide medical treatment within its capacity which minimizes risks to patient's health;

(B) The receiving facility to agree to transfer, to agree to provide appropriate treatment, to have available space, and qualified personnel to treat patient;

(C) The transferring hospital to send all medical records; and

(D) The transfer to be effectuated through qualified personnel and transportation equipment.

42 U.S.C. §1395dd(c)(2). EMTALA imposes no duty to complete a transfer within a certain period of time. There is no basis for any claim of inappropriate transfer in this case.

The pleadings do not allege a failure to provide care, a refusal by the receiving hospital to accept the transfer or to provide appropriate treatment, failure to send the medical records, or the failure to perform the transfer without qualified personnel and equipment. (Second Am. Complt.). In fact, the evidence demonstrates the transfer met the requirements imposed by EMTALA under section 1395dd(c)(2). First, Dr. Siddiqi rendered medical treatment to minimize risks to T.'s health. For example, after initiating the transfer at 11:20, (MHSE-046) Dr. Siddiqi ordered antibiotics and fluids that were administered to T. (MHSE-047). Furthermore, Dr. Sidiqqi intubated T. when his respiratory status declined while awaiting transfer. (MHSE-045). The medical record demonstrates care T. received to treat his condition, to protect his airway, to treat his pain, his nausea, and to hydrate him. (MHSE-031-51). There is

no evidence that Dr. Siddiqi and MHSE failed to provide stabilizing treatment while waiting for the transfer.

The transfer was delayed in order to ensure the appropriate personnel and equipment for transport as *required* by EMTALA. (McCrumb depo., p. 89:24–p. 99:5). Dr. Siddiqi initiated the initial transfer at approximately 11:20 a.m. on February 13 and the transfer was accepted at 12:27 (MHSE-046). At 13:05, when the Memorandum of Transfer was initiated, T. was to be transferred to a regular floor bed at Children's Memorial Hermann and the mode of transport was AMR, a regular ambulance. (MHLF-009; McCrumb depo., p. 90:1-7, p. 93:22-24). However, once T. was intubated, he could no longer be placed in a regular floor bed at the receiving hospital and needed to be placed in a higher level of care, such as a pediatric intensive care unit (PICU) (McCrumb depo., p. 90:5-15). Thus, Dr. Siddiqi contacted the transfer center in order to have Children's Memorial Hermann accept T. into the appropriate level of care. (McCrumb depo., p. 91:12-17; MHLF-06. Dr. Siddiqi and Dr. Erikson spoke, and Dr. Erikson accepted T. into the PICU but needed to make a bed for him. (McCrumb depo., p. 91:14-17, p. 92:15-24; MHLF-06). Dr. Erikson also told Dr. Siddiqi he wanted T. transported by the pediatric transport team which was on its way to Beaumont at that time. (McCrumb depo., p. 93; MHLF-06). The pediatric transport team provides a higher level of care during transport than a standard ambulance crew because the pediatric transport team has more members, including a pediatric critical care nurse, a respiratory therapist, a paramedic and, at times, a physician. (McCrumb depo., p. 93:13-10). Dr. Siddiqi indicated that he was willing to wait for the pediatric transport team. (MHLF-06.) Once T. developed a temperature of 108.2°, which in hindsight was caused by an allergic reaction to the medication used during the intubation, the physicians agreed that he

needed to be transported via Lifeflight helicopter. (MHLF-06). T. was then transported by Lifeflight, the gold standard in medical transport.

Plaintiffs have not alleged a viable transfer claim but only a negligent delay of transfer. Even if the court were willing to allow a negligence claim to masquerade as an EMTALA claim, MHSE is entitled to summary judgment because the transfer complied with all the statutory requirements and Plaintiffs cannot show the delay in transfer caused T.'s injuries. *See,* 42 USC § 1395dd(c)(2).

## 6.    CONCLUSION

MHSE is entitled to summary judgment on Plaintiff's EMTALA claims because:

- The screening claims represent negligent diagnosis allegations, MHSE complied with its medical screening policy, and there is no material evidence of discriminatory or disparate treatment;

- Plaintiffs cannot show MHSE failed to stabilize an emergency medical condition actually diagnosed by Dr. Haynes; and

- Plaintiffs cannot show the transfer requirements of EMTALA were violated.

To allow these claims to support a viable EMTALA cause of action will allow every emergency room negligent diagnosis claim to be re-cast as an EMTALA claim. There is simply none of the kind of disparate treatment the statute intended to prohibit. Therefore MHSE respectfully requests this Court grant this motion for partial summary judgment on Plaintiffs' EMTALA claims.

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

By: *Christine A Bry*

Craig Smyser
State Bar No. 18777575
Federal Bar No. 0848

Christina A. Bryan
State Bar No. 03264000
Federal Bar No. 15042
2300 Bank of America Center
700 Louisiana Street
Houston, Texas 77002
Telephone:   713/221-2300
Facsimile:   713/221-2320
ATTORNEYS FOR DEFENDANT
MEMORIAL HERMANN HOSPITAL SYSTEM
d/b/a MEMORIAL HERMANN SOUTHEAST
HOSPITAL

## CERTIFICATE OF SERVICE

This pleading was served in compliance with the Federal Rules of Civil Procedure on this 9th day of April, 2009.

Christina A. Bryan