IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | §§ | |
| AND AS NEXT FRIEND OF TRISTAN | §§ | |
| GUZMAN, A MINOR, PLAINTIFF | §§ | |
| | §§ | NO. 4:07-CV-03973 |
| V. | §§ | (JURY DEMANDED) |
| | §§ | |
| MEMORIAL HERMANN HOSPITAL | §§ | |
| SYSTEM D/B/A MEMORIAL HERMANN | §§ | |
| SOUTHEAST HOSPITAL, DEFENDANT | §§ | |

PLAINTIFFS' RESPONSE TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF DEFENDANT,
MEMORIAL HERMANN HOSPITAL SYSTEM, D/B/A
<u>MEMORIAL HERMANN SOUTHEAST HOSPITAL</u>

<u>RESPECTFULLY SUBMITTED</u>

/s/ Phillip A. Pfeifer

<u>Phillip A. Pfeifer</u>
Phillip A. Pfeifer, PC
5216 Jackson St.
Houston, TX 77004
SBOT No. 15883200
Fed. ID No. 2005
713.528.7700 (voice)
1.866.616.6888 (fax)
Attorney for Plaintiff(s)

# TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.    The facts based on the medical record and testimony of health care witnesses. . . 2
        B.    The disputed facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    MEMORIAL EMERGENCY ROOM POLICIES AND PROCEDURES. . . . . . . . . . . . 4

IV.     SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.      PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . 9

VI.     LEGAL STANDARD FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . 10
        A.    Memorial has the initial burden. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        B.    Plaintiffs' "version of any disputed issue of fact is presumed correct." . . . . . . . 10
        C.    Summary judgment is improper when the credibility or state of mind of
              Memorial's witnesses is in issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VII.    PLAINTIFFS HAVE ALLEGED AND PROVEN THE ELEMENTS OF AN EMTALA
        SCREENING CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        A.    The law applicable to EMTALA medical screening cases. . . . . . . . . . . . . . . . . . 13
              1.    Neither discrimination nor patient "dumping" are required elements of an
                    EMTALA screening case            . . . . . . . . . . . . . . . . . . . . . 15
              2.    Disparate means "non-uniform" or "different," and nothing more. . . . . 15
              3.    EMTALA requires hospitals to develop and to uniformly provide
                    screening procedures to identify critical conditions in symptomatic
                    patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
              4.    If a hospital does not develop standard screening procedures to identify
                    critical conditions in symptomatic patients, EMTALA liability may be
                    based on its failure to meet the standard of care to which the hospital
                    adheres. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
              5.    That a hospital may have treated a patient with a "'battery' of tests and
                    evaluation" does not preclude liability under EMTALA . . . . . . . . . . . . . 19
              6.    Negligence by a physician does not preclude a hospital's liability for
                    failure to provide an appropriate medical screening examination. . . . . 20
              7.    There is no "corporate practice of medicine" exception to EMTALA
                    requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        B.    Application of the law to the facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
              1.    Failure to complete the screening by evaluating the white cell differential
                    test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
              2.    Failure to perform a urinalysis as a required part of the screening. . . . . 28

      3.      Failure to monitor the vital signs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      4.      Dr. Haynes did not follow the customary practice of reviewing all laboratory information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      5.      Discharge without ruling out a bacterial source of infection or giving empiric antibiotics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.     Memorial, not the Guzmans, is guilty of recasting the case. . . . . . . . . . . . . . . . . 33

D.     The *Vickers - Summers* "perception of the physician" test for EMTALA screening liability is legally and factually irrelevant in this case . . . . . . . . . . . 34

      1.      *Vickers-Summers* reasoning was rejected by the Fifth Circuit in *Battle.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      2.      There is conflicting evidence about whether Dr. Haynes chose not to look at the white cell differential results *because* he felt this was a viral syndrome from the outset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      3.      The *Vickers - Summers* "perception" argument is totally circular reasoning in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      4.      The *Vickers - Summers* "perception" test does not apply in this case because there is no evidence Dr. Haynes perceived the symptoms differently from the patient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      5.      The *Vickers-Summers* "perception" test does not apply in this case because the tests TG required were clearly indicated by the symptoms that Dr. Haynes knew. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E.     Memorial's alleged compliance with its policy "Medical Screening Criteria to Timely Identify Patients Not Presenting with an Emergency Medical Condition" is no basis for summary judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VIII.   PLAINTIFFS HAVE PLED AND PROVED A LEGITIMATE STABILIZATION CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A.     The corporate knowledge of the hospital of the emergency medical condition, not the physician's diagnosis, determines Memorial's duty to stabilize. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B.     The hospital gains its knowledge from all its agents or employees, not just the emergency physicians. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

C.     It is the emergency medical condition, not the diagnosis, that triggers the duty to stabilize . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

D.     The evidence shows clearly that Memorial knew of TG's emergency medical condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

E.     There is ample summary judgment proof that TG had an emergency medical condition at the time of discharge, and was unstable. . . . . . . . . . . . . . . . . . . . . . 51

IX.    MEMORIAL FAILED TO PROVIDE AN APPROPRIATE MEDICAL TRANSFER OF TG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.     The transfer facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

B.     The transfer law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

C.      Why the transfer was inappropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

D.      If Plaintiff's pleading was inadequate, Memorial should have filed a Rule 12(e) motion for more definite statement.

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

<u>INDEX OF AUTHORITIES</u>

<u>CASES</u>

*Abercrombie v. Osteopathic Hosp. Founders Assoc.*, 950 F.2d 676, 681 (10th Cir. 1991)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Baber v. Hosp. Corp. of America*, 977 F.2d 872 (4th Cir. 1992) . . . . . . . . . . . . . . . . . 16, 24, 33

*Battle v. Memorial Hosp. at Gulfport*, 228 F.3d 544 (5th Cir. 2000) . . . . . . . . . . . . . . . . *passim*

*Broderson v. Sioux Valley Memorial Hosp.*, 902 F. Supp. 931 (N.D. Iowa 1995) . . . . . . . . . . . . . . . 51

*Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002) . . . . . . . . . . . . . . . . . 46

*Burditt v. U. S. Dept. of HHS*, 934 F.2d 1362 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 14, 46

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) . . . . . . . . . . . 10

*Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266 (6th Cir. 1990) . . . . . . . . . . . . . . 14

*Collins v. DePaul Hosp.*, 963 F.2d 303, 308 (10th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Correa v. Hospital San Francisco*, 69 F.3d 1184, 1193 - 4 (1st Cir. 1995) . . . . . . . . . . . . . . . . . 14

*Croley v. Matson Navigation Company*, 434 F.2d 73, 77 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . 12

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 2077 (U.S. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 249 (2nd Cir. 1985) . . . . . . . . . . . . . 11

*First Nat. Bank of Amarillo v. Martin*, 48 B.R. 317, 322 (N.D. Tex. 1985) . . . . . . . . . . . . . . . . 12

*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D. C. Cir. 1991) . . . . . . . 14, 15, 33

*Godwin v. Memorial Medical Center*, 25 P.3d 272 (NM CA 2001) . . . . . . . . . . . . . . . . . . . . . 21

*Griffith v. Mt. Carmel Med. Center*, 813 F. Supp. 1532, 1543 (D. Kan. 1993) . . . . . . . . 18, 20, 21

*Hoffman v. Tonnemacher*, 425 F.Supp.2d 1120 (E.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . 27, 47

*Holcomb v. Monahan*, 30 F.3d 116 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Irwin v. United States*, 558 F.2d 249, 252-253 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Jackson v. East Bay Hosp.*, 246 F.3d 1248 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Jones v. Wake County Hosp. System, Inc.,* 786 F. Supp. 538, 544 (E.D. N.C. 1991) . . . . 15

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 81 (5th Cir.1987) . . . . . . . 12

*Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319 (5th Cir.) . . . . . . . . . . . . . 19, 33

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348,
 89 L.Ed.2d 538 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Matter of Baby K,* 16 F.3d 590 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ortiz v. Mennonite Gen. Hospital,* 106 F.Supp. 327 (D. P. R. 2000) . . . . . . . . . . . . . . . . . . . . . 2

*Ortiz v. Mennonite General Hospital*, 106 F.Supp.2d 327 (D. P. R. 2000) . . . . . . . . . . . . . . . . 44

*Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 857 (4th Cir.1994) . . . . . . . . . . . 14, 16, 18, 21, 44

*Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) . . . . . . . . . . . . . . . . 10

*Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Roberts v. Galen of Virginia, Inc.,* 325 F.3d 776, 787-8 (6th Cir. 2003) (after remand) . . . . . . . 45

*Roberts v. Galen of Virginia, Inc.,* 525 U.S. 249, 119 S.Ct. 685 (1999) . . . . . . . . . . . 1, 14, 15

*Romar v. Fresno Comm. Hosp. & Med. Ctr.*, 583 F.Supp.2d 1179 (E.D. Cal. 2008) . . . . . . . . . 22

*Romo v. Union Mem. Hosp., Inc.,* 878 F. Supp 837, 842 (W.D. N.C. 1995) . . . . . . . . . . 17, 19, 30

*Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 10

*Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 628-29, 64 S.Ct. 724, 88 L.Ed. 967 (1944) . . 11

*Sastre v. Hosp. Doctor's Center, Inc.*, 93 F. Supp.2d 105, 110 (D. P.R. 2000) . . . . . . . . . . . . 18

*Stevison v. Enid Health Sys's*, 920 F.2d 710, 713 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . 15

*Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132 (8th Cir. 1996)
(*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 34 - 39

*Torres Otero v. Hosp. Gen. Menonita*, 115 F. Supp. 2d 253, 259 (D. P.R. 2000) . . . . . . . 17, 19

*TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 -1159 (Fed. Cir. 2004) . . 11

*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) . . . 11

*Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 34 - 39

## FEDERAL STATUTES

42 U.S.C. A. § 1395dd (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

42 U.S.C. § 1395dd(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 1395dd(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

42 U.S.C.A. 1395dd (b) (West 2005 ed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## OTHER AUTHORITIES

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice Procedure
§2726, at 446 (3d ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 C.F.R. § 489.24(d)(1)(ii)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

BLACK'S LAW DICTIONARY 470 (6TH ED. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## I.       INTRODUCTION.

"Sir, you raise your voice, when you should reinforce your argument."  Dr. Samuel Johnson.

Memorial begins its Motion for Summary Judgment with histrionics, predicting that Pandora's box will be opened on the health care world if Plaintiff prevails.  This is to urge the Court to forget statutory analysis, and rule on the basis of the spin that Memorial seeks to place on a relatively unambiguous statute.  Memorial therefore urges the court to adopt its arguments that EMTALA requires evidence of discrimination based on suspect classifications or indigence, that only "dumping" cases are covered, and that the statute applies only when the emergency physician "perceives" the patient's symptoms to require certain tests.

Plaintiffs will demonstrate how these arguments are not supported by traditional statutory analysis of EMTALA by the Supreme Court or the Fifth Circuit.  It is quite remarkable that Memorial has filed a MSJ without even referring to the only Supreme Court case on point, while glossing over Fifth Circuit authority.  Plaintiffs respectfully request that this Court read and follow *Battle v. Memorial Hosp. at Gulfport,* 228 F.3d 544 (5th Cir. 2000), and  *Roberts v. Galen of Virginia, Inc.,* 525 U.S. 249, 119 S.Ct. 685 (1999).

Rather than producing a health care disaster, a ruling for the Plaintiff in this case furthers the public health, by requiring one of Houston's biggest hospitals to abide by Federal law, adopt and enforce a uniform policy for screening similarly situated patients, and not attempt to insulate itself from federal law liability by tortuous arguments that are not supported by statutory language.

This case is not ripe for a full-blown summary judgment because Plaintiffs have not received the patient files of other similar patient requests.  The Court has not ruled on this request.  Furthermore, Memorial indicated during the discovery hearing about those other patient records that

the purpose of this MSJ is simply to test the legal sufficiency of Plaintiff's pleadings. Instead, Memorial moves for MSJ on the whole case, while denying and stonewalling discovery on the issue of how other similar patients were screened or treated. *Ortiz v. Mennonite Gen. Hospital*, 106 F.Supp. 327 (D. P. R. 2000). Memorial's motion should be denied.

II.     THE FACTS.

      A.     The facts based on the medical record and testimony of health care witnesses.

Plaintiffs will refer to the medical records in this case by their Bates numbers, which are MHSE-0001 to 0098, and which are attached to Memorial's MSJ as Exhibit A. Plaintiffs hereby incorporate these records into this response by reference.

There are some facts upon which both sides agree. TG was brought to the ER at Memorial Hermann Southeast Hospital (hereinafter "Memorial") on the morning of February 12, 2006. He arrived at 07:39 a.m. MHSE-0013. His chief complaints were fever and vomiting. MHSE-0007. He was triaged by Nurse April Ganz, RN, who characterized him as a Level II, emergent patient, and put him in a room to be seen by Dr. Philip Haynes, the emergency room physician. His treatment nurse was Frank Blain, RN, who did a nursing assessment at 7:55. MHSE-0013. TG was seen by Dr. Haynes between 08:00 and 08:33. Dr. Haynes recorded that TG had vomited 8 times the previous night, that TG had fever that had been treated with Tylenol and Motrin, that TG complained of epigastric abdominal pain, had a cough, had a decreased level of activity and diffuse malaise, was irritable, and was ill-appearing. MHSE-0009. Dr. Haynes did a physical examination, and recorded a differential diagnosis that included gastroenteritis, UTI (urinary tract infection), diabetes, diabetic ketoacidosis, and viral syndrome. MHSE-0010. Dr. Haynes then ordered blood to be drawn from TG, for lab tests that included a BMP (basic metabolic panel) and a CBC

(complete blood count).  Dr. Haynes also ordered IV fluids for TG as a fluid challenge.  MHSE-0011.  At Memorial Hermann Southeast Hospital, a CBC automatically includes the order for a white cell differential test.

At 08:34, the order for blood lab tests was charted.  At 08:40, the blood was drawn and sent to the lab.  MHSE-0014.  The lab received the blood for testing and began processing the blood.  Doug Mitchell, the laboratory director, has testified from the lab computer records that the automated results of the BMP and of the overall CBC (but not the white cell differential) were completed and released onto the hospital computer system by 9:11 a.m. on 2/12/06.  (Mitchell depo, pp. 49 - 51).  The automated processor for the CBC generated an abnormality flag in the lab, requiring a manual white cell differential test to be performed.  (Mitchell depo, pp. 37 - 38).  Between 9:11 and 9:35, Suzette Dalmeida was performing the manual differential.  By 9:35 a.m., she was finished, and the results were certified and released on to the hospital computer system.  (Mitchell depo, pp. 49 - 51). There were no reports of any outages or down time of the hospital computer system that day.  Hospital records show that the only outage of the hospital computer system was between midnight and 2:00 a.m. on February 12, 2006, and none other.  (Depo of Tom Flanagan, pp. 69-71, and Exh.11).  Thus, the hospital computer system was working while TG was at MHSE.

At 9:58 a.m, Nurse Blain noted that TG's heart rate had decreased from 145 to 105-110.  No other vital signs were recorded.  (Medical records, *passim*).  At 10:17 a.m., Nurse Blain notes that a pain reassessment was done, but TG's pain was unchanged.  MHSE-0014.  No vital signs were recorded by Frank Blain, RN.  At 10:13 a.m.,  TG was seen by Dr. Haynes, who noted "improved" "HR", and ordered TG discharged with a diagnosis of viral syndrome.  MHSE-0011.  Dr. Haynes

has admitted that he never saw the results of the white blood cell differential test. (Haynes depo, p. 18 - 20) Dr. Haynes has admitted that if he had know the results of the white blood cell differential test, he would have done further evaluation of TG, contacted a pediatrician, probably admitted TG and discussed giving antibiotics. (Haynes depo., pp. 24 - 25). Dr. Haynes did not request any follow up to determine the results of the white blood cell differential test that he admits he never saw. (Medical record, *passim*). The remaining facts are discussed later in the brief under the sections related to stabilization and transfer.

        B.       The disputed facts.

1.       After months of discovery, what exactly is Memorial's EMTALA policy?

2.       Did Dr. Haynes intentionally discharge TG without seeing the results of the white cell manual differential, or did he simply forget to look?

3.       Why didn't Dr. Haynes order a urinalysis, when he suspected a urinary tract infection (UTI) as part of his differential diagnosis?

4.       Why didn't the nurses take TG's vital signs, especially his discharge vital signs?

5.       Did the hospital have actual knowledge of TG's emergency medical condition?

6.       Did Dr. Haynes actually rule out a bacterial source of TG's condition just because he wrote down a diagnosis of "viral syndrome"?

III.     MEMORIAL EMERGENCY ROOM POLICIES AND PROCEDURES.

        While Memorial has never formally answered interrogatories or requests for production indicating what its policies and procedures about EMTALA are, Memorial has now produced several emergency room policies and procedures that apply to this case and show that Memorial violated its own standards concerning the medical screening provided to TG.

1.      The Emergency Center Triage Guidelines.

First and foremost is a document called "Emergency Center Triage Guidelines." Pff SJ Exh. A. This document refers specifically to "protocols" that nurses could implement for patients presenting with specific complaints. These protocols were not limited to use by only triage nurses; the "Guidelines" state that the protocols may be invoked by treatment nurses after triage. The "Emergency Center Triage Guidelines" on their face state that they were approved by the medical director and administration of Memorial Hermann SE. One such protocol was for pediatric patients presenting with complains of nausea and vomiting. This protocol would have required a CBC test and a urinalysis for a patient like TG. This is the same set of tests that Plaintiff's expert, Stephen Hayden, M.D., has indicated, were required for a routine medical screening exam for a patient like TG in his expert report of August 2008, without his ever having seen these "Guidelines."

Tammy McCrumb, RN, who was the ER Nurse who took care of TG on February 13, 2006, has testified that this set of guidelines is authentic, and that she discovered the document in the triage area of Memorial Hermann Southeast Hospital's emergency room. (McCrumb depo, p. 12 - 13). This document was in the policies and procedures notebook at Memorial Southeast in February 2006 (McCrumb depo, p. 14) and is still in the notebook today (McCrumb depo, p. 16). April Ganz, RN, now a nursing supervisor at Memorial Hermann SE, testified to the existence of protocols, which are hospital approved best practices for treatment of similar conditions. (Ganz depo, pp. 91 - 92). McCrumb talked to nurse April Ganz, RN, who is now the current clinical educator at Memorial SE. (McCrumb depo, p. 78). Ganz confirmed to McCrumb that the triage "Guidelines' were the correct guidelines that were in place in 2006. (McCrumb depo, p. 81).

A protocol is a standing order for a nurse to initiate lab testing and other care for a patient

to expedite care (McCrumb depo, p. 42). These "Guidelines" provide the routine standard laboratory testing that can be obtained based upon a nurse's clinical judgment to initiate testing on a patient where there is a delay in the patient's being seen by a physician or other provider. (McCrumb depo, p. 46). The "Guidelines" are standards that are done throughout emergency rooms across the country for routine laboratory testings that they would do based on complaints. (McCrumb depo, p. 46).

It should be emphasized that the Memorial Hermann Healthcare System triage policy (a different document) produced by Memorial's corporate VP, Tom Flanagan, RN, states that "protocols may be implemented based on patient acuity and available resources." The "Emergency Center Triage Guidelines" are the only "protocols" that have been produced by Memorial in discovery.

2.      The Emergency Center Assessment-Reassessment Policy.

Memorial has produced a policy concerning nursing assessment and reassessment of the patient. These guidelines are marked as Pff SJ Exh. B. The taking of vital signs is part of the reassessment of a patient. The reassessment policy of Memorial required a set of vital signs to be obtained within one hour of the patient's discharge. This was in accordance with Tammy McCrumb's understanding of what was required for reassessment of vital signs. (McCrumb depo, 34 - 35).

3.      The Emergency Center Documentation Policy.

This policy requires in section 3.4.2 that the discharge vital signs of the patient be documented. (McCrumb depo, page 58). This policy is attached as Pff. SJ Exh. C. This was not done. (None noted in Med Records.)

4.      Lab Testing Post-Discharge Follow Up Policy.

Memorial has produced its follow up policy.  This policy required a physician to document on a form lab testing that had not been completed at the time of patient discharge.  This policy is attached as Pff SJ Exh. D.  Dr. Haynes did not initiate such a form.  (Medical records, *passim*). Therefore no one brought the lab results to Dr. Haynes' attention after TG left the ER.

IV.      SUMMARY OF THE ARGUMENT.

Memorial Hermann Hospital System, hereinafter referred to as "Memorial," has totally mis-characterized the language and interpretation of EMTALA.    It has done no statutory analysis. Under Memorial's view of EMTALA, a Plaintiff would have to prove discriminatory "patient dumping," even though there is no such language in the EMTALA statute.    While preventing "patient dumping" may have been the legislative intent, it is clear that there is no requirement of discrimination in EMTALA, and no language restricting the causes of action to "patient dumping" only.

Memorial also asserts that any allegations that could possibly be characterized as negligence of an emergency room physician or nurse cannot be EMTALA claims as a matter of law.  Such an argument is pure folly.  The focus in EMTALA is on whether the hospital met its statutory obligations of providing an appropriate medical screening exam, stabilizing the patient, and providing an appropriate transfer.  Since the actions of the hospital, a corporate entity, are carried out by human beings, it is entirely possible that the failure of a hospital to comply with the statutory duties of EMTALA may arise because human beings were negligent.  But the existence of human negligence does not defeat the EMTALA claims against Memorial.  When a misdiagnosis occurs *because* the hospital failed to complete its standard screening examination, EMTALA liability

attaches. It is only when the physician misdiagnoses the case *despite* the completion of the hospital's standard screening exam that there is no EMTALA liability.

The EMTALA claim is valid because it was the hospital that failed to give TG the same medical screening that would have been given to other patients presenting to Memorial with similar symptoms. This is the essence of "disparate" or non-uniform treatment. Plaintiff TG received a non-uniform medical screening exam for several reasons. First, the exam that was ordered by Dr. Haynes was never completed. Dr. Haynes has admitted that he never saw the white cell differential test, even though it was part of the CBC test that he ordered. Second, the routine medical screening exam for a patient like TG required a urinalysis, which was not done. Third, the hospital required that TG's vital signs be monitored, particularly before discharge. This was not done. Fourth, the hospital did not follow its own aftercare policy for follow up of the lab results. Fifth, Dr. Haynes did not follow his routine procedure of reviewing all lab work that was available to him before discharging a patient. Finally, TG was discharged from the hospital with a possible bacterial infection, without ruling out the possibility that the source of the infection was bacterial. All of these are specific allegations of differential treatment, rather than negligence or misdiagnosis.

A disputed fact issue exists whether Memorial knew of the alleged emergency medical condition, i.e,. that TG had vomiting and cough, with a likely bacterial source of infection that had not been ruled out on February 12, 2006. A fact issue exists whether Dr. Haynes knew he had not ruled out a likely bacterial infection in TG. Furthermore, the knowledge of the hospital is the combined knowledge of its agents, servants and employees. Dr. Haynes was Memorial's agent and the lab tech was Memorial's employee. The hospital knew through these agents that it had not ruled out TG's emergency medical condition. No stabilizing care was provided.

Finally, on February 13, 2006, the hospital violated EMTALA's transfer requirements, because it persistently tried to transfer him to Memorial Hermann Children's Hospital, knowing that there were no ICU beds available, and no available ambulance for transporting him to Memorial Hermann Children's. There is no evidence that Memorial Hermann Southeast ever tried to contact Texas Children's Hospital, or any other hospital besides Memorial Hermann Children's. The hospital also failed to provide appropriate care to minimize the risk to TG's health before the transfer. Each act or omission is an EMTALA transfer violation.

V.     PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE.

    A.     Memorial Hermann Southeast Hospital "Emergency Center Triage Guidelines."

    B.     Memorial Hermann Healthcare System Assessment Reassessment Policies.

    C.     Memorial Hermann Healthcare System Documentation Policy.

    D.     Memorial Hermann Healthcare System Aftercare and Follow Up Policy.

    E.     Selected testimony of Philip Haynes, M.D., Ph.D.

    F.     Selected testimony of Doug Mitchell, Memorial Hermann SE lab director

    G.     Selected testimony of April Ganz, RN – triage nurse

    H.     Selected testimony of Frank Blain, RN – staff nurse

    I.     Selected testimony of Tom Flanagan, RN – Memorial Director of Emergency Services

    J.     Affidavit of Stephen Hayden, M.D., Plaintiff's expert witness, with attached report

    K.     Memorial Hermann Healthcare System Triage Policy, Policy Number EMC-00006

    L.     Records from Memorial Hermann Children's Transfer Center

M.      Copy of *Thomas v. St. Joseph Healthcare, Inc.,* No. 2007-CA-001192-MR (Ky. Ct. App., Dec. 4, 2008)

N.      Selected testimony of Mohamad Siddiqi, M.D.

O.      Memorial Hermann Hospital System, Answers to Plaintiff's First Interrogatories.

P.      Memorial Hermann Hospital System, Answers to Plaintiff's Second Interrogatories and Third Requests for Production

Q.      Selected testimony of Tammy McCrumb, RN – staff nurse

R.      Affidavit of Phillip A. Pfeifer – attesting to summary judgment evidence

## VI.    LEGAL STANDARD FOR SUMMARY JUDGMENT.

Plaintiffs will focus on those elements of the summary judgment standard that are particularly relevant to Memorial's motion.

### A.      Memorial has the initial burden.

"A party is entitled to summary judgment if it can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) (quoting Fed. R. Civ. P. 56 advisory committee's notes, 1963 amend.); *Stillman v. Travelers Inc. Co.*, 88 F.3d 911, 913 (11th Cir. 1996) (same). It is only after the summary judgment movant has met its threshold burden that the burden shifts to the non-moving party to produce evidence—"even when the issue involved is one on which the non-movant will bear

the burden of proof at trial." *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir. 1991).

B.      Plaintiffs' "version of any disputed issue of fact is presumed correct."

The non-movant's "version of any disputed issue of fact is presumed correct." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 2077 (U.S. 1992) ("Mindful that respondents' version of any disputed issue of fact thus is presumed correct, we begin with the factual basis of respondents' claims."). Thus, when ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Similarly, "a district court must resolve all ambiguities . . . in favor of the party defending against the motion." *Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 249 (2nd Cir. 1985) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (reversing district court's summary judgment and holding, "A study of the record in this light leads us to believe that inferences contrary to those drawn by the trial court might be permissible.")).

C.      Summary judgment is improper when the credibility or state of mind of Memorial's witnesses is in issue.

"Summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 -1159 (Fed. Cir. 2004); see *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 628-29, 64 S.Ct. 724, 88 L.Ed. 967 (1944) (reversing summary judgment where the only evidence in support of the movant's contention was the testimony of its experts and there were specific bases for doubting the credibility of that testimony); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice Procedure §2726, at 446 (3d ed. 1998) ("[I]f the

credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial ...."). The Fifth Circuit has said "where specific facts are alleged that if proven would call the credibility of the moving party's witness into doubt, summary judgment is improper." *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 81 (5th Cir.1987).

Similarly, where the issue in dispute involves the state of mind of the movant or its witnesses, the Fifth Circuit has held "summary judgment is improper." See, e.g., *Irwin v. United States*, 558 F.2d 249, 252-253 (5th Cir. 1977) ("It has been established in this court that summary judgment is improper if factual issues necessary for decision involve the state of mind of a party." (citations to numerous Fifth Circuit cases omitted)). Thus, in *Croley v. Matson Navigation Company*, 434 F.2d 73, 77 (5th Cir. 1970) the Fifth Circuit reversed a summary judgment where the "crucial issue" involved a party's knowledge of a certain condition, stating:

> Knowledge on the part of the company can be proved only by showing the state of mind of its employees. The court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind. Much depends on the credibility of the witnesses testifying as to their own states of mind. In these circumstances the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue.

In reversing the summary judgment, the Fifth Circuit agreed "that since the fact of ADDSCO's knowledge rests largely on the testimony of Turner and Backes, [plaintiffs] should have an opportunity to cross-examine the witnesses and test the credibility of their statements." The Court agreed "that Turner and Backes may have an interest in the outcome of the litigation," and that their relationship with the entity that will bear ultimate responsibility for an unfavorable judgement "may have some bearing on the credibility of Turner and Backes." See also *First Nat. Bank of Amarillo*

*v. Martin*, 48 B.R. 317, 322 (N.D. Tex. 1985) (holding "determination of the constructive trust issues is inappropriate on summary judgment" since issues involved "an element of intent in the conduct of the wrongdoer," citing *Croley v. Matson*).

In this regard, the credibility of Dr. Philip Haynes, Dr. Mohammad Siddiqi, Tom Flanagan, RN, April Ganz, RN, Frank Blain, RN, Suzette Dalmeida and Tammy McCrumb, RN are in issue. Memorial's MSJ depends on statements from their depositions, which are often inexact, inconsistent with the medical records, and sometimes unbelievable. Summary judgment is inappropriate for this reason alone.

## VII. PLAINTIFFS HAVE ALLEGED AND PROVEN THE ELEMENTS OF AN EMTALA SCREENING CASE.

Plaintiffs have not alleged that Memorial has EMTALA liability for misdiagnosis or for medical malpractice. Plaintiffs recognize that the Courts have uniformly rejected those contentions. Instead, Plaintiffs have alleged well-recognized claims of non-uniform screening of TG as compared to other pediatric patients complaining of vomiting and fever. Each of these complaints is based on existing Memorial policies, procedures or protocols, and not on standards of care from other hospitals. Plaintiffs have therefore pleaded the essence of the EMTALA screening claim. *Battle v. Memorial Hospital at Gulfport*, 228 F.3d 544 (5th Cir. 2000). The following discussion will examine those pleadings, the legal basis for them, and the evidence in support of the claims.

### A. The law applicable to EMTALA medical screening cases.

#### 1. Neither discrimination nor patient "dumping" are required elements of an EMTALA screening case.

One of the fundamental, erroneous premises that Memorial stridently asserts is that EMTALA applies only to "dumping" cases, and that some evidence of discrimination against TG

because of race, religion, financial status or other improper motive must be shown in order for Plaintiff to prevail on an EMTALA case. These arguments are absolutely, unequivocally false.

        a.        Discrimination is irrelevant to EMTALA stabilization cases.

In *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 119 S.Ct. 685 (1999), which is the only Supreme Court opinion interpreting EMTALA, the Court held that an improper motive was not a requirement of an EMTALA stabilization claim, "finding no such requirement in the text of the statute."

        b.        Discrimination is irrelevant to EMTALA transfer cases.

Years before *Roberts, supra*, the Fifth Circuit followed the same reasoning as *Roberts* in holding that improper motive is not an element of an EMTALA transfer claims. *Burditt v. U. S. Dept. of HHS*, 934 F.2d 1362 (5th Cir. 1991)("As written, EMTALA prevents patient dumping without such a requirement [non-medical motive]. We refuse to alter the statutory scheme.") Given that the statutory language controls over the legislative intention, it is clear that EMTALA applies to statutory violations that do not rise to the level of discriminatory "dumping," despite Defendant's arguments to the contrary.

        c.        Discriminatory motive applies in screening cases only in the Sixth Circuit, and that is a doubtful holding in light of *Roberts*.

The only circuit that holds that Plaintiff must allege and prove a discriminatory motive, such as race, sex, national origin or indigence is the Sixth Circuit. *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266 (6th Cir. 1990). All of the other circuits that have considered motive in screening cases have ruled it to be irrelevant, based on the statutory language of EMTALA, which requires a medical screening examination be given to "any individual" who comes to the emergency department seeking care. *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D. C. Cir.

1991); *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1193 - 4 (1st Cir. 1995); *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 857 (4th Cir.1994); *Collins v. DePaul Hosp.*, 963 F.2d 303, 308 (10th Cir.1992); *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996) (en banc).

More important, the Supreme Court in *Roberts, supra*, fn 1 specifically noted that the Sixth Circuit was a distinctly minority view, thereby indicating indirectly its opinion of the invalidity of the Sixth Circuit position.

> d.      "Good faith" is not a defense.

EMTALA imposes "'strict liability' on a hospital which violates [EMTALA]'s requirements." *Abercrombie v. Osteopathic Hosp. Founders Assoc.*, 950 F.2d 676, 681 (10th Cir. 1991); *Stevison v. Enid Health Sys's*, 920 F.2d 710, 713 (10th Cir. 1990) ("We construe [section 1395dd(a)] as imposing a strict liability standard subject to those defenses available in the act."). Thus, as the D.C. Circuit has said:

> **[A]ny departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act. The motive for such departure is not important to this analysis,** which applies whenever and for whatever reason a patient is denied the same level of care provided others and guaranteed him or her by subsection 1395dd(a).

*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041(D.C. Cir. 1991) (Emphasis added); *Jones v. Wake County Hosp. System, Inc.*, 786 F. Supp. 538, 544 (E.D. N.C. 1991) ("Should a deviation from that standard occur, that patient's rights under COBRA will have been violated regardless of the hospital's motives.").

In short, Memorial cites no authority whatsoever for its ongoing suggestions that EMTALA is limited to "dumping" or "discrimination."

2. Disparate means "non-uniform" or "different," and nothing more.

Memorial argues that "disparate" treatment means "differential treatment "on the basis of race, color, religion, sex, national origin, handicap or veteran's status" citing BLACK'S LAW DICTIONARY 470 (6TH ED. 1990), and citing *employment* **law.** This is an inexcusable distortion of EMTALA. *Battle, supra,* at 557 states quite clearly that "the plaintiff must show that the hospital treated him *differently* from other patients with similar symptoms." (Emphasis added) Accord, *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996) (en banc) (lack of uniform treatment). There is no discrimination requirement in the term "disparate" in the EMTALA context.

3. EMTALA requires hospitals to develop and to uniformly provide screening procedures to identify critical conditions in symptomatic patients.

EMTALA recognizes that hospitals across the United States have varying capabilities by modifying the phrase "appropriate medical screening examination" with the phrase, "within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department[.]" 42 U.S.C. § 1395dd(a). Thus, EMTALA did not establish a federal medical malpractice cause of action nor a national standard of medical care. Instead:

> [t]he plain language of the statute requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints.

*Baber v. Hospital Corp. of America*, 977 F.2d 872, 879 (4th Cir. 1992) (Footnote omitted); see also *Cruz-Queipo v. Hospital Espanol Auxilio Mutuo de Puerto Rico, 417 F. 3d 67, 70 (1st Cir. 2005)* ("When a hospital prescribes internal procedures for a screening examination, those internal procedures 'set the parameters for an appropriate screening.' A hospital must adhere to its own

procedures in administering the screening examination."); *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 858 n.4 (4th Cir. 1994) (". . . the plain language of EMTALA requires hospitals to develop screening procedures and apply the procedures uniformly," pointing out that the "failure to have any screening procedures could itself be a violation of EMTALA . . . ."). Thus, as the Fifth Circuit specifically held in *Battle*:

> Evidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment.

228 F.3d at 558 (reinstating EMTALA screening claim where evidence showed hospital "failed to follow its own published standards in Daniel's case"); *Romo v. Union Memorial. Hosp., Inc.*, 878 F. Supp 837, 842 (W.D. N.C. 1995) (denying summary judgment on EMTALA screening claim, noting, "[T]he evidence presented here suggests that the procedure governing the taking and recording of vital signs, part of the nursing protocol which is presumably followed as a matter of routine, was not followed in Mr. Romo's case."); *Torres Otero v. Hosp. Gen. Menonita*, 115 F. Supp. 2d 253, 259 (D. P.R. 2000) (denying summary judgment on EMTALA screening claim, noting, "Plaintiffs have produced evidence that the Hospital only partially followed its protocol for patients reporting chest pain . . . .").

Of critical importance for a summary judgment proceeding, the very existence of a hospital-adopted protocol can raise a triable issue of whether it should have been followed as one the hospital's "own screening procedures." See *Battle*, 228 F.3d at 558; *Torres Otero*, 115 F. Supp. 2d at 259; *Romo*, 878 F. Supp. at 842-43. In the Fifth Circuit, a hospital's "explanations" regarding its physician's failure to do so, including that the protocol "do[es] not embody the hospital's screening procedures" and "do[es] not dictate" what the physician must do simply raise "credibility determinations that preclude judgment as a matter of law." *Battle*, 228 F.3d at 558; cf *Torres Otero*,

115 F. Supp. 2d at 259 ("In light of the admission from the Hospital that it only partially followed its own protocol for chest pain, and in the absence of evidence that such departure was standard procedure, the Court finds that there is a genuine issue of material fact as to whether the Hospital failed to conduct an appropriate screening of co-Plaintiff Torres Otero when he presented himself at the Hospital's emergency room with chest pain on April 8, 1998.").

> 4. If a hospital does not develop standard screening procedures to identify critical conditions in symptomatic patients, EMTALA liability may be based on its failure to meet the standard of care to which the hospital adheres.

Courts that have addressed the issue have uniformly held that a hospital cannot avoid EMTALA liability by failing to develop "standards," or "standard policies dictating the medical screening that a patient with [the patient's] symptoms should receive." *Griffith v. Mt. Carmel Medical Center*, 831 F.Supp. 1532, 1542-43 (D. Kan. 1993) ("Mount Carmel has admitted that it has no standard policies dictating the medical screening that a patient with Mr. Griffith's symptoms should receive."); *Power*, 42 F.3d at 855-59 ("Arlington Hospital cannot 'simply hide behind this lack of standard emergency room procedures,'" citing *Griffith*); *Power v. Arlington Hosp. Ass'n*, 800 F. Supp. 1384, 1387 n.6 (E.D. VA 1992), aff'd in part, rev'd in part, 42 F.3d 851 (4th Cir. 1994). In such a case, "an EMTALA claim may be established through 'proof of a failure to meet the standard of care to which the Hospital adheres.'" *Power*, 42 F.3d at 858 (Emphasis in original); *Sastre v. Hosp. Doctor's Center, Inc.*, 93 F. Supp.2d 105, 110 (D. P.R. 2000) ("In successfully pursuing an EMTALA claim, it is up to the plaintiff to show that, in screening him or her, the hospital failed to follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions," citing Power, 42 F.3d at 858).  Thus, a plaintiff may carry "her threshold burden of proof by presenting evidence of differential treatment" that

shows the hospital's emergency room physician deviated from his "typical" or "usual procedure" for screening patients in the emergency room. *Power*, 42 F.3d at 855, 859; *Griffith*, 831 F. Supp. at 1540.

> 5.    That a hospital may have treated a patient with a "'battery' of tests and evaluation" does not preclude liability under EMTALA.

Though a hospital may have "attended to [the patient] and treated him with a variety, or [] 'a battery', of tests and evaluations, it may still fall short of an 'appropriate medical screening.'" *Romo*, 878 F. Supp at 842; *Torres Otero*, 115 F. Supp. 2d at 259 ("The Court disagrees with the Hospital's contention that the provision of some testing or treatment to a patient *a priori* satisfies a hospital's statutory obligation," citing *Romo*). EMTALA mandates that when screening a patient, hospitals (including by and through their physicians) must "follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions." *Torres Otero*, 115 F.Supp. at 258 (citing, inter alia, *Power*, 42 F.3d at 858 and *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 323-24 (5th Cir. 1998)). Thus, though the evidence shows that a patient was "attended to" and "treated with a variety, or 'battery', of tests and evaluations" during the screening exam, "the Court would be remiss not to compare this particular screening with other indicia of the standard screening procedures." *Romo*, 878 F. Supp. at 842. The patient's screening exam "may still fall short of an 'appropriate medical screening,' if there is evidence that the nature, extent and timing of these actions differs from the standard operating procedures received by other paying patients." *Id*. (Emphasis added) (rejecting "Defendants argu[ment] that they performed numerous tests and evaluations, and therefore, the medical screening was appropriate within Union Memorial's capabilities" and denying summary judgment); *Torres Otero*, 115 F. Supp. 2d at 259 (rejecting "Defendants argu[ment] that because it is uncontested that the Hospital performed a

number of tests on co-Plaintiff Torres Otero after he presented himself at the Hospital's emergency room, including a CBC, and electro cardiogram, and CPK, Plaintiffs cannot maintain their cause of action for failure to appropriately screen" and denying summary judgment ); see, e.g. *Battle*, 228 F.3d at 548-49, 558 (reinstating EMTALA screening claim, though patient was twice taken to the hospital and screened by physicians and twice misdiagnosed, where evidence showed physicians failed to follow one of hospital's "Emergency Department Nursing Care Standards," stating in relevant part, "Memorial Hospital's policy may have been satisfied by further screening—that is, continued observation in the emergency room until the source of Daniel's fever and infection was confirmed.") (Emphasis added); *Griffith*, 831 F. Supp at 1534-35, 1538 n.4 (rejecting hospital's argument "that the 'appropriate medical screening' requirement in EMTALA merely requires a hospital to give 'access' to medical screening examinations"—which for Mr. Griffith included "a number of diagnostic tests, including a chest x-ray" and "[m]ore diagnostic tests, including a CT scan of Mr. Griffith's brain, a complete blood count, and an analysis of his arterial blood gases"—observing, "That is clearly an understatement of the duty imposed by EMTALA" and denying summary judgment).

> 6. Negligence by a physician does not preclude a hospital's liability for failure to provide an appropriate medical screening examination.

Memorial claims that the negligence of Dr. Haynes in failing to consider the results of the white cell differential test before discharging TG automatically and absolutely precludes EMTALA liability for failure to perform an appropriate medical screening exam. In Memorial's view, EMTALA screening violations and negligent screening are "either - or" propositions. Yet Memorial offers absolutely no authority for this preposterous proposition.

The courts that have addressed the issue recognize that "[t]he same evidence that supports

a medical malpractice claim under state law may, in some circumstances, also constitute evidence of differential treatment sufficient to support a claim for failure to give an 'appropriate medical screening' under EMTALA." *Griffith v. Mt. Carmel Med. Center*, 813 F. Supp. 1532, 1543 (D. Kan. 1993)(evidence of hospital's failure to perform an EKG may be evidence of both a medical malpractice and negligence); *Power v. Arlington*, 42 F.3d at 858; Power, 800 F. Supp. at 1387 n.6; see, e.g., Battle, 228 F.3d at 548-551, 555, 558-59 (physician's failure to provide patient with an adequate medical screening, leading to a misdiagnosis and subsequent wrongful discharge gave rise to both medical malpractice claim against the physician and EMTALA claims against hospital). Indeed, "'in many instances'" the EMTALA standard "'will also be the malpractice standard of care,'" though "they are still distinct causes of action." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 859 (4th Cir.1994), (quoting *Power*, 800 F. Supp. at 1387 n.6). Quoting from the district court's opinion in *Power*, the court of appeals explained [emphasis added]:

> Consider a situation in which a hospital adheres to a standard requiring tests A, B, and C as part of an appropriate emergency room medical screening. In many instances, this standard will also be the malpractice standard of care. **Thus, failure to perform test C, for example, would violate both EMTALA and the standard of care applicable in a malpractice claim.** But if tests A, B, and C are preformed and the doctor evaluating the results draws the wrong conclusion, a violation of EMTALA may not be established, but medical negligence may be. In short, the issue is not whether the Hospital's treatment was adequate as measured against a malpractice standard of care, . . . but rather whether the claimant received the same screening examination regularly provided to other patients in similar circumstances.

Likewise, in *Godwin v. Memorial Medical Center*, 25 P.3d 272 (NM CA 2001), the court considered in depth whether the failure of a hospital to call in an on-call neurologist constituted an EMTALA screening violation. The court concluded that there is often overlap between state malpractice claims and EMTALA screening violations, and the same evidence may support both the EMTALA screening claim and the medical malpractice claim, when failing to administer tests that

were part of the hospital's standard screening for patients with neurologic conditions.

In *Romar v. Fresno Comm. Hosp. & Med. Ctr.*, 583 F.Supp.2d 1179 (E.D. Cal. 2008), the court recognized that the EMTALA screening obligation could overlap state law negligence claims. If a hospital has high screening standards, it is possible that there could be EMTALA liability, even in the absence of negligence. Likewise it is possible that a screening may be negligently performed by a physician, but not violate EMTALA if the hospital's screening standards are low.

How then can the Court reconcile TG's case with the cases holding that there is no EMTALA liability for misdiagnosis? The answer is quite simple: if the misdiagnosis occurred *because* of the failure to complete the medical screening, then EMTALA applies; if the misdiagnosis occurred *despite* the completion of the medical screening exam, then EMTALA does not apply.

In the present case, Plaintiffs allege both EMTALA screening claims against Memorial and state law malpractice claims against Dr. Haynes. Plaintiff's EMTALA screening claims involve a failure to comply with standard screening procedures of the hospital. The ordinary patient presenting to the hospital would get a screening that includes a CBC, a BMP and a urinalysis, plus ongoing monitoring of vital signs by the nurses. TG did not get that full exam – Dr. Haynes did not look at all the lab results that were required for the standard exam (the white cell differential and the urinalysis) and the nurses did not monitor the vital signs. The misdiagnosis by Dr. Haynes was *because* of the failure to complete the medical screening exam. The EMTALA statutory language modifies the term "appropriate medical screening examination" with the phrase "within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists." 42 U.S.C. 1395dd(a) (parenthetical in

original).  It is the capability of the hospital emergency department that dictates the content of the appropriate medical screening exam, and not the vagaries of physician judgment.  It also means that a medical screening examination is not complete when the history and physical examination is completed, if that history and physical exam, in and of themselves, are insufficient to rule in or rule out an emergency medical condition. If Congress had intended that the screening examination is completed when a history and physical are done, the language "including ancillary services routinely available in the emergency department" would be superfluous.

7.    There is no "corporate practice of medicine" exception to EMTALA requirements.

Memorial argues that it cannot control the conduct of Dr. Haynes, and it cannot require standards for its physicians to follow in screening patients because of the Texas doctrine against the corporate practice of medicine.  Therefore, Memorial argues, it cannot be responsible for the failure of its emergency physicians to provide uniform medical screening exams.  This argument is also false, given the pre-emptive power of EMTALA over conflicting state laws.  In *Matter of Baby K,* 16 F.3d 590 (4th Cir. 1994), the Fourth Circuit under EMTALA ordered a hospital and its physicians to continue to provide life support to stabilize an anencephalic baby who had limited life expectancy and would never be conscious.  The hospital argued that the Virginia statutes specifically allowed physicians to refuse to treat patients if the physician felt that it medically or ethically inappropriate, and that its physicians were refusing to provide care based on ethical concerns.  The Fourth Circuit rejected this argument completely, holding that EMTALA preempted the Virginia statute.  This same preemption argument applies to Memorial's claims about the corporate practice of medicine.  EMTALA specifically requires hospitals to develop uniform policies and procedures, applicable to all patients, concerning the medical screening examination to be provided.  *Baber v. Hospital Corp.*

*of America*, 977 F.2d 872, 879 (4th Cir. 1992). This requirement of uniform policies sets a minimum requirement and does not impede physician judgment. However, to the extent that it does, state restrictions of corporate practice of medicine are preempted by EMTALA.

    B.      Application of the law to the facts.

        1.      Failure to complete the screening by evaluating the white cell differential test.

The first duty of a hospital under EMTALA is medical screening.

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e) (1) of this section) exists.

42 U.S.C. A. § 1395dd (a).

The language "appropriate medical screening examination" is followed immediately by the phrase "within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department. . . ." The plain and unambiguous language requires Memorial to use its lab for medical screenings, if that is usual and customary.

In this case, Memorial did not use the "ancillary services" because neither Dr. Haynes nor Nurse Blain looked at the white cell differential test of TG. The exam simply was not completed. While Dr. Haynes offers the explanation for why he did not look at the white cell differential (he decided to send TG home without looking at it), neither Plaintiffs, the Court nor the Jury are required to accept this explanation as true.

Memorial seems to suggest that Dr. Haynes completed his medical screening exam when he

finished doing the history and physical exam (around 8:30 a.m.). This is false – Dr. Haynes did not feel that the medical screening was over until he saw the actual lab results. Dr. Haynes has testified that he did not make the decision whether to discharge TG or continue to evaluate him until around 10:15 a.m. because he needed to see the results of the laboratory tests to make that evaluation and "complete his screening exam." (Haynes depo, p. 81). Dr. Haynes, by his own admission, had not completed his screening exam until around 10:00 to 10:15 a.m., a time when the lab results were readily available. Dr. Haynes' misdiagnosis arose because of the failure to complete the screening exam, not despite it! *Griffith v. Mt. Carmel Medical Center*, 831 F.Supp. 1532 (D. Kan. 1993); *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 857 (4th Cir.1994). At the very least, another fact issue exists - when did Dr. Haynes complete the medical screening exam?

This case is really very simple, and Memorial attempts to make it arduously complex. Dr. Haynes ordered a CBC. No one disputes that. At Memorial, ordering a CBC includes several components, including the white cell differential. No one disputes that. There is no dispute that the white cell differential was ordered and not seen by the physician who ordered it. It is also undisputed that Dr. Haynes never issued an order canceling the white cell differential. The screening exam was not completed because Dr. Haynes never looked at the results of the test.

Plaintiffs have summary judgment proof that a complete CBC is part of the standard medical screening for a pediatric patient with multiple episodes of vomiting. First, Dr. Haynes ordered it. Second, the very next day, with TG having similar but more severe symptoms, Dr. Siddiqi, the emergency physician at Memorial, ordered a CBC. MHSE-0037. He recorded the results, including a specific notation of a change in the band count. MHSE-0037. Dr. Siddiqi looked at the bands. (Siddiqi depo, page 57: 12 - 25). The presence of a left shift [abnormally high band count] assisted

Dr. Siddiqi on 2/13/06 of confirming or ruling out a bacterial source of infection. (Siddiqi depo, page 78-79). Third is the Memorial policy entitled "Emergency Center Triage Guidelines", Pff SJ Exh. A. This is a protocol that on its face states that it has been approved by the medical director and administration at Memorial Hermann Southeast. From the testimony of Tammy McCrumb, RN (see above discussion of policies), this is valid summary judgment proof of Memorial's standard screening policies for standard types of complaints. Furthermore, April Ganz, RN, a Memorial nursing educator (who triaged TG), has testified about the importance of protocols, pages 91 to 92:

> **Q. And tell me what you mean by a "protocol."**
> 23 **A. There is a standard order set that the**
> 24 **hospital has agreed upon that meets with best**
> 25 **practices.** *And all physicians try to adhere to those*
> 1 *orders unless there is a specific reason why they*
> 2 *wouldn't with that case to achieve the best outcome*
> 3 *for the patient.* **(emphasis added)**
> 4 **Q. To your knowledge are there protocols**
> 5 **concerning pediatric patients who come in with**
> 6 **complaints similar to those that Tristan had?**
> 7 MS. BRYAN: Form.
> 8 **A. We do have protocols in the emergency room**
> 9 **that are approved by the medical director that, for**
> 10 **example, a nurse may start in triage if they could not**
> 11 **get the patient to a room for a medical screening, you**
> 12 **know, in which situation it would be the doctor that**
> 13 **saw the patient that would order things.**

Thus, the "Emergency Center Triage Guidelines" that have been identified in this case are some evidence of a standard set of orders that the hospital has agreed upon that meets best practices, and the physicians try to adhere to those orders unless there is a specific reason why they would not. This exact type of nursing standard was the determinative evidence in *Battle v. Memorial Hospital at Gulfport*, 228 F.3d 544, 558 (5th Cir. 2000), which is the most detailed and authoritative Fifth Circuit EMTALA case. A nursing protocol therefore is sufficient evidence of a hospital's standard screening practice, and a deviation from that practice is sufficient reason to reverse a directed verdict

in favor of the hospital. *Battle, Id.* See also *Hoffman v. Tonnemacher*, 425 F.Supp.2d 1120 (E.D. Cal. 2006), in which the court ruled that failure to follow hospital medical screening policies and procedures was evidence of a screening violation. *Hoffman* was a sepsis case, with allegations almost identical to Guzman, i.e., failure to rule out a bacterial source of a severe infection, which resulted in septic shock. *Hoffman* is discussed in detail in the stabilization arguments, *infra.*

This document, the "Guidelines for Emergency Triage" clearly states that the testing for pediatric vomiting/diarrhea includes a CBC. The CBC includes the white cell differential. The doctor never saw these results, and so he never completed the required medical screening under Memorial Hermann Southeast's own guidelines. Why Dr. Haynes did not see the results, or why Nurse Blain did not tell him the results are not the issues. That inquiry goes to negligence. But for the purpose of the limited EMTALA inquiry concerning the white cell differential, *Battle* is completely on point and requires that Memorial's MSJ be denied.

Memorial attempts to distinguish *Battle* by claiming it is the discrimination aspect of Battle, not the nursing standards, that was determinative. The very language used by the Fifth Circuit dispenses with this argument.

> Defendants' explanations for Memorial Hospital's failure to follow its own published standards in Daniel's case, while perhaps persuasive to a jury, require credibility determinations that preclude judgment as a matter of law.

*Id.*, at 558.

Memorial argues that these "Guidelines" were not part of its medical screening exam or EMTALA policy. This same argument was made and rejected by the defendant hospital in *Battle, supra* at 558. The hospital argued that this *nursing protocol* was not binding on physicians, and occurred after a diagnosis of pneumonia and ear infection had already been made by the physician.

The hospital also argued that the nursing standards were not binding on physicians, and that the nursing standard only stated how such patients were "usually" treated. Nevertheless, the Fifth Circuit reversed a directed verdict in favor of the hospital and remanded the case for a new trial on the EMTALA allegations.

2.       Failure to perform a urinalysis as a required part of the screening.

Dr. Haynes did not order a urinalysis. The "Emergency Center Triage Guidelines", Exh. A, MHSE-0298 have two provisions that apply to TG: the section for pediatric vomiting/ diarrhea, and the section for urinary tract infection. Under the pediatric vomiting/diarrhea section, a urinalysis [UA] is required if the patient has suffered 3 or more episodes of vomiting. TG had vomited 8 times. MHSE-0009. Under the urinary tract infection section of the protocols, a urinalysis is required if urinary tract infection is suspected. Dr. Haynes circled UTI on his differential diagnosis. MHSE-0010. He now claims during his deposition that circling UTI was a "mistake." (Haynes depo, page 111). However, whether it was actually a mistake or not is for the jury to decide. If the jury believes that Dr. Haynes suspected a urinary tract infection, then the urinalysis was the required screening. There is a fact issue that must be resolved by the jury.

Dr. Siddiqi ordered a urinalysis the next day for TG. MHSE-0037. TG had complained of abdominal pain not only to Dr. Siddiqi (MHSE-0055), but also to Dr. Haynes. MHSE-0009. Dr. Siddiqi testified that a urinalysis is a standard screening for suspected urinary tract symptoms for TG on 2/13/06. (Siddiqi depo, pp. 44 - 46) This is some evidence that a urinalysis was required as part of the medical screening exam.

Memorial's only answers to this argument are its irrelevance argument and its "de minimis" arguments. Both are false. First, the "Emergency Center Triage Guidelines" had been approved

by the medical director and administration at Memorial. Hence, the "Guidelines" on their face establish their significance. Second, Memorial offers no expert testimony that a urinalysis would not be significant in evaluating a patient such as TG. Plaintiff has offered the affidavit and report of Dr. Stephen Hayden, Professor of Emergency Medicine at UC San Diego, and Editor-in-Chief of the Journal of Emergency Medicine, who has given the opinion in his report that a urinalysis would be required for a patient like TG and also why it is medically important. This evidence creates a fact issue, and should prevent the Court from accepting Memorial's unsupported argument of lack of materiality and *de minimis* violation. In the presence of uncontroverted expert testimony from Plaintiff's expert and none from the defense, the Court should not conclude that Memorial's deviation from its standard screening is merely a *de minimis* violation of policy.

3.     Failure to monitor the vital signs.

The Memorial guidelines on vital signs require vital signs to be taken every two hours (McCrumb depo, p. 32).   McCrumb adhered to this policy on 2/13/06 in taking TG's vital signs. McCrumb testified that she recorded TG's vitals signs every two hours, in accordance with hospital policy. (McCrumb depo, p. 32). The medical records support the fact that McCrumb recorded vital signs more frequently than every two hours. MHSE-0043. Furthermore, the hospital guidelines require vital signs to be done within one hour before discharge, and McCrumb did this also. MHSE-0043. (McCrumb depo, p. 34 - 35).

The medical records show that TG's vital signs were taken only once on 2/12/06, during triage by April Ganz, RN. (Medical records, *passim*). Nurse Blain also recorded TG's heart rate at 9:58 a.m. However, there is no record of repeated blood pressure, temperature, or respiratory rate. Memorial's policy on Assessment/Reassessment, Pff SJ Exh B, requires a set of vital signs to be

taken within one hour of discharge.  The Documentation Policy, Pff SJ Exh C, requires these vital signs to be documented.  This was not done.  (See Medical Records, passim and deposition of Frank Blain, RN, pp. 32-34, 43).  Nurse Blain did not even know that there was a policy about obtaining discharge vital signs. (Blain depo, p. 55).  Memorial's failure to follow its own policy concerning recording vital signs is adequate evidence of differential treatment to avoid summary judgment. *Romo v. Union Memorial. Hosp., Inc., 878 F. Supp 837, 842 (W.D. N.C. 1995)* (denying summary judgment on EMTALA screening claim, noting, "[T]he evidence presented here suggests that the procedure governing the taking and recording of vital signs, part of the nursing protocol which is presumably followed as a matter of routine, was not followed in Mr. Romo's case.") In the Guzman case, one of Plaintiff's complaints was fever, which had been suppressed by Motrin Tylenol.  It would be important to know how the fever reacted once the drugs wore off.  Furthermore, given that TG possibly had a bacterial infection, it would be important to know what effect the infection had on his blood pressure.  The vital signs are extremely important, relevant data to those inquiries.  As noted in *Romo, supra* at 843, (" Plaintiff correctly points out that failure to record these vital signs is arguably necessary in order for the physician to make the determination of whether an emergency medical condition exists as required under the Act.").

Finally, Plaintiff urges the Court to consider the affidavit of Dr. Stephen Hayden, Plaintiff's emergency medicine expert, which is attached as Exhibit J.  Dr. Hayden makes it clear that from a medical standpoint, the vital signs are not "de minimis," but very important medical information that was part of the medical screening exam and not obtained for TG.  On such an important medical issue, Memorial has provided no expert testimony that this is "de minimis".

       4.     Dr. Haynes did not follow the customary practice of reviewing all laboratory information.

Memorial has not addressed this allegation, and it is therefore not grounds for summary judgment. In addition, since the Court has not yet granted discovery of the medical records of other patients (despite Plaintiff's efforts to obtain them), summary judgment is inappropriate on this point. Plaintiffs have filed the appropriate Rule 56(f) affidavit, based on incomplete discovery of medical records of other patients.

5. Discharge without ruling out a bacterial source of infection or giving empiric antibiotics.

The same arguments set forth in subsection D, above, apply to this allegation. Memorial has not provided any records of other similarly situated patients to be able to make this assessment. Again, Plaintiffs have filed the appropriate Rule 56(f) affidavit, based on incomplete discover of medical records of other patients.

Memorial argues that it could not be liable for Dr. Haynes' discharging the patient, after he made a diagnosis of viral syndrome. Yet, if his testimony is accepted as true that he knew that he had not seen the results of the white cell differential, then he had not ruled out a bacterial infection at all. He still had not completed the medical screening examination that he ordered himself. His motive for not completing the medical screening exam is irrelevant.

Defendant's citation of *Bergwall v. MGH Health Services, Inc.,* 243 F.Supp.2d 364 (D. Md. 2002) is totally misplaced. In *Bergwall,* a 71 year old woman came to the emergency department complaining of chest pain and dizziness. She was triaged and seen at 1:05 by the emergency physician, who conducted a physical exam and ordered lab tests that included cardiac markers and an EKG. These tests were done, and at 2:45 the results were given to the emergency physician, who reviewed the results and determined that the patient had suffered a heart attack and needed a cardiology consultation. The cardiologist came and ordered a right-sided EKG and an

echocardiogram, which were never done. The plaintiff contended that the medical screening exam should have included the right-sided EKG and the echocardiogram because these tests were available at the emergency room. The plaintiff had no proof, however, that the right-sided EKG or electrocardiogram were part of the routine screening given to a patient like Mrs. Bergwall. Summary judgment was therefore granted on the medical screening claim. This is far different from the Guzman matter. In Guzman, there is abundant proof that the routine exam would include a CBC, and that test includes the white cell differential test. In addition, there is evidence that the standard screening at Memorial would include a urinalysis that was never done. *Bergwall* is clearly distinguishable.

6.         Failure to follow-up.

Memorial asserts that Plaintiff's argument concerning the failure to follow up is "preposterous." Yet Memorial had such a policy in place. Dr. Haynes has testified that he knew he had ordered a test and had not reviewed the results. Plaintiffs have offered summary judgment proof of the violation of this policy as evidence of a screening failure in the affidavit of Dr. Stephen Hayden, which is attached as Exhibit J. This affidavit, in the presence of the follow-up policy, is sufficient reason to deny summary judgment on this issue.

C.       Memorial, not the Guzmans, is guilty of recasting the case.

One of Memorial's primary arguments is that Plaintiff's case is merely attempting to charge Memorial with the conduct of Dr. Haynes through the EMTALA allegations. Since Memorial has no actual defense to the uncontested facts of the violations of its own policies and procedures, it attempts to recast Plaintiffs' allegations as negligence.

Memorial states "Summary judgment is proper when EMTALA claims are, in actuality,

medical negligence claims." Memorial MSJ, p. 3. This is a broad and unsupported misreading of the cases it cites. None of these cases supports this proposition. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319 (5th Cir.) was a summary judgment case in which the issue was whether the affidavit of a nurse was sufficient summary judgment proof to challenge the affidavit testimony of a physician that no differential treatment was given to the plaintiff. While the Court made an incidental comment that the plaintiffs allegations were in effect claiming that the physician committed negligence in the medical screening, that statement was pure dicta and had nothing to do with the decision. The Fifth Circuit held that the nurse's affidavit was incompetent to challenge the doctor's, and thus no fact issues were created. *Baber v. Hosp. Corp. of America*, 977 F.2d 872 (4th Cir. 1992) was a case in which the plaintiff contended that EMTALA created a national standard of care applicable to hospitals; there was no proof offered of disparate treatment. *Gatewood v. Washington Healthcare Corp.*, 993 F.2d 1037 (D. C. Cir. 1991), was another early case in which the plaintiff claimed that negligent screening as opposed to disparate screening was the basis of a valid EMTALA claim. *Jackson v. East Bay Hosp.*, 246 F.3d 1248 (9th Cir. 2001), was a psychiatric case in which the plaintiff's own experts testified that Jackson was treated no differently from any other patient, and the court rejected the novel contention that the medical screening examination was so poor as to constitute evidence of bad faith. *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519 (10th Cir. 1994) was a case in which plaintiffs actually alleged deviations from hospital standard screenings, rather than negligence of the hospital. No ruling about recasting of allegations was even suggested. Finally, *Holcomb v. Monahan*, 30 F.3d 116 (11th Cir. 1994) was a case in which the court rejected that plaintiff's contention that the "appropriateness" of the screening should be determined by its adequacy in identifying the patient's illness.

In short, none of the cases cited by Memorial are even remotely related to its claim of recasting. Memorial is trying to "spin" Plaintiffs' allegations into negligence contentions against the hospital, when nothing of the sort is true. Plaintiffs have made no allegation that the hospital was guilty of misdiagnosis, or that EMTALA establishes a national standard of emergency care. Plaintiffs' allegation are mainstream claims of disparate treatment by the hospital in the performance of the medical screening exam.

> D.     The *Vickers - Summers* "perception of the physician" test for EMTALA screening liability is legally and factually irrelevant in this case.

Memorial argues strenuously that it has no liability because Dr. Haynes diagnosed TG's condition as a viral syndrome, and therefore Memorial has no liability to follow its own standard screening procedures for pediatric vomiting and UTI and vital sign monitoring. To support this argument, Memorial relies on two cases: *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139 (4th Cir. 1996) and *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132 (8th Cir. 1996) (en banc). Both of these cases were situations in which there was a strong dispute after the fact between the patient and the emergency room doctor about the severity of the patient's complaints about his symptoms. In each case, the physician did not order lab or imaging tests because he did not think that the patient's symptoms were severe enough to warrant a more elaborate set of tests. These two courts therefore adopted a corollary to the disparate treatment test, i.e., that the hospital must give uniform screenings to patients who are "perceived" to be the same by the hospital. The cases hold that a hospital has no duty to screen for symptoms that the hospital never "perceived" to exist.

Memorial's attempt to apply these cases to TG fails for multiple reasons as set forth below.

> 1.     *Vickers-Summers* reasoning was rejected by the Fifth Circuit in *Battle.*

*Vickers-Summers* come from different circuit courts than the Fifth Circuit, which has

implicitly rejected *Vickers-Summers* in *Battle, supra*.   Therefore, this Court is not bound to follow the "perception" test.   *Battle* involved a little boy who was brought to the emergency room with complaints that his jaw had been snapping shut and his eyes had been rolling back.   The plaintiff made EMTALA screening allegations which included claims that pediatric patients whose source of infection had not been definitively identified were "usually hospitalized."   The plaintiff provided evidence of a hospital-approved nursing standard that stated precisely that.   The hospital argued that this standard did not apply because the doctors had already determined that the source of infection was pneumonia.   This is precisely the *Vickers – Summers* argument, i.e., that the patient was not entitled to standard treatment because the physicians "perceived" the symptoms differently.   The Fifth Circuit dismissed this argument, reversing the case and remanding it for a new trial:

> Defendants' explanations for Memorial Hospital's failure to follow its own published standards in Daniel's case, while perhaps persuasive to a jury, require credibility determinations that preclude judgment as a matter of law. A rational jury may have concluded, based on the notations concerning Daniel's seizure disorder, that the source of his fever and infection was not determined at the time he was released. Further, a jury could have concluded that Daniel was sent home sooner than other similarly situated patients. The evidence does not support Defendants' false dichotomy that Defendants had to release Daniel immediately to go home or to admit him as an inpatient. Memorial Hospital's policy may have been satisfied by further screening-that is, continued observation in the emergency room until the source of Daniel's fever and infection was confirmed.

228 F.3d at 558.

The Fifth Circuit recognized the fundamental flaw in the *Vickers - Summers* argument – it necessarily involves determinations of credibility, which are the province of the jury.   In both *Vickers* and *Summers*, the appellate courts accepted the testimony of the physician as fact.   Yet this is clearly inappropriate in a summary judgment context, where credibility is in issue, as set forth in detail in Section VI(C) above in Plaintiffs discussion of the summary judgment standard.

2.      There is conflicting evidence about whether Dr. Haynes chose not to look at the white cell differential results *because* he felt this was a viral syndrome from the outset.

There are numerous reasons to question the credibility of Dr. Haynes's testimony, particularly about his diagnosis of viral syndrome. First, Dr. Haynes actually ordered the white cell differential test as part of the CBC; Memorial now claims Dr. Haynes always thought that test was unnecessary. MHSE-0009. Second, Dr. Haynes is clearly an interested witness whose testimony is not clear and unequivocal, since he is a defendant on the state law medical malpractice claims. Third, there is no notation in the medical records to support his claim that he discharged TG knowing that he had not seen the results of the white cell differential. Fourth, Dr. Haynes has testified that he looked at the computer around 10:00 a.m. and the white cell differential values were not on the computer. (Haynes depo., p. 20). However, the testimony of Doug Mitchell and the supporting records shows that the results of the white cell differential test were available on the hospital computer from 9:35 a.m. until 10:18 a.m., when TG was discharged. (Mitchell depo, pp. 49 - 51) Thus, if either Dr. Haynes or Nurse Blain had even looked at the computer, they could have seen the results. Thus Haynes' testimony is refuted by Mitchell. Fifth, Haynes has not followed his usual custom of recording abnormal findings from the lab. On page MHSE-0011 of the medical record under "Pertinent Lab Values," Dr. Haynes recorded the abnormal findings from the basic metabolic panel. However, he never recorded any abnormal findings from the CBC, even though the results were available to him on the computer if he had looked. Several of the results of the CBC were abnormal, including RBC, MCV and MCH values, but these were not recorded under pertinent lab values. MHSE-0020. Seventh, Dr. Haynes also included urinary tract infection as part of his differential diagnosis, MHSE-0010, but has testified that he made a mistake in circling UTI.

(Haynes depo, p. 111). Eighth, there are several notations in the medical record made by "ph1), but Dr. Haynes has denied making those notations, even though those are his initials. (MHSE-0014 and Haynes depo, p. 61). All of these inconsistencies cast doubt on the argument that Dr. Haynes did not see the results of the white cell differential *because* he did not think the test was necessary. The jury is free to reach whatever conclusion it wants about why Dr. Haynes did not see the results of the white cell differential.

In summary, Dr. Haynes testimony is inconsistent with Memorial's *Vickers - Summers* claim that Dr. Haynes disregarded the test because he did not think it was important; it is externally inconsistent with the actual facts from the Memorial Hermann Southeast lab director.

3.      The *Vickers - Summers* "perception" argument is totally circular reasoning in this case.

A third reason to reject the *Vickers - Summers* "perception" argument in this case is that it is completely circular. It is the perception of the severity of the ***symptoms*** that counts under *Vickers - Summers*, not the diagnosis. These cases simply require the standard screening to be compared with the screening for patients with similar symptoms. In *Vickers* and *Summers*, the additional tests that Plaintiffs contended were required were not ordered because the physicians did not think that the symptoms were severe enough to merit elaborate, expensive tests, not because they reached a diagnosis that excluded the condition. Memorial claims that it should not have to complete a medical screening exam to differentiate between a bacterial and a viral source of infection, because the physician concluded that it was a viral infection before seeing the battery of tests that could permit him to reach that conclusion. This is a gross distortion of *Vickers - Summers*, and completely circular reasoning.

4.      The *Vickers - Summers* "perception" test does not apply in this case because

there is no evidence Dr. Haynes perceived the symptoms differently from the patient.

Assuming solely for the sake of argument that the *Vickers - Summers* "perception" test is valid law in the Fifth Circuit, summary judgment still should be denied. *Vickers* and *Summers* do not apply in this case because there is no difference between the symptoms that Dr. Haynes perceived and those that the patient reported. There is no doubt that the chief complaint was fever and vomiting. MHSE-0007. Dr. Haynes wrote that down. MHSE-0009. He also recorded that TG had thrown up 8 times the night before. MHSE-0009. He noted discrete epigastric pain, and decreased activity. In short, there is no difference in perception of symptoms as was present in *Summers* and *Vickers*, where the doctors did not test because they did not think the symptoms were severe enough. Dr. Haynes knew and understood all the symptoms of TG, and his only "perception" was of a diagnostic reason for those symptoms. The purpose of the medical screening is to determine whether an emergency medical condition existed, i.e., a severe bacterial infection versus a routine virus. The fact that Dr. Haynes may have thought it was a routine virus assumes the facts that the medical screening exam was supposed to prove, and only the lab tests could prove the difference. Thus Dr. Haynes' perception that it may have been a viral syndrome is no basis for absolving the hospital of its EMTALA screening duty, even if he thought that from the beginning. Otherwise the lab tests were superfluous, and the hospital would not be using the ancillary services that EMTALA requires for medical screening exams.

5.     The *Vickers-Summers* "perception" test does not apply in this case because the tests TG required were clearly indicated by the symptoms that Dr. Haynes knew.

Assuming solely for the sake of argument that the *Vickers - Summers* "perception" test is valid law in the Fifth Circuit (which would be totally inconsistent with *Battle*), the reasoning still

would not give Memorial a basis for summary judgment. In *Vickers* and *Summers*, the Plaintiff's allegation was that *additional* testing that had not been ordered needed to be done to comply with the medical screening requirement. In Guzman, the white cell differential test had actually been ordered as part of the CBC. The problem is that no one looked at it – no one completed the use of "ancillary facilities" at the hospital to determine if an emergency medical condition existed. This is fundamentally different from either *Vickers* or *Summers*. Additionally, there is no "perception" involved in the failure to take vital signs, which is another part of the disparate screening argument.

With regard to the urinalysis part of the medical screening, *Vickers - Summers* does not apply because the conflict is between Dr. Haynes notation of a "UTI" and his testimony that he really meant "URI" and circled "UTI" by mistake. (Haynes depo, p. 111) If the jury believes that Dr. Haynes really believed a UTI was possible, then the urinalysis was part of the required screening. This is not a "perception" issue; it is a credibility issue.

In summary, Memorial's argument based on *Vickers - Summers* is no basis for summary judgment in this case.

> E.    Memorial's alleged compliance with its policy "Medical Screening Criteria to Timely Identify Patients Not Presenting with an Emergency Medical Condition" is no basis for summary judgment.

Memorial argues that it is absolved of EMTALA liability for non-uniform screening of TG by alleged compliance with a policy entitled "Medical Screening Criteria to Timely Identify Patients Not Presenting with an Emergency Medical Condition" (hereinafter referred to as the "Flanagan policy.") Summary judgment should be denied because of the absence of any testimony that anyone at Memorial Hermann SE was aware of this policy or was working under this policy in examining TG.

The "Flanagan policy" was produced for the first time on January 12, 2009 at the deposition of Tom Flanagan, RN, who was appearing as a corporate representative of the Memorial System concerning its policies and procedures. There are many reasons this policy does not apply to TG, not the least of which is that it does not set forth Memorial's requirements for a medical screening exam for a patient like TG. The policy only sets forth criteria for non-physician personnel to use to determine that low-priority patients do not have an emergency medical condition. Mr. Flanagan states unequivocally that the policy is NOT Memorial's medical screening policy ("the one thing I don't want is people walking out of this room thinking that this is our medical screen. It is not.") (Flanagan depo, p. 84:13 -15). This policy contains nothing that would describe the content of the medical screening exam to be performed by a physician. (Flanagan depo, p. 91). The policy does not even mention any laboratory tests, and therefore does not even contemplate the use of "ancillary facilities" available to the emergency department. It was designed to inform mid-level providers (physician assistants and nurse practitioners) what Memorial's expectation was of them in screening patients who were unlikely to have an emergency medical condition based on triage. (Id., p. 91). It simply does not state what is the screening for a patient who is more serious than a low-level risk based on triage. Flanagan does not know of any document that sets forth what was required of physicians. (Id, pp. 92 - 93). Flanagan did not know of any policy that would require uniform medical screening exams between different physicians at Memorial. (Id., p. 95). There is nothing in the policy itself or in Mr. Flanagan's testimony that indicates that this policy is Memorial's only policy and procedure, or that its presence excludes other policies and procedures from applying to TG.

What is more significant, however, is that Flanagan did not know anything about the

protocols at Memorial Hermann SE, particularly the "Emergency Center Triage Policy." Flanagan testified that he was unaware of any clinical pathways, which he defined as "protocols," for any of TG's symptoms, including nausea and vomiting, fever or cough. (Flanagan depo, pp. 40 - 42). According to Flanagan, there were no policies or procedures as to written policies or procedures of Memorial that related to what should be done to perform the medical screening exam for a pediatric patient who presents with chief complaint of vomiting, cough, and fever. (Flanagan depo, pp. 76 - 77). Flanagan's deposition was taken on January 12, 2009. The "Emergency Center Triage Guidelines" was finally produced on February 25, 2009, after they were retrieved by Nurse Tammy McCrumb from the triage desk at Memorial Hermann SE emergency room. Flanagan was apparently unaware of the "Guidelines" produced by Tammy McCrumb.

The "Flanagan policy" was produced by a corporate executive of Memorial who has admitted that neither he, nor anyone else, compared the policies at Memorial Hermann SE against the corporate policies to see if they were the same. (Flanagan depo, p. 33). Furthermore, there is no evidence that there was a mid-level provider (nurse practitioner or physician's assistant) who was even on duty on the shift where TG was seen, or who had any contact with TG on 2/12/06. The only thing that came into play in this "policy" was triage. The same triage routing is described in other documents, e.g., the MHHCS Triage Policy, Policy Number EMC-00006, which is attached as Pff SJ Exh. K. Thus, there is nothing to substantiate that the "Not Presenting" policy had anything to do with the manner in which TG was triaged, much less the parameters of his medical screening exam.

To now assert that the "Medical Screening Criteria to Timely Identify Patients Not Presenting with an Emergency Medical Condition" is the only medical screening policy and

procedure for Memorial Hermann Southeast is subject to severe impeachment of Mr. Flanagan, and is completely inconsistent with the deposition testimony of both Tammy McCrumb, RN, and April Ganz, RN, who are nurses who work in the MHSE emergency room.  This creates a substantial fact question: just what were Memorial's policies and procedures?  After months of discovery, the only things we have of substance are the policies and procedures that are the basis of Plaintiffs' pleadings.

Counsel for Plaintiff sent a set of interrogatories and requests for production inquiring into similar information in June 2008, but received answers indicating that Memorial had no policies and procedures applicable to this case.  See Pff. SJ Exh. O.  See responses to interrogatories 6, 7, and 8, indicating Memorial had no policies and procedures related to medical screening examinations for pediatric patients complaining of cough, or nausea and vomiting, or fever.  See also responses to requests for production 7 through 11, indicating that Memorial had no policies, procedures or protocols for medical screening exams for patients with complaints similar to those of TG. Memorial has never supplemented these discovery responses.

In January 2009, Mr. Flanagan gave his deposition in which the "Not Presenting" policy was identified.  On February 25, 2009, Memorial produced the "Emergency Center Triage Guidelines" with a transmittal letter that stated "Enclosed are additional Emergency Center policies (bates numbered MHSE-TG-0287 to 0297."  The transmittal also stated "This shall serve as Memorial Hermann Hospital System d/b/a Memorial Hermann Hospital Southeast's supplemental responses to all discovery requests."  Plaintiff later sent out a set of requests for admissions and a second set of interrogatories trying to clarify just what are Memorial's policies and procedures concerning EMTALA.  Memorial refused to admit that the "Emergency Center Triage Guidelines", which it

called a "policy" on February 25, 2009, was in fact a policy of Memorial or that it was in force and effect! See Pff. SJ Exh. P:

> 13. Admit or deny that protocols contained in Exhibit A, which is attached hereto, were in force and effect on February 12, 2006.
>> RESPONSE: Defendant objects on the basis that this request is vague and ambiguous as to the terms "protocols" and "in force and effect."
>> Subject to and without waiving the objection, deny, but see the testimony of Tammy McCrumb, p. 12-15 and 81.

In addition, Memorial refused to answer simple interrogatories trying to pin down exactly what its policies and procedures were in 2006, objecting that this is "overly burdensome and harassing" and that the number of interrogatories is excessive. It also objected to trying to identify what "protocols" are referred to in its other policies, if they are not the protocols set forth in the "Emergency Center Triage Guidelines."

Memorial cannot "have its cake and eat it too." It cannot refuse to permit discovery of other patient files and then claim that Plaintiff has not produced evidence of the screenings given to other patients. It cannot supplement discovery, indicating that a document it produces is a policy, and then deny that it was a policy in a response to a request for admission. It cannot deny that the policy was in force and effect, while at the same time referencing statements from its own employees that the policy was in force and effect. When the defendant controls the keys to the dismissal of an EMTALA case, yet refuses to answer in a straight forward manner requests for discovery of critical issues related to disparate treatment, summary judgment should be denied. *Ortiz v. Mennonite General Hospital*, 106 F.Supp.2d 327 (D. P. R. 2000) (SJ denied where defendant hospital gave evasive answers to interrogatories related to medical screening policies and procedures).

Memorial is dragging the "Flanagan policy" out of the closet and trumpeting that this is its medical screening policy for a specific reason. Memorial recognizes that it must have "some" policy

to avoid being in violation of EMTALA for having no policy at all. *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 857 (4th Cir.1994). Thus, it is trying to argue that it does not need any type of uniform substantive screening, but only a routing process. This amounts to no policy at all, and EMTALA liability attaches when there is no policy at all.

VIII.   PLAINTIFFS HAVE PLED AND PROVED A LEGITIMATE STABILIZATION CLAIM.

Memorial argues that it had no duty to stabilize TG's emergency medical condition because Dr. Haynes diagnosed a viral syndrome. Once again, Memorial places a "spin" on the statute that does not exist in the language of EMTALA, and does not address the actual allegations of Plaintiffs' complaint.

The analysis again begins with the text of 42 U.S.C.A. § 1395dd (b) (West 2005 ed), which states [emphasis added]:

> (b)   "If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and **the hospital** determines that the individual **has an emergency medical condition**, the  hospital must provide either -
>
> > (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> >
> > (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.."

The text of EMTALA  does not refer to the medical diagnosis, nor does it refer to the knowledge of the physician. Rather, the duty to stabilize is based on the knowledge of the hospital, not an individual doctor, of the emergency medical condition, not the physician's diagnosis.

A.   The corporate knowledge of the hospital of the emergency medical condition, not the physician's diagnosis, determines Memorial's duty to stabilize.

This Court recognized this distinction between the knowledge of Dr. Haynes and the

knowledge of the hospital in its ruling on the "willful and wanton" negligence argument.

> Guzman's EMTALA allegations do not alter the analysis. Guzman's expert's opinions that the child was suffering from an emergency medical condition do not create a fact issue as to whether the willful and wanton negligence standard applies to Dr. Haynes. Guzman alleged that Memorial Hermann, not Dr. Haynes, had actual knowledge of the emergency medical condition.

Docket Entry No. 92, pp. 19 - 20.

It is clear that the language of EMTALA refers to a stabilization requirement when "the hospital" determines there is an emergency medical condition. In *Roberts v. Galen of Virginia, Inc.,* 325 F.3d 776, 787-8 (6th Cir. 2003) (after remand), the Sixth Circuit held that a jury instruction that focused only on the actual knowledge of the emergency room physician, rather than the knowledge of the hospital, was erroneous. It is clearly the knowledge of the ***hospital*** that is in issue, and the knowledge of an emergency medical condition that is attributed to the hospital can come from other hospital staff besides the physician.

> B.     The hospital gains its knowledge from all its agents or employees, not just the emergency physicians.

The hospital obtains its knowledge vicariously through individuals, and for the purposes of EMTALA a physician is considered the agent of the hospital. *Burditt v. U. S. Dept. of HHS,* 934 F.2d 1362 (5th Cir. 1991), followed in *Battle, supra.* "[A]ny hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA." *Roberts, supra.,* at 788. But the physician, Dr. Haynes, was not the ***only*** person through whom Memorial could gain knowledge. The hospital knew, through the lab tech, Suzette Dalmeida, and through the hospital computer, that there was an abnormal band count. The hospital also knew, through Dr. Haynes, that a person can have a bacterial infection if the band count is abnormal. The hospital knew through Dr. Haynes that he had not ruled out a bacterial

source of infection. And the hospital knew through Dr. Haynes that the underlying bacterial infection had not been stabilized because no antibiotics had been administered or prescribed.

Memorial relies on *Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002) for the claim it makes in a footnote that only the medical staff can import knowledge to the hospital. The quoted sentence ("If the hospital's ***medical staff*** determines that there is an emergency medical condition, then . . . the staff must stabilize the patient . . ." (emphasis added)) is totally out of context. Whether the knowledge of other persons besides the physician medical staff can be attributed to the hospital for EMTALA stabilization claims was simply not contested. *Bryant* is case in which it was admitted that the medical screening was adequate; the only allegation was stabilization. The case involved a misdiagnosis of a lung abscess on a chest x-ray. The emergency physician had actually reviewed Bryant's chest x-ray and had misread the chest x-ray, failing to see the lung abscess. Therefore, his actual knowledge was that the chest x-ray was negative, and that he had ruled out a lung abscess. The emergency physician's knowledge was the only person whose knowledge was in issue. The Ninth Circuit held that the hospital had no knowledge of the lung abscess at the time the patient was discharged, so there was no valid EMTALA claim. Bryant supplies no authority to rebut the clear holding in *Roberts v. Galen of Virginia., Inc. supra.*

Defendant cites *Hoffman v. Tonnemacher*, 425 F.Supp.2d 1120 (E.D. Cal. 2006) in its discussion of stabilization, but not concerning medical screening. Hoffman was a case in which an elderly immunosuppressed woman was brought to the emergency room complaining of a previous fever of 106, chills with hyperventilation, chest pain, nasal congestion, cough and numbness in her hands. Dr. Tonnemacher, the ER physician, did a history and physical exam, and ordered a urinalysis and a chest x-ray, but no other tests. He actually reviewed the tests that he ordered, and

diagnosed fever and bronchitis.  He prescribed and administered oral antibiotics to Hoffman, and discharged her.  She returned to the hospital the next day suffering from sepsis and septic shock. Memorial relies on Hoffman for its argument that there can be no EMTALA liability for stabilization because Dr. Tonnemacher did not know about the emergency medical condition or that fact that Mrs. Hoffman was unstable; therefore, there was no EMTALA liability for failure to stabilize.  However, this case does not address Plaintiff's arguments in Guzman: first, that a fact issue exists whether Dr. Haynes knew he had not ruled out a bacterial cause of TG's symptoms; and second, that the knowledge of the hospital includes the knowledge of both Dr. Haynes and the lab tech.  In this regard, *Hoffman* is merely a recitation of the ordinary requirement of EMTALA that the hospital must know of the emergency medical condition.

*Hoffman* hurts Memorial much more than it helps.  In Hoffman, the court denied summary judgment on the medical screening issue under allegations almost identical to those in Guzman, i.e., that Mrs. Hoffman had a likely bacterial infection that had not been ruled out by the standard screening exam given at the hospital.  The Court held that a material fact issue existed whether Hoffman had been given an appropriate medical screening exam to rule out bacterial infection under the hospital's policies.  The Court also held that expert testimony that the hospital "could have done more" by giving additional tests, including a CBC and a blood culture, was evidence of a fact issue on the medical screening exam issue.  425 F.Supp.2d at 1139.  *Hoffman* is just like *Battle* – when the alleged emergency medical condition is a bacterial infection that has not been ruled out, failure to follow hospital guidelines and protocols is sufficient evidence of differential treatment to deny summary judgment.

C.      It is the emergency medical condition, not the diagnosis, that triggers the duty to stabilize.

Under the text of EMTALA, it is not the diagnosis that forms the basis of the duty to stabilize, but the emergency medical condition, which if left untreated, could result in serious impairment or injury to the patient. In *Thomas v. St. Joseph Healthcare, Inc.,* No. 2007-CA-001192-MR (Ky. Ct. App., Dec. 4, 2008) (see Pff SJ EXH M), the Defendant argued that the doctor's diagnosis of a different condition from the emergency medical condition alleged would prohibit an EMTALA stabilization claim being asserted against the hospital. However, the court held that it was not the diagnosis, but the existence of symptoms of sufficient acuteness and severity that could lead to material deterioration that trigger the duty to stabilize. *Id., at 8 - 9.* In sustaining a jury finding that the hospital had failed to stabilize the patient, the court found liability for failure to stabilize the condition, even though the physician testified to a different diagnosis and that the patient was stable. The court found that there was sufficient evidence in the abnormal laboratory results and the medical records to indicate that the patient's condition was likely to materially deteriorate. *Id,* at 9 - 10.

> D. The evidence shows clearly that Memorial knew of TG's emergency medical condition.

Plaintiffs have pled:

> Memorial Hermann Hospital System therefore had actual knowledge of an emergency medical condition, to wit, nausea, vomiting and cough in which a bacterial source of the condition was likely and which had not been ruled out by medical examination or laboratory tests.

Pff's Second Amended Complaint, Par. 4.4.1. This allegation is very close to the allegations made by the Plaintiffs in *Battle, supra,* i.e., a serious set of symptoms of infection (seizures), in which the source of the infection had not been determined or ruled out. Memorial had completely disregarded what Plaintiffs' have pled. Plaintiff's actual allegation is not even discussed in its motion. Instead,

Memorial argues about what Dr. Haynes diagnosed. It is important to analyze whether there is summary judgment proof to sustain Plaintiffs' allegation, despite the "diagnosis" of Dr. Haynes. In this regard, Memorial never offers any proof nor does it even deny that TG suffered from an emergency medical condition as alleged.

The Court should also not be unduly influenced by the idea that Dr. Haynes had diagnosed a viral syndrome. Viral syndrome is a diagnosis of exclusion. The relevant question is whether Dr. Haynes had "ruled out" a bacterial source of the infection. Memorial offers no testimony at all about whether Dr. Haynes had "ruled out" a bacterial source of infection. There is no such testimony from Dr. Haynes, and there is none from any of Memorial's experts. An unresolved fact question clearly exists whether Dr. Haynes had "ruled out" a bacterial infection (plaintiffs' allegation), even though his "diagnosis" was viral syndrome. Dr. Haynes' testimony is not conclusive, and is subject to substantial impeachment and contradiction, about whether he "ruled out" a bacterial source of infection. Dr. Haynes acknowledges that a person can have an abnormal white cell differential bacterial infection even if the total white cell count is normal. (Haynes depo, p. 153). There is nothing in the actual medical record to substantiate that Dr. Haynes even looked at any of the CBC, since he did not record the abnormal values of MCV, MCH and RBC on the order sheet under pertinent lab values. MHSE-0011. (Haynes depo, pp. 40 - 41). Regardless of why he did not see the white cell differential (conscious decision to discharge without seeing it or simply didn't look or didn't see it when he looked), a fact issue remains about whether Dr. Haynes had actual knowledge that he had not ruled out a bacterial source of infection. The state of Dr. Haynes knowledge or state of mind is extremely important, and this is the precise type of factual dispute in which summary judgment is improper. See section VI(C) and the cited cases.

In TG's case, it is quite clear that the laboratory technician, Suzette Dalmeida, had actual knowledge of the significantly abnormal white cell differential lab result, but did not personally report it to either Dr. Haynes or the nursing staff. According to Doug Mitchell, laboratory director at Memorial Southeast, the lab tech who did the manual white cell differential test must have had actual knowledge of the white cell differential test because she manually counted the cells. (Mitchell depo, pp. 63 - 4). Furthermore, it is also clear that if Dr. Haynes had this information, which the hospital knew, he would have done further work-up on TG to evaluate his condition and contacted his pediatrician. (Haynes depo, pp. 24 - 5). The results of the white cell differential had been published on the hospital computer system by 9:35 a.m. (Doug Mitchell depo, pp. 50 - 1). The lab computer system automatically creates a footnote when the manual differential is completed and posted, with the initials "GLM." (Mitchell depo, pp. 39 - 40) This footnote, GLM, appears in the laboratory medical records of TG, showing it was done at 9:35 a.m. (MHSE-0020). Thus, the hospital knew by 9:35 a.m. of the results of the manual differential. All of this knowledge is the hospital's corporate knowledge of TG's emergency condition, and it is this corporate knowledge that would have required Memorial Hermann Southeast to provide stabilizing treatment unless the likelihood of bacterial infection could be ruled out.

As the Court pointed out in *Battle*, the Fifth Circuit has interpreted EMTALA's provisions and "defined 'to stabilize' as '***treatment*** that medical experts agree would prevent the threatening and severe consequence of' the patient's emergency medical condition while in transit." In *Battle*, the Fifth Circuit reinstated the Plaintiff's "Stabilization" claim, concluding that the plaintiffs had met their burden to "identify evidence from which a jury could conclude that Memorial Hospital had actual knowledge that [the patient] had an emergency medical condition and, if so, that he was not

stabilized prior to discharge." *Id.*

The question of whether the hospital had actual knowledge of the emergency medical condition is a question for the trier of fact. *Broderson v. Sioux Valley Memorial Hosp.*, 902 F. Supp. 931 (N.D. Iowa 1995). In *Broderson,* the hospital's emergency physician and the nurses both testified and gave affidavits that no emergency medical condition existed. Yet the Plaintiff's expert suggested that no competent physician could reach such conclusions about the patient and objective evidence in the medical chart suggested that the hospital's witnesses were incorrect. The Court held that the plaintiff had to prove the existence of actual knowledge at trial, but for the purposes of summary judgment, a fact question had been presented.

E. There is ample summary judgment proof that TG had an emergency medical condition at the time of discharge, and was unstable.

Memorial argues that there is no evidence that TG was unstable, basing the argument on Dr. Haynes testimony that he felt TG was stable. However, there is abundant proof of the alleged emergency medical condition:

1. He had nausea, vomiting and cough. MHSE - 0009; (Haynes depo, p. 23).

2. The white blood cell differential had been completed by 9:35 a.m. and showed 59 % bands. (Mitchell depo, p. 50-51); MHSE-0020; affidavit of Stephen Hayden, MD, and accompanying report, Pff SJ Exh. J. This condition is known as a "left shift." (Haynes depo, p. 23).

3. A person can have an abnormal white cell differential bacterial infection even if the total white cell count is normal. (Haynes depo, p. 153). Furthermore, a normal white cell count does not rule out a bacterial infection. (Haynes depo, p. 154). The "left shift" was important the next day to Dr. Siddiqi in ruling in or ruling out the diagnoses that he considered in his

differential diagnosis on 2/13/06.  (Siddiqi, p. 78).  If Dr. Haynes had known of the results of the white cell differential, he would have re-evaluated TG and called in a pediatrician.

Therefore it is likely that this patient was suffering from a bacterial source of infection that had not been ruled out by medical examination or tests.

Plaintiffs direct the Court to the affidavit of Dr. Stephen R. Hayden, M.D., Plaintiffs' expert, which is attached at Pff. SJ Exh. J.  In this affidavit, Dr. Hayden points out that there was an emergency medical condition existing at the time of discharge as Plaintiffs have alleged, and that TG was unstable at the time of discharge because of the probably bacterial infection, even though TG may have appeared to be stable to Dr. Haynes.

EMTALA is not a negligence statute; it is a statute that rests responsibility on the hospital under limited situations.  Plaintiffs do not claim that Dr. Haynes' misdiagnosis makes the hospital liable.  Rather, Plaintiffs claim that the hospital is the sum of its parts.  Memorial should not escape liability because a patient like TG falls through the cracks of the system, when every bit of knowledge needed to confirm that he had an emergency medical condition was actually known to the hospital, and treatment required an injection of antibiotics and supportive care.

IX.     MEMORIAL FAILED TO PROVIDE AN APPROPRIATE MEDICAL TRANSFER OF TG.

A.     The transfer facts.

TG was brought back to the ER at Memorial Hermann Southeast on the morning of February 13, 2006, and after triage was seen by Dr. Mohammad Siddiqi, an emergency physician working with the same physician provider as Dr. Haynes.  Dr. Siddiqi first saw TG around By 9:45 a.m., Dr. Siddiqi had a definitive diagnosis of pneumonia.  (Siddiqi depo, p. 86).  At 11:15, Nurse Tammy

McCrumb noted that Dr. Siddiqi wanted to transfer TG to Memorial Hermann Children's Hospital. A call was initiated to Memorial Hermann around 11:30. The transfer coordinator's notes indicate that there were no pediatric ICU beds available at 11:30. Pff SJ Exh. L, page MHLF-0007. TG began to significantly deteriorate around noon. By 12:03 Dr. Siddiqi was considering that TG had sepsis. (Siddiqi depo, pp. 83-84). A note at 1204 by Tammy McCrumb indicates "still waiting on acceptance." MHSE-0048. Nevertheless, Memorial did not attempt to call Texas Childrens' or any other high level hospital. At 1337, the Transfer Coordinator at Hermann Children's noted that Dr. Erickson at Hermann Children's "would like to have pedi txport get the pt. (At this time they are on there [sic] way to Beaumont). Dr. Siddiqi is aware of the wait and is OK with it." MHLF-0007. At 1400, nurse McCrumb again noted that no beds were available. The transfer was to be by a pediatric transfer team. MHSE-0043. At 1425, an ambulance arrived for TG, but was turned away because Dr. Erickson at Memorial Children's wanted to use the pediatric transport ambulance. Dr. Siddiqi noted that no ICU beds were available at Memorial Childrens. MHSE-0040. Dr. Siddiqi's shift ended at 1500, and he discussed TG's case with another physician, and left the hospital around 1530. There is no evidence that Dr. Siddiqi or anyone else at Memorial Hermann SE or Memorial Hermann Children's hospital ever considered initiating transfer to Texas Children's Hospital, despite the unavailability of beds and a pediatric transport ambulance.

TG was intubated and placed on a ventilator about 1:30. At 1532, Nurse McCrumb recorded that his temperature was 107.9 degrees. She tried to locate Dr. Siddiqi, and learned 20 minutes later that Dr. Siddiqi had left the hospital. She contacted Dr. David Nguyen, another emergency physician on duty, and got him to examine TG. Dr. Nguyen contacted Hermann Childrens' and arranged for Life Flight, which was dispatched quickly thereafter. During this time TG's temperature reached

111.2 degrees. On arrival at Hermann Children's he had no palpable pulse and no blood pressure, and was breathing on a ventilator.

The EMTALA informed consent certification is included on the Memorial Transfer Memorandum, MHSE-

B.    The transfer law.

Plaintiffs have alleged, and the summary judgment evidence will substantiate that Memorial failed to provide an appropriate transfer of TG. EMTALA spells out the requirements of an "appropriate transfer" in 42 U.S.C. § 1395dd(c)(2), which states:

An appropriate transfer to a medical facility is a transfer:

(A)    in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

(B)    in which the receiving facility –
    (I)    has available space and qualified personnel for the treatment of the individual, and
    (ii)    has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(C)    [paraphrased] in which appropriate records, imaging studies and the informed consent certification have been sent;

(D)    in which the transfer is effected through qualified personnel and transportation equipment, as required, including the use of necessary and medically appropriate life support measures during transfer; . . . .

In addition, the certification required under EMTALA "shall include a summary of the risks and benefits upon which the certification is made." 42 U.S.C. § 1395dd(c)(1)(B).

C.    Why the transfer was inappropriate.

First, the transfer was inappropriate because it did not include the required "summary of the

risks and benefits upon which the certification was made." The form, page MHSE-0031, is signed by Dr. Siddiqi, but there is no explanation of the risks and benefits for the transfer included in the blank on the form. This violates both 42 U.S.C. § 1395dd(c)(1)(B), but also 42 C.F.R. § 489.24(d)(1)(ii)(B), which states that "[t]he certification must contain a summary of the risks and benefits on which it is based . . . ." The idea is to provide meaningful informed consent so that the patient's family can understand those risks and benefits of transfer.

Second, the transfer is appropriate only if the transferee hospital "has available space . . . for treatment of the individual." In this case, it is quite clear that there was no space available at 11:30, no space at 1400, and no space at 1424. Despite this fact, no attempt was made to transfer TG to Texas Childrens or to UTMB.

Third, the transfer has to be through qualified personnel and equipment. It is quite clear that Dr. Siddiqi was told at 1337 that the pediatric transport team was en route to Beaumont. There was no qualified transfer team available because it had been sent to Beaumont, and no one knew when it would be available. This is either a violation of subsection (D) (qualified personnel and transportation equipment) or (B) has available space.

Fourth, MHSE did not "provide the medical treatment within its capacity which minimizes the risks to the individual's health" under subsection A. Attached as summary judgment evidence is the affidavit and report of Dr. Stephen Hayden, who is the Editor-in-Chief of the Journal of Emergency Medicine, and has virtually every other credential in the field of emergency medicine one can imagine. Dr. Hayden's report, which was served on Defendant in August 2008, shows clearly that the hospital did not provide the medical treatment within its capacity to minimize the risks to TG's health for several reasons: the delay in giving antibiotics; the failure to initiate

aggressive fluid hydration or ventilatory support, which is the reason TG had to have an emergency intubation. Memorial has never addressed these opinions of Dr. Hayden, despite knowing of them since August 2008. These opinions clearly raise factual issues.

All of this evidence raises substantial fact questions concerning Memorial's compliance with EMTALA's transfer duties, precluding summary judgment.

D.    If Plaintiff's pleading was inadequate, Memorial should have filed a Rule 12(e) motion for more definite statement.

Memorial's claim that Plaintiffs' pleading are vague is without merit. The Federal Rules require notice pleading, and if Memorial felt Plaintiffs' pleading were inadequate, it should have filed a Rule 12(e) motion for more definite statement. Having failed to file such a motion, Memorial cannot now complain by moving for summary judgment.

X.    CONCLUSION AND PRAYER.

For all the reasons set forth above, Plaintiffs believe that there is sufficient summary judgment evidence in the record to defeat Memorial's Motion for Partial Summary Judgment Under Rule 56(C) on the EMTALA claims, and asks the Court to deny the Motion in its entirety. Alternatively, Plaintiff request that the Court grant a continuance from this Motion for Partial Summary Judgment and grant Plaintiff the right of discovery of records of other similar patients in order to more fully discover whether the medical screening examination given to TG by Memorial was different from that provided to other similar patients.

RESPECTFULLY SUBMITTED


_____/s/ Phillip A. Pfeifer_____
Phillip A. Pfeifer
Phillip A. Pfeifer, PC
5216 Jackson St.
Houston, TX 77004
SBOT No. 15883200
Fed. ID No. 2005
713.528.7700 (voice)
1.866.616.6888 (fax)
Attorney for Plaintiff(s)



## CERTIFICATE OF SERVICE

I, Phillip A. Pfeifer, attorney of record for Plaintiffs, hereby certify that a true and correct copy of Plaintiffs' Response to Motion for Partial Summary Judgment of Defendant, Memorial Hermann Hospital System, d/b/a Memorial Hermann Southeast Hospital was served on all counsel of record on April 29, 2009 in accordance with the Federal Rules of Civil Procedure, by electronic document transfer by the Clerk of the Court.

_____*/s/ Phillip A. Pfeifer*_____