Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit A

# SMYSER KAPLAN & VESELKA, L.L.P.

BANK OF AMERICA CENTER
700 LOUISIANA  SUITE 2300  HOUSTON, TEXAS 77002
TELEPHONE 713.221.2300  FACSIMILE 713.221.2320

Direct Dial Number:
713 221-2345

Author's E-mail Address:
cbryan@skv.com

February 25, 2009

Mr. Phillip A. Pfeifer                                          *Via Certified Mail-RRR*
Phillip A. Pfeifer, P.C.
5216 Jackson Street
Houston, TX 77004

> Re:  CA No. 07-03973; *Wendy Guzman vs. Memorial Hermann Hospital System; In the United States District Court, Southern District of Texas, Houston Division*

Dear Phil:

Enclosed are additional Emergency Center policies (bates numbered MHSE-TG-0287 through 0297).  Also enclosed is a redacted list of patients for whom Dr. Haynes ordered CBC with Differential from February 12, 2005 through February 12, 2006 (bates numbered MHSE-TG-0298 through 0300).

This shall serve as Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital's supplemental response to all discovery requests.

Sincerely,

Chris Bryan

CAB/tm
Encls.

cc:  Mr. Charles Brennig, III
     The Henke Law Firm, LLP
     3200 Southwest Freeway, 34th Floor
     Houston, Texas  77027

## Memorial Hermann Hospital System:
## EMERGENCY CENTER TRIAGE GUIDELINES
(Original document 6-1-99, REVISED 4-11-00, revised 10-17-00, revised 4/17/01, 5-30-02)

These guidelines have been developed to assist in expediting patient flow. These orders are substantiated based on the patient's chief complaint and the documented nursing assessment. They are meant to assist the staff in ordering appropriate studies which expedites evaluation by the physician or physician extender. The patient is to be brought directly to a room if one is available. They are not intended to delay physician evaluation. Triage guidelines may be initiated by the appropriate provider in the triage area or by the nurse assigned to the patient room if the patient is brought directly back. These protocols should not in any way delay the physician or physician extender evaluation, not meant in any way to be interpreted as a standard of care. They have been reviewed and approved by the site medical director and administrative director.

Protocols are designed based on Chief complaint. IV rates should be determined from the physician. Large bore IV is considered 16 or 18 gauge. It is accepted that IV starts, blood draws, performing EKG's, placing a patient on an EKG monitor, performing a bedside glucose determination, and oxygen administration are within the scope of practice of the ED tech and may be initiated by these providers. These providers, however, may only accomplish this after appropriate in servicing and documentation of skill/competency.

In event that a patient leaves prior to evaluation by the practitioner, the nursing staff must present all aged labs, EKGs, and/or x-rays to the attending physician. These will then be reviewed by the physician, if required, the patient will contacted and advised to return to the Emergency Center.

### ABDOMINAL PAIN
**FEMALE**
NPO
➢ CBC,
➢ HCG if childbearing age/HCG Quantitative if known pregnancy
➢ UA clean catch - Female cath specimen if vag. bleeding ↑ vag. Discharge or obese (Foley preferable if elderly, incontinent)
➢ Save extra tubes (draw 4 tubes)
Consult MD/MLP for pelvic exam as indicated
Saline lock (18 G) for severe pain or unstable V/S
Old chart
**MALE**
NPO
➢ CBC
➢ Collect and hold urine
➢ Save extra tubes (draw 4 tubes)
Saline lock (18 gauge) for severe pain
Old chart

### ALTERED MENTAL STATUS (NONTRAUMATIC)
Notify MD on arrival
O2 by nasal cannula at 2L/min
Cardiac, BP and pulse oximetry monitors
Saline lock (18g or larger)
Stat bedside glucose
➢ CBC
➢ BMP

➢ UA (Foley as appropriate)
➢ HCG if childbearing age/HCG Quantitative if known pregnancy
➢ Save and hold blood tubes
Old chart

### AMBULANCE PATIENTS WITH SPINAL IMMOBILIZATION
TRIAGE: Immediately notify the MD and/or MLP for any patient with complaint or finding suspicious of a spinal cord injury (numbness or weakness)
Notify the MD/MLP pt is awaiting room (may be assessed in hallway)
MD/MLP will assess patients with neck pain for X-table lateral, C-spine order
*Ambulatory patients with significant mechanism of injury and neck pain should be appropriately immobilized in triage

### ANAPHYLACTIC REACTIONS
Notify MD on arrival
O2 by nasal cannula at 2L/min if dyspnea/shock
Cardiac, BP, and pulse oximetry monitors
Saline lock
IV NS (large bore) if pulse ≥120 and/ or BP ≤ 90. (ask MD for rate)
Request MD medication order as appropriate
Old chart

### CVA/STROKE
Notify MD on arrival
Frequent Neuro reevaluation and record
Cardiac, BP, and pulse oximetry monitors
O2 by nasal cannula at 2L/min
Alert CT of potential CT scan
Saline lock
➢ CBC
➢ BMP
➢ PT/PTT
➢ Save extra tubes
EKG
Old chart

### CHEST PAIN (SUGGESTIVE OF CARDIAC DISEASE > 35 YEARS)
Obtain EKG in triage if no bed immediately available and show to MD
O2 by nasal cannula at 2L/min
Cardiac, BP and pulse oximetry monitors
Saline lock (consider twin lumen catheter)
➢ CBC
➢ BMP
➢ CK
➢ CKMB
➢ Troponin T
Medications
➢ ASA - 325 mg po if not allergic, on anticoagulant, and not received prior to arrival
➢ NTG - 1/150 gr. SL q 5 min x 3 for c/p if patient previously on nitrates and blood pressure > or = 100mm. **Do not give NTG if received prior to arrival or if patient has taken Viagra within 24 hours (without consulting MD first)
Old Chart

### DIABETIC KETOACIDOSIS (KNOWN DIABETIC WITH N/V, KUSSMAUL RESP. AND/OR ODOR ACETONE ON Breath)
Notify MD on arrival
Cardiac and BP monitors
IV normal saline (large bore) Request rate from MD
Stat bedside glucose
➢ CBC
➢ BMP

➢ Serum acetone
➢ UA voided
Old chart

### DIABETES WITH HYPOGLYCEMIA
Adult patients presenting with altered mental status and potential hypoglycemia:
Obtain STAT bedside fingerstick
Saline lock
➢ BMP
➢ Save and hold 4 blood tubes
Administer D50 1 amp for finger stick of < 50
Notify MD immediately

### DYSPNEA (PEDIATRICS)
Notify MD on arrival if patient is distressed with rapid or labored respirations, use of accessory muscles or O2 sat ≤ 92% on Room air on arrival
Follow adult dyspnea protocol with the following medications:
1. If O2 sat ≤ 92% give O2 by nasal cannula at 3L/min or mask (10L) to younger children
2. If wheezing present - Albuterol 0.5 cc Neb Tx Zopenex may be substituted
3. Peak flow before/after every treatment
4. Delete BP monitoring if arrival BP monitoring normal
5. Delete cardiac monitoring if pulse ≤ 150 (child < 6 yr. old)

### DYSPNEA (ADULT)
Notify MD if distressed or O2 sat ≤ 92%
O2 by nasal cannula at 2L/min
Cardiac, BP and pulse oximetry monitors
Saline lock if pt is distressed or arrival O2 sat ≤ 92%
Lab - Aminophylline level if pt. taking this, hold extra tubes
If wheezing present - Albuterol Neb Tx - Albuterol 0.5cc (Atrovent 1 unit dose if no history of glaucoma)
Peak flow before/after every Neb Tx

### EXTREMITY FRACTURES (EXTREMITIES ONLY)
Notify the MD on arrival for suspected long bone fractures any ANY open fractures
Immobilize injury as appropriate
Elevate the injured area
Apply an insulated cold pack to the area
Perform neurovascular exam
Consider pregnancy potential before x-raying and offer pregnancy testing in nonemergent/equivocal cases (or consider shielding for x-rays)
Order 1 but not more than 2 sets of the following selections: shoulder, humerus, elbow, forearm, wrist, hand, finger(s), femur, knee, tib/fib, ankle, foot, or toe(s). If > 2 sets are required, MD/MLP consultation regarding ordering should be done
Notify the MD for any abnormalities: cyanosis, pallor, weak or absent pulse, gross deformity, absence of sensation, absence of movement, suspicion of open fracture, inability to weight bear if pain is in hip or thigh

### EYE INJURIES
Notify MD immediately for:
➢ acute chemical burns
➢ hyphema
➢ Suspected globe rupture (leak of humor)
➢ Penetrating injury
Visual acuity and record
Slit lamp and Eye tray to room

MD = Emergency Room Physician
MLP = Mid-Level Practitioner (NP, PA, etc...)
08/13/02

Prepare to irrigate chemical injuries (on the MD's order) with lactated ringers
Administer DT 0.5 cc IM as ordered

## FEVER: PEDIATRIC (< 3 MONTHS)
If temp ≥ 100.6 F rectally, notify MD immediately to consider septic work-up
**4 WEEKS:**
Notify MD immediately
Saline Lock
➢ Blood Culture x 1
➢ CBC
➢ BMP
➢ UA (cath)
Chest x-ray
Prepare for potential LP and IV infusion

## FEVER: PEDIATRIC (3 MONTHS TO 18 YRS)
1. Tylenol 15mg/kg Temp ≥ 101F. Compensate for parental underdosing prior to child's arrival. Avoid po route for patients presenting with a chief complaint of abd. Pain  Exceptions: Allergy or age less than 60 days - notify MD
2. Pediatric Motrin 10 mg/kg Temp ≥ 102.5F  Exceptions: allergy to ibuprofen, NSAID, ASA; age less than 6 months; prior history of GI bleed, gastritis, ulcer or asthma; suspected chicken pox (varicella) or influenza; Tylenol has not been given by protocol; presentation of abdominal pain as a chief complaint

## FEVER: ADULT  - Fever > or = 101F
Tylenol 650-1000mg po unless allergic
OR
Motrin 400-800 mg po unless allergic including NSAID/ASA

## KIDNEY STONE (SUSPECTED)
Notify MD for severe pain and request medication
Strain all urine
line lock
➢ CBC
➢ BMP
➢ UA clean catch  - Female cath specimen if vag. bleeding ↑ vag. discharge or obese (Foley preferable if elderly, incontinent)
Old chart

## HEAD INJURY
Notify MD on arrival
Follow major trauma protocol as indicated including care/evaluating of C-spine
Cardiac, BP, and pulse oximetry monitors
Position head higher than feet, immobilize C-spine
Glasgow coma scale (document HOURLY)
Old chart

## GI BLEEDING
Notify MD for active bleeding or unstable vital signs
O2 by nasal cannula at 2L/min
Position head lower than feet if shock is present (BP ≤ 90/60)
Cardiac and BP monitors
IV NS (large bore) and request a rate from the MD
➢ CBC
➢ BMP
➢ PT/PTT
➢ Type and screen
➢ Save and hold  4 extra tubes
Orthostatic VS if tolerated and BP ≥ 90 mm hg
Old chart

## HTN WITH S/S (> 180/110, HEADACHE, BLURRED VISION, DIZZINESS, ETC.)

---

Notify MD on arrival
O2 by nasal cannula at 2L/min
Cardiac and BP monitors
Saline lock
Take and record BP on both arms
➢ CBC
➢ BMP
➢ HCG - if childbearing age
➢ Save and hold 4 extra tubes
EKG if age ≥ 35 yr.
Old chart

## LACERATION PREP
Unless directed otherwise by MD, perform the following procedure utilizing aseptic technique:
1. In triage, examine the wound and then cover with sterile gauze, which has been slightly moistened with normal saline.  Do not soak the wound in saline, water, or betadine
2. After MD and/or MLP evaluation, set up/open suture tray, place suture material as ordered by MD/MLP
3. Apply sterile moistened saline gauze if there will be a delay in anesthetic administration
4. Wound irrigation may be performed by the MD and/or MLP or as directed by the MD/MLP and will typically be of the high pressure type employing a syringe and needle or cath. (20 cc syringe and 18g catheter), and using an appropriate volume of NS
5. Administer DT 0.5cc IM to adults as ordered by MD/MLP

## URINARY TRACT INFECTION (SUSPECTED)
➢ UA - males clean catch / females clean catch - cath specimen if vag. bleeding ↑ vag. discharge or obese (Foley preferable if elderly, incontinent)
➢ Hold urine for C&S (request from MD)
➢ HCG if childbearing age/HCG Quantitative if known pregnancy
Old chart

## SEIZURES
Notify MD on arrival
Guardrails up
Document neuro assessment
Cardiac, BP, and pulse oximetry monitors
Apply O2 as needed to maintain saturation > 90%
Saline lock
Lab- draw and hold tubes, order therapeutic drug levels if appropriate
** New onset seizures order CBC, BMP (HCG for women of child bearing age)
Old Chart

## SHOCK (NONTRAUMATIC)
Notify MD on arrival
Administer O2 to maintain sat. > 90% via facemask or cannula
Cardiac, BP, and pulse oximetry monitors
IV NS (large bore) and request a rate from the MD
Modified Trendelenberg position
➢ Blood culture if febrile or hypothermic
➢ CBC
➢ BMP
➢ UA (Cath)
➢ PT/PTT
➢ HCG if childbearing age
Portable CXR
EKG
Old chart

## SICKLE CELL PAIN CRISIS
Apply O2 per nasal cannula at 2L

---

Normal Saline IV line
➢ CBC
➢ BMP
➢ Retic count
➢ UA for patient with back/flank pain Female cath specimen if vag. bleeding ↑ vag. discharge or obese (Foley preferable if elderly, incontinent)
Add CXR PA/lateral for cough/fever, dyspnea
Notify MD immediately for pain medications and fluid bolus/ therapy

## VAGINAL BLEEDING
NPO
Orthostatic V/S,
**FHT's if known pregnancy
IV access (larger bore), saline lock if stable.  If unstable, request IV fluids / rate from MD
Notify MD if unstable, severe bleeding, severe pain, or passage of tissue
Consult MD and/or MLP for coordination of pelvic exam
➢ CBC
➢ HCG if childbearing age/HCG Quantitative if known pregnancy
Old chart

## VOMITING/DIARRHEA: PEDIATRIC (2 MONTHS TO 18YR)
Notify MD if:
➢ child appears toxic
➢ Dehydration
➢ Vital signs are abnormal
Use protocol for pedi fever
➢ Saline lock, CBC and BMP if child appears significantly dehydrated
➢ UA voided (bag or clean void) if 3 or more episodes of vomiting or if UTI symptoms present and not likely to be contaminated by stools, Cath UA requires order from MD

## PSYCHIATRIC PATIENT (SUICIDAL/HOMICIDAL)
If patient is an active threat to self/others, triage to bed (for patient protection consider security to bedside or psych tech to bedside) Restraint per policy.
Notify MD for expedited eval and medical clearance
Page Psych response for consultation/eval (may be done at triage to expedite eval)
Consider Tylenol and ASA level for any suspicion of overdose
➢ CBC
➢ BMP
➢ ETOH
➢ UDS
➢ HCG if childbearing age & no hysterectomy

## TRAUMA
Notify MD on arrival
Notify trauma team if patient meets trauma activation criteria
O2 by nasal cannula at 2L/min or high flow mask as appropriate
Cardiac, BP, and pulse oximetry monitors
IV NS (large bore) x 2 and request rate
Modified Trendelenberg position if BP < or = 90/60
Stat x-table portable C-spine x-ray for head injury, neck pain, or suspected neck injury (immobilize c-spine)
Stat portable CXR for injury to chest, back, abd, or pelvis

MD = Emergency Room Physician
MLP = Mid-Level Practitioner (NP, PA, etc…)
08/13/02

Clean obvious wounds and apply sterile saline
dressing
➤　　CBC
➤　　BMP
➤　　HCG if childbearing age
➤　　UA (request collection method from MD or if
　　　decreased level of consciousness or shock
　　　present)
➤　　For abdominal pain/ injury - consider PT/PTT,
　　　type and screen, hold extra tubes,
EKG for chest injury or shock
Old Chart

TRAUMA:  PREGNANCY > 20 WEEKS
Notify MD immediately
See above guideline
Record vital signs and FHTs

Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit B

# SMYSER KAPLAN & VESELKA, L.L.P.

BANK OF AMERICA CENTER
700 LOUISIANA  SUITE 2300  HOUSTON, TEXAS 77002
TELEPHONE 713.221.2300  FACSIMILE 713.221.2320

Direct Dial Number:
713 221-2345

Author's E-mail Address:
cbryan@skv.com

February 25, 2009

Mr. Phillip A. Pfeifer
Phillip A. Pfeifer, P.C.
5216 Jackson Street
Houston, TX 77004

*Via Certified Mail-RRR*

Re:   CA No. 07-03973; *Wendy Guzman vs. Memorial Hermann Hospital System; In the United States District Court, Southern District of Texas, Houston Division*

Dear Phil:

Enclosed are additional Emergency Center policies (bates numbered MHSE-TG-0287 through 0297). Also enclosed is a redacted list of patients for whom Dr. Haynes ordered CBC with Differential from February 12, 2005 through February 12, 2006 (bates numbered MHSE-TG-0298 through 0300).

This shall serve as Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital's supplemental response to all discovery requests.

Sincerely,

Chris Bryan

CAB/tm
Encls.

cc:   Mr. Charles Brennig, III
The Henke Law Firm, LLP
3200 Southwest Freeway, 34th Floor
Houston, Texas  77027

## MHHCS
## CORPORATE POLICY AND PROCEDURE MANUAL

**POLICY TITLE:**   Assessment/Reassessment

**CATEGORY:**                Emergency Center
**INDEX NUMBER:**        EMC-00006
**ORIGINAL DATE:**        6/30/2005
**LAST REVIEW DATE:**    7/1/2005
**SUPERCEDES:**

---

1.   **PURPOSE:**

   1.1   To determine the severity of illness or injury for all patients who present to the Emergency Department for treatment. To perform a systematic and comprehensive evaluation of those illnesses or injuries and initiate appropriate interventions

2.   **STATEMENT:**

   2.1   Assessments are divided into primary and secondary surveys. Assessments shall be initial and ongoing.

3.   **PROCEDURE:**

   3.1   Primary Survey:

      3.1.1   Involves a brief, rapid assessment to identify actual or potential, life threatening illness or injury:
         3.1.1.1   Airway
         3.1.1.2   Breathing
         3.1.1.3   Circulation
         3.1.1.4   Disability
            3.1.1.4.1   GCS (Glascow Coma Score)

   3.2   Secondary Survey:

      3.2.1   Involves a more focused & detailed evaluation of the patient to identify other, less severe, non-life-threatening, illness or injury. After the life-threatening issues have been addressed, the following should be obtained:

MHSE-TG-0293

3.2.1.1 **Vital signs:** a complete set of vital signs, when clinically indicated, including pulse oximetry and pain scale, should be obtained.

3.2.1.2 **Head to toe assessment of body systems**, when clinically indicated. The assessment may be focused on only the area of complaint, or the entire body.

3.2.1.3 **Cardiac rhythm:** When clinically indicated (ie: chest pain, arrhythmia), an EKG should be obtained & monitor strip mounted on the nurses notes as a baseline and whenever significant changes in rate, rhythm or ectopy occur.

3.2.1.4 **Glascow coma scale:** should be obtained on all patients when clinically indicated (ie: head trauma, altered mental status). All trauma patients require an admission GCS.

3.2.1.5 **Last menstrual period:** should be obtained on all female patients of child bearing age, when clinically indicated (ie: abdominal pain, vaginal bleeding).

3.2.1.6 **Immunization history:** (specifically last tetanus) should be obtained on all patients, when clinically indicated (ie: laceration, all trauma patients).

3.2.1.7 **Weight:** should be obtained on all pediatric patients and any patient requiring medications with weight based dosing (ie: rabies immunization, heparin). Weight should be actual (by scale) , not estimated/stated weight.

3.2.1.8 **Head circumference:** should be obtained on children < 12 months when clinically indicated (ie: hydrocephalus, failure to thrive).

3.2.1.9 **Visual acuity:** should be obtained when clinically indicated.

3.2.1.10 **Past medical & surgical history:** any significant medical or surgical history should be ascertained & documented in the chart.

3.2.1.11 **Current medications:** A complete list of the patients' medications, including over the counter & herbal/natural remedies should be documented in the chart.

3.2.1.12 **Allergies:** A complete list of the patients' allergies should be listed in the chart.

3.3 Reassessment:

3.3.1 The frequency of reassessment is based on the patient's acuity, condition, history & complaint, or as directed by the Physician; minimally every four (4) hours.

3.3.2 Timing of reassessments should reflect the patients' status at any given moment they are in the Emergency Center.

MHSE-TG-0294

      3.3.3 An additional set of vital signs, including temperature and GCS, when clinically indicated, should be obtained within one hour of patient's discharge.

APPROVED: <u>Thomas J. Flanagan, RN, BSN, MA, LP, CMTE</u>
                  Assistant Vice-President
                  Corporate Emergency Services

APPROVED: <u>John Zerwas, MD</u>
                  Sr. Vice President & Chief Medical Officer
                  Memorial Hermann Healthcare System

DATE: <u>June, 2005</u>

MHSE-TG-0295

Plaintiffs' Response to Memorial Hermann Motion for Summary Judgment

Exhibit C

# SMYSER KAPLAN & VESELKA, L.L.P.

BANK OF AMERICA CENTER
700 LOUISIANA  SUITE 2300  HOUSTON, TEXAS 77002
TELEPHONE 713.221.2300  FACSIMILE 713.221.2320

Direct Dial Number:                                                    Author's E-mail Address:
713 221-2345                                                           cbryan@skv.com

February 25, 2009

Mr. Phillip A. Pfeifer                                    *Via Certified Mail-RRR*
Phillip A. Pfeifer, P.C.
5216 Jackson Street
Houston, TX 77004

      Re:    CA No. 07-03973; *Wendy Guzman vs. Memorial Hermann Hospital System; In the United States District Court, Southern District of Texas, Houston Division*

Dear Phil:

Enclosed are additional Emergency Center policies (bates numbered MHSE-TG-0287 through 0297). Also enclosed is a redacted list of patients for whom Dr. Haynes ordered CBC with Differential from February 12, 2005 through February 12, 2006 (bates numbered MHSE-TG-0298 through 0300).

This shall serve as Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital's supplemental response to all discovery requests.

Sincerely,

Chris Bryan

CAB/tm
Encls.

cc:    Mr. Charles Brennig, III
       The Henke Law Firm, LLP
       3200 Southwest Freeway, 34th Floor
       Houston, Texas  77027

**MHHCS**
**CORPORATE POLICY AND PROCEDURE MANUAL**

**POLICY TITLE:**   Documentation

| | |
|---|---|
| **CATEGORY:** | Emergency Center |
| **INDEX NUMBER:** | EMC-00007 |
| **ORIGINAL DATE:** | 6/30/2005 |
| **LAST REVIEW DATE:** | 7/1/2005 |
| **SUPERCEDES:** | |

---

**POLICY PURPOSE:**

1.1   To provide guidelines for documentation expectation for every Emergency Center patient.

**2.   POLICY STATEMENT:**

2.1   Each patient will be placed into the Med Host tracking and charting system upon arrival to triage and each patient will have an Emergency Center Nursing Record completed.

**3.   PROCEDURE:**

3.1   The Emergency Center Nursing Record will be initiated on the patient on arrival, with all required identification and demographic data.

3.2   A Pediatric Emergency Nursing Record will be initiated on all patients less than 14 years old.

3.3   Trauma Nursing Record will be initiated on all patients who have traumatic mechanism of injury, vital signs or who meet physiological criteria in all facilities that are Designated Trauma Centers.

3.4   3.4.1  The Registered Nurse will document the time of the patient presentation and initial triage assessment time, the patient's primary complaint, triage acuity level, allergies, current medications, recent tetanus vaccine (if appropriate), initial vital signs, significant past medical history, room disposition when placed into a EC room and actual weights on children less than thirteen years old.

3.4.2  Reassessments and vital signs will be documented as directed in the assessment/reassessment policy.

MHSE-TG-0296

3.5    All orders must be initialed and timed when completed.

APPROVED: Thomas J. Flanagan, RN, BSN, MA, LP, CMTE
                      Assistant Vice-President
                      Corporate Emergency Services


APPROVED: John Zerwas, MD
                      Sr. Vice President & Chief Medical Officer
                      Memorial Hermann Healthcare System

DATE: June, 2005

Plaintiffs' Response to Memorial Hermann Motion for Summary Judgment

Exhibit D

### MHHS
### MEMORIAL HERMANN SOUTHEAST HOSPITAL
### POLICY AND PROCEDURE MANUAL

**POLICY TITLE:**   AFTERCARE INSTRUCTIONS AND FOLLOW-UP

| | |
|---|---|
| **CATEGORY:** | Emergency Services |
| **INDEX NUMBER:** | EMS-00015 |
| **ORIGINAL DATE:** | 4/1/1997 |
| **LAST REVIEW DATE:** | 6/22/2005 |
| **SUPERCEDES:** | 07/25/2003 |

#### POLICY PURPOSE:

1.   All patients who are treated in the Emergency Department will receive follow-up care instructions.

#### POLICY STATEMENT:

1.   The aftercare instruction will be given verbally by the nurse or physician to the patient, appropriate caregiver or significant other.  The aftercare instruction page should be signed by the nurse/physician and patient.  Original remains with the chart and patients will be given written copies of the aftercare instruction page.
2.   When the Emergency Department physician determines a need for change in follow-up of care and treatment in regards to final diagnostic results (to include culture and x-ray reports) after the patient has been discharged, they are to:

    2.1   Initiate the Emergency Department *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form*.
    2.2   Document request and when appropriate, write a prescription.
    2.3   The nurse will document the outcome.

3.   The Emergency Department Follow-Up/Patient Consultation for Lab and X-Ray Reports Form is to remain with the chart.  A copy of any correspondence should be put in the patient's record.
4.   It is the responsibility of the charge nurse or designee to:

    4.1   Promptly respond to follow-up reports
    4.2   Document any recommended changes in treatment plan on the *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form*.
    4.3   If it is a diagnostic follow-up change for any further recommended tests or medications that are needed after the patient is discharged from the Emergency Department:

       4.3.1  Patient will be contacted and notified by phone.

       4.3.2  A certified letter will be sent out within 48 hours of notice of change in treatment plan if unable to reach by phone.

5.    Culture/Sensitivity Follow-up Protocol

    5.1    All culture and sensitivity reports are reviewed by the physician or Mid-Level Providers (MLP) as they are returned from the laboratory, to ascertain that the appropriate antibiotic therapy has been administered in accordance with the sensitivity patterns.

    5.2    If the report was evaluated by the Emergency Department physician and found that a more appropriate antibiotic should have been ordered, it will be brought to the attention of the current physician or MLP on duty for a recommended change in treatment plan and a prescription will be written as appropriate and follow-up procedure followed.

6.    Diagnostic Imaging Follow-Up Protocol

    6.1    Next day confirmed reading from radiologist with recommended follow-up will be brought to the Emergency Department.

    6.2    Nurse/unit secretary will document:

       6.2.1  Document the confirmed change on the *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form.*

       6.2.2  Retrieve the chart

       6.2.3  Give confirmed reading, chart, and Emergency Department *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form* to the Emergency Department physician or MLP on duty.

    6.3    Physician or MLP on duty fills out the Emergency Department *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form* then gives it and the prescription to the charge nurse/Fast Track nurse.

    6.4    Nurse/unit secretary will:

       6.4.1  Log the final recommendation on the *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form.*

       6.4.2  Call the patient to have the test done.

       6.4.3  If unable to reach by phone, a certified letter will be sent within 24 hours.

       6.4.4  Follow the protocol for documenting on Emergency Department *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form.*

       6.4.5  Take the prescription to Triage for patient pick-up.

    6.5    Provide patient instructions:

6.5.1  Tell patient to come by Triage window to pick up the prescription for the recommended further diagnostics.

6.5.2  The Emergency Department *Follow-Up/Patient Consultation for Lab and X-Ray Reports Form* gets placed in the patient record when completed.

## RESPONSIBILITY:

Charge Nurse, LVN, Mid-Level Provider, Emergency Physician

## PROCEDURE:

None

| APPROVED: | Christine Wiese, Director | Trudi Stafford, AVP Nursing |
|-----------|--------------------------|------------------------------|
| DATE:     | 6/22/2005                | 6/27/2005                    |

Plaintiffs' Response to Memorial Hermann Motion for Summary Judgment

Exhibit E

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
                   HOUSTON DIVISION

WENDY GUZMAN, INDIVIDUALLY  )
AND AS NEXT FRIEND OF       )
████████   GUZMAN, A MINOR  )
                            )
                            ) CIVIL ACTION NO. 07-3973
V.                          )
                            )        JURY DEMANDED
MEMORIAL HERMANN HOSPITAL   )
SYSTEM, D/B/A MEMORIAL      )
HERMANN SOUTHEAST HOSPITAL  )
***********************************************************
```

                ORAL AND VIDEOTAPED DEPOSITION OF

                  PHILIP HAYNES, M.D., Ph.D.

                      January 18, 2008

                      Volume 1 of 1

```
***********************************************************
```

    ORAL AND VIDEOTAPED DEPOSITION of PHILIP HAYNES,

M.D., Ph.D., produced as a witness at the instance of

the Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 18th of January,

2008, from 9:45 a.m. to 1:25 p.m., before Connie H.

Lindsay, CSR, in and for the State of Texas, reported by

machine shorthand, at the law offices of Callaway &

Brennig, Three Allen Center, 333 Clay, Suite 4510,

Houston, Texas, pursuant to the Federal Rules and the

provisions stated on the record or attached hereto.

Page 18

1    A.  -- counts.
2    Q.  In terms of the values that are present on
3  Exhibit 1, are those correct values as compared to
4  Exhibit 2 so far as it goes?
5    A.  Are you asking me are they identical values?
6    Q.  Yes.
7    A.  Yes, sir, they are.
8    Q.  Okay.  Here's the question:  When you were
9  seeing ███ on February 12th of '06, were you aware
10  of those differential white cell count values?
11    A.  No, sir, I was not.
12    Q.  And what explanation do you have for why you
13  were not aware of those white cell count values?
14    A.  At -- as I remembered that day, I -- when I
15  looked at the lab values for Mr. Guzman, the -- the only
16  values I remember seeing were the -- results of the
17  CBC:  the white blood cell count, the hemoglobin,
18  hematocrit and the electrolytes.  And when I looked at
19  the time, the differential count was not there.
20    Q.  Okay.  Would it be possible for you to take a
21  pen, I guess -- I've got a red pen here, I believe.  If
22  you would, take a red pen and on Exhibit No. 2 put a
23  check mark by those values that you believe that you did
24  actually see on February 12th.
25    A.  By each one?

Page 19

1    Q.  Yes, please.
2    A.  (Complies.)
3    Q.  Have you done that?
4    A.  Yes, sir.
5    Q.  May I take a look at that, please?
6    A.  (Complies.)
7    Q.  Thank you.
8        So would it be fair to say that you saw
9  the hemogram but not the differential on February 12th?
10    A.  Correct.  The -- the total white blood cell
11  count, the hemoglobin, hematocrit and the platelet count
12  but not the differential.
13    Q.  Okay.  Now, had you ordered the differential?
14    A.  I didn't order the differential specifically,
15  it just comes as part of the complete blood count.
16    Q.  Okay.  So when you circle complete blood count
17  on the physician order page, you're ordering not just
18  the hemogram, you're also automatically going to get the
19  differential values from that order.
20    A.  Correct.
21    Q.  Okay.  So here's the question:  Why didn't you
22  get the differential information that day?
23    A.  Are you asking me why I didn't see the
24  differential or why it didn't -- why it wasn't presented
25  to me?

Page 20

1    Q.  We'll go with the first part, why you didn't
2  see the differential, number one.
3    A.  Okay.  Well, I -- on that day I evaluated
4  Mr. Guzman.  I believed he was -- he complained about
5  nausea and vomiting and I believed he was suffering from
6  a viral-type syndrome.  Based on his clinical picture --
7  excuse me -- based on his clinical progression that day,
8  based on the laboratory values I had available to me at
9  that time, I felt he was stable for discharge.  And
10  I did not see that differential count --
11    Q.  Okay.
12    A.  -- before I discharged him.
13    Q.  All right.  Is the reason that you didn't see
14  the differential count because you didn't look for the
15  differential count before you discharged him?
16    A.  No, sir.  The reason I didn't see it when I --
17  when I looked at the lab values -- I think it was
18  sometime around 10:00 o'clock in the morning -- the
19  differential values were not there on the computer.
20    Q.  Okay.  Did you make any inquiry about the
21  differential values when you decided to send ███
22  home?
23    A.  No, sir, I did not.
24    Q.  In looking at the differential values here
25  today as shown on Exhibits 1 and 2, do you agree with me

Page 21

1  that the differential on ███ is abnormal?
2    A.  Yes, sir, I do.
3    Q.  And how would you characterize the degree of
4  abnormality in that differential that you see on
5  ███
6    A.  I don't know that I would be able to
7  specifically say there degrees of abnormality other than
8  to say that it is abnormal.
9    Q.  Okay.  Does that differential show what is
10  called a left shift?
11    A.  Yes, sir, it does.
12    Q.  Okay.  At any time on February 12th of '06,
13  did anyone from the laboratory department ever call you
14  and talk to you about these lab values on ███
15    A.  No, sir, no one did.
16    Q.  On the morning of February 12th of '06 at
17  Memorial Hermann, did any member of the staff in the
18  emergency department contact you about these
19  differential white cell count values on ███
20    A.  No, sir, no one did not.
21    Q.  Okay.  Did Frank Blain ever discuss with you
22  any of the blood work on ███
23    A.  No, sir.  He didn't discuss the -- that
24  specific values.  He did ask me if I'd taken a look at
25  them before the patient was discharged home.  He -- he

Page 22

1   was the one who came to me and said that the family was
2   wondering what the lab values were and -- and what our
3   plan was for him.  But he didn't look at those values
4   specifically.  He didn't question me about the specific
5   values.
6       Q.  Okay.  Well, let's break this down, then.
7   Sometime around -- between 10:00 and 10:15 on the
8   morning of February 12th of -- of '06 you have a
9   conversation with Frank Blain.
10      A.  Correct.
11      Q.  And the conversation with Frank Blain is from
12  the family -- he's relating that the family wants to
13  know what the lab results were.
14      A.  If I remember correctly, he -- he came to me
15  and -- and said that the family was wondering what our
16  plan was for them, mentioned that they were interested
17  in going home and -- and wanted to know if he could pull
18  out the IV.
19      Q.  Well, you told me in a previous answer that
20  you had a discussion with him about the lab values prior
21  to discharge.
22      A.  I believe -- I believe that's not correct.
23  I -- I spoke with him.  He was wondering what the lab
24  values were, but he didn't ask me specifically what they
25  were.  In other words, he -- he told me that the family

Page 23

1   wanted to know what our plan was.  It wasn't
2   specifically, Hey, what are these lab values?  What are
3   they -- what do they mean?  He didn't speak to me about
4   specific lab values at all.  He just wanted to know what
5   the plan was and if I was ready to send him home.
6   And -- and I told him to hold on, I was going to come
7   talk to the family about those values.
8       Q.  Did you know at the time that you were
9   discussing this with Frank that you didn't have the
10  differential back?
11      A.  Yes, I did.
12      Q.  Okay.  And so is it true, then, that you made
13  the decision to discharge ▇▇▇▇▇ knowing that the
14  differential values had not come back and you hadn't
15  seen them?
16      A.  Yes, I did.
17      Q.  Okay.  And would you give us your reasoning
18  for making the decision to discharge ▇▇▇▇ knowing
19  that the lab values for the differential had not come
20  back?
21      A.  Certainly.  I -- I can tell you that when
22  ▇▇▇▇▇ presented that day, he -- you know, as I said
23  before, I think I mentioned that -- he was complaining
24  of nausea and vomiting.  His mother told us that he was
25  suffering from a -- a cough also.  And based on his

Page 24

1   clinical picture at that time went -- you know, I went
2   in and did a whole physical exam on him, interviewed him
3   and talked to his parents.  Based on that information,
4   based on the fact that he was clinically stable, his
5   saturation on room air was normal.  He had clear breath
6   sounds bilaterally, had no retractions, was in no
7   respiratory distress.  I believe we gave him a fluid
8   challenge by mouth to make sure that he was no longer
9   vomiting.  And based on all that and the fact that the
10  family wanted to go home, he -- when I went in to see
11  him, I was the one who took out his IV personally and he
12  was telling me he was no longer hurting anywhere other
13  than the place where his IV was and he was comfortable
14  going home.  The family was comfortable going home.
15  His -- his saturation remained normal on room air.  His
16  heart rate had decreased, initially it was a little
17  high.  We gave him a fluid bolus.  And based on all that
18  information and on the lab information I had available
19  to me at that time, I felt he was stable for discharge.
20      Q.  If you had actually received the information
21  about the differential white cell count that's reflected
22  in Exhibits 1 and 2, what would you have done?
23      A.  Based on this differential, I would have gone
24  back and reevaluated the patient, I would have told the
25  family members about the abnormal values, I would have

Page 25

1   contacted his primary care physician -- I believe is
2   Dr. Hung -- and I would have admitted him to the
3   hospital.
4       Q.  Would you have given him antibiotics if you
5   had known about the differential?
6       A.  I -- I think I would have contacted his
7   primary care doctor and discussed the case with him and
8   seen what he wanted to do.  I think it would be
9   reasonable based on his clinical presentation, the way
10  he looked that day, to withhold antibiotics pending
11  further evaluation; but it -- you know, we -- we might
12  have given him antibiotics also.
13      Q.  As part of the evaluation, the additional
14  evaluation, would that have included a chest X-ray?
15      A.  I don't think at the time the way he presented
16  that a chest X-ray was necessarily indicated.  If --
17  if -- if Dr. Hung had requested one, we certainly would
18  have done one.
19      Q.  Okay.  What additional evaluation do you
20  believe you would have done in the emergency department
21  that day?
22      A.  Probably would have sent a blood culture on
23  him also.
24      Q.  Are you able to tell me from your
25  recollection -- pardon me -- about what time it was that

Page 26

1   you looked at the computer to verify the laboratory
2   results on ███████ that morning?
3       A.  I -- I believe, from my recollection, that it
4   was around -- sometime around 10:00 a m. because I'd
5   already seen Mr. Guzman and ordered those tests and
6   was other -- seeing other patients when Frank Blain came
7   to me and asked me roughly around 10:00 o'clock if he
8   could pull out the IV because Mr. Guzman was telling him
9   that he was feeling better.  And I said at that time
10  that I -- I told him, Hold on.  Let me look at the lab
11  values and I'll come talk to the family and make sure
12  he's doing better and reevaluate.  I believe that was
13  around 10:00 a m.
14      Q.  Okay.  Do you see in the note that is on
15  Exhibit No. 2 that there is a footnote added by the
16  laboratory about these values, that the differential --
17  the manual differential was performed at 9:35?
18          MR. BRENNIG:  Objection to form.
19          MS. BRYAN:  Form.
20      Q.  (By Mr. Pfeifer)  Okay.
21      A.  I -- I do see that.  But there's often a
22  differential -- in other words, a time discrepancy.  I'm
23  not sure if that's exactly the time that they entered
24  the orders or what; but I can tell you when I looked at
25  the lab results on the computer at that time, sometime

Page 27

1   around 10:00 a.m., that that was not there.
2       Q.  Okay.  So, what I want to do is back up now
3   and try to understand and get you to explain how it is
4   that blood is drawn in the emergency department, sent to
5   the lab and how lab results get back to the emergency
6   department in February '06 at Memorial Southeast.
7       A.  I'm not clear on your question.  Are you
8   asking me how -- how we draw the blood and how the
9   results --
10      Q.  Not -- not the details.  I'm -- I'm not asking
11  about where you stick the thing and where -- how
12  you attach a syringe and how you obtain.  I'm talking
13  about generally the processing.  Let me break it down.
14      A.  Okay.
15      Q.  All right.  Where is the lab?
16      A.  I believe it's upstairs on the second floor.
17      Q.  The same building you're in?
18      A.  It's in the same building but on a different
19  floor.
20      Q.  Okay.  Is there a dedicated emergency
21  department there at Memorial Southeast?
22      A.  There's a dedicated emergency center --
23      Q.  Okay.
24      A.  -- yes.
25      Q.  All right.  And in the same building upstairs

Page 28

1   on the second floor is the laboratory for the hospital.
2       A.  Correct.
3       Q.  When you get blood samples from the emergency
4   department from a patient like ███████ -- and all these
5   questions are now going to be about February 12, '06.
6   Okay?
7       A.  Yes, sir.
8       Q.  All right.  At that point in time when blood
9   is drawn from a patient like ███████ tell me how that
10  blood gets from the emergency department to the lab.
11      A.  Actually I don't really know the answer to
12  that question.
13      Q.  Okay.  How does the order get entered for the
14  laboratory department to know what to do with the blood
15  they receive?
16      A.  All I can tell you -- I'm not sure if I know
17  the answer to that question either.  All I can tell you
18  is that when I order tests, I -- I circle different
19  boxes on our order sheet and I give that to either the
20  unit clerk or the nurse and they are the ones that enter
21  those orders in the computer.
22      Q.  Okay.  Is Exhibit No. 3 a copy of the order
23  sheet that you signed with regard to ███████ on February
24  12, '06?
25      A.  Yes, sir, it is.

Page 29

1       Q.  All right.  Is Exhibit 4 an enlargement of the
2   portion of the order sheet that you just looked at with
3   regard to the order for blood for ███████ on that day?
4       A.  Yes, sir, it is.
5       Q.  Okay.  Now, when you circle this order "CBC,"
6   it was your understanding at that time that someone
7   would take that information and make the actual physical
8   request to the lab for what you had ordered.  Correct?
9       A.  I'm not sure I understand your question.
10      Q.  Okay.
11      A.  Your -- I --
12      Q.  You've -- you've circled "CBC" on this page,
13  the order sheet, Page 3.  Okay?  Correct?
14      A.  Yes, sir.
15      Q.  Now, who takes this order sheet and tells the
16  lab what needs to be done?
17      A.  Oh.  It's either the unit clerk or if we don't
18  have a unit clerk working that day, it's the nurse.
19      Q.  Okay.  So either a unit clerk, who is a --
20  basically a medical secretary, enters information or the
21  nurse enters information.  Correct?
22      A.  Correct.
23      Q.  And is that information entered into a
24  computer?
25      A.  I believe it is.

Page 38

```
1        A.  -- that day?
2            I think the -- I would have to say that
3   the sodium level being minorly low, probably not a big
4   deal.  And I think his glucose as well, probably just
5   related to is albuterol use and the fact that he was
6   ill, having had a fever and cough.
7        Q.  Okay.  Would you go to the exhibit, then, that
8   has the hemogram on it.  You've indicated by red check
9   marks that you saw certain laboratory values that day.
10  Correct?
11       A.  Correct.
12       Q.  Okay.  Would you go back to Exhibit 4, the
13  blowup of the lab value grid.  Is there a --
14       A.  Correct.
15       Q.  -- place in there where one would routinely
16  enter the results of the hemogram on the medical record?
17       A.  Yes, there is.  There is a -- little stick
18  mark.  I'm not sure exactly what the technical term for
19  that is.
20       Q.  Okay.  Let me give you a red pen and have you
21  circle the area you just described as the "stick mark".
22       A.  (Complies)
23       Q.  Now, do the emergency physicians such at
24  yourself customarily chart in that little stick mark
25  that you've circled there?
```

Page 39

```
1            MR. BRENNIG:  Objection, form.
2        A.  Yes, sir.  We do.
3        Q.  (By Mr. Pfeifer)  Okay.  In your training were
4   you taught to mark in that area?
5            MR. BRENNIG:  Objection, form.
6        A.  Actually, no.  I wasn't really taught in my
7   training to mark there.  It just becomes a -- habit.
8        Q.  (By Mr. Pfeifer)  A habit.
9        A.  Just doing it day after day.
10       Q.  Okay.  And what material do you routinely
11  enter in each part of the stick mark?
12       A.  Well, on the -- on the leftmost portion, you
13  would enter the white blood cell count.
14       Q.  Okay.
15       A.  And the top portion, you'd enter the
16  hemoglobin.  The bottom portion would contain the
17  hematocrit.  And then the rightmost portion would be the
18  platelet count.
19       Q.  Okay.  And so on this particular day, did you
20  enter any of those values at all on this diagram?
21       A.  No, sir, I did not.
22       Q.  Okay.  Did you make any entries of any
23  abnormal values from the hemogram?
24       A.  No, sir, I did not.
25       Q.  Were there abnormal values from the hemogram
```

Page 40

```
1   that you saw on the day that ███ was in the
2   emergency room?
3        A.  Yes, there were.  He had an elevated red --
4   red blood cell count.  He had a -- a low mean
5   corpuscular volume, or MCV.  And he had a low mean
6   corpuscular hemoglobin.
7        Q.  Okay.  Did you ever enter any of those
8   abnormal values onto this order sheet, Exhibit 3, which
9   we've blown up as Exhibit 4?
10       A.  No, sir, I did not.
11       Q.  Okay.  Is there any document at all in the
12  medical record that you can point me to, any entry made
13  by you or anyone else that would -- you would point to
14  as evidence that you had actually seen the hemogram on
15  the day that ███ was in the emergency department?
16       A.  Well, I -- I would point to this right here
17  because I -- it was in -- within normal limits except.
18  And those four values that we usually record there were
19  normal and that's why I did not record them there.
20       Q.  Okay.  Is there any other piece of paper in
21  the emergency room chart that you feel that you can
22  point to that would suggest and provide evidence,
23  documentation, that you actually saw the hemogram on the
24  day that ███ was in the emergency room?
25       A.  No, sir.  It would be this -- this paper right
```

Page 41

```
1   here.
2        Q.  Okay.  And that paper would ordinarily be
3   blank anyway because the values that you would enter in
4   those four little areas on that grid were normal on the
5   hemogram.  Correct?
6        A.  Correct.
7        Q.  Okay.  Now, with regard to the abnormalities
8   that are shown on the hemogram, they relate to the total
9   red blood cell count, the MCV and the MCH.  Correct?
10       A.  That's correct.
11       Q.  What does an elevated red blood cell count
12  indicate?
13           MR. BRENNIG:  Objection, form.
14           MS. BRYAN:  Form.
15       A.  It can mean a lot of different things.  In --
16  in general, it just means that -- one of them is that
17  you could be hemoconcentrated, meaning you're a little
18  dehydrated; but there are many others.
19       Q.  (By Mr. Pfeifer)  Okay.  Was the red blood
20  cell count elevated?
21       A.  Yes, sir, it was mildly.
22       Q.  Okay.  What is MCV?
23       A.  MCV is -- stands for mean corpuscular volume.
24  It's basically the size of the cell.
25       Q.  And what is MCV used for by physicians to
```

Page 58

1    computer for the management of the emergency department
2    as opposed to the overall hospital system computer?
3         MS. BRYAN:  Can you repeat the question?
4         MR. PFEIFER:  Is there a separate
5    computer for this QualChart System that he's talking
6    about as compared to the overall computer for the
7    hospital?
8         A.  I think --
9         MS. BRYAN:  Form.
10        A.  -- from what I remember and I haven't worked
11   at Memorial Southeast since June of last year, but I
12   think that we -- we had multiple different computers.
13   And one of them was a QualChart computer that also, I
14   believe, had some patient tracking software on it.  And
15   then there's other computers we used to look up
16   laboratory values.
17        Q.  (By Mr. Pfeifer)  Okay.  I guess what I'm
18   trying to find out is this:  When you went to look at
19   the laboratory values on the computer, is -- tell me
20   what information is on that computer.
21        A.  You mean the different programs that are on it
22   or -- because it's usually one computer that has
23   different software applications.  There'll be one that's
24   a QualChart, you can print that out.  You could go to
25   another one and -- and look at patient tracking data and

Page 59

1    another one to access the lab value.
2         Q.  Okay.  So, there's one set of programs for
3    this QualChart System that you've talked about and then
4    there's a different set of programs that would allow you
5    to have access to the computerized laboratory and
6    medical record information.
7         A.  I believe that's correct.
8         Q.  Okay.  And you believe that the software for
9    both of those programs are on the same computer.
10        A.  I actually don't know.  I'm suspecting they
11   are.
12        Q.  Okay.
13        A.  But I don't remember because I haven't worked
14   there since June.
15        Q.  Okay.  Back when you were working there, did
16   they have multiple computers that people could use or
17   was there just one in the ER?
18        A.  No, sir.  There were multiple computers.
19        Q.  Okay.  Was there one that was dedicated for
20   the physicians to use and one that was dedicated for the
21   nursing staff or how did that work?
22        A.  There was a separate nurses station set of
23   computers.  We all kind of, as you migrate around, use
24   different computers; but -- but for the most part the --
25   there's the physician area that has two physician

Page 60

1    computers and then there's other, like, radiology
2    viewing program there.  So we used multiple different
3    computers.
4         Q.  Okay.  Well, I guess here's the question that
5    I have.  We've -- we've seen Exhibit 1 which appears to
6    be the printout of a computer screen.  That was the very
7    first exhibit that I gave you.
8         A.  Correct.
9         Q.  Does that computer screen look like the kind
10   of computer screen that you would have had back at
11   Memorial Southeast in '06 to look at this patient data?
12        MS. BRYAN:  Form.
13        A.  I -- I believe from my memory that it does
14   look similar to what we used, but different -- sometimes
15   there are different -- different times on there.
16        Q.  (By Mr. Pfeifer)  Okay.
17        A.  Different -- different number of columns.
18        Q.  Okay.  But the access to that particular
19   patient information system as reflected on Exhibit No. 1
20   would be something that the physicians have access to
21   and the nurses have access to.
22        A.  I'm not certain --
23        MS. BRYAN:  Form.
24        A.  -- if the nurses have access to it, but I know
25   that the physicians do.

Page 61

1         Q.  (By Mr. Pfeifer)  Okay.  Where do the nurses
2    enter the computerized nursing notes?
3         A.  At their computers in the nursing stations.
4         Q.  There appear also to be some computerized
5    typing with your initials associated with it in the
6    chart.
7         A.  I -- I did see some of that and I'm not sure
8    how -- how that came about because I don't -- they use
9    a -- it's a separate system.  I'm not sure what that
10   designates.  There were a few ph1's that refer to me --
11        Q.  Yeah.
12        A.  -- as I recollect.  But that -- that's not my
13   access in the computer at that time.  That's just
14   somebody making a notation, I presume, that I was in the
15   room or something at that time.
16        Q.  Okay.  So, if we look in the medical records
17   and we see the notation "ph1," is that something that
18   you typed into the computer or somebody else did with
19   your initials?
20        MS. BRYAN:  Form.
21        A.  I don't know.
22        Q.  (By Mr. Pfeifer)  Okay.
23        A.  Don't know the answer to that question.
24        Q.  All right.
25        A.  I did not -- I know that I did not write that.

Page 78

1   the laboratory results and the X-ray results and that
2   sort of stuff on it and the QualChart paper forms.
3          MS. BRYAN:  Form.
4      A.  The QualChart paper forms are just used to
5   generate a QualChart just for the patient encounter.
6   After that, there are no results in it at all.  It's
7   just a -- that's the initial chart you pull out when you
8   see the patient's chart sitting in the rack.
9      Q.  (By Mr. Pfeifer)  Okay.  Well, I -- I
10  understand that; but then you go in and you make your
11  notations on it.
12     A.  On the chart that you printed out, yes.
13     Q.  Okay.  So when you're making the decision as
14  to whether or not the patient should be discharged, what
15  you will have is your handwritten notes that you've made
16  on the preprinted QualChart form and access to the
17  computer with regard to the lab data.
18     A.  Correct.  And we usually --
19         MS. BRYAN:  Form.
20     A.  -- enter the lab data that we have on the
21  QualChart.
22     Q.  (By Mr. Pfeifer)  Okay.  Now, you've told me
23  that the original encounter -- the first encounter
24  occurred about 8:00 --
25     A.  Yes, sir.

Page 79

1      Q.  -- ballpark.  8:00 to 8:15, somewhere in that
2   range.
3      A.  Yes, sir.
4      Q.  The second encounter, when did it occur?
5      A.  I don't really know if I could pinpoint a
6   specific time, but -- what -- I -- I can tell you from
7   my usual practice what I do is I -- I stop by people's
8   rooms as I'm going back and forth through the emergency
9   center, poke my head in, ask them how they're doing
10  and -- and -- and sometimes answer questions, things of
11  that nature.
12     Q.  All right.  And so are you able to pinpoint
13  the time of the second encounter?
14     A.  I -- I really can't.
15     Q.  Okay.  Do you believe it would have been the
16  kind of encounter where you're just poking your head
17  back in and asking how the patient's doing?
18     A.  Yes.
19         MS. BRYAN:  Form.
20     A.  I sometimes ask -- you know, make sure that
21  he's getting fluids and see what's been done and, Have
22  they done this yet, you know, Have they start your IV,
23  things of that nature.
24     Q.  (By Mr. Pfeifer)  Okay.  And is the third
25  encounter for ▮▮▮▮▮▮   the one that occurred prior to the

Page 80

1   time of discharge?
2      A.  Yes.
3      Q.  10:00 to 10:15, in that range.
4      A.  Yes.
5      Q.  Okay.  When do you believe is the first time
6   on that morning that you saw any laboratory values?
7      A.  I believe it was around 10:00 a.m.
8      Q.  Okay.  And you had -- according to the nurse's
9   note entry, it looked like the orders for the lab work
10  were entered at about 8:35 -- 8:34, 8:35.  Does that
11  sound about right to you?
12     A.  Yes, it does.
13     Q.  Okay.  You, by that time, had completed the
14  history and physical of the patient.
15     A.  Correct.
16     Q.  And you had completed the orders for the lab
17  work that you wanted done by that time.
18     A.  Correct.
19     Q.  Okay.
20     A.  We usually ordered the things after I come out
21  of the room and after I talk to them.
22     Q.  You, as the physician, obviously are the
23  person who makes the decision about whether or not
24  further evaluation needs to be done or whether the
25  patient needs to be transferred or whether the patient

Page 81

1   is okay to go home or whether the patient needs to be
2   admitted.  Correct?
3      A.  Correct.
4      Q.  Okay.  And you did not make that decision
5   until around 10:00 o'clock.
6      A.  Or a little bit after, probably around 10:15.
7      Q.  Okay.  Because you needed to get the
8   laboratory data back in order to make that decision and
9   complete your screening exam.
10     A.  Right.
11         MR. BRENNIG:  Objection, form.
12         MS. BRYAN:  Form.
13     A.  Plus I also needed to go reevaluate the
14  patient and discuss his case with his parents and -- and
15  with him, see how he's doing.
16     Q.  (By Mr. Pfeifer)  Okay.  This is an
17  off-the-wall question.  You appear to be a relatively
18  young man.  Do you have kids?
19     A.  Yes, sir, I do.
20     Q.  Back in '06, how many kids did you have?
21     A.  I believe I had three.
22     Q.  Okay.  The reason I'm asking this is that my
23  client, Mrs. Guzman, has given testimony about the
24  patient encounter with you and that there was a
25  discussion that she had with you related to one of your

Page 110

1    Q. And I can't read what you've got under there.
2    A. Phallus normal.
3    Q. Okay. All right. "Medical Decision Making".
4  There's a box there that has "Differential Diagnoses".
5    A. Correct.
6    Q. And you circled a bunch of things on there.
7  What does it mean by circling those things?
8    A. Well, everybody may be different; but when I
9  use this form, I circle things that I consider likely
10 possibilities, things that may be happening.
11   Q. Okay.
12   A. And -- and in his case I didn't suspect that
13 he had diabetes, but I thought it might be possible
14 because he had a family history of it and had been
15 having vomit. So I circled that --
16   Q. And is that --
17   A. -- for example.
18   Q. And is that the reason that when he was sent
19 home, you included in the discharge instructions to
20 follow up with the family doctor about whether or not he
21 had diabetes?
22   A. Oh, yes. Correct.
23   Q. Okay. Gastroenteritis, did you consider that
24 as part of your differential diagnosis?
25   A. Yes, I did.

Page 111

1    Q. Okay. And --
2    A. Because he had been vomiting.
3    Q. Okay. You also included "Pyelonephritis/UTI".
4    A. Right. That was an error on my part. I was
5  thinking it was URI, which would be an upper respiratory
6  infection.
7    Q. Okay.
8    A. So I didn't consider his symptoms consistent
9  with a urinary tract infection at all.
10   Q. Okay. So you -- even though you circled that,
11 you -- that was a mistake.
12   A. Correct.
13   Q. Okay. And then "Other: Viral syndrome."
14 Correct?
15   A. Correct.
16   Q. Did you feel that the viral syndrome was
17 related to one particular organ system or multiple?
18   A. Well, I -- I believe it was mostly upper
19 respiratory. And then you can also have involvement of
20 the GI system because a lot of times patients are
21 swallowing mucus and that makes them nauseated and
22 you'll throw up. So there can be involvement of
23 multiple organ systems from one disease, but I thought
24 it was primarily respiratory.
25   Q. Okay. So you thought that he had a viral

Page 112

1  respiratory syndrome that was secondarily causing his
2  vomiting.
3    A. I -- I believe so. It's -- it's -- it's tough
4  to say. You can have both going on at the same time,
5  too.
6    Q. Okay. All right. Under the "Re-Evaluation"
7  over there on the right side of the page, you've got the
8  time, 10:13 --
9    A. Right.
10   Q. -- recorded. "Improved". And then under that
11 you have something written in, "NR". What does that
12 mean?
13   A. That's actually "HR".
14   Q. HR.
15   A. Stands for heart rate. And what I
16 usually do -- my usual practice I'll write -- and this
17 was written after I reevaluated him before we discharged
18 him. And I'd gone in to assess him and noticed that his
19 heart rate had decreased and his blood pressure was
20 good, his -- his heart rate was lower. And I meant to
21 write heart rate decrease with a down arrow there. But
22 for some reason -- I may have been distracted or -- what
23 happens frequently ER nurses come in, throw an EKG in my
24 face or ask me to come see somebody. So it may have
25 been that I just didn't get a chance to finish that. I

Page 113

1  might have been interrupted and I never went back and
2  filled that in.
3    Q. All right. Did you ever make any notations
4  about his pain scale?
5    A. I believe I did at the beginning. Actually,
6  no, I did not. I just -- I -- I basically assessment
7  that he had pain.
8    Q. Okay.
9    A. And I know the nurse did.
10   Q. Okay. Anybody ever reassess his pain and
11 record a scale?
12   A. No. I -- I reassessed his pain, but I did not
13 reassess a scale on it.
14   Q. Okay.
15   A. I went in and asked him a little bit before I
16 wrote that last note where I wrote "HR" at 10:13 if he
17 was hurting anywhere. He told me he was not -- the only
18 place he was hurting was with his IV and he wanted me to
19 take that out.
20   Q. Okay. Did you give him any treatment for his
21 respiratory condition?
22   A. No, I did not.
23   Q. And was the hydration that you gave him to try
24 to treat the heart rate issue?
25   A. Right. I remember I mentioned earlier I

Page 150

1      Q.  And that did not make a difference in your
2  decision to discharge ████████ on February 12th.
3      A.  Can you rephrase your question?  I'm not sure
4  what you meant by that.
5      Q.  Sure.
6          We -- it's -- we've already asked and
7  answered it, so it's just repetitive.  But --
8      A.  I know.
9      Q.  The fact that --
10         MR. PFEIFER:  Okay.  Then we object.
11     Q.  (By Ms. Bryan)  The fact that the differential
12  had not yet -- either had not yet been completed or you
13  hadn't yet seen it did not affect your decision to
14  discharge ████████
15     A.  No, it did not.
16         MS. BRYAN:  Those are all the questions I
17  have at this time.
18         Thank you, Dr. Haynes.
19         THE WITNESS:  Thank you.
20             FURTHER EXAMINATION
21  BY MR. PFEIFER:
22     Q.  Have you ever spoken to Ms. Bryan other than
23  on the record here?
24     A.  No, sir, I have not.
25     Q.  Ever been in a meeting with her?

Page 151

1      A.  No, sir, I have not.
2      Q.  Okay.  Let me see if I understand something
3  here.  Are you saying that it is your routine practice
4  as an emergency physician to disregard white cell counts
5  differentials?
6          MS. BRYAN:  Objection, form.
7          MR. BRENNIG:  Objection, form.
8      A.  No, sir, it's not.
9      Q.  (By Mr. Pfeifer)  If you have differential
10  white cell count information, do you consider that
11  information in evaluating the patient?
12     A.  Yes, sir, I do.
13     Q.  If you have the white cell count differential
14  information, do you consider that as part of your
15  medical screening examination of the patient?
16         MS. BRYAN:  Form.
17     A.  No.  I don't believe it is part of the medical
18  screening exam.
19     Q.  (By Mr. Pfeifer)  Why not?
20     A.  Because a medical screening exam is -- is part
21  of an exam done to determine if medical -- emergency
22  medical condition exists.  But that's a screening exam.
23  I'm not sure if that's different from the exam that we
24  do in the emergency center.  Those are two different
25  things, I think.

Page 152

1      Q.  Do you know what the legal definition of a
2  medical screening exam is?
3      A.  I'm not familiar with that, no.  Not
4  completely.
5      Q.  All right.  Let's put it in plain terms, then,
6  rather than legalese.  If you have the results of the
7  white cell count differential on a patient, do you
8  consider them in evaluating what you do with the
9  patient?
10         MS. BRYAN:  Objection, form.
11     A.  Yes.
12     Q.  (By Mr. Pfeifer)  Okay.  And are you saying
13  that if you had the results in this particular case, you
14  would have disregarded them?
15         MS. BRYAN:  Form.
16     A.  No, sir, I'm not.
17     Q.  (By Mr. Pfeifer)  Are you saying just the
18  contrary?  If you had the results, you would have taken
19  different action?
20         MS. BRYAN:  Objection, form.
21     A.  Yes, I would.
22     Q.  (By Mr. Pfeifer)  Okay.  Now, is it your
23  testimony here today that you routinely do not look at
24  the results of differentials even if they are reported?
25         MR. BRENNIG:  Objection, form.

Page 153

1          MS. BRYAN:  Form.
2      A.  No, that's not what I'm saying.  I routinely
3  look at all labs available to me.
4      Q.  (By Mr. Pfeifer)  Okay.  And the routine at
5  the emergency room at Memorial Hermann Southeast is for
6  all labs to be reviewed by the physician --
7          MR. BRENNIG:  Objection --
8      Q.  (By Mr. Pfeifer)  -- prior to discharge.
9  Correct?
10         MR. BRENNIG:  Objection -- objection,
11  form.
12         MS. BRYAN:  Form.
13     A.  I don't know if that's a routine.  I think it
14  just differs on a case-by-case basis.
15     Q.  (By Mr. Pfeifer)  Okay.  The white cell count
16  differential in a patient, can you have a normal total
17  white blood cell count and have an abnormal
18  differential?
19     A.  Yes, you can.
20     Q.  When did you first learn that?
21     A.  Probably in medical school.
22     Q.  Okay.  And have you continued to have that
23  knowledge throughout your practice of emergency
24  medicine?
25     A.  Yes.

Page 154

1    Q.  Is it true that a normal white cell count does
2  not necessarily rule out a bacterial infection in a
3  patient?
4    A.  Yes, that's true.
5    MS. BRYAN:  Form.
6    Q.  (By Mr. Pfeifer)  Okay.  Is it the routine at
7  Memorial Southeast that if a CBC is circled on a chart
8  in the emergency department, that patients are sent home
9  from the emergency department and discharged prior to
10  physicians seeing the white cell differential?
11    MR. BRENNIG:  Objection, form.
12    MS. BRYAN:  Form.
13    A.  I'm not aware -- I don't believe that it's
14  routine.  It just, again, depends on the case-by-case
15  basis.  Depends on all the circumstances.
16    Q.  (By Mr. Pfeifer)  Okay.  What good does it do
17  to have a white cell count differential generated for
18  evaluating a patient if the doctor never sees it?
19    MR. BRENNIG:  Objection, form.
20    MS. BRYAN:  Form.
21    A.  I'm not sure I understand the -- the wording
22  of your question.  Just -- what good does it do --
23    Q.  (By Mr. Pfeifer)  Yes.
24    A.  -- to have it if it's not --
25    Q.  Seen by the physician.

Page 155

1    A.  -- seen?
2    I guess in that -- if it's not seen by the
3  physician, it doesn't do any good.
4    Q.  Okay.  And you've previously told me that when
5  you circle CBC, you routinely get the total white cell
6  count, the differential and the platelets.  Correct?
7    A.  Yes, that's true.  When you circle CBC, part
8  of the -- part of the evaluation is the hemogram and
9  then part of it's the differential.
10    Q.  Okay.  That is the routine of the hospital.
11  Correct?
12    A.  I don't know if that's a routine of the
13  hospital, but that's a -- a routine of the lab values.
14  When you order that, you get that complete blood count
15  evaluation.
16    Q.  At the emergency room.
17    A.  In the emergency center, yes.
18    Q.  Okay.  And so that is the routine in the
19  emergency center.
20    A.  I believe so.  Yes.
21    Q.  Okay.  And in this particular case, the
22  routine would be to expect to get those results for the
23  patient before the patient is sent home.
24    MR. BRENNIG:  Objection, form.
25    MS. BRYAN:  Objection, form.

Page 156

1    A.  Not necessarily.  Again, that kind of depends
2  on the whole clinical circumstances on a case-by-case
3  basis.
4    Q.  (By Mr. Pfeifer)  In this particular
5  situation, information that was routinely ordered for
6  ███████ Guzman was not completed by the time the patient
7  was discharged.  Correct?
8    A.  Correct.  Well, actually, I -- I don't know if
9  I can answer that question.  I don't know if it was
10  completed or not.
11    Q.  Okay.  But it wasn't completed in the sense
12  that the physician knew the information.  Correct?
13    A.  All I could say is that I wasn't aware of that
14  information prior to discharge.
15    Q.  Do you routinely discharge patients that have
16  white cell count differentials ordered on them without
17  knowing the white cell count?
18    MR. BRENNIG:  Objection, form.
19    MS. BRYAN:  Form.
20    A.  No -- no, I don't.
21    MS. BRYAN:  I think you misspoke, Phil.
22  You meant to say --
23    Q.  (By Mr. Pfeifer)  Okay.  Do you routinely --
24    MR. BRENNIG:  You've already asked that
25  question four times.

Page 157

1    Q.  (By Mr. Pfeifer)  Do you routinely discharge
2  patients who have white cell differentials ordered and
3  you don't know the results?
4    MR. BRENNIG:  Objection, form.
5    A.  No, I do not.
6    Q.  (By Mr. Pfeifer)  Okay.  Did you ever make a
7  complaint to the laboratory director about the failure
8  to get the lab results?
9    MS. BRYAN:  I'm going -- to the extent
10  that there were any complaints made that would be part
11  of a peer review, quality review, performance
12  improvement, medical committee complaint, I'm going to
13  assert the privilege of the hospital and instruct
14  Mr. Brennig to instruct his witness not to answer.
15    MR. BRENNIG:  Don't talk about anything
16  if it's related to any of those matters she just listed.
17    Q.  (By Mr. Pfeifer)  Any of the committees.
18    A.  I didn't speak --
19    MS. BRYAN:  Part of an investigation of
20  any of those committees.
21    A.  I'm not sure how to answer that under those
22  constraints.
23    MR. BRENNIG:  Well, if it --
24    A.  I mean --
25    MR. BRENNIG:  If you had -- if any -- had

Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit F

DOUG MITCHELL
November 12, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

WENDY GUZMAN, INDIVIDUALLY :
    NEXT FRIEND OF     :
   █████  GUZMAN, A MINOR   :
                      : CIVIL ACTION NO. 07-3973
V.                :
               :     JURY DEMANDED
MEMORIAL HERMANN HOSPITAL  :
SYSTEM, D/B/A MEMORIAL    :
HERMANN SOUTHEAST HOSPITAL :


\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

ORAL AND VIDEOTAPED DEPOSITION OF
DOUG MITCHELL
November 12, 2008

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*


ORAL AND VIDEOTAPED DEPOSITION OF DOUG MITCHELL,

produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 12th day of

November, 2008, from 9:54 a.m. to 11:53 a.m., before

Gretchen C. Dowda, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of

Smyser, Kaplan & Veselka, LLP, Bank of America

Center, 700 Louisiana, Suite 2300, Houston, Texas

77002, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record

or attached hereto.

DOUG MITCHELL
November 12, 2008

Page 34

1  one flag is positive; and the verify -- the VER means
2  verify.  It is -- this is not a chartable result.
3  This is for the use of the technician only.
4      Q.  Okay.
5      A.  This would not be visible to the physician
6  attending.
7      Q.  When there is -- is a flag like this at
8  9:35, is there an audible sound that comes out of the
9  instrument to bring it to the attention of the lab
10 tech that there is the need for positive
11 verification?
12     A.  No.  It is on the -- it is just like this.
13 What you're seeing printed here is what the tech
14 would see on the screen.
15     Q.  Okay.  Would the tech also see the
16 automated results?
17     A.  Uh-huh.
18     Q.  Okay.
19         MS. BRYAN:  Say "yes" or "no."  You
20 said "uh-huh."
21         THE WITNESS:  Oh, I'm sorry.
22     A.  Yes.
23     Q.  (By Mr. Pfeifer)  Okay.  And if the tech
24 then proceeds to a manual differential, what happens
25 to the automated data that was generated with regard

Page 35

1  to that lab test?
2      A.  It is overridden.  Gone.
3      Q.  It's gone.
4          Okay.  And the only result that
5  remains, then, would be the manual results that are
6  recorded by the technician?
7      A.  Right.
8      Q.  Okay.
9      A.  Now, the printout from the instrument is
10 kept for one week.
11     Q.  Okay.  When you say "the printout from the
12 instrument," are you saying that the printout of the
13 results of the man -- of the automated differential
14 would have been available at the hospital for one
15 week and routinely kept for that period of time?
16     A.  Right.
17     Q.  And after one week it is thrown away?
18     A.  (Witness nods head.)
19     Q.  Is that "yes"?
20     A.  Yes.
21         MS. BRYAN:  Say --
22     A.  Sorry.
23     Q.  (By Mr. Pfeifer)  So in this particular
24 case it would be impossible to go back and get the
25 actual results of the automated differential at this

Page 36

1  time?
2      A.  Yes.
3      Q.  Okay.  Then on line 8 we have MSW.  Again
4  that's Mina Suzanne Wagner, at least according to how
5  the hospital had it recorded?
6      A.  Yes.
7          MS. BRYAN:  Is it Suzette or Suzanne?
8          MR. PFEIFER:  He's got -- he said
9  Suzanne.
10         THE WITNESS:  It -- you know, it may
11 be Suzette.
12         MR. BRENNIG:  That's her name in the
13 deposition.
14         MS. BRYAN:  I think it's Suzette.
15         THE WITNESS:  Yeah, okay.
16         MR. BRENNIG:  That's her official
17 name.
18     A.  Right.  She's been Sue for -- ever since
19 I've known her.
20     Q.  (By Mr. Pfeifer)  All right.  In any event,
21 Sue is the person who is doing the manual
22 differential, according to this record, correct?
23     A.  Correct.
24     Q.  Okay.  And then, again, the time is
25 recorded here as 9:35?

Page 37

1      A.  Yes.
2      Q.  Okay.  What would the time 9:35 mean?
3      A.  That is the time at which she verified her
4  manual diff.  The reason that the M gram 1 crossed at
5  that time is because it is part of the differential
6  field.  So it came at that same time.
7      Q.  Okay.  Physically how long does it take to
8  do a white cell differential manually?
9      A.  I would say probably the fastest that you
10 could do it -- because you have to make a slide; you
11 have to let it dry, put it on the stainer, which
12 takes five or six minutes, and then sit down and
13 count it and do all that.  So a reasonable time is
14 anywhere from 20 to 35 minutes.
15     Q.  Okay.  Well, given the times that we have
16 recorded here, would it be fair, in retrospect, to
17 say that probably what happened here is that sometime
18 around 9:11, when they were running the automated
19 processing with regard to this, the flag came up
20 suggesting the need to do the manual differential
21 correct?
22     A.  Correct.
23     Q.  And then between 9:11 and 9:35, a period of
24 about 24 minutes, was probably the period during
25 which Sue was processing and tabulating the manual

DOUG MITCHELL
November 12, 2008

Page 38

1  differential?
2      A.  Correct.
3      Q.  And then probably at 9:35 -- well,
4  actually, according to this record, at 9:35 she
5  verified the results on the computer system?
6      A.  Correct.
7      Q.  Now, when you used the term "verified on
8  the computer system," what does that actually mean
9  the tech is doing?
10     A.  They're releasing the results.  They are
11 saying at that point, I am looking at these results.
12 It's done.  It's finished.  It's valid.  I verify
13 it.  It's gone.
14     Q.  Okay.  And when you say "I verify it, it's
15 gone," it is being transmitted in the ordinary course
16 of business through the Cerner computer system
17 through the interface into the Hospital Information
18 System?
19     A.  Yes.
20     Q.  Now, on line 12 -- I'm sorry, line 10 of
21 this same page 006 --
22     A.  Uh-huh.
23     Q.  -- it has a notation that gives the normal
24 values for lymphocytes.  And then it has 8.0 and it
25 has L and then it has f written by it.

Page 39

1      A.  Right.
2      Q.  Okay.  Why is it that there is supposedly a
3  footnote for lymphocytes and no footnote with regard
4  to segs or bands or monos?
5      A.  The footnote that you're seeing attached to
6  the lymphocytes is a footnote that states -- and
7  that's what we read here -- that a manual
8  differential was performed.  That was added several
9  years back; they came up with the suggestion of
10 putting a footnote on the lymphocyte when an auto --
11 or when a manual differential was performed, because
12 some of the physicians had complained that they did
13 not know whether it was an automated diff or a manual
14 diff.  So this is simply a footnote attached to the
15 lymphocytes that says "manual differential
16 performed."
17     Q.  Okay.
18     A.  It is an automated thing and that's why it
19 says "GLM."  When you order the manual diff, the
20 footnote comes with it.
21     Q.  Okay.  From the standpoint of the
22 technician entering this material, are they pushing
23 certain key strokes on a computer keyboard that will
24 generate this automated footnote?
25     A.  When they say yes to manual diff, when

Page 40

1  you're sitting down at your -- when you make the
2  slide and you sit down, you call it up in the
3  differential mode.  And at that point you can either
4  say:  The automated diff is correct, and you say no
5  and release it and the automated diff goes.
6          If you say no, I need to do a manual
7  diff, then you say:  Manual diff, you perform it,
8  release it, and it goes.  And at that time it
9  generates the footnote.
10     Q.  Okay.  And the content of the footnote is
11 simply the fact that the manual differential was
12 performed?
13     A.  That's -- that's the sole content of it.
14     Q.  Okay.
15     A.  It could have been attached to anything.
16 They just chose lymphs.
17     Q.  Okay.  I'm going next to page 7 of the same
18 document.  Can you tell me what information is being
19 generated here in terms of the lab tests that are
20 being run?
21     A.  On this page?
22     Q.  Yes, sir.
23     A.  Page 7?
24     Q.  Yes.
25          MS. BRYAN:  Objection, form.

Page 41

1          Phil, I don't understand the question.
2      Q.  (By Mr. Pfeifer)  What are the tests that
3  are being run here?
4      A.  Okay.  There are no tests.  These are
5  simply the results of the manual differential.
6      Q.  Okay.
7      A.  The last three items that you see here is
8  platelet morphology, and the result of microcytes.
9  There were some small red cells.
10     Q.  All right.
11     A.  And then the last one is the response that
12 I mentioned to you that if you say "manual diff,
13 yes," it generates that footnote.
14     Q.  Okay.
15     A.  It's just a back end of the manual
16 differential.
17     Q.  Okay.  Turn to page 8.  Again, we are in
18 Exhibit 1.  There is a line that begins with the word
19 "ordered."
20     A.  Uh-huh.
21     Q.  2-12-06.  And then it says 0831.
22     A.  Right.
23     Q.  ID HIS.
24     A.  Right.
25     Q.  Okay.  How is it -- what does HIS mean?

DOUG MITCHELL
November 12, 2008

Page 46

1    Information System about the order for the lab test
2    for this patient?
3        A.  Yes --
4              MS. BRYAN:  Form.
5        A.  -- they do.
6        Q.  (By Mr. Pfeifer)  Okay.
7        A.  That's what is listed here as HIS.
8        Q.  All right.  And is that information that
9    they enter in the Hospital Information System in the
10   emergency room about the order for the lab test on
11   this patient transmitted automatically to the
12   laboratory electronically?
13       A.  Yes.
14       Q.  Okay.  Then -- but you don't -- you don't
15   know about that or try to match it to anything until
16   you receive the blood through the pneumatic tube?
17       A.  That's correct.
18       Q.  And so when the blood is available in the
19   lab, the tech would take the pneumatic tube, they
20   would look up the patient number on the specimen and
21   it would be in the computer and they match it to make
22   sure it's the right person and the right test?
23       A.  That's right.
24       Q.  Okay.  So unless there is an override of
25   some sort, the information here about the order and

Page 47

1    the draw time would be data that were entered into
2    the computer in the emergency room?
3        A.  That's correct.
4        Q.  And that same data would be available to
5    you through the Cerner system in the lab?
6        A.  Yes.
7        Q.  Okay.
8        A.  This -- this particular sheet that you're
9    looking at is a Cerner Classic --
10       Q.  Okay.
11       A.  -- sheet.
12       Q.  All right.  Now, the line down there, it
13   says "In Lab."
14       A.  Right.
15       Q.  And it gives a time of 8:56.  Who is it
16   that makes the entry at 8:56?
17       A.  That -- it's a lab person -- and I did not
18   look this up.  I'm not sure who that is.  61685.
19   That's an ID, and I'm -- I don't know.  Off the top
20   of my head, I can't tell you who that is.  It's
21   easily found out, though.
22       Q.  Okay.  In any event, we now know there are
23   three people in the lab.  We know there's the person
24   who has the ID 61685.
25       A.  Uh-huh.

Page 48

1        Q.  We know there is Suzette or Sue.
2        A.  Right, Sue.
3        Q.  And we know there's Ashwa --
4        A.  Asha.
5        Q.  Asha, okay.
6              In any event, the person that makes
7    the notation of the sample being in the lab is a lab
8    person?
9        A.  Yes.
10       Q.  And they're entering that in to the lab
11   person's computer?
12       A.  Right.
13       Q.  Okay.  And what does it say -- mean MC10?
14       A.  MC10 is Southeast designation.  All that
15   means is -- the Cerner Classic is a giant main frame
16   and all of the hospital laboratories run off of that
17   with the exception of Hermann, which -- at this time
18   Hermann had their own.  But all the other hospitals
19   have access -- or are all fed into the same main
20   frame.
21       Q.  Okay.
22       A.  MC10 is simply southeast designation.
23       Q.  All right.  So let's try to put this back
24   into a sequence of events, then, from the records
25   that we have from the Cerner system, okay?

Page 49

1        A.  Okay.
2        Q.  From the records is it fair to say that
3    sometime around 8:31, the order was entered by a
4    person in the Emergency Room Department for the blood
5    tests for ███ Guzman?
6        A.  Yes.
7        Q.  And that the blood was drawn and recorded
8    in the emergency room on the Hospital Information
9    System about 8:33.
10       A.  Yes.
11       Q.  The blood was then placed in pneumatic
12   tubes and sent from the Emergency Department to the
13   lab and --
14       A.  Yes.
15       Q.  -- the blood was received and logged in the
16   lab at 8:56 a.m.
17       A.  Yes.
18       Q.  Okay.  Then there were different specimens
19   or different tubes of blood for the basic metabolic
20   profile and the CBC, correct?
21       A.  Correct.
22       Q.  Would there have been two tubes of blood?
23       A.  Oh, yeah.
24       Q.  Okay.  And so one tube of blood went to
25   Asha, the lab tech, and the other tube of blood went

13  (Pages 46 to 49)

DOUG MITCHELL
November 12, 2008

Page 50

1  to Sue?
2      A.   Right.
3      Q.   Asha used a different device to process the
4  basic metabolic profile from the device that Sue used
5  to do the complete blood count, correct?
6      A.   Yes.
7      Q.   The results of the basic metabolic profile
8  were completed and logged on the Hospital
9  Information -- I'm sorry, the Lab Information System
10  at 9:11 a.m., correct?
11      A.   Correct.
12      Q.   And at the same time, at 9:11 a.m., the
13  results of the overall CBC, but not the differential,
14  were logged on to the Laboratory Information System
15  at 9:11?
16      A.   Yes.
17      Q.   And it's at that point in time that you
18  believe that the flag was probably generated by the
19  Coulter counter to suggest that a manual differential
20  should be performed?
21      A.   Yes.
22      Q.   And after 9:11 and between 9:11 and 9:35 is
23  when Suzette Dalmeida, or Wagner, was actually
24  performing the task of a lab tech in generating and
25  recording onto the computer the results of the manual

Page 51

1  differential test?
2      A.   Yes.
3      Q.   And by 9:35 in the morning she had logged
4  onto the laboratory information system the results of
5  the manual differential test that was done on ███
6  that morning?
7      A.   Yes.
8      Q.   Okay.  And you believe that if the
9  system -- the computer system were functioning as it
10  normally would, that those lab results would be
11  instantaneously available on the Hospital Information
12  System from your background knowledge and experience
13  as the manager of the lab?
14          MR. BRENNIG:  Object; calls for
15  speculation, no foundation.
16      A.   Yes.
17      Q.   (By Mr. Pfeifer)  Okay.  Is Exhibit 7 that
18  I have here -- this is the one about the differential
19  whole blood auto scan manual.
20      A.   I don't have that.
21          MS. BRYAN:  That's attached to --
22      Q.   Oh, is that this?
23          MS. BRYAN:  Back of that.
24      A.   Let me get everything organized.  All
25  right.

Page 52

1          Okay.  What was the question, sir?
2      Q.   (By Mr. Pfeifer)  Is this particular
3  document that we have marked as Exhibit 7 here a
4  description of the policy and procedure for when
5  there should be a manual white cell differential
6  performed?
7      A.   Yes.
8      Q.   I'm looking on the bottom of page 134.
9      A.   Okay.
10      Q.   It's the second page of the document.
11      A.   Uh-huh.
12      Q.   And it lists manual differential.  And then
13  it says, "a manual differential must be performed
14  when," and it lists a bunch of bullet points there.
15      A.   Uh-huh.
16      Q.   Do you believe that the bullet point that
17  applies is the one that says, quote:  Immature cells
18  are seen on the scan such as Metamyelocytes
19  Myelocytes, promyelocytes, Blasts?
20      A.   No.
21          MS. BRYAN:  Form.
22      Q.   (By Mr. Pfeifer)  Okay.  Can you point me
23  in this document where it is that the particular flag
24  that you described would come into play?
25      A.   Well, the flag comes into play on the

Page 53

1  beginning of the procedure, when it states that you
2  will do a scan if any one of the following occurs.
3  And if you will look down here, this is on that same
4  page --
5      Q.   Right.
6      A.   -- under Category 3, right at the top.  If
7  you go down to the --
8      Q.   Right.
9      A.   -- to the very bottom.  Any suspect flags
10  for Blast, immature neutrophil 1, immature
11  neutrophils 2, which is the same as immature gran.
12  Granulocytes.
13      Q.   Okay.
14      A.   That's what caused her to scan the slide.
15  The part that caused her to do the manual diff is, if
16  you look two bullet points above where you were
17  originally referring to, it says bands greater than
18  11 percent.
19      Q.   Okay.
20      A.   So if she makes a slide and she sees
21  estimated more than 11 percent bands, then she, at
22  that point, would stop, order the manual diff, and
23  result it.
24      Q.   As a -- I presume, from background, you're
25  a certified laboratory technologist?

DOUG MITCHELL
November 12, 2008

Page 62

1  Is an emergency room patient
2  considered to be a hospital registered inpatient?
3  A.  No, they're not.
4  Q.  Okay.
5  A.  This -- this does also -- basically, it's
6  applying to those results that would be verified
7  after the patient was gone.  Some tests -- for
8  instance, microbiology tests might take as long as a
9  week or a send-out that has to go to California or
10  somewhere.  And that's what this is mostly referring
11  to.
12  Q.  Well, here's -- here's what I'm trying to
13  get at.
14  A.  Okay.
15  Q.  Is there any way the lab knows when an
16  emergency room patient is actually discharged?
17  A.  Is there any way that we know?
18  Q.  Yes.
19  A.  Not in real time, no.  I mean, we don't get
20  notification patient is discharged.  I mean, at -- if
21  they have placed the patient in a discharge status
22  and sent them home, we can look and see that they are
23  discharged.  But we would not normally do that.  That
24  information is not something we would normally be
25  looking at when you're resulting tests.

Page 63

1  Q.  I've heard something called a "callback
2  procedure" with regard to laboratory results that may
3  be reported after a patient has left the Emergency
4  Department.  For example, suppose a patient has a
5  test that's ordered and the test is not yet completed
6  and the patient is sent home before the lab result is
7  completed.
8  What I'm trying to find out is how --
9  how does it work at the hospital that those results
10  get reported back to the patient, if you know?
11  MS. BRYAN:  Objection, form, over
12  broad.
13  Q.  (By Mr. Pfeifer)  Do you know?
14  A.  No, actually.  That -- I don't know
15  exactly.  But basically, it would be the emergency
16  room that would perform that.
17  Q.  Just so we're clear about it -- this is a
18  different issue, but just so we're clear about, when
19  a manual differential is done, that's done by a human
20  being who is conscientiously making a count or
21  tabulation of the results of a white cell
22  differential, correct?
23  A.  Correct.
24  Q.  So the lab tech at the hospital knows the
25  result of the white cell differential by the time

Page 64

1  they post it and verify it on the Laboratory
2  Information System.
3  A.  Yes.
4  Q.  Is there any way that you can tell from the
5  documentation in Exhibit 1, which was the printout of
6  the data, whether or not there were any abnormalities
7  with the functioning of the computer system on the
8  day that all this occurred, February 12 of '06?
9  A.  I can tell that there were none on the
10  laboratory computer system.
11  Q.  Okay.
12  A.  This does not tell me whether there was a
13  problem on the other end.
14  Q.  Okay.  At least as far as your half of it
15  is concerned, the Laboratory Information System, you
16  can say that there were no malfunctions from the
17  Laboratory Information System that morning?
18  A.  Well, not at this -- with this particular
19  tests.
20  Q.  Yes.
21  A.  I mean, these are all automated entries
22  that went across.
23  Q.  Okay.  I'm now shifting to a different
24  document which is the Critical Value Reporting
25  Process.

Page 65

1  A.  Critical Value Reporting Process.
2  Q.  Which exhibit number is that?
3  A.  Three.
4  MR. BRENNIG:  Give us the Bates stamp
5  numbers on it, Phil, please.
6  MR. PFEIFER:  Yes.  It's 0032, in the
7  bottom corner.
8  MR. BRENNIG:  Thank you.
9  Q.  (By Mr. Pfeifer)  Under the policy
10  statement -- first of all, did you have anything to
11  do with drafting these policies?
12  A.  No.
13  Q.  Mr. Faucett looks to be the Vice President
14  for System Laboratory Services.  Correct?
15  A.  Yes.
16  Q.  Was he basically your boss?
17  A.  Well, at the end of it, yeah.  There were
18  several layers in between.  There was a director that
19  I reported to directly at Memorial Southeast.  There
20  was a medical director at Memorial Southeast, which
21  is Dr. Floyd.
22  Q.  Dr. who?
23  A.  Floyd.
24  Q.  What's his first name?
25  A.  Craig Floyd.

Gretchen Dowda Reporting  (713) 521-1117

Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit G

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                      HOUSTON DIVISION

WENDY GUZMAN, INDIVIDUALLY  :
AND AS NEXT FRIEND OF       :
        ████████ GUZMAN, A MINOR  :
                            :
V.                          :  CIVIL ACTION NO. 07-3973
                            :
MEMORIAL HERMANN HOSPITAL   :
SYSTEM, D/B/A MEMORIAL      :
HERMANN SOUTHEAST HOSPITAL  :
```

     *    *    *    *    *    *    *    *    *    *    *    *    *    *


                 ORAL AND VIDEOTAPED DEPOSITION OF
                           APRIL GANZ
                       January 30, 2008


     *    *    *    *    *    *    *    *    *    *    *    *    *    *


     ORAL AND VIDEOTAPED DEPOSITION OF APRIL GANZ,

produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 30th day of

January, 2008, from 11:58 a.m. to 2:40 p.m., before

Gretchen C. Dowda, CSR in and for the State of Texas,

reported by machine shorthand, at Smyser, Kaplan &

Veselka, L.L.P., 700 Louisiana St., Suite 2300,

Houston, Texas 77002, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the

record or attached hereto.

Page 6

1    Q.  Okay.  Can you tell me briefly what work
2  experience you've had as a registered nurse between
3  the time you graduated from nursing school up until
4  February of '06?
5    A.  I have predominantly worked in the Emergency
6  Department.  During the time I was an agency nurse I
7  took a contract in I.C.U. as well.
8    Q.  Okay.  When did you start working for
9  Memorial Hermann Southeast?
10   A.  I have been on staff about five and a half
11 years as a Memorial Hermann Southeast employee and for
12 a year and a half prior to that I worked for an agency
13 where I was regularly assigned to work at the E.R. at
14 Memorial Hermann Southeast.
15   Q.  At this time in February of '06 who did you
16 work for?
17   A.  I worked for Memorial Hermann Southeast.
18   Q.  And you were a paid employee of them, get
19 your W-2 from them?
20   A.  Yes.
21   Q.  And by "them" I mean Memorial Hermann
22 Hospital System.
23   A.  That's correct.
24   Q.  Okay.  And what is the name of the agency
25 that you worked at before you worked for Memorial

Page 7

1  Southeast?
2    A.  Hou Staff.
3    Q.  Are you a certified emergency nurse?
4    A.  I am.
5    Q.  Okay.  And explain what that means.
6    A.  It means that the Emergency Nursing
7  Association, which is the association for emergency
8  nurses that kind of regulates their practice or makes
9  recommendations on their practice, I have sat before
10 an exam and shown that my knowledge is sufficient to
11 pass the exam of certified emergency nurse
12 specializing in the area of emergency nursing.
13   Q.  Okay.  When did you become a certified
14 emergency nurse?
15   A.  I believe it was in 2006, slightly after
16 this took place.  After this case took place.
17   Q.  All right.  And had you taken the exam prior
18 to -- when did you take the exam I guess is a good
19 question?
20   A.  I took the exam I want to say the end of
21 March or April of 2006.  And at this time I had
22 completed the review course, but I had not studied and
23 taken the exam.
24   Q.  Can you tell me what positions that you had
25 held during the period of time of your employment at

Page 8

1  Memorial Southeast?
2    A.  Well, I came on staff as a staff nurse and I
3  currently am a shift supervisor.  I have also served
4  as a charge nurse.  I work all areas of the Emergency
5  Department and I have other positions, like, I'm the
6  pediatric liaison for the Emergency Department and was
7  at this time.  And I also chair the career ladder for
8  the hospital.
9    Q.  That's a lot of stuff.  Let's go through
10 them one by one if we can.  You told me something
11 about being shift supervisor.  Is that nursing shift
12 supervisor?
13   A.  Yes.
14   Q.  And when did you first become the nursing
15 shift supervisor?
16   A.  I would say that I accepted that position
17 about nine months ago.  The position was created
18 shortly before then throughout the hospital.
19   Q.  Okay.  So nine months ago would be summer of
20 '07?
21   A.  Yes.
22   Q.  What was your position in February of '06?
23   A.  I worked as a staff nurse and did relief
24 charge work.
25   Q.  And on the day that you saw ████ the 12th

Page 9

1  of February of '06 were you working as a staff nurse
2  or charge nurse?
3    A.  I was working as a staff nurse and I was
4  assigned to the triage area.
5    Q.  Okay.  At that time had you temporarily been
6  assigned to charge nurse duties in the E.R.?
7    A.  I had, but I was not that day.
8    Q.  Okay.  Do the different -- do the
9  responsibilities of a staff nurse differ from those of
10 the charge nurse?
11      MS. BRYAN:  Form.
12   A.  Yes.
13   Q.  (By Mr. Pfeifer)  Are you able to tell me
14 who the charge nurse was on the day of this visit
15 February 12th of '06?
16   A.  I don't recall.
17   Q.  Where would one go look to find out who the
18 charge nurse was?
19      MS. BRYAN:  Form.
20   A.  I suppose you could talk to the department
21 manager about the records.  I'm really not sure.  I
22 don't maintain that log.
23   Q.  (By Mr. Pfeifer)  Who is that?  Who is the
24 department manager?
25   A.  Currently it's Mutlu Smith.

Page 90

1    improvement review, which would be privileged.
2            THE WITNESS:  Okay.
3            MS. BRYAN:  And it's not really
4    relevant to the question.  So Phil, do you mind
5    reasking the question?
6            MR. PFEIFER:  Sure.
7            MS. BRYAN:  I'm lost now.
8        Q.  (By Mr. Pfeifer)  What sorts of best
9    practice from outside the hospital would be reviewed
10   and considered by the nursing staff?  You said that
11   there were several sources of information outside the
12   hospital that are reviewed routinely and considered as
13   part of best practice.
14           Focusing now on the emergency room
15   only, can you give me some idea where those materials
16   are found?
17           MS. BRYAN:  Objection, form.
18       A.  I think that's kind of vague for me to
19   answer that way.
20       Q.  (By Mr. Pfeifer)  All right.
21           MS. BRYAN:  I think --
22       Q.  Help me out.
23           MS. BRYAN:  -- he's asking you if there
24   are any sources outside the hospital that would
25   contain best practices.

Page 91

1            MR. PFEIFER:  -- that relate to the
2    Emergency Department, yes.  You have phrased it very
3    well.
4            MS. BRYAN:  Thank you.  Always here to
5    help.
6        A.  Okay, let me think about that for a minute
7    that relate to the Emergency Department.
8            Okay, I thought about it.
9        Q.  (By Mr. Pfeifer)  Okay.
10       A.  One example might be the revision of our
11   acute myocardial infarction protocol.
12           (Mr. Brennig left the deposition
13           room at this time.)
14       Q.  (By Mr. Pfeifer)  Okay.
15       A.  Organizations outside the hospital made
16   recommendations on what best practice would be and we
17   revised our practice and admission orders for acute MI
18   and response.
19       Q.  Okay.  So is there actually a protocol with
20   regard for acute MI at the hospital?
21       A.  Yes.
22       Q.  And tell me what you mean by a "protocol."
23       A.  There is a standard order set that the
24   hospital has agreed upon that meets with best
25   practices.  And all physicians try to adhere to those

Page 92

1    orders unless there is a specific reason why they
2    wouldn't with that case to achieve the best outcome
3    for the patient.
4        Q.  To your knowledge are there protocols
5    concerning pediatric patients who come in with
6    complaints similar to those that ▮▮▮▮ had?
7            MS. BRYAN:  Form.
8        A.  We do have protocols in the emergency room
9    that are approved by the medical director that, for
10   example, a nurse may start in triage if they could not
11   get the patient to a room for a medical screening, you
12   know, in which situation it would be the doctor that
13   saw the patient that would order things.
14       Q.  (By Mr. Pfeifer)  Any other protocols with
15   regard to standard orders that are to be given with
16   regard to pediatric patients?
17       A.  The only one that I'm aware of specifically
18   in regards to pediatric patients that comes to my mind
19   is there a protocol to administer Tylenol or Motrin
20   if the child has a fever over a certain range.
21       Q.  Do you know whether there is a protocol with
22   regard to vital signs?
23       A.  There is no protocol that I'm aware of that
24   lists a specific time frame or anything specific about
25   vitals outside of the fact that it is based on the

Page 93

1    clinical appropriateness of the case.
2        Q.  Are there any protocols with regard to chest
3    x-rays of pediatric patients in the emergency room?
4        A.  I have never seen anything that specific.
5        Q.  Any protocols at all with regard to chest
6    x-rays?
7        A.  I am not aware -- I think there are
8    protocols that include a chest x-ray in the situation,
9    say, for example of the acute MI.  That would be
10   included in that protocol.
11       Q.  Okay.  Are there protocols that you are
12   aware of that just deal with the general flow of
13   pediatric patients that have medical conditions that
14   come to the Emergency Department?
15       A.  No.
16       Q.  Okay.  In your experience would what is
17   necessary for medical screening exam in that
18   circumstance be left solely to the clinical judgment
19   of the physician who was conducting the exam?
20       A.  Are you asking whether the physician
21   conducting the exam would be the one who decided what
22   to order?
23       Q.  Not exactly.
24       A.  Okay.
25       Q.  What I'm asking is whether or not there

Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

WENDY GUZMAN, INDIVIDUALLY :
AND AS NEXT FRIEND OF       :
███████  GUZMAN, A MINOR    :
                            :
V.                          : CIVIL ACTION NO. 07-3973
                            :
MEMORIAL HERMANN HOSPITAL   :
SYSTEM, D/B/A MEMORIAL      :
HERMANN SOUTHEAST HOSPITAL  :
 *   *   *   *   *   *   *   *   *   *   *   *   *   *

ORAL AND VIDEOTAPED DEPOSITION OF
FRANK BLAIN
February 4, 2008

 *   *   *   *   *   *   *   *   *   *   *   *   *   *

       ORAL AND VIDEOTAPED DEPOSITION OF FRANK BLAIN,

produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 4th day of

February, 2008, from 10:03 a.m. to 12:02 p.m., before

Gretchen C. Dowda, CSR in and for the State of Texas,

reported by machine shorthand, at Smyser, Kaplan &

Veselka, L.L.P., 700 Louisiana St., Suite 2300,

Houston, Texas 77002, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the

record or attached hereto.

f6a60040-0bba-4329-9c81-f3cc0e48bfc0

Page 30

1    A.  That's it.  I just -- I couldn't tell you
2  anything specifically about it.
3    Q.  Do you know who it is, if anybody, that is
4  reviewing lab tests that come in that are abnormal
5  after the patient has been sent home?
6    A.  I don't know --
7    MS. BRYAN:  Form?
8    A.  -- who would do that.
9    Q.  (By Mr. Pfeifer)  Okay.  I'm going to show
10  you Exhibit 2.  Is that a copy of the chart for
11  February the 12th?
12    A.  Yes, sir.
13    Q.  Okay.  And you have previously reviewed
14  those records, correct?
15    A.  Yes, sir, I believe I have.
16    Q.  Okay.  There are notations in there that
17  have been typed in with the letters "fb1" on the pages
18  of that chart.  Do you see "fb1"?
19    A.  Yes, sir, I do.
20    Q.  Does "fb1" stand for Frank Blain?
21    A.  I'm assuming that's what it stands for, yes,
22  sir.
23    Q.  Can you tell me whether you have any actual
24  recollection of the events of February 12th with
25  regard to ▆▆▆▆▆ Guzman?

Page 31

1    A.  Some.
2    Q.  Okay.  Is there anything that you remember
3  about ▆▆▆▆ that is not recorded in the chart here?
4    A.  I don't believe so.
5    Q.  All right.  Sometimes after an event people
6  make notes to themselves for the purpose of being able
7  to review them or refresh their memory or something
8  later on.  And what I'm trying to find out is whether
9  you ever wrote anything to yourself for your own
10  reference about the events concerning ▆▆▆▆ Guzman,
11  either handwritten or typed up something, or made any
12  kind of notation at all that you could go back and
13  review to try to refresh your memory about what
14  happened concerning ▆▆▆▆
15    A.  No, sir, I did not.
16    Q.  Okay.  So if we were to look for any records
17  at all about what happened to ▆▆▆▆ concerning the
18  interaction you had with him as a patient and the care
19  that was rendered to him, would it be within this
20  chart?
21    A.  Yes, sir.
22    Q.  Okay.  No other records you know of anywhere
23  concerning ▆▆▆▆
24    A.  No, sir, I didn't.
25    Q.  Okay.  I'm just trying to be sure.

Page 32

1    A.  Right.
2    Q.  Because sometimes in my past I have
3  encountered that, that sometimes people make notes,
4  okay?  That's the reason for those questions.
5    By reference to the record can you tell
6  me how many times during ▆▆▆▆ visit to the ER in
7  February 12 that you actually interacted with him or
8  his family?
9    A.  I couldn't tell you a specific number, no,
10  sir.
11    Q.  Do you have any independent recollection of
12  ▆▆▆▆ vital signs that are not recorded in the
13  chart?
14    A.  Not specifically, no.
15    Q.  I just want to know all you know
16  about vital signs, because there may be testimony that
17  you can give about recollections that are not recorded
18  in the chart here.  Do you understand what I'm getting
19  at?
20    MS. BRYAN:  Objection, form.
21    Q.  (By Mr. Pfeifer)  And what I'm trying to
22  find out now is whether you have some independent
23  recollection of ▆▆▆▆ vital signs that are not
24  reflected here in this chart.
25    A.  It's -- it's possible with vital signs, yes,

Page 33

1  sir.
2    Q.  Okay.  Well, tell me what you recall about
3  the vital signs that are not recorded in the chart.
4    A.  I don't recall anything specific.
5    Q.  Okay.  Do you recall anything about heart
6  rate that is not recorded in the chart?
7    A.  I don't recall if it was continuous or if it
8  was -- if this was spot.  I'm not a hundred percent
9  certain.
10    Q.  How about with regard to oxygen saturation?
11  Do you recall anything about oxygen saturation
12  that's --
13    A.  By the document I do.
14    Q.  Okay.  But not independent?
15    A.  Not specifically, no, sir --
16    Q.  The problem I have --
17    A.  -- that stands out.
18    Q.  Let me just tell you what -- what I'm trying
19  to find out here.  You may have information about
20  ▆▆▆▆ medical condition that is not reflected in
21  this medical chart.  And when you answer "not
22  specifically," it leads me to believe that there may
23  be something general that you know that I haven't
24  asked the right targeted question for.  You follow
25  me?

Page 34

1        And what I'm trying to find out now and
2   make it as global as possible is this:  Is there
3   anything about ████ vital signs that you can tell
4   us that would add to or supplement in any way from
5   your memory what is recorded in this chart?
6        MS. BRYAN:  Form.
7   A.  No, sir, I couldn't.
8   Q.  (By Mr. Pfeifer) Okay.  Did you make
9   entries in the medical chart using the initials "ph1"?
10  A.  No, sir.
11  Q.  Okay.  Here's what I'm trying to find out:
12  Ph1 on page 15, MHSE-15, seems to indicate that that
13  is Dr. Phillip Haynes.  Okay?  And we've taken
14  Dr. Haynes' deposition.  And I want you to assume that
15  Dr. Haynes has indicated that he did not make the
16  entries in the chart with the name "ph1" next to
17  them.  Okay?
18       But we know from looking at the record
19  that the entries are there for "ph1."  You follow me?
20  A.  (Witness nodding.)
21  Q.  What I'm trying to find out is:  Did you
22  make entries for Dr. Haynes in this chart with the
23  name of "ph1" at his request?
24  A.  No, sir.  Not knowingly, no.
25  Q.  Okay.  And did you make entries in this

Page 35

1   chart at all under the name "ph1"?
2   A.  No, sir, not -- no, sir.
3   Q.  Okay.  Do you have any explanation then of
4   how entries were made into the chart under the
5   initials "ph1"?
6   A.  No, sir.
7   Q.  Let's start at 7:55.  I'm looking on page 13
8   of the chart, okay, at the bottom.  MHSE-013.
9   A.  Yes, sir.
10  Q.  And it looks to me that that is the first in
11  time note that is made by you concerning ████
12  Does that look to be accurate?
13  A.  Yes, sir, it has my initials by it.
14  Q.  Okay.  At 7:55 you wrote that he was crying;
15  is that right?
16  A.  Yes, sir.
17  Q.  So you saw that he was crying?
18       MS. BRYAN:  Form.
19  A.  That's what I documented.  I don't --
20  Q.  (By Mr. Pfeifer) Okay.  Well, if you
21  documented it, it was true, correct?
22       MS. BRYAN:  Form.
23  A.  I guess.  But I don't know in reference to
24  what.
25  Q.  (By Mr. Pfeifer) Why he was crying?

Page 36

1   A.  Right.
2   Q.  Okay.  Also at 7:55 you have written that he
3   was unable to use the pain scale.  Did I read that
4   correctly?
5   A.  Yes, sir.
6        MS. BRYAN:  Form.
7   Q.  (By Mr. Pfeifer) Can you tell me what you
8   meant when you documented that he was unable to use
9   the pain scale?
10  A.  I don't know what I meant with that.
11  Q.  Did you actually perform a physical
12  examination of ████ from a nursing standpoint?
13  A.  I performed a nursing assessment.
14  Q.  Okay.  Can you tell me generally what you
15  did from an exam point of view in your nursing
16  assessment?
17  A.  The best I can remember and what I
18  documented, I listened to his lungs, listened to his
19  abdomen, touched his abdomen.  Just an overall general
20  appearance.
21  Q.  What were you looking for when you looked in
22  his ears?
23  A.  I don't know that I did.  That -- sometimes
24  a physician -- if I'm in the room and the physician
25  looks in his ears and he says they are clear, or I

Page 37

1   will ask him what they look like or whoever the
2   practitioner is.
3   Q.  Well, here we have a notation at 7:55 at the
4   bottom says, "EENT:  Tympanic membrane clear on right
5   ear and left ear.  Ear canal on right and left ear,
6   oral mucosa is moist."
7        Now, the question I have now is, is
8   that as a result of your personal exam of ████ or
9   are you recording what the doctor is telling you?
10  A.  The oral mucosa would be -- I could tell you
11  without a doubt that that's mine.
12  Q.  Okay.
13  A.  Now, how I get to the oral mucosa, since
14  it's computerized, I don't know if you have to go
15  through these, you know, click the buttons or what.
16  Q.  Okay.  Here's all I'm trying to find out at
17  this point is:  What is written after the letters EENT
18  about the tympanic membranes being clear on the right
19  and left and the ear canal being clear on right and
20  left, is that something that is written as a result of
21  an exam that you did?
22  A.  It could have been.  I mean, I...
23  Q.  Well, had anybody else seen -- had
24  Dr. Haynes seen the patient by then?
25  A.  I don't recall what time he went in the room

Page 42

1      Q.   Okay.  Better question is:  What information
2   do you get from the pulse ox?
3      A.   Heart rate and pulse oxygenation.
4      Q.   Okay.  Does pulse ox display also
5   respiratory rate?
6      A.   It can.  Well, I back up.  No, sir, it
7   wouldn't.
8      Q.   Okay.  So the pulse oximeter would show
9   oxygen saturation level and the heart rate?
10     A.   Yes, sir.
11     Q.   Okay.  But the pulse oximeter would not
12  display his blood pressure, correct?
13     A.   No, sir.
14     Q.   Not correct or it wouldn't do it?
15     A.   It wouldn't.  It wouldn't show.
16     Q.   In order to get the blood pressure, you
17  would have to have some sort of automated blood
18  pressure cuff attached to the patient, correct?
19     A.   Or it could be done manually.
20     Q.   Okay.  And if there were no automated blood
21  pressure cuffs attached, then it wouldn't be
22  monitoring the blood pressure continually, correct?
23     A.   If it were not attached, no, sir, it
24  wouldn't monitor.
25     Q.   Okay.  Can you tell me from reference to the

Page 43

1   record or a reference to your memory what the
2   patient's vital signs were on discharge for ▊
3   Guzman on February 12, '06?
4      A.   I can't tell you specifically, no, sir,
5   other than what I documented his heart rate.
6      Q.   Okay.  Can you tell me generally what
7   his --
8      A.   I couldn't tell you generally other than his
9   heart rate.
10     Q.   Okay.  Was the time that you documented the
11  heart rate at 9:58?
12     A.   Yes, sir.  According to the document, yes,
13  sir.
14     Q.   Okay.  Other than the notation at 9:58 that
15  says, "No adverse reaction.  Heart rate is decreased
16  to 105 dash 110," is there any indication in the
17  chart that his vital signs were ever taken after that
18  before he was discharged?
19     A.   Not documented, no, sir.
20        MS. BRYAN:  Form.
21     Q.   (By Mr. Pfeifer)  Okay.  And do you have any
22  information from any source at all about what his
23  vital signs were at the time of discharge?
24     A.   I don't have anything recorded, no, sir.
25     Q.   Okay.  Are you the person who drew the blood

Page 44

1   for ▊
2      A.   I believe I was, yes, sir.
3      Q.   There is a notation here under procedures at
4   about 8:40, "Lab drawn, sent.  First IV started
5   peripheral.  IV 20-gauge catheter in left antecubital
6   area."  Is that correct?
7      A.   Yes, sir.
8      Q.   In the Emergency Department how did you go
9   about making sure that the blood tests that the doctor
10  ordered -- that the doctor had ordered were actually
11  administered?
12        MS. BRYAN:  Form.
13     A.   I'm not sure I understand the question.
14     Q.   (By Mr. Pfeifer)  Okay.  There is paperwork
15  in the chart where Dr. Haynes has circled "CBC."
16  Do you see that?
17     A.   Which page are you referring to?
18     Q.   I'm looking at page MHSE-11 down at the
19  bottom.
20     A.   At the bottom of the page, sir?
21     Q.   The bottom is the page number.
22     A.   Oh.
23     Q.   The order is up at the top.
24     A.   Yes, sir, I see it.
25     Q.   Okay.  Do you see where the letters "CBC"

Page 45

1   are and there appears to be a handwritten "X" mark
2   next to that?
3      A.   Yes, sir.
4      Q.   All right.  Did you ever see this order
5   sheet the day that ▊ was at the emergency room?
6      A.   I'm sure I saw it at some time.
7      Q.   Okay.  After the doctor saw ▊ in his
8   initial exam, did he come out and give you
9   instructions about what he wanted done with regard to
10  ▊
11     A.   I can't remember how that happened, if I
12  took the information off of this or if he told me.
13     Q.   Okay.  Did you understand back at the time
14  that you were to draw blood for a CBC as reflected on
15  this order sheet?
16     A.   Again, I'm not sure I understand what the
17  question is.
18     Q.   Let me go at it this way:  How did you get
19  the information that you were supposed to go draw the
20  blood?
21     A.   Like I said, I don't know how I got it off
22  of there, whether I got it off the paper or whether
23  he told me, or possibly both.
24     Q.   Okay.  Did you understand that you were
25  drawing blood for a CBC which included the white cell



Page 54

1    Q.  Okay.  So we know somehow you knew that an
2  order had been entered for a CBC and a BMP to go to
3  the laboratory, correct?
4    A.  Yes, sir.
5    Q.  Because you went and drew the blood in two
6  different, separate containers, marked the blood,
7  labeled the blood, and sent it to the lab, correct?
8    A.  Yes, sir.
9    Q.  Okay.  Now, that gets the blood to the lab.
10  Now, my question has to do with following up on those
11  results.  Okay?  And what I'm trying to find out is
12  whether you had ever been taught at the Emergency
13  Department at Memorial Southeast that it was part of
14  your job to go back and verify whether labs that had
15  been ordered for which blood was drawn were actually
16  completed before the patient is discharged.  You
17  understand that?
18    A.  Yes, sir.
19    Q.  So what's your answer?
20    A.  It was not my job to verify that anything
21  was completed.
22    Q.  Was it your job to make sure that vital
23  signs were repeated and recorded in the chart prior to
24  patient discharge?
25    A.  Can I have the question again, please.

Page 55

1    Q.  Was it your job as the emergency room nurse
2  taking care of ███ Guzman to make sure that his
3  vital signs were taken and recorded in the chart
4  before discharge?
5    A.  If there was a need to put them, if there
6  was something specific that I needed to put in the
7  chart for that.
8    Q.  Okay.  Was it left to your discretion to
9  decide whether or not vital signs needed to be
10  repeated for ███ Guzman on the day he was in the
11  ER?
12      MS. BRYAN:  Form.
13    A.  I don't know what their policy is.
14    Q.  (By Mr. Pfeifer)  So as you sit here today,
15  you don't know what the policy at Memorial ER is with
16  regard to repeating vital signs on patients before
17  discharge?
18      MS. BRYAN:  Form.
19    A.  No, sir, I don't know a specific policy.
20    Q.  (By Mr. Pfeifer)  Okay.  And did you know of
21  any policies in February of '06?
22      MS. BRYAN:  Form.
23    A.  No, sir, I -- I -- I don't -- no.
24      VIDEO TECHNICIAN:  Need to go off the
25  record and change the tape.  It is 11:20.

Page 56

1      (Recess taken.)
2      VIDEO TECHNICIAN:  We're back on the
3  record. It's 11:30.
4    Q.  (By Mr. Pfeifer)  All right.  We know
5  that -- if you go back to page 13 down at the bottom,
6  at 7:55 you did an initial assessment of ███
7  correct?
8    A.  Yes, sir.
9    Q.  And as a result of that assessment, did you
10  consider at the time that he was stable?
11    A.  Yes, sir.
12    Q.  Can you tell me by looking at your resume
13  here who some of these people are?  There is listed
14  Charlotte Ware, RN.
15    A.  A nurse that I have worked with.
16    Q.  At Memorial or --
17    A.  Yes, sir.
18    Q.  Okay.  Who is Arthur Schaffer?
19    A.  Actually, that's an ex father-in-law.
20    Q.  Okay.  Michael Shaw?
21    A.  Father-in-law now.
22    Q.  Okay.  So he is your wife's father?
23    A.  Yes, sir.
24    Q.  Okay.  Dr. Nadir?
25    A.  Ali.

Page 57

1    Q.  Dr. Ali, I'm sorry.  How do you know
2  Dr. Ali?
3    A.  From Clear Lake Medical Center.
4    Q.  Okay.  Did you work for him?
5    A.  With him, yes, sir.
6    Q.  In an emergency department?
7    A.  No, sir, in a cardiac cath lab.
8    Q.  Okay.  You have identified on your resume
9  that you were the valedictorian of the associate class
10  in nursing at McLennan County or McLennan Community
11  College?
12    A.  As such, yes, sir.
13    Q.  That mean you were number one?
14    A.  Number one ranking, yes, sir.
15    Q.  In your nursing class?
16    A.  Yes, sir.
17    Q.  In 1996?
18    A.  Yes, sir.
19    Q.  And how many in that class?
20    A.  I can't recall exactly.  It changed every
21  semester.
22    Q.  Okay.  Several hundred?
23    A.  No, sir.  It wasn't several.
24    Q.  Do you know whether they still have a
25  McLennan Community College nursing program?

Plaintiffs' Response to Memorial Hermann Motion for Summary Judgment

Exhibit I

TOM FLANAGAN
January 12, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

WENDY GUZMAN, INDIVIDUALLY       :
AND AS NEXT FRIEND OF            :
███████ GUZMAN, A MINOR          :
                                 :
V.                               : CIVIL ACTION NO. 07-3973
                                 :
MEMORIAL HERMANN HOSPITAL        :
SYSTEM, D/B/A MEMORIAL           :
HERMANN SOUTHEAST HOSPITAL       :

*   *   *   *   *   *   *   *   *   *   *   *   *   *

ORAL AND VIDEOTAPED DEPOSITION OF
TOM FLANAGAN
AND AS MEMORIAL HERMANN HOSPITAL SYSTEM DESIGNEE
January 12, 2009

*   *   *   *   *   *   *   *   *   *   *   *   *   *

    ORAL AND VIDEOTAPED DEPOSITION OF TOM FLANAGAN

AND AS MEMORIAL HERMANN HOSPITAL SYSTEM DESIGNEE,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on the 12th day of January, 2009, from

1:17 p.m. to 4:25 p.m., before Gretchen C. Dowda, CSR in

and for the State of Texas, reported by machine

shorthand, at the law offices of Smyser, Kaplan &

Veselka, L.L.P., 700 Louisiana St., Suite 2300, Houston,

Texas 77002, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

TOM FLANAGAN
January 12, 2009

Page 30

1   is that?
2       A.   This is a policy.  Exhibit No. 7 is a policy
3   regarding admission of patients to the emergency center.
4       Q.   Okay.  When you say admission of patients to
5   the emergency center, exactly what are you describing
6   there?
7       A.   When patients -- when a person presents to the
8   emergency department and requests to be seen.
9       Q.   Okay.  Was that policy and procedure also in
10  effect back in 2006 in February?
11      A.   According to the dates here, yes.
12      Q.   Okay.  I'm going to hand you Exhibit 8.
13  What's that?
14      A.   This is the triage policy.
15      Q.   And it was -- was it in force and effect at
16  Memorial Southeast back in February of 2006?
17      A.   According to the dates on here, yes.
18      Q.   Okay.  And Exhibit 9 is the document you
19  referred to just a while ago as assessment or
20  reassessment.  Was that a policy and procedure that was
21  in force and effect at Memorial Southeast back in
22  February of '06?
23      A.   According to these dates, yes.
24      Q.   Okay.
25           MS. BRYAN:  And just for clarification,

Page 31

1   you said Southeast.  Is that one Southeast?
2       A.   This one is Memorial Hermann Healthcare
3   Systems.  This is Memorial Hermann Healthcare Systems.
4           MS. BRYAN:  Do you want to distinguish
5   between the corporate policies and the Southeast
6   policies, Phil, or --
7       A.   That's Southeast and that's Southeast.
8       Q.   (By Mr. Pfeifer) Okay.  All right.  Let me
9   ask you this.  With regard to a corporate policy would
10  that policy be in force and effect for all the hospitals
11  in the Memorial System, including Memorial Southeast?
12      A.   That is correct.
13      Q.   Okay.  On the policies, if it says MHHS at the
14  top, does that indicate that it is Memorial
15  Hermann Hospital Southeast or -- I guess that really
16  doesn't refer to it, does it?
17      A.   No.
18      Q.   Okay.
19      A.   But you can look for it -- let me just show it
20  to you so you'll see the difference.  It's Memorial
21  Hermann Healthcare System, Memorial Hermann Healthcare
22  System.
23      Q.   All right.
24      A.   They just didn't put the "C" in.  Down here
25  the second title --

Page 32

1       Q.   Yes.
2       A.   -- tells you this is a Southeast based
3   policy.  This one -- these two do not have that on
4   there.
5       Q.   Okay.
6       A.   So it's corporate.
7       Q.   Okay.  Who maintains the policies and
8   procedure manual for corporate policies about the
9   emergency department?
10      A.   Today or then?
11      Q.   Back then.
12      A.   It would have been me.
13      Q.   Okay.  And who does today?
14      A.   I can't answer that.
15      Q.   Okay.
16      A.   Sorry.
17      Q.   Back in '06 who was it that maintained the
18  policy and procedure manual for the emergency department
19  at Memorial Southeast?
20      A.   As I recall, the director at that time was
21  Christine Wiese.
22      Q.   Do you know if she's still there in that job?
23      A.   No, she's not.
24      Q.   Do you know where she is now?
25      A.   I couldn't tell you.

Page 33

1       Q.   Is she still with Memorial or did she leave --
2       A.   No.
3       Q.   -- Memorial?
4       A.   She left after -- she left the city.  That's
5   all I do know.
6       Q.   All right.  At any point in time did corporate
7   management such as yourself review the Memorial
8   Southeast policies and compare them with the corporate
9   policies of the Memorial System to determine whether
10  they were consistent?
11      A.   Rephrase that for me.
12      Q.   Was there any point in time where you or
13  anybody under your supervision or direction was asked to
14  go compare the emergency room policies and procedures of
15  Memorial Southeast with the corporate system-wide
16  policies and procedures to see if they were congruent or
17  whether they were in conflict?
18      A.   No.
19      Q.   Okay.  To your knowledge have we identified in
20  these documents that we have marked here 6, 7, 8, 9, I
21  guess 4, as being all of the policies and procedures
22  that would relate to emergency care as relates to what
23  nurses do in the emergency department at Memorial
24  Southeast?
25           MS. BRYAN:  The only thing I'm going to

9  (Pages 30 to 33)

TOM FLANAGAN
January 12, 2009

Page 38

1    Q. Okay.
2         MS. BRYAN: And when we produced these
3    documents in response to whatever document request they
4    came from, we produced all the ones that we thought were
5    responsive to this case.
6    Q. Okay. All right. Very good. But what you're
7    telling me and what I think you testified to before,
8    there may be predecessor policies. If we were to ask
9    you to go back and click on febrile illness, for
10   example, you would be able to click on it, look at the
11   policy, and see whether it was a new policy as of
12   November 20 of '07 or whether there was some previous
13   policy. Would that be accurate?
14   A. That is correct --
15   Q. Okay.
16   A. -- as I recall.
17   Q. All right. Then there is a policy EMS-00032
18   that says Treatment of Emergency Patients by Emergency
19   Physicians. Are you familiar with that policy?
20   A. Not off the top of my head, no.
21   Q. Okay. Can you tell me just generally what it
22   discussed without --
23   A. I couldn't unfortunately, I'm sorry.
24   Q. Okay.
25   A. I would have to literally go and look at it.

Page 39

1    Q. Okay. 00027 talks about Transportation of
2    Emergency Center Patients to Interdepartmental Areas.
3    Does that mean areas within the Memorial Southeast
4    Hospital or does it deal with transfers between
5    hospitals?
6    A. That as I recall, best of my recollection,
7    it's related to departments within Memorial Hermann
8    Southeast.
9    Q. In other words, if you're taking the patient
10   out of the emergency department to go to radiology for
11   an MRI or CT scan and then bringing them back to the ER,
12   would these policies relate to that kind of thing?
13   A. That's correct.
14   Q. What is the EMS-00029 about evidence
15   preservation? What does that have to do with?
16   A. I would have to go back and look at that.
17   Q. Okay.
18   A. I couldn't just tell you off the top of my
19   head.
20        MS. BRYAN: From my experience, things
21   like rape kits or any sort of police chain of custody
22   issue but...
23        MR. PFEIFER: Okay.
24   A. I would think that may be what it is.
25   I don't -- but I can't...

Page 40

1    Q. (By Mr. Pfeifer) All right. Let's go back to
2    our list of things I asked you to bring.
3    A. Okay.
4    Q. Have we covered everything then on 3 of which
5    you are aware?
6    A. As I recall, that I'm aware of, yeah, I
7    believe so.
8    Q. Okay. Number 4 talks about policies and
9    procedures concerning monitoring of vital signs as
10   related to the emergency department. Would that be the
11   assessment, reassessment policy that you described?
12   A. May I look at that policy?
13        MS. BRYAN: I think it's in this stack.
14   A. I may have it. Okay. Let me look at that.
15   If you'll give me just a moment.
16        And repeat your question, please.
17   Q. (By Mr. Pfeifer) Is the assessment policy
18   that you have in your hand, Exhibit 9, the only policy
19   and procedure concerning monitoring of vital signs as
20   related to the emergency department at Memorial
21   Southeast?
22   A. That is correct. It is addressed in this
23   policy.
24   Q. Okay.
25   A. Exhibit 9.

Page 41

1    Q. Okay. And it looks like you're the one who
2    approved that policy?
3    A. It does look that way, doesn't it?
4    Q. Okay. All right. Now, number 5.
5    A. Uh-huh.
6    Q. Any policies and procedures, any clinical
7    pathways for pediatric patients in the emergency
8    department at Memorial Hermann Southeast for the
9    following types of patients. And then we have patients
10   presenting with complaints or symptom of fever.
11        Were there any clinical pathways for
12   those kinds of patients?
13   A. I have tried to recall and I do not recall
14   that we had any clinical pathways at that time in the
15   emergency department there.
16   Q. Okay. Would that be -- well, let me just
17   cover b and c then. Were there any clinical pathways
18   about patients presenting with complaints or symptoms of
19   nausea or vomiting to your knowledge?
20   A. Not that I can recall. I'm sorry.
21   Q. Okay. And finally, patients presenting with
22   complaints of cough?
23   A. Same thing, not that I can recall.
24   Q. Okay. Do you know whether or not there were
25   clinical pathways of any kind for any condition for

Gretchen Dowda Reporting   (713) 521-1117

TOM FLANAGAN
January 12, 2009

Page 42

1   patients presenting to the ERs at Memorial Hermann
2   Southeast back in February of '06?
3       A.   At Southeast I can't recall that we had any in
4   place at that time.
5       Q.   Okay.  Then, let me back up for just a second
6   and ask this general question:  What do you understand
7   to be a clinical pathway for -- in terms of the
8   emergency department?
9       A.   My understanding is a clinical pathway is a
10  standardized form, format and standardized protocol set
11  forth by physicians so that you can treat patients if
12  they fall under that protocol --
13      Q.   Okay.
14      A.   -- and not have to wait for a physician
15  order.
16      Q.   Now, back in February of '06 did Memorial have
17  clinical pathways for any kind of condition within the
18  emergency department at any of the hospitals to your
19  knowledge?
20           This is broad as it can get and I'll try
21  to narrow it down.  For example, were there clinical
22  pathways for things like heart attack or stroke or --
23      A.   In '06.  I know that our Level One Trauma
24  Center, our downtown campus, has some pathways.  How
25  long they have been in place, I can't -- I can't -- I

Page 43

1   can't -- I don't know.
2           But the Level One Trauma Center was the
3   one campus where you would -- that I recall where we
4   dealt with clinical pathways, not the community
5   hospitals.
6       Q.   In other words, the Memorial Hermann Hospital
7   ER was the one where there were clinical pathways but
8   not the community outlying hospitals?
9       A.   Memorial Hermann Hospital, what we know today
10  as Memorial Hermann Hospital TMC.  Texas Medical Center.
11      Q.   TMC, okay.  The one where Life Flight arrives?
12      A.   Correct.
13      Q.   But to your knowledge back in '06 there were
14  no clinical pathways that the hospital had adopted?
15      A.   Not at the community hospitals that I recall.
16      Q.   Okay.
17      A.   Not that I...
18           MR. BRENNIG:  And just so we're clear,
19  when you say "community hospital," does that include
20  Memorial Hermann Southeast?
21           THE WITNESS:  Yes.
22           MR. BRENNIG:  I just wanted to be clear.
23           MS. BRYAN:  All the Memorial --
24           MR. BRENNIG:  I thought so.
25      A.   When I'm saying the community hospitals, I'm

Page 44

1   using all of them except the Texas Medical Center
2   campus, the Level One Trauma Center.
3           MR. BRENNIG:  Perfect.
4       Q.   (By Mr. Pfeifer)  All right.  I want to skip
5   down now to number eight.  You have brought the medical
6   staff bylaws with you here, correct?
7       A.   Yes.
8       Q.   All right.  There was something that was
9   tabbed here before I started reading it with the
10  indication that this was the only thing that may relate
11  to EMTALA.  And it has to do I think with page 129 of
12  the bylaws about mid-level providers may perform medical
13  screening exams on non-urgent patients in the emergency
14  room under the direct supervision and delegation of the
15  emergency room physician.
16           How in your mind does that relate to
17  EMTALA?
18      A.   Could I see that?
19      Q.   Sure.  Of course.
20      A.   Repeat your question again.
21      Q.   How does that quoted portion of the medical
22  staff bylaws in your mind relate to EMTALA?
23      A.   In my understanding it's that EMTALA clearly
24  delineates that every individual has the right when they
25  walk into an emergency department for an evaluation to

Page 45

1   determine if an emergency medical condition exists.
2           And part of getting to the point of
3   emergency medical condition existing is performing the
4   medical screen evaluation.  And so, it can only be
5   performed by certain personnel on the staff of the
6   hospital.  And so, the bylaws reflect -- the medical
7   staff bylaws reflect what we, that campus, would allow
8   to be performed at a mid-level provider or under the
9   direct supervision of an M.D., that the mid-level
10  provider could perform the medical screen, which it goes
11  back to Exhibit No. 5, my lovely drawing of this bucket
12  of folks.
13           The medical screen is performed by the
14  qualified medical provider, which could be either the,
15  according to your bylaws, the mid-level provider or the
16  medical director.
17      Q.   Now, the -- is the medical director a
18  physician?
19      A.   The medical director of the emergency
20  department?
21      Q.   Yes.
22      A.   Yes.
23      Q.   Okay.  With regard to mid-level providers are
24  you talking about physician's assistants or are you
25  talking about nurse practitioners or are you talking

12  (Pages 42 to 45)

TOM FLANAGAN
January 12, 2009

Page 66

1      Q.  Okay.
2      A.  Date.  And I think discharge disposition.
3      Q.  Okay.  And with regard to discharge
4  disposition, are you talking about whether they were
5  admitted to the hospital, not admitted, or thirdly,
6  transferred to another facility?
7      A.  Correct.
8      Q.  Okay.  Would there be any other options
9  besides those three?
10      A.  Not that I can recall at this time.
11      Q.  Okay.  Anything else you can think of which
12  would be data query fields for MEDHOST system?
13      A.  I think that from what I can recall that
14  pretty much covers it.
15      MR. PFEIFER:  Okay.  Why don't we stop
16  right now and see if we've got the fax in.
17      MS. BRYAN:  We didn't get the right
18  information, so we'll go call.  We'll take a quick break
19  and go call.
20      VIDEO TECHNICIAN:  We're off the record
21  at 3:00.
22      (Recess taken.)
23      VIDEO TECHNICIAN:  We're back on the
24  record.  It's 3:08.
25      Q.  (By Mr. Pfeifer)  Okay.  Let's look again

Page 67

1  at -- I want to go back to this exhibit that you brought
2  with you here today.  I think it's Exhibit 4.
3      A.  Uh-huh.
4      Q.  Okay?
5      A.  Yes, sir.
6      Q.  And I'm not sure we have all the pages of it.
7  Let me just ask you about it.  Would you look at the
8  bottom of the page that is Bates stamped 140?
9      A.  Yes, sir.
10      Q.  And do you see under 3.3.1 it says,
11  patients -- it talks about presenting with minor
12  complaint on non-emergency list.  (See 3.6.)  Correct?
13      A.  Yes, sir.
14      Q.  Well, I don't see a 3.6.  And also the list on
15  page 142, the last page, seems to start with "I" and
16  does it look to you like it's in alphabetical order?
17      A.  It sure does.
18      Q.  Where are A through I?
19      A.  Well, I need to go back and take a look.
20      Q.  Okay.
21      A.  And that was -- this is -- I'm the one that
22  devised this process, so I can speak to this.  This is
23  the non-emergency list, part of it.  But you are
24  correct, we're missing two pages.
25      MS. BRYAN:  My fault.  Two pages.

Page 68

1      THE WITNESS:  We're missing page 3.5
2  behind that.  And then -- well, may only be one page.
3  May only be one page.  Actually when we -- what did you
4  say?
5      MS. BRYAN:  I said, it's not my day.
6      THE WITNESS:  No.  And that's my -- that
7  was my issue because I --
8      MS. BRYAN:  Okay.  We'll investigate the
9  missing pages.  And as soon as I find them, I will give
10  them to you.  I can do that on a different break.  Can
11  you cover -- can you go ahead and cover things?
12      MR. PFEIFER:  I'll try to cover some
13  other stuff while we're waiting on the page that you
14  have requested to be faxed to you.  Maybe we can --
15      THE WITNESS:  Can we take a break and
16  I'll call Mike?
17      MS. BRYAN:  You want to try to look
18  for it?
19      THE WITNESS:  Yeah.  I can get it for
20  you.
21      MR. PFEIFER:  Go back off the record.
22      VIDEO TECHNICIAN:  Off the record at
23  3:11.
24      (Recess taken.)
25      VIDEO TECHNICIAN:  Back on the record at

Page 69

1  3:18.
2      Q.  (By Mr. Pfeifer)  Okay, Mr. Flanagan, we have
3  before us a document which is Exhibit 11.  First of all,
4  can you tell me what that document purports to show?
5      A.  Yes.  What it's showing is, it's a change
6  request detail from our information systems.
7      Q.  So that's talking about the computer
8  information system?
9      A.  It is.  Correct, it is talking about
10  computer.  Any changes we are making in the computer
11  system during the course of business.  And a change
12  request has to go in to information systems.  And then
13  it shows here the date, the time, the solution segment,
14  the description.
15      And so what it shows is on the date of
16  February 12, 2006 at midnight, the system came down
17  until February 12, 2006 at 2:00 a.m. in the morning.  So
18  for two hours the system came down for patient
19  management to achieve older accounts from Healthquest
20  system.  It's a typical, every night at midnight the
21  system goes down because it starts dumping older
22  accounts into another system.  So it takes -- it usually
23  takes about anywhere from an hour and a half to two
24  hours to dump.  So when it's dumping, the system is
25  down.  So it's showing on that day that was the only

TOM FLANAGAN
January 12, 2009

Page 70

1  reason why the system was down.
2         If you take a look right underneath here,
3  it's no emergency customer interruptions.  So it didn't
4  crash for any other reason or anything.
5      Q.  All right.  So let's try to put this in simple
6  terms.  Have we asked you to get information from the
7  business records of the Memorial System about whether or
8  not the hospital information system was functioning on
9  February 12th of '06 during the period of time from 7 in
10 the morning until 11 in the morning, during that time
11 frame?
12     A.  Yes.
13     Q.  Okay.  And have you provided to us in this
14 document Exhibit 11 evidence of all of the times at
15 which the computer system is reported to have been down
16 for any reason?
17     A.  That is correct, yes, I have.
18     Q.  And the only period of time when the computer
19 system was down on that day was during the time period
20 between midnight and 2 a.m.  Is that what this record
21 shows?
22     A.  That is correct.
23     Q.  So from the standpoint of the records of the
24 Memorial Hermann Hospital System, the computer hospital
25 information system was functioning during the period of

Page 71

1  time from 7 in the morning to 11 in the morning on
2  February the 12th of '06?
3      A.  That is correct.
4      Q.  Okay.  And when we say the hospital
5  information system was functioning, does that include
6  the ability of personnel such as physicians or nurses to
7  be able to review on the computer laboratory data that
8  is sent from the laboratory system on to the hospital
9  information system?
10     A.  Yes.
11         (Flanagan Exhibit No. 10 marked.)
12     Q.  Okay.  I'm going to hand you now what's been
13 marked as Exhibit 10.  And is Exhibit 10 the same thing
14 as Exhibit 4 except it has all the pages?
15     A.  It is the same as Exhibit 4.  It is all
16 inclusive.
17     Q.  Okay.
18         MS. BRYAN:  Do you have a copy?
19         THE WITNESS:  Yes, I do.  Here.
20     Q.  (By Mr. Pfeifer)  It's my understanding that
21 Exhibit 10, then, would include the information about
22 the medical screening exam to be performed by a
23 qualified non-physician medical personnel when they are
24 doing the MSE on patients that are triaged and
25 determined to be qualified to have a non-medical person

Page 72

1  perform the medical screening exam.  Is that correct?
2      A.  You need to repeat that.
3      Q.  Okay.
4      A.  Sorry.
5      Q.  You've drawn a diagram here of Exhibit 5?
6      A.  Correct.
7      Q.  And in your diagram you have I guess what you
8  call three buckets of patients.  And I guess what I'm
9  trying to figure out is:  Is Exhibit 10 applicable to
10 one or more of those buckets of patients that you have
11 drawn?
12     A.  It is applicable to the three buckets,
13 correct.
14     Q.  Okay.  This particular procedure in 3.0
15 provides information about what the MSE consists of,
16 correct?
17     A.  Correct.
18     Q.  Now, the question I have is this:  Does this
19 procedure that is described here for the MSE reflect
20 what the MSE must consist of if it is performed by a
21 physician?
22         MR. BRENNIG:  Objection.  Overly broad,
23 vague.
24         MS. BRYAN:  Same objection.
25         MR. BRENNIG:  And calls for speculation.

Page 73

1      A.  Repeat that.  I'm sorry.
2      Q.  (By Mr. Pfeifer)  I'm trying to determine
3  whether or not the procedure for the MSE that is set
4  forth in 3.1 applies to medical screening examinations
5  that are performed by physicians?
6         MR. BRENNIG:  Objection.  Overly broad,
7  vague and calls for speculation.
8      A.  I really can't --
9         MS. BRYAN:  Objection, form.
10     A.  I can't answer that because I am not a
11 physician.
12     Q.  (By Mr. Pfeifer)  Let's look at the 3.6 list.
13 This has a non-urgent chief complaint.  Okay.  What is
14 your understanding of what that means, non-urgent chief
15 complaint?
16     A.  Exactly what that states.  Their chief
17 complaint is not -- is non-urgent, meaning non-urgent.
18     Q.  Okay.  Under cough it says mild without
19 hemoptysis or respiratory impairment.  What does the
20 word "hemoptysis" mean?
21     A.  Blood in the sputum.
22     Q.  And what would constitute respiratory
23 impairment?
24     A.  That would be the individual assessment, but
25 impairment meaning that they -- their resp -- they can't

19  (Pages 70 to 73)

TOM FLANAGAN
January 12, 2009

Page 74

1  breathe due to impaired for some reason unknown.
2      Q.  For it to be non-urgent for nausea or
3  vomiting, it has to be resolved for greater than 12
4  hours, correct?
5      A.  Correct.
6      Q.  And have normal vital signs, correct?
7      A.  Correct.
8      Q.  Is there anything in this non-urgent list that
9  relates to complaints of abdominal pain?
10     A.  Number one, two, three, four, five -- number
11  seven on page 19.  The last non-urgent chief complaint
12  dysuria, female - mild, not pregnant, no abdominal pain.
13  And --
14     Q.  I guess a better question is:  Is there
15  anything about abdominal pain relating to a male?
16     A.  Not that I can see.
17     Q.  Okay.  Let's go back to page 17 of this
18  exhibit under 3.1.  Under 3.1.8 it says General
19  Appearance.  Does the patient look well or ill?  Okay?
20          To me that's very general and
21  nonspecific.  Do emergency room people have a way to
22  classify people according to whether they seem well or
23  ill?
24     A.  No.
25     Q.  Can you tell me what criteria one might use to

Page 75

1  determine whether someone appears well or ill?
2      A.  My understanding of this is that number eight
3  is giving -- general appearance is one of the indicators
4  when you look at assessing a patient.  When I look at
5  your general appearance, that would be your general
6  appearance, okay?
7          What they're trying to put in here is, in
8  other words, do they look sick, do they not look sick?
9  Do they look like they are in distress?  Do they look
10  like they might be anxious?  What's their color looking
11  like?  All of those things that are done through
12  observation and through experience.
13     Q.  So I take it that whether they look well or
14  ill is important in the experience of someone who is
15  doing a medical screening exam to determine whether they
16  have an emergency medical condition?
17          MS. BRYAN:  Objection, form.
18          MR. BRENNIG:  Objection.  Over broad,
19  vague?
20     A.  Can you rephrase that for me?
21     Q.  (By Mr. Pfeifer)  I take it, then, that the
22  description of someone looking well or ill is an
23  important factor to consider in whether a person might
24  have an emergency medical condition?
25          MS. BRYAN:  Objection, form.  Over broad.

Page 76

1          MR. BRENNIG:  Objection.  Over broad,
2  vague.
3          MS. BRYAN:  Speculation.
4      A.  My answer is not necessarily, no.
5      Q.  (By Mr. Pfeifer)  What constitutes the vital
6  signs that should be taken in the emergency department
7  with regard to the assessment of a patient?
8      A.  From a nursing perspective?
9      Q.  Yes.
10     A.  The blood pressure, heart rate, respiratory,
11  temperature.  And typically those are the baseline vital
12  signs you would take.
13     Q.  Okay.  Would you also consider pulse oxymetry?
14     A.  Not as a vital sign, no.
15     Q.  Okay.  Are you able to tell me whether or not
16  at Memorial Southeast in February of 2006 there were any
17  specific requirements on physicians on what laboratory
18  tests should be done to evaluate pediatric patients
19  whose primary complaint was cough, nausea, vomiting and
20  fever?
21     A.  Can you repeat that question?  You want to
22  know if there was what?
23     Q.  What I want to know is whether there were any
24  written policies or procedures of Memorial that related
25  to what should be done to perform the medical screening

Page 77

1  exam for a pediatric patient who presents with chief
2  complaint of vomiting, number one, cough, fever?
3      A.  Absolutely not.
4      Q.  For that kind of patient, if they proceed
5  through triage and the triage suggests that they be seen
6  by the, I think you said, intermediate level provider?
7      A.  Mid-level.
8      Q.  Mid-level provider.  Would that exam by the
9  mid-level provider --
10         MS. BRYAN:  Let me -- I can either object
11  at the end of question or not.  But if there is a fever,
12  they're not going to a mid-level provider.
13     Q.  All right.
14         MS. BRYAN:  I'm sorry.  I'll let you ask
15  your --
16     Q.  (By Mr. Pfeifer)  Well, is that right?
17     A.  That is correct.  I was waiting until you got
18  to the end so...
19     Q.  Okay.  If they have a fever that is measured,
20  right, on triage?
21     A.  Uh-huh.
22     Q.  Is that what you mean?
23     A.  Okay.  Triage doesn't determine or suggest who
24  is going to see the patient.  Let me clarify that real
25  clear.

20  (Pages 74 to 77)

TOM FLANAGAN
January 12, 2009

Page 78

1    Q.  Okay.
2    A.  Triage doesn't make that decision.  It's the
3  nurse and the mid-level provider who is working on the
4  direct supervision and through delegation protocols
5  under the physician, they make the decision of who is
6  going to see what patient based upon acuity, volume, all
7  that's going on in the department.  And obviously,
8  experience and expertise.
9         Triage makes no decision as to who will
10  evaluate.  Their job at triage from nursing is to assess
11  and to sort patients.  That's it.
12    Q.  Okay.  Well, maybe I didn't understand.  And
13  let me back up, then.
14    A.  Okay.
15    Q.  We know in this particular case that the
16  triage nurse was April Ganz --
17    A.  Uh-huh.
18    Q.  -- involving ████ Guzman.  Okay?  And
19  April Ganz did some sorting of some sort and placed him
20  in a level, a certain level based on the triage.
21         Does the level of the triage have
22  anything to do at all with whether they are seen by a
23  mid-level provider or by a physician for the performance
24  of the medical screening exam?
25    A.  Too broad.

Page 79

1    Q.  Okay.
2    A.  You have thrown too many things in there.  I
3  can't answer that.
4    Q.  All right.  Who makes the decision as to which
5  of the three buckets the patient is put onto on your
6  Exhibit 5?
7    A.  The triage nurse.
8    Q.  Okay.  Do those three buckets that you have
9  described have any relationship to the level, the
10  emergency room level that is assigned to the patient by
11  the triage nurse?
12    A.  Yes, it is part of it.
13    Q.  Okay.  So which levels go in the bucket that
14  are seen by the intermediate provider?
15    A.  On the system that we use, level one through
16  five -- I've got to look at my level one through five
17  actually.
18        MS. BRYAN:  The triage policy?
19        THE WITNESS:  Yeah, I think it's in
20  there.  It should be in here, I thought.
21    A.  Okay.  It would be the least acute.  Let me
22  put it to you that way.  It's not just one level.  It
23  could be the last two.  Whether it's four and five or
24  one and two -- I can't remember which direction it goes
25  is what I'm trying to tell you.

Page 80

1         Uh-huh.  Right here.
2    Q.  Okay.
3    A.  So look at Exhibit No. 8 --
4    Q.  All right.
5    A.  -- under the triage policy.  So typically
6  level four and level five.  These two levels would
7  typically fall into the bucket for the qualified medical
8  person to do the medical screening.
9    Q.  Okay.  Now, when QMP, you've written qualified
10  medical person, we have also used the term "intermediate
11  medical provider," or QM --
12    A.  We never used intermediate medical provider.
13  Let me clarify that.
14    Q.  All right.
15    A.  I have used mid-level provider.
16    Q.  Mid-level provider?
17    A.  That is the professional title for PAs and
18  nurse practitioners, --
19    Q.  Okay.
20    A.  -- mid-level provider.
21        MS. BRYAN:  And we also all need to be
22  careful because QMP includes those mid level --
23    A.  And physician.  That's what I was getting
24  ready to tell you.
25    Q.  (By Mr. Pfeifer)  All right.  That's what I

Page 81

1  want to get.
2    A.  Right.
3    Q.  Okay.  So QMP is mid-level plus physicians?
4    A.  Correct.
5    Q.  Obviously, physicians can see any of them?
6    A.  Absolutely.
7    Q.  Okay.  But also for the -- the group that can
8  be seen by a mid-level provider --
9    A.  Uh-huh.
10    Q.  -- that is the acuity levels you have
11  indicated here on Exhibit 8?
12    A.  Typically that is correct.
13    Q.  Okay.
14    A.  Level four, non-urgent level five routine can
15  be seen by a mid-level provider.  The --
16    Q.  Okay.
17    A.  -- medical screen evaluation and examination
18  is done by both, according to our bylaws, the emergency
19  room physician and/or the mid-level providers.  So they
20  both provide screens to all patients.
21    Q.  Okay.
22    A.  And can.
23    Q.  All right.  But what you're saying is that
24  typically one and two levels will be seen by the
25  mid-level provider?

21  (Pages 78 to 81)

TOM FLANAGAN
January 12, 2009

Page 82

1     A.  Four and five.
2     Q.  I'm sorry.  Four and five are seen by the
3  mid-level providers?
4     A.  Can be.
5     Q.  Can be.
6     A.  Uh-huh.
7     Q.  Okay.  Can a mid-level provider see a level
8  one?
9     A.  To screen them out?
10    Q.  Yes.
11    A.  Typically, that does not happen, no.
12    Q.  Okay.
13    A.  Huh-uh.  If they're critical, then there is no
14  even need to get the mid-level provider if they are
15  critical.
16    Q.  I guess what I'm trying to figure out is
17  this:  On the Exhibit 10 that you have here that we have
18  identified --
19    A.  Uh-huh.
20    Q.  -- does that identification of what
21  constitutes a medical screening exam apply to physicians
22  or mid-level providers or both?
23        MR. BRENNIG:  Objection.  Over broad,
24  vague, calls for speculation.
25    A.  My answer to that is no.

Page 83

1     Q.  (By Mr. Pfeifer)  Then to whom does it apply?
2     A.  This -- the title of this policy is not a
3  medical screening exam.  Okay?  This is medical
4  screening criteria to timely identify patients
5  presenting with an emergency medical condition.
6        If you read in the very, the very --
7  1.1.1, I refer you to page 16, "These criteria are to be
8  used for screening purposes as a guideline" -- this is
9  not -- these are criteria when performing a medical
10  screen exam.  This is not the end all be all of the
11  medical screening exam.
12    Q.  They are criteria?
13        MS. BRYAN:  To --
14    A.  To -- to -- to be able to identify patients
15  presenting without an emergency medical condition.  So
16  it's --
17    Q.  Okay.  In other words, when you say to
18  identify patients who are presenting without an
19  emergency medical condition, you're saying to rule out
20  those patients who do not have an emergency medical
21  condition?
22        MS. BRYAN:  I'm just going to object
23  because I have -- you had a double negative so I'm
24  trying to figure out what the question is.
25    A.  These are criteria that we built, that I built

Page 84

1  with the physicians, okay, so that we had some
2  guidelines and criteria for mid-level providers when
3  trying to do medical screening.  It is not the medical
4  screen.
5        I'm hearing two things in your statement
6  to me.  My ears are hearing you ask me if these criteria
7  here are what we use or these steps here is what we use
8  to do a medical screen.  It is not the medical screen
9  end all and be all in itself.
10        These are criteria to help them get to
11  the point of making decisions of, do we need to do more,
12  do we need to add more to determine if an emergency
13  medical condition exists or not.  So I -- the one thing
14  I don't want is people walking out of this room thinking
15  that this is our medical screen.  It is not.
16    Q.  Okay.
17    A.  Am I making sense?
18    Q.  Well, we'll see.
19    A.  Okay.
20    Q.  Would you agree with me that a medical
21  screening examination for a particular patient must be
22  one that helps identify whether or not the patient has
23  an emergency medical condition?
24        MS. BRYAN:  Objection, form.
25    A.  Repeat that one more time.  I'm sorry.  I am

Page 85

1  really getting tired.  Repeat that one more time.
2     Q.  (By Mr. Pfeifer)  Would you agree with me that
3  a medical screening exam is a process by which it is
4  determined whether a patient has an emergency medical
5  condition?
6        MS. BRYAN:  Form.
7     A.  Yes.
8     Q.  (By Mr. Pfeifer)  Would you agree with me that
9  there can be several steps to that process?
10    A.  Yes.
11    Q.  Would you agree with me that that process may
12  be different, depending on different complaints of
13  patients?
14    A.  Yes.
15        MS. BRYAN:  Form.
16    Q.  (By Mr. Pfeifer)  Okay.  Does Memorial or did
17  Memorial, back in 2006 in February when ████ Guzman
18  was there, have written requirements for the minimum
19  level of a medical screening examination for a patient
20  who presented with a history of nausea and vomiting,
21  pediatric, cough, and a subjective complaint by the
22  mother of fever?
23    A.  Not that I'm aware of.
24    Q.  Okay.  To your knowledge were there any
25  written policies or procedures of Memorial that at that

TOM FLANAGAN
January 12, 2009

Page 86

1  time identified the minimum medical screening exam for a
2  patient who presented with a complaint of vomiting?
3      A.  Not that I can recall.
4      Q.  Okay.  Same question with regard to a patient,
5  a pediatric patient who presents with a complaint of
6  cough.
7      A.  Not that I recall.
8      Q.  Okay.  Same question for a patient that
9  presents with complaints of subjective fever.
10     A.  Not that I recall.
11     Q.  Okay.  So how is it determined what level of
12 medical screening exam will be given to each particular
13 patient at Memorial back in February of '06?
14     A.  I'm going to try to remain very calm.  As you
15 can tell, I'm getting very anxious.
16         MS. BRYAN:  If you're getting anxious, we
17 need to take a break.
18     A.  Well, hold on.  What I'm hearing you ask me,
19 what I'm hearing you say -- I'm trying to educate
20 people.  The medical screen -- I'm hearing you look to
21 me like the medical screen we have a posit that says
22 this will be done for vomiting for medical screening,
23 this will be done for this.
24         Medical screening is not a -- a recipe
25 cookbook in the emergency department at all.  Medical

Page 87

1  screen is based upon multiple, multiple factors, all
2  related to the patient in front of you.
3          And based upon your education, your
4  experience, your expertise, there is many more -- that's
5  how these decisions are made.  It's not just every
6  patient that comes in with a cough we will do this,
7  this, this and this and this, and if all that's
8  negative, then they can go home.  No.
9          It's all -- it's based upon experience,
10 education, training, age, maturity.  I mean, all those
11 things come into play, just -- just very much in your
12 profession.  The young lawyer that comes out of law
13 school is going to change the world.  He doesn't have a
14 recipe and a cookbook.  How did you get to become so
15 good in your arena, because your years of experience and
16 expertise and all of those things.
17          And the reason I'm -- I'm getting
18 frustrated -- and I apologize, it's not personal -- is
19 we are -- we do 350,000 medical screens a year.  Okay?
20 We do them.  We see 350,000 patients in our ERs.  They
21 come in, they sign in, we see them whether they have
22 money or insurance.
23         MS. BRYAN:  I'm going to ask you to
24 finish your answer and we're going to take a break.
25     A.  Okay.  The medical screen is done.  What I'm

Page 88

1  hearing you ask is:  Does Hermann or Memorial Hermann
2  have a policy or a process for a patient who comes in
3  with nausea or vomiting, of what the medical screen
4  consists of?  No.
5          It -- part of the medical screening,
6  that's the reason we hire you.  And that's how come it
7  can't be done by a nurse is because --
8         MS. BRYAN:  Okay.
9      A.  -- of your experience, expertise, your
10 education, your years as an emergency room physician.
11 Where have you practiced, what you've done.  That all is
12 part of determining, you know, through -- just like when
13 you said here, the question, general appearance.  Does
14 the patient look well or ill.  Do I look like I'm in
15 pain?  I'm smiling, I'm not sweating.  No.  That's
16 general appearance.
17         MS. BRYAN:  Okay.  There is no question.
18 Let's take a break.
19     A.  Sorry.
20         VIDEO TECHNICIAN:  Off the record.  It is
21 3:52.
22         (Recess taken.)
23         VIDEO TECHNICIAN:  We're back on the
24 record.  It'S 3:57.
25     Q.  (By Mr. Pfeifer)  Are you ready to proceed?

Page 89

1      A.  I'm ready.
2      Q.  Okay.  Have you reviewed any of the medical
3  records concerning ███ Guzman?
4      A.  No, I have not.
5      Q.  Okay.  How long has it been since you have
6  actually done clinical practice in an emergency
7  department?
8      A.  Actually, it may have been '05 or '06.  I may
9  have -- I may have either flown or been in the E.D. for
10 sure.
11     Q.  Okay.  Were you doing it at that time just to
12 keep your skills up and --
13     A.  Actually we -- I had taken over one of our
14 other E.R.s as the interim director.  And so -- I'm from
15 a liberate that you must model what you want your staff
16 to be doing so we -- by example.  So I would go in and
17 take care of patients and take assignments as a director
18 and show them what my expectations were.
19     Q.  Okay.  Was it your understanding as an E.D.
20 nurse working in 2006 --
21     A.  Uh-huh.
22     Q.  -- that, if a physician ordered a CBC, that
23 that would include the automated CBC and a differential?
24     A.  I was not aware that it would include a
25 differential.  I came from a system where it did not, so

23  (Pages 86 to 89)

TOM FLANAGAN
January 12, 2009

Page 90

1    I'm not -- I mean, I guess some systems they do and some
2    systems they don't.
3        Q.   Okay.
4        A.   So I was not --
5        Q.   All right.
6        A.   -- bluntly aware of it.
7        Q.   As an E.D. nurse, were you familiar with what
8    a differential was used for?
9        A.   From a nursing perspective, I'm fairly
10   comfortable with my understanding.
11       Q.   Okay.  What was -- what was your understanding
12   generally speaking of what a differential was used for?
13       A.   Typically as a second -- what would the word
14   be?  I look at -- to explain what I'm trying to share
15   is, there is a set, so to speak, of, let's say, lab
16   values that you would get.  And based upon what those
17   showed, then you would drill it farther down to a subset
18   of differential.  The differential.
19            So the differential is never a primary
20   set in the E.R.s I worked in.  It was always looked at
21   as a second set of indicators but never the primary
22   indicators.
23       Q.   Okay.  And a second set of indicators of
24   inflammation or infection?
25       A.   Typically, yeah.  Typically.

Page 91

1        Q.   You understand that the purpose of my
2    questions before the break were simply to try to
3    identify what was in writing and what was not?
4        A.   Okay.
5        Q.   You understand that?
6        A.   Okay.
7        Q.   Did you feel that I was being rude in the
8    questions that I asked you?
9        A.   No, I didn't think you were being rude.  You
10   have to understand I have a lot of passion for what I
11   do.  And this whole policy obviously is personal to me
12   because I was the person that redesigned our emergency
13   departments due to the overcrowding.  And so the whole
14   genesis of this was not to -- it's not to teach our
15   physicians about medical screening.
16       Q.   Yeah.
17       A.   Okay?  It was for our mid-level providers who
18   had never done medical screening, to get them to the
19   understanding of what the expectation was, how they
20   would go about it in a systematic step-wise fashion.
21   Okay?
22            So when you kept going back to, so the
23   physician, this is the medical screen.  It's not the
24   medical screen.  And this was never -- this policy was
25   never set forth for the physicians.  We don't -- we

Page 92

1    don't dictate to the physicians how to practice
2    medicine.  The physicians come with that expertise.
3            So this was strictly for the mid-level
4    providers, because they had never done this before.  And
5    because we're a firm believer in providing medical
6    screenings for all of our patients and we're looking at
7    being able to free up the emergency departments for
8    patients that don't need to be there so we can treat
9    those that are critically ill and injured and so on and
10   so forth, we want to insure that everything is tightly
11   documented and in a nice format so that, when we teach
12   our mid-level providers, they can start following
13   through.
14            I can't even tell you -- you know, a
15   physician, they may follow this; but this is not -- was
16   never designed for them.
17       Q.   Okay.
18       A.   So you weren't rude.  Let me clarify that for
19   the record.
20       Q.   All right.  Do you know of anywhere where it
21   is written down what the hospital expects of the
22   physicians in the performance of medical screening
23   exams?
24            MS. BRYAN:  Form.
25       A.   I -- I wouldn't know that, no.

Page 93

1        Q.   Okay.
2        A.   Huh-uh.
3        Q.   To your knowledge there is no such written
4    document?
5        A.   No, huh-uh.
6        Q.   How would we know, then, whether or not the
7    patients were being processed in the same manner by
8    different doctors?
9            MS. BRYAN:  Form.
10       A.   I'm not sure that I can answer that.  Process?
11       Q.   (By Mr. Pfeifer)  In other words, whether they
12   were worked up in a similar manner?
13            MS. BRYAN:  Objection, form.
14       A.   From a process perspective I'm pretty
15   confident all of our patients follow the same process.
16       Q.   (By Mr. Pfeifer)  Okay.  And what do you mean
17   by "process" in terms of --
18       A.   They come to triage, they are triaged and
19   sorted.  They are acuitized.  And based upon that,
20   whether they are screened in or they're screened out --
21   if they're screened in and they're in a room, the nurse
22   comes in and does an assessment, the doctor comes in and
23   does an exam.  Based upon the physician orders, those
24   orders are carried out.  Based upon the results of those
25   orders, the decision is made whether to admit or

24  (Pages 90 to 93)

TOM FLANAGAN
January 12, 2009

Page 94

1  discharge.  And then based on those orders, the nurse
2  follows through and either discharges them out with
3  instructions or admits them up into the house.
4      Q.  Okay.
5      A.  So in process our patients throughout the
6  system follow the exact same process
7      Q.  Okay.  My question really didn't have to deal
8  with process.  Okay?
9      A.  Okay.
10     Q.  My question deals with this:  Would you assume
11 that if a patient with a relatively straightforward set
12 of complaints -- and by that I mean just nausea,
13 vomiting, some cough, Mom says they have a fever -- that
14 doesn't sound to be real complex in terms of those
15 levels of complaints.
16          Would you expect that that kind of
17 patient would get a similar work-up in terms of the
18 physical exam and the lab tests that are ordered for
19 that patient among different physicians at the
20 hospital?
21         MR. BRENNIG:  Objection.
22         MS. BRYAN:  Form.
23         MR. BRENNIG:  Vague, overly broad, calls
24 for speculation.
25     A.  I don't know that I am qualified to answer

Page 95

1  that actually.
2      Q.  (By Mr. Pfeifer)  Okay.  All you can tell me
3  is, there is nothing written down at the hospital that
4  would require that kind of patient to be given the same
5  kind of exam, the same kind of laboratory tests
6  physician to physician.  Would that be correct?
7          MS. BRYAN:  Form.
8      A.  We don't -- we have no policies or any of --
9  that would be practicing corporate medicine.  Huh-uh.
10     Q.  With regard to Memorial, I know you're a
11 passionate guy about Memorial, and the provision of
12 emergency services at the hospital, you have testified
13 that.
14     A.  Uh-huh.
15     Q.  And I know you feel strongly that they try to
16 provide a high level of quality of care.
17     A.  Uh-huh.
18     Q.  Yes?
19     A.  Yes.
20         MS. BRYAN:  You have to say "yes."
21     A.  I'm sorry.
22     Q.  (By Mr. Pfeifer)  And I know that you feel
23 that they provide a good return of service in exchange
24 for the compensation that they charge people?
25     A.  I believe that, yes.

Page 96

1      Q.  Okay.  If a patient is billed for a particular
2  service, do you think they should receive that service?
3         MS. BRYAN:  Objection, form.
4         MR. BRENNIG:  Objection.  Overly broad,
5  vague, calls for speculation.  No foundation.
6      A.  Repeat that question.  If what?
7      Q.  (By Mr. Pfeifer)  If a patient is billed by
8  the hospital for the service, wouldn't you expect that
9  that service would have been performed --
10         MS. BRYAN:  Same objection.
11         MR. BRENNIG:  Objection.
12     Q.  -- on behalf of the patient?
13         MR. BRENNIG:  Overly broad, vague.
14     A.  Yes.
15         MR. BRENNIG:  Calls for speculation.
16     Q.  (By Mr. Pfeifer)  Okay.  And even though the
17 hospital can perform a service such as an x-ray for a
18 patient --
19     A.  Uh-huh.
20     Q.  -- if that particular service is not reviewed
21 by a physician, it doesn't do any good, does it?
22         MS. BRYAN:  Objection, form.
23         MR. BRENNIG:  Objection.  Overly broad,
24 vague, calls for speculation, no foundation.
25     A.  Repeat that.

Page 97

1      Q.  (By Mr. Pfeifer)  Well, if a patient is billed
2  for an x-ray and nobody reviewed the x-ray, what good
3  does it do the patient?
4         MS. BRYAN:  Objection, form.
5         MR. BRENNIG:  Objection.  Vague, overly
6  broad.  No foundation, calls for speculation.
7      A.  Good question.  I'm not sure.
8      Q.  (By Mr. Pfeifer)  Would you agree with me,
9  sir, that the medical screening exam is a process where
10 it may be continuing over a course of several hours in
11 an emergency department as more information is
12 gleaned--
13         MS. BRYAN:  Objection.
14     Q.  (By Mr. Pfeifer) -- about the patient?
15         MS. BRYAN:  Objection, form.
16     A.  I can't answer that because I'm not a
17 physician that can perform that evaluation.
18     Q.  (By Mr. Pfeifer)  Well, how about your
19 mid-level providers?  Haven't you written policies and
20 procedures for what's required for the mid-level
21 providers in terms of guidelines for the medical
22 screening exam?
23         MS. BRYAN:  Objection, form.  Listen to
24 the question; answer the question.
25     A.  I have not -- I have not written those.

25  (Pages 94 to 97)