Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit K

# SMYSER KAPLAN & VESELKA, L.L.P.

BANK OF AMERICA CENTER
700 LOUISIANA  SUITE 2300  HOUSTON, TEXAS 77002
TELEPHONE 713.221.2300  FACSIMILE 713.221.2320

Direct Dial Number:
713 221-2345

Author's E-mail Address:
cbryan@skv.com

February 25, 2009

Mr. Phillip A. Pfeifer
Phillip A. Pfeifer, P.C.
5216 Jackson Street
Houston, TX 77004

*Via Certified Mail-RRR*

Re:    CA No. 07-03973; *Wendy Guzman vs. Memorial Hermann Hospital System; In the United States District Court, Southern District of Texas, Houston Division*

Dear Phil:

Enclosed are additional Emergency Center policies (bates numbered MHSE-TG-0287 through 0297).  Also enclosed is a redacted list of patients for whom Dr. Haynes ordered CBC with Differential from February 12, 2005 through February 12, 2006 (bates numbered MHSE-TG-0298 through 0300).

This shall serve as Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital's supplemental response to all discovery requests.

Sincerely,

*Chris Bryan*

Chris Bryan

CAB/tm
Encls.

cc:    Mr. Charles Brennig, III
The Henke Law Firm, LLP
3200 Southwest Freeway, 34th Floor
Houston, Texas  77027

## MHHCS
## CORPORATE POLICY AND PROCEDURE MANUAL

POLICY TITLE:   Triage Policy

**CATEGORY:**          Emergency Center
**INDEX NUMBER:**      EMC-00005
**ORIGINAL DATE:**     6/15/2005
**LAST REVIEW DATE:**  7/1/2005
**SUPERCEDES:**

1.   **PURPOSE:**

1.1   To provide a standardized system whereby patients presenting to the Emergency Center are treated in order of priority based upon acuity utilizing the Emergency Severity Index Five-Level triage system.

2.   **STATEMENT:**

2.1   Patients presenting to the Emergency Center will be triaged utilizing the 5-Level ESI model.

3.   **PROCEDURE:**

3.1   An RN will triage all patients arriving to the Emergency Center to identify life-threatening conditions and prioritize patients according to acuity.

3.2   The triage process is organized to identify life-threatening conditions and prioritize patients. The ESI model does not require vital signs during the initial triage unless the information is necessary to determine acuity category. Please refer to the attached *ESI Algorithm, v3* for the process of identifying one of the following five acuity categories:

3.2.1   Level 1: Critical

3.2.2   Level 2: Emergent

3.2.3   Level 3: Urgent

3.2.4   Level 4: Non-Urgent

3.2.5   Level 5: Routine

3.3     The appropriate focused assessment should be documented on the nursing record.

3.4     The triage nurse should document the appropriate acuity category on the nursing record.

3.5     The triage assessment may be limited to only those areas necessary to accurately assign a triage level based on the ESI system.

3.6     Protocols may be implemented based on patient acuity and available resources.

3.7     Patients will be placed in the treatment area based on acuity and available resources.

3.8     Primary nurses are responsible for reviewing the triage registered nurse's documentation and performing the focused assessment.

3.9     The triage nurse needs to communicate any special patient needs to the charge registered nurse to maintain the flow of patients.

3.10    Patients should be reassessed at appropriate intervals while waiting to be taken to the treatment area, based on acuity level and EC Assessment and Reassessment Policy.   Any significant symptoms should be reassessed for change and the acuity category modified

3.11    For Level I and Level II patients, every effort should be made to immediately place in a treatment area.   The Charge Nurse and/or Attending Physician shall be notified of any delays in bedding these patients.

APPROVED:  Thomas J. Flanagan, RN, BSN, MA, LP, CMTE
                  Assistant Vice-President
                  Corporate Emergency Services

APPROVED:  John Zerwas, MD
                  Sr. Vice President & Chief Medical Officer
                  Memorial Hermann Healthcare System


DATE: June, 2005

Attached *ESI Algorithm, v3*



Figure 5-1 Emergency Severity Index, v3

Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit L



# Memorial Hermann Healthcare System
# Life Flight Air Ambulance Services

## Medical Necessity Form

Patient Name  Guzman ████████  Tracking Number ‗ ‗ ‗ ‗

Date of Service  2-13-06  Destination  Herman childrens

### Statement of Medical Necessity for Interfacility Transport

Doctor  Dr. Nguyen  at  MHSE  recommends transfer of the above patient by MHHS Life Flight due to his/her medical condition. The patient's condition requires transportation under emergency conditions and prior authorization could not be obtained. THE DOCTOR (S) HAS DETERMINED THE DIAGNOSIS OF THE PATIENT TO BE: (Narrative required)  Pneumonia - RLO Spain

### Transfer by Air Ambulance Versus Ground Ambulance

TRANSPORT BY AIR AMBULANCE VERSUS GROUND AMBULANCE HAS BEEN DEEMED NECESSARY BECAUSE: (Narrative required)

_____  Trauma victim – injury or mechanism of injury requires transport to a Level I Trauma Center for evaluation and treatment. Supporting information/condition: _____

_____

X  Patient has a life threatening medical condition requiring the time spent between hospitals to be as short as possible. Supporting information/condition: _____

_____

The undersigned physician certifies that he/she is familiar with the patient's condition, has reviewed the foregoing certification and has determined that air ambulance transportation is medically necessary for the reasons specified above. Air ambulance transport is hereby ordered.

Physician's signature _____  Date: _2/13/06_

Physician's name (print) _David Nguyen MD_  Date: _____

PLEASE RETURN TO FAX NUMBER 713-704-6004. THANK YOU.

3537

**Memorial Hermann Life Flight**
**6411 Fannin**
**Houston, TX 77030**
**713-704-3590**

### Transport Request: Division: South Base

| | |
|---|---|
| Request #: **0602-0687-A** | Call Rcvd: **02/13/06 @ 16:14** |
| Priority: **Emergent** | |
| Aircraft: **N330HH** | Notify Plt: **02/13/06 @ 16:27** |
| Type: **Interhospital** | Wx Confirm: 16:27 |
| Location: **MHHS - Southeast** | Dispatch: 16:27 |
| **Houston, TX 77089** | Liftoff: 16:30 SB |
| Disposition: | Arrive 1: 16:33 H407 |
| Ref Agency: **MHHS - Southeast** | * Depart 1: 17:06 H407 |
| Requestor: **Blake-T.C.** | * Arrive 2: 17:14 HH |
| Callback: **(281)929-6282/** | Depart 2: HH |
| Ref MD: **Mohammad I Siddiqi** | Arrive 3: FFUE |
| Ref MD Tel: **(281)929-6100/** | Depart 3: FFUE |
| Ref Unit: **Emergency Department** | Arrive 4: SB |
| | |
| Rec Agency: **MHHS - Hermann Hospital** | |
| **Houston, TX 77030** | |
| Rec MD: **Beatrize S. Cua** | |
| Rec MD Tel: **(713)704-4000/** | |
| Rec Unit: **Pediatric Intensive Care** | |
| Rec U Tel: **(713)704-4000/** | |
| | |
| Crew 1: **Dick, Penny** | Turnaround: |
| Crew 2: **Meyn, Judi** | Completed: / / |
| | |
| | Ar Bedside: 16:38 |
| | Dp Bedside: 17:06 |
| Pilot 1: **Lonergan, Curt** | Total Miles: **38** nm |
| | Loaded Miles: **12** nm |
| Comm 1: **Gray, Melissa** | |
| | Weather: **VFR, Day** |

### Patient Information

Patient 1: History:
Name: **Guzman,** ▓▓▓▓ | Account: **471151969367**
Address: **695 Pineloch Dr** | DOB: **03/17/98** Age: **7 yrs** Race: **3**
**Apt 1806** | Sex: **M** Wgt: SS: - -
**Webster, TX 77598** | Cat: **Pedi Medical**
**USA** | Dx: **Pneumonia**
Next of Kin: **WENDY GUZMAN-MOTHER**
Contact:
Pers. MD:

Med. Info:

———————< *Insurance Information* >————————

Insurance Screen: **Patient**

**MHLF-0002**

—————————————————————— < *EXCEPTIONS:* > ——————————————————————

DISPATCH > 1      DSP>1 TRANSFER

| **NOTIFICATIONS** |
|---|

*Other Numbers:*                          *Notified:*
**Patient 1 (Home)**     (281)286-2317/    Standby    :
**Pt 1 (Next of Kin)**   (281)286-2317/    Trauma     :
**Patient 2 (Home)**     (    )   -    /    Emerg Med  :
**Pt 2 (Next of Kin)**   (    )   -    /    ECBO       :
                                           Flt Crews  :
                                           Security   :
                                           Gnd T-port :
                                           Txfer Ctr  :        Who:
How Called: **Transfer Center**            Rec Unit   :
                                           Admin      :

**MHLF-0003**

**Memorial Hermann Life Flight**
6411 Fannin
Houston, TX 77030
713-704-3590

### Transport Request: Division: South Base

| | |
|---|---|
| Request #: 0602-0687-A | Call Rcvd: 02/13/06 @ 16:14 |
| Priority: Emergent | |
| Aircraft: N330HH | Notify Plt: 02/13/06 @ 16:27 |
| Type: Interhospital | Wx Confirm: 16:27 |
| Location: MHHS - Southeast | Dispatch: 16:27 |
| Houston, TX 77089 | Liftoff: 16:30 SB |
| Disposition: Patient Transported | Arrive 1: 16:33 H407 |
| Ref Agency: MHHS - Southeast | * Depart 1: 17:06 H407 |
| Requestor: Blake-T.C. | * Arrive 2: 17:14 HH |
| Callback: (281)929-6282/ | Depart 2: 18:04 HH |
| Ref MD: Mohammad I Siddiqi | Arrive 3: 18:10 FFUE |
| Ref MD Tel: (281)929-6100/ | Depart 3: 18:13 FFUE |
| Ref Unit: Emergency Department | Arrive 4: 18:20 SB |

Rec Agency: **MHHS - Hermann Hospital**
Houston, TX 77030
Rec MD: **Beatrize S. Cua**
Rec MD Tel: **(713)704-4000/**
Rec Unit: **Pediatric Intensive Care**
Rec U Tel: **(713)704-4000/**

| | |
|---|---|
| Crew 1: **Kegley, Michael** | Turnaround: 18:13 |
| Crew 2: **Dodson, Sam** | Completed: 18:20 02/13/06 |
| Crew 3: **Ride-a-Long,** | |
| | Ar Bedside: 16:38 |
| | Dp Bedside: 17:06 |
| Pilot 1: **Seiberling, Steve** | Total Miles: 38 nm |
| | Loaded Miles: 12 nm |
| Comm 1: **Stanley, Jasper** | |
| | Weather: **VFR, Day** |

### Patient Information

Patient 1: History:
Name: Guzman, ███████
Address: 695 Pineloch Dr
Apt 1806
Webster, TX 77598
USA

Account: 471151969367
DOB: 03/17/98   Age: 7 yrs   Race: 3
Sex: M   Wgt:            SS:    - -
Cat: **Pedi Medical**
Dx: **Pneumonia**

Next of Kin: **WENDY GUZMAN-MOTHER**
Contact:
Pers. MD:

Med. Info:

————————< Insurance Information >————————

Insurance Screen: **Patient**

- 1 -                                    MHLF-0004

---
─────────────< *EXCEPTIONS:* >─────────────
```
DISPATCH > 1     DSP>1 TRANSFER
```

| NOTIFICATIONS |
|---|

*Other Numbers:*                          *Notified:*
**Patient 1 (Home)**    (281)286-2317/    Standby   :
**Pt 1 (Next of Kin)**  (281)286-2317/    Trauma    :
**Patient 2 (Home)**    (  )   -   /      Emerg Med :
**Pt 2 (Next of Kin)**  (  )   -   /      ECBO      :
                                          Flt Crews :
                                          Security  :
                                          Gnd T-port:
                                          Txfer Ctr :          Who:
How Called: **Transfer Center**           Rec Unit  :
                                          Admin     :

**MHLF-0005**

## COMMUNICATIONS

| PFS | Date | Time | Who | Appr: Y  N | Time | Auth #/Reason for Denial |
|---|---|---|---|---|---|---|
| Clinicals | Date | Time | Who | Appr: Y  N | Time | Reason for Denial |
| Booking | Date | Time | Who | | | |
| Life Flight | Date | Time | Who | | | |
| Txprt Team | Date | Time | Who | | | |

## CHRONOLOGICAL COMMENTS

| Time | Comments |
|---|---|
| 1337 | Dr. Siddiqi is going to intubate. paged Dr. Erikson to accept pt into PICU. Connected Erikson/Siddiqi. Erikson Accepts Hroc/ME to PICU. There are no beds however Erikson is going to make one. He would like to have PEDI Txport get the pt. (At this time they are on there way to Beaumont) Dr. Siddiqi is aware of the wait and is ok with it. |
| 1613 | Meagan from SE called back and req the helicopter. Connected Nguyen/Erikson. They are both in agreement of Life-Flight. Got report and handed it over to dispatch (Melissa) |

MHLF-0006

Completed By: _____     Date: 2-13-06  Time: _____

**Memorial Hermann Healthcare System**

*For Your Whole Life*

## TRANSFER INTAKE FORM

MR # HHH-5396-A

REQ # 06-0687-A

Disposition: (Accepted)  Denied  Cancelled

Review Req:  Y  N  By: _____

MOT: (Filed)  Letter Sent - Date: _____

## TRANSFER INFORMATION

| | | | |
|---|---|---|---|
| Indication for Transfer: (HLOC)  Lateral | Reason for Lateral | | Procedure |
| Time 1123  Date 2-13-06  Medical Emergency (Y)  N | Transfer started by Blake Milnes | | Actual Transfer Date 2-13-06 |
| Caller Siddiqi, Mohamed | Location | | Ph. 781-929-6628 |
| Referring MD | | | Ph. |
| Referring Facility MHHS-SE | Pt Loc: (ER)  InPt (unit): | | Ph. |
| Req. Facility (HH) NW FB SE MC SW TW KATY | | | |
| Patient Name Guzman, ▮▮▮▮▮ | | Age 7 | Sex: (M)  F |
| Diagnosis Pneumonia  (tett) | | Pt PCP | |

## BED INQUIRY/REQUEST

| Unit | Available | Name | | Inquired | Responded | Requested | Received |
|---|---|---|---|---|---|---|---|
| ☆ PICU | Y (N) | Cohen | | 1123 | 1123 | | |
| PIMU | (Y) N | | | | | | |
| Floor | (Y) N | | | | | | |
| | Y  N | | | | | | |

## PHYSICIAN COMMUNICATION

| Time ☆ 1337 | Physician Paged Smith, Holly | Service PED | Call Back number 713-905-4434 |
|---|---|---|---|
| Time | Conference Connected Siddiqi, Smith | | |

## DISPOSITION OF TRANSFER

| | | | | |
|---|---|---|---|---|
| Time 1730  (Accepted)  Denied  Cancelled | | Called To Dawkins, Megan  Bed Control | | Title Clerk |
| Response in 30 min.? YES / (NO) | Extenuating Circumstances: | | | |
| Admitting Physician Cua, Beatrice | | | Ph. | |
| ER EVAL / (Direct Admit): PICU #14 | | Call Report to: 42238 | | |
| Notify | | | Ph. | |
| Pt. Arriving VIA: (LF)  AMB  Pvt. CAR  LF FW  Other: | | | | |
| *Denied*  (circle one) | | *Reason for Medical Denial*  (circle one) | | |
| No Beds  Medical  Finance | | Physician Determination  Service Not Provided | | |
| Denial Approved by:  UD  OA  VP | | Who: | | Time: |
| *Cancelled*  Date | Time | Reason | | |
| Bed Given Back : YES / NO | Time | Who | | MHLF-0007 |

# Patient Report

| Date | Time | Flight # |
|------|------|----------|
| Name  Guzman, T█████ | | Sending MD  SIDDIQI, Mohamed |
| | | Sending Facility  MHHS-SE |
| Age  7 | Sex  M | Weight  25 K | Pt. Location  ER |
| Allergies | | Call Back #  281-929-6282 |
| | | Fax #  281-929-5153 |
| Diagnosis:  Pneumonia  (+ett) | | Receiving MD  Erikson |
| | | Receiving Facility  Herman |
| | | Unit Phone #  42238 |
| | | Receiving Unit/Bed  PICU #14 |
| Isolation: Y  N | | Guarantor |

| GCS 3 | B/P 78/p | P 230 | Rhythm  STACH | R 25 | Pulse Ox 96 |
|-------|----------|-------|----------------|------|-------------|

NS

| C-Collar |
|----------|
| Backboard |
| Immobilized |

| Infusions | # | 1 |
|-----------|---|---|
| Peripheral IVs | # | 2 |
| Central Lines | # | 0 |
| Arterial Line | Y | / N |
| Swan Ganz | Y | / N |

| Vent | Y / N |
|------|-------|
| PEEP | Y / N |
| Amount of PEEP | |
| IABP | Y / N |
| Transvenous Pacer | Y / N |

**Report received from:**  DAWKINS, Megan

**Dispatcher:**

MHLF-0008

FEB-13-2006 14:10 From:NUR )STATION TRAUMA 2819294153 ) To:97137043537 P.1/2

INSTRUCTIONS: SECTION A (WITH ATTACHMENTS REQUIRED BY SECTION 11-29. HOSPITAL LICENSING STANDARDS) MUST BE FILLED
OUT BY TRANSFERRING HOSPITAL. SECTION B MUST BE FILLED OUT BY RECEIVING HOSPITAL.

**SECTION A (To Be Filled Out At Transferring Hospital)**     TO: H976        1255

1. Name of Hospital:
☐ Memorial Hermann Southwest Hospital
   7800 Beechnut
   Houston, Texas 77074
   (713) 776-5110
☐ Memorial Hermann Northwest Hospital
   1635 North Loop West
   Houston, Texas 77008
   (713) 867-3380
☐ Memorial Hermann Hospital The Woodlands
   9250 Pinecroft
   The Woodlands, Texas 77380
   (409) 364-2300
☐ Memorial Hermann Rehabilitation Hospital
   3043 Gessner
   Houston, Texas 77080
   (713) 462-2516
☐ Memorial Hermann Hospital Memorial City
   920 Frostwood
   Houston, Texas 77024
   (713) 932-3000
☐ Memorial Hermann Baptist Beaumont Hosp.
   P.O. Drawer 1591
   Beaumont, Texas 77704
   (409) 835-3781
☒ Memorial Hermann Southeast Hospital
   11800 Astoria Blvd.
   Houston, Texas 77089
   (713) 929-6100
☐ Memorial Hermann Health Center
   1211 Highway 6
   Sugar Land, Texas 77478
   (713) 242-7220
☐ Memorial Hermann Fort Bend
   3803 FM 1092
   Missouri City, Texas 97459
☐ Memorial Hermann Katy Hospital
   5602 Medical Center Drive
   Katy, Texas 77494
☐ Memorial Hermann Baptist Orange Hosp.
   608 Strickland Drive
   Orange, Texas 77630
   (409) 883-9361
☐ Memorial Hermann Children's Hospital — Error PB
   6411 Fannin
   Houston, Texas 77030
   (713) 704-4000
☐ Memorial Hermann Hospital
   6411 Fannin
   Houston, Texas 77030
   (713) 704-4000

2. Information on Individual (If known)
   Individual's full name: GUZMAN ⬛⬛⬛
   Address: 695 PINELOCH DR. APT 1806
   WEGMAN TX 77598

3. Phone Number: (281) 286.0317

4. Sex: ☒ M   ☐ F     Age: 7y

5. National Origin: UNK     Race:

6. Religion: CATHOLIC

7. Physical Handicap(s) if known: UNK

8. Date of Arrival: 2.13.06     Time: 04:59

9. Legal Guardian/next of kin Information (If known)
   Name: GUZMAN, WENDY
   Relationship: MOTHER
   Address:
   Phone Number: (281) 286.0317

10. Initial contact of accepting physician:
    Date: 2.13.06     Time: 1120

11. Accepting physician secured by transferring physician:
    Date: 2.13.06     Time: 1120
    Name of accepting physician: DR. SMITH H.
    Date: 2.13.06     Time: 1127
    Address: 6411 FANNIN HOUSTON, TX 77030
    Phone Number: (713) 704.4000

12. Transferring physician's signature or signature of Hospital staff acting
    under physician's orders: [signature]
    Home Number: (281) 929.6288
    Address: 11800 ASTORIA BLVD HOUSTON TX 77089

13. Accepting hospital initially contacted by transferring hospital:
    Date: 2.13.06     Time: 1120
    Address: 6411 FANNIN HOUSTON, TX 77030
    Name of accepting hospital administration person: ANTHONY COMEAUX
    Date: 2.13.06  Time: 1237  Title: TRANSFER COORD.

14. Transferring Hospital Administration Signature: [signature] T. Branson

15. Title: CN     Time: 1310

15. Type of vehicle and company used (Note special equipment needed):
    AMR

16A. Facility transported to: MEMORIAL HERMANN CHILDRENS
     Date: 2.13.06     Time:
     Address: 6411 FANNIN HOUSTON, TX 77030

16B. Diagnosis: PNEUMONIA

16C. Attachments:
     X-Ray ✓          MD Progress Notes ✓
     Lab Reports ✓    Nurses Progress Notes ✓
     H&P ✓            Medication Record ✓
     Other records related to the individual's emergency medical condition,
     observations of signs and symptoms, preliminary diagnosis, treatment
     provided and test results  CR STATUS

16D. Name and address of any on-call Physician who has refused or failed
     to appear within a reasonable time to provide necessary stabilizing
     treatment

**Transfer of Individual With an Emergent or Unstable Medical Condition**
I have evaluated, determined, and explained to the individual/individual's
legal guardian or next of kin, based on the information available at the time
of transfer:
   1. that the benefits of obtaining medical treatment at another medical
   facility and the risks of not being transferred to another medical facility for
   medical treatment are:

                                    and
   2. that the medical benefits reasonably and expected from the provisions
   of appropriate medical treatment at another medical facility far outweigh the
   increased risks to the individual, and in the case of labor, to the unborn child
   from effecting the transfer; further, the transfer to the Receiving Hospital is
   appropriate.

   Physician Signature: [signature]     Date: 2.13.06

   I have been informed of the hospital's obligation to individuals with an
   emergency medical condition/women in labor. I have been informed
   of my [the individual's] medical condition. The risks and benefits of the trans-
   fer have been explained to me and I request transfer to the
   Receiving Hospital.

   Individual/individual's Legal Guardian or [signature] Wendy Yergan   Date: 2.13.06
   Next of Kin Signature

   Time: 1305

   Relationship to individual/next of kin: [signature] Wendy Yergan y Mother

   Witness Signature: [signature]     Date: 2.13.06

   Time: 1305

DISTRIBUTION:   COPIES   1. Send with individual to be retained in receiving hospital. – White
                          2. Retain in transferring hospital. – Yellow
                          3. Transferring hospital retains in the individual's medical record. – Pink



**Memorial Hermann Hospital System**
FOR YOUR WHOLE LIFE.

# Memorandum of Transfer

37540797-6044 C   A:02/13/06
GUZMAN, TRISTAN        M
DOB:03/17/1998    TY SER:EMR

MHLF-0009

51700   4/05   Page 1 of

3-13-2006 14:10 From:NUF    STATION TRAUMA 2819294153        To:97137043537        P.2/2

# MEMORIAL HERMANN HEALTHCARE SYSTEM          Patient Registration

| | | | | | |
|---|---|---|---|---|---|
| **Patient Type** EMERGENCY C | **Location** CER1/ER01-03/ | **Religion** CATHOLIC | **Priv Admit By** | **Admit By** OJM | **Print By** JAMOR  02/13/06  0711 |

**Date Admitted** 02/13/06   **Time** 07:10   **M.R. Account Number** 37540797-6044   **Privacy Code** RELEASE   **Accom. Data**   **Service** EMR   **Financial Class** COMMERCIAL   IG

**Discharge Date**   **Age** 7Y   **Date of Birth** 03/17/1998   **Sex** M   **Mid** 6   **Social Security No** NOT OBTAINED   **Race** X   **Admit Type** E   **Admit Course** DOCTOR/   **Acc. Code**

## PATIENT DEMOGRAPHIC INFO

Patient's Name: GUZMAN, ▮▮▮▮▮   VIP:

Patient's Address (1): 695 PINELOCH DR APT 1806

Patient's Address (2):

City, State, Zip: WEBSTER          TX 77598

Country/County: HARRIS   Phone: 281-286-2317

Patient's Employer: UNEMPLOYED

Employer's Address (1):

Employer's Address (2):

City, State, Zip:

Employer's Phone:          Ext:   LOB:

Occupation: CHILD

Patient's Spouse:

Father's Name: GUZMAN, DOMINIC

Mother's Name: GUZMAN, WENDY

Mother's Account Number:

### EMERGENCY COMPLAINT

Name: GUZMAN, WENDY          Relation: MC

Employer's Name:

Home Phone: 281-286-2317

Work Phone:

CHIEF : VOMITING

ADM DX:

Proc:

## GUARANTOR INFORMATION

Guarantor's Name: GUZMAN, WENDY
CPI #: 037910929
Address (1):          DOB: 05/05/1963
695 PINELOCH DR APT 1806

Address (2):

City, State, Zip: WEBSTER          TX 77598

Home Phone: 281-286-2317   Relation: MO

Social Security No.: 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

Guarantor's Employer: UNEMPLOYED

Address (1):

Address (2):

City, State, Zip:

Work Phone:          Ext:

Occupation:

Effective Date: 02/12/06

### MEDICAL

| | | | |
|---|---|---|---|
| Admitting Physician: | - - | | UPIN DR# |
| | Fax: | - - | |
| Attending Physician: | SIDDIQI, MOHAMMAD I | | UPIN H47315 |
| | 281-929-6200 | | DR# 047900 |
| | Fax: 281-929-4153 | | |
| PCP Physician: | PHYSICIAN, NON ASSOCIATED | | UPIN UTH000 |
| | Fax: - - | | DR# 099999 |
| IPA/PHO: | | | |
| Referring Physician: | - - | | UPIN |
| | Fax: - - | | DR# |
| Address: | | | |
| City, State, Zip: | | | |
| Transfering Institution: | | | |

Last Hospital Activity Date

I/P          Clinic Site:

O/P          Life Flight #:          MOA: W

E/R  02/12/06          Discount Type:

## PRIMARY INSURANCE

Insurance Co.: GREAT WEST COM          Code: GW1

Insured: GUZMAN, FRANK

S.S.# or Certificate#: 464335496   D.O.I. (If w. Comp.): / /

Group#: 0005550   Eff. Date: 02/09/06   Contr:
Verified With:          Date:

Phone: 800-685-3020          Ext:

AOB: Y          Authorization:

Medicare B:          Blueshield:

Mail Claim to: GREAT WEST COM
1000 GREAT WEST DR
KENNETT          MO 638573749

Rvw Agcy:          Ph: 800-685-3020

Comments:

## SECONDARY INSURANCE

Insurance Co.:          Code:

Insured:

S.S.# or Certificate#:

Group#:          Eff. Date: / /
Verified With:          Date:

Phone: - -          Ext:

AOB:          Authorization:

Medicare B:          Blueshield:

Mail Claim to:

Rvw Agcy:          Ph: - -

**MHLF-0010**

MHIS HOSPITAL:

Info by: MOTHER

Plaintiffs' Response to Memorial Hermann Motion for Summary Judgment

Exhibit M

**Page 1**

**Larry O'Neil THOMAS, as Administrator of the Estate of James "Milford" Gray, Deceased, and all Lawful Survivors of James "Milford" Gray, Deceased, Appellants**

**v.**

**ST. JOSEPH HEALTHCARE, INC., D/B/A St. Joseph Hospital, Appellee and Saint Joseph Healthcare, Inc., Cross-Appellant**

**v.**

**Larry o'neil thomas, as Administrator of the Estate of James "Milford" Gray, Deceased, and all Lawful Survivors of James "Milford" Gray, Deceased, Cross-Appellees**

**No. 2007-CA-001192-MR.**

**No. 2007-CA-001244-MR.**

**Court of Appeals of Kentucky.**

**December 5, 2008.**

**Page 2**

Cross-Appeal from Fayette Circuit Court, Honorable Robert Overstreet, Special Judge, Action No. 00-CI-01364.

Charles A. Grundy, Jr., Elizabeth R. Seif, Lexington, Kentucky, Darryl Lewis, West Palm Beach, Florida, Briefs for Appellants/Cross-Appellees.

Elizabeth R. Seif, Oral Argument for Appellants/Cross-Appellees.

Robert F. Duncan, Jay E. Ingle, K. Brad Oakley, Lexington, Kentucky, Briefs for Appellee/Cross-Appellant.

Robert F. Duncan, Jay E. Ingle, Oral Argument for Appellee/Cross-Appellant.

Before: CLAYTON, DIXON, and WINE, Judges.

OPINION

WINE, Judge.

FACTS

The parties vigorously disagree about the facts of this case. However, they agree that James Milford Gray (Gray), age 39, arrived at St. Joseph Hospital's (Hospital) emergency room on April 8, 1999, at 8:08 p.m. He was complaining of abdominal pain, constipation for four days, nausea and vomiting. He was seen by physician's assistant Julia Adkins (Adkins) and Dr. Barry Parsley. He received medication for pain and later received an enema and manual disimpaction of his colon. Although lab tests were ordered, either Gray refused to cooperate, or upon reorder, they were never conducted. Likewise, no x-rays were conducted.

Gray was discharged at 12:40 a.m. on April 9. He was taken by ambulance to the homes of different family members with whom he had previously stayed. However, no family member agreed to provide a place to stay, so he was

Page 3

returned to the Hospital. Upon his return to the emergency room, the Hospital made arrangements for Gray to stay at the nearby Kentucky Inn.

Gray returned to the Hospital at 5:25 a.m. after the staff of the Kentucky Inn contacted 911 on his behalf. He had been vomiting dried blood for several hours. He was again seen and evaluated by physician's assistant Adkins and Dr. Parsley. Lab tests and x-rays were conducted during this visit. Subsequently, he was discharged by Dr. Jack Geren at 12:15 p.m.

However, Gray died later that day at a family member's home. The autopsy report listed the cause of death as purulent peritonitis caused by a rupture of a duodenal ulcer due to duodenal peptic ulcer disease. The autopsy



report also listed constrictive atherosclerotic coronary artery disease as a contributory cause of Gray's death.

Gray's Estate (Estate) brought this action on April 8, 2000, alleging medical negligence against the Hospital, Dr. Joseph Richardson (a physician who treated Gray during an earlier visit to the Hospital on March 9, 1999), Dr. Parsley, Dr. Geren, physician's assistant Adkins, and several members of the nursing staff. In addition, the Estate alleged that the Hospital violated the Emergency Medical Treatment and Active Labor Act (EMTALA). After a lengthy period of discovery, the matter proceeded to trial on October 3, 2005. However, that trial ended in a mistrial.

Prior to the second trial, the Estate settled with Drs. Richardson, Parsley and Geren. The matter then proceeded to a jury trial on the claims against

Page 4

the Hospital on November 7-9, 14-17, and 21-23, 2005. The jury returned verdicts for the Estate on both the medical negligence and the EMTALA claims. The jury apportioned fault as follows: 15% to the Hospital; 0% to Dr. Richardson; 30% to Dr. Parsley and physician's assistant Adkins; 30% to Dr. Geren; and 25% comparative fault to Gray. The jury awarded compensatory damages of $25,000.00, of which the Hospital's share was $3,750.00. The jury also assessed punitive damages against the Hospital in the amount of $1,500,000.00.

Thereafter, the Hospital filed motions for a judgment notwithstanding the verdict and for a new trial. The trial court denied the motions with respect to the jury's findings of liability and the award of compensatory damages. However, the court concluded that the award of punitive damages was clearly excessive and therefore a new trial on that issue was in order. This appeal and cross-appeal followed.1

I. EMTALA CLAIM

In its cross-appeal, the Hospital first argues that the Estate failed to establish the elements of a viable claim under EMTALA. Specifically, the Hospital raises two arguments. First, the Hospital contends that a plaintiff cannot simultaneously pursue a claim under EMTALA and for medical negligence. Second, the Hospital argues that it cannot be liable under EMTALA merely because its agents failed to correctly diagnose Gray's condition. Rather, the

Page 5

Hospital contends that it could only be liable for failing to stabilize an emergency medical condition which its physicians actually detected.

The EMTALA is found at 42 U.S.C. § 1395dd. As explained in Vickers v. Nash General Hospital, Inc., 78 F.3d 139 (4th Cir. 1996):

Congress enacted EMTALA in 1986 "to address a growing concern with preventing `patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir.1994). The Act accordingly imposes two principal obligations on hospitals. First, it requires that when an individual seeks treatment at a hospital's emergency room, "the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a). Second, if the screening examination reveals the presence of an emergency medical condition, the hospital ordinarily must "stabilize the medical condition" before transferring or discharging the patient. 42 U.S.C. § 1395dd(b)(1). . . .

The Act thereby imposes a "limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there." Brooks v. Maryland General Hosp., Inc., 996 F.2d 708, 715 (4th Cir. 1993). The duty created by EMTALA is a "limited" one in a very critical sense: "EMTALA is not a substitute for state law malpractice actions, and was not



intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." Power, 42 F.3d at 856. We have frequently reaffirmed this limit on the Act's scope. Id. at 869 (Ervin, C.J., concurring in part and dissenting in part) ("Virtually every decision addressing EMTALA has recognized that Congress did not intend for the Act to be a substitute for a state medical malpractice action."); Brooks, 996 F.2d at 710 ("The Act was not designed to provide a federal remedy for misdiagnosis or general malpractice.");

Page 6

Baber v. Hospital Corp., 977 F.2d 872, 880 (4th Cir.1992)

("EMTALA is no substitute for state law medical malpractice actions.").

Vickers, 78 F.3d at 142.

We disagree with the Hospital that claims under EMTALA and for medical negligence are mutually exclusive. The case law makes it clear that these claims are separate and have different elements of proof. Nevertheless, a failure to provide appropriate medical screening and stabilization of an emergency medical condition may amount to both a violation of EMTALA and medical negligence. See Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 270 (6th Cir. 1990). Thus, the fact that the Estate is asserting a medical negligence claim does not automatically preclude it from bringing a claim against the Hospital under EMTALA.

The more germane issue is whether the Estate has presented sufficient evidence to support a claim under EMTALA. The trial court dismissed the Estate's claim that the Hospital did not provide an appropriate medical screening examination, and the Estate does not appeal from that ruling. Consequently, the only issue presented to the jury was whether the Hospital failed to stabilize Gray's emergency medical condition prior to discharging him. The Hospital argues that the Estate cannot sustain an action under the Act because Gray actually received treatment. Even if the treatment was inadequate

or negligent, the Hospital maintains that such treatment fulfilled its duties under EMTALA to stabilize

Page 7

Gray's emergency medical condition. The Hospital further argues that it cannot be liable under EMTALA for failing to detect Gray's duodenal ulcer, but only for failing to stabilize and treat the emergency medical conditions which its physicians actually detected.

We agree with the Hospital that liability under EMTALA does not rest on its negligence for failing to detect and treat a condition. However, the jury instruction on the EMTALA claim explained that the Hospital's duty to stabilize arose "if it determined that . . . Gray had an emergency medical condition." The instruction's definition of "emergency medical condition" is the same as the statutory definition found at 42 U.S.C. § 1395dd(e)(1).

The Hospital relies heavily on the Sixth Circuit's opinion in Cleland v. Bronson Health Care Group, supra, which held, among other things, that a failure-to-stabilize claim under EMTALA cannot be based solely on a negative outcome. Rather, for liability to arise, the doctors on duty must have actual knowledge of the patient's emergency medical condition. Id. at 268-69. See also Jackson v. East Bay Hospital, 246 F.3d 1248, 1257 (9th Cir. 2001); Summers v. Baptist Medical Center Arkadelphia, 91 F.3d 1132, 1140 (8th Cir. 1996); Vickers, 78 F.3d at 145; Urban v. King, 43 F.3d 523, 525-26 (10th Cir. 1994); Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991). In other words, a hospital does not violate its failure to stabilize under EMTALA if it fails to detect or if it misdiagnoses an emergency condition. Baker v. Adventist Health, Inc., 260 F.3d 987, 993-94 (9th Cir. 2001).

Page 8

However, the Hospital further attempts to equate knowledge of a specific diagnosis with knowledge of the symptoms of an emergency medical condition. We disagree. The duty to



stabilize under EMTALA "to provide such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.] . . ." 42 U.S.C. § 1395dd(e)(3)(A). The term "emergency medical condition" means

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in —

(i) placing the health of the individual . . . in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A).

When these definitions are read together, it is clear that the duty to stabilize under EMTALA does not require that the Hospital had actual knowledge of a specific condition. Rather, the duty arises upon the Hospital's determination that the patient is manifesting symptoms of sufficient severity as to constitute an "emergency medical condition." In assessing the physical stability of a patient, Courts have generally focused on the EMTALA requirement that "no material

Page 9

deterioration" of the condition is likely. Thomas v. Christ Hospital and Medical Center, 328 F.3d 890, 893 (7th Cir. 2003), citing St. Anthony Hospital v. United States Dep't of Health and Human Services, 309 F.3d 680, 697 (10th Cir. 2002); Harry v. Marchant, 291 F.3d 767, 771 (11th Cir. 2002); Bryant v. Adventist Health Sys./West, 289 F.3d 1162, 1167 (9th Cir. 2002).

In Cleland v. Bronson Health Care Group, supra, and Vickers v. Nash General Hospital, supra, the respective hospitals' failures to diagnose potentially life-threatening conditions were arguably negligent. Nevertheless, the Courts in both cases dismissed the EMTALA claims, noting that neither hospital had reason to know that the patients' conditions were not stable, that the conditions were worsening in any way, or that the conditions presented any risk that might become life-threatening. Cleland, 917 F.2d at 271; Vickers, 78 F.3d at 145. In this case, the Hospital correctly notes that its physicians diagnosed Gray with "acute gastritis, with hemorrhage," and he was treated for this condition. The Hospital also points to Dr. Geren's conclusion that Gray was stable at the time of discharge. Thus, the Hospital maintains that these determinations, even if erroneous, would preclude a claim under EMTALA.

However, the Hospital's own records also show that Gray was in severe pain, was vomiting blood, and had an above normal respiratory rate, highly elevated white cell count, below normal red cell count, below normal lymph percentage, increased hematocrit, and below normal urine output and density. Finally, the Estate's EMTALA claim was not based only on the actions of the

Page 10

Hospital's physicians, but also on the actions of the Hospital's nursing staff who failed both to properly record and advise the physicians about the extent of Gray's distress. Based on this evidence and the testimony of the Estate's expert witnesses, the jury could conclude that, particularly by the second emergency room visit, the Hospital released Gray even though the doctors knew his condition was not stable and was likely to deteriorate.

Therefore, the Hospital was not entitled to summary judgment or to a directed verdict. Rather, the trial court properly submitted this issue to the jury. Furthermore, we find that the jury instruction on the EMTALA claim was substantially correct and not materially



misleading. As previously noted, the EMTALA instruction stated that "[i]t was the duty of [the Hospital], if it determined that . . . Gray had an emergency medical condition when he came to the emergency department on April 8, 1999 and/or April 9, 1999, to provide for such further medical examination and such treatment as may be required to stabilize the medical condition." (Emphasis added). The instruction implicitly required the jury to find that the Hospital's physicians had knowledge of Gray's emergency medical condition, as required by EMTALA.

## II. NEGLIGENCE CLAIM

We also find that the trial court properly submitted the Estate's medical negligence claim to the jury. The Hospital contends that the Estate failed to present evidence showing that any negligence by the Hospital was a substantial factor in causing Gray's injuries. Baylis v. Lourdes Hospital, Inc., 805 S.W.2d

Page 11

122, 124 (Ky. 1991). However, the Estate presented such evidence through the testimony of its nursing expert, Janice Rodgers, and its medical expert, Dr. Eric Munoz. Furthermore, while evidence of causation must be in terms of probability rather than mere possibility, the focus of the inquiry should be on the substance of the expert testimony rather than its particular form. Baylis, 805 S.W.2d at 124. Under the circumstances, we conclude that the Estate presented sufficient evidence to submit the issue of causation to the jury.

## III. FRATZKE ISSUE

The Hospital also argues that the trial court erred by denying its motion in limine to preclude any award of unliquidated damages. On October 3, 2005, prior to the first trial in this matter, the Hospital moved to preclude any award of unliquidated damages because the Estate had not identified the amount of unliquidated damages which it was seeking. The Estate attempted to serve supplemental discovery responses on October 1, 2005. However, the trial court found that the supplementation was not seasonable.

However, that trial ended in a mistrial and the trial court allowed the Estate to present evidence of unliquidated damages at the second trial in November of 2005. Kentucky Rules of Civil Procedure (CR) 8.01(2) authorizes the use of an interrogatory to obtain disclosure of the amount of unliquidated damages being sought. If a plaintiff fails to disclose this amount in the interrogatory and further fails to seasonably supplement its response and provide the information, then the plaintiff will be precluded from recovering such damages. Fratzke v. Murphy, 12 S.W.3d 269, 272-73 (Ky. 1999).

Page 12

See also LaFleur v. Shoney's Inc., 83 S.W.3d 474, 480-81 (Ky. 2002). CR 8.01(2) is mandatory and gives the trial court no discretion as to the application of this remedy. Fratzke, 12 S.W.3d at 273. Thus, the Hospital maintains that the trial court was required to bar the Estate from presenting evidence of unliquidated damages once it had found that the Estate had failed to seasonably identify its claim for such damages in its discovery responses.

However, we conclude that this rule was not applicable under the specific circumstances of this case. While the Estate failed to specify the amount of its claim for unliquidated damages prior to the first trial, that trial ended in a mistrial. Thus, even if the court erred by allowing the claim for unliquidated damages at the first trial, the Hospital was not prejudiced by this ruling. Moreover, Fratzke does not preclude a trial court from entertaining a motion to supplement discovery responses even after a trial has commenced. Fratzke, 12 S.W.3d at 272. Although the Estate's supplemental discovery response on September 30, 2005, may not have been timely with respect to the first trial, the trial court could reasonably find that it was seasonable with respect to the second trial. Therefore, the trial court did not err by allowing the Estate's claim for unliquidated damages.

## IV. NEW TRIAL BASED ON TRIAL ISSUES

fastcase

Thomas v. St. Joseph Healthcare, Inc., No. 2007-CA-001192-MR (Ky. App. 12/5/2008) (Ky. App., 2008)

The Hospital next raises a series of issues involving the conduct of the trial in this case. The Hospital contends that it is entitled to a new trial based upon these errors. CR 59.01 sets out the grounds upon which a court may grant a new trial as follows:

Page 13

(a) Irregularity in the proceedings of the court, jury or prevailing party, or an order of the court, or abuse of discretion, by which the party was prevented from having a fair trial.

(b) Misconduct of the jury, of the prevailing party, or of his attorney.

(c) Accident or surprise which ordinary prudence could not have guarded against.

(d) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice or in disregard of the evidence or the instructions of the court.

(e) Error in the assessment of the amount of recovery whether too large or too small.

(f) That the verdict is not sustained by sufficient evidence, or is contrary to law.

(g) Newly discovered evidence, material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial.

(h) Errors of law occurring at the trial and objected to by the party under the provisions of these rules.

As an appellate Court, we review the circuit court's ruling on a motion for a new trial motion for an abuse of discretion and will reverse only if there is clear error. Miller v. Swift, 42 S.W.3d 599, 601 (Ky. 2001). The trial court's decision is presumed correct and will not be reversed absent clear error. Shortridge v. Rice, 929 S.W.2d 194, 196 (Ky. App. 1996). This rule recognizes that a decision on a motion for a new trial depends, to some extent, upon factors and impressions not

included in the appellate record. Id. A trial court has broad

Page 14

discretion in ruling upon a motion for a new trial and we will not disturb such ruling absent an abuse of that discretion. Lewis v. Grange Mutual Casualty Co., 11 S.W.3d 591 (Ky. App. 2000). An abuse of discretion occurs when a "trial judge's decision [is] arbitrary, unreasonable, unfair, or unsupported by sound legal principles." Goodyear Tire and Rubber Co. v. Thompson, 11 S.W.3d 575, 581 (Ky. 2000). "The discretion of the trial judge, who participates in the conduct of the trial, in refusing or granting a new trial will be interfered with only in exceptional cases." Wilkins v. Hopkins, 278 Ky. 280, 128 S.W.2d 772, 774 (1939). While we are concerned by the circumstances surrounding some of these issues, we cannot find overall that any or all of them deprived the Hospital of a fair trial nor does the Hospital show how it was prejudiced by any of these claimed errors. Consequently, the trial court did not abuse its discretion by denying the Hospital's motion for a new trial on these grounds.

A. Denial of Motion to Strike Jurors for Cause

First, the Hospital argues that the trial court improperly failed to strike two jurors for cause. The Hospital maintains that the trial court improperly considered the fact that both of the jurors were African-American in denying the motions to strike. We find no error or abuse of discretion.

It is well-established that parties may not use peremptory challenges to exclude jurors based upon race. See Batson v. Kentucky, 476 U.S. 79, 96-98, 106 S. Ct. 1712, 1722-24, 90 L. Ed. 2d 69 (1986). Although Batson was a criminal case, the rule applies equally to civil litigation. Edmonson v. Leesville Concrete

Page 15

Co., Inc., 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991). See also Washington v.



Goodman, 830 S.W.2d 398, 400-02 (Ky. App. 1992). While the trial court in this case noted the race of Juror 588, the court expressly stated that race did not play a role in its decision to deny the Hospital's motion to strike Juror 588. We find no reason not to take the trial court at its word, and there is no indication in the record that the trial court considered the race of Juror 675 in denying the Hospital's motion.

Moreover, the Hospital's grounds for seeking to strike Jurors 588 and 675 had nothing to do with their abilities to render a fair and impartial verdict. During voir dire, Juror 588 informed the court that he had a medical condition which required him to take certain medications, and after taking these medications, he was prone to falling asleep. The trial court denied the Hospital's motion to strike Juror 588 for cause, but asked the juror to inform the court if he was having difficulty staying awake during the trial. Juror 588 served on the jury in this case and there is no allegation that he was unable to stay awake during the trial. Separately, the Hospital moved to strike Juror 675, who had advised the court that she could not serve as a juror because her employer would not give her the time off. Nevertheless, the trial court denied the Hospital's motion to strike and it subsequently used a peremptory challenge to remove Juror 675 from the panel.

A decision whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial

Page 16

court's determination. Pendleton v. Commonwealth, 83 S.W.3d 522, 527 (Ky. 2002). Here, the trial court was satisfied by Juror 588's statement that he would inform the court if he had any difficulty staying awake. Under these circumstances, the court's decision to deny the Hospital's motion to strike was reasonable. As for Juror 675, the trial court had previously excused several jurors for employment-related reasons. However, the trial court stated that it

could not continue to allow potential jurors to request dismissal for work. Furthermore, the court was not convinced that Juror 675 had shown that jury service would cause her true hardship or that her position at work was indispensible. Consequently, the trial court's decision to deny the Hospital's motion to strike was well within its discretion.

Page 17

B. Exclusion of Deposition Testimony Based upon Misrepresentation by Counsel

Second, the Hospital argues that it was entitled to a new trial due to misrepresentations by the Estate's counsel which prevented it from introducing evidence to the jury. Prior to trial, the Estate's counsel informed the court that its settlement with the physicians contained a term which prevented its experts from testifying for the Hospital. Based on this representation, the trial court did not allow the Hospital to introduce the deposition testimony of Dr. Dean Hawley, an expert previously retained by Dr. Richardson, Dr. Parsley, and physician's assistant Adkins. Following the trial, however, the court reviewed the settlement agreement and found no such provision.

The Hospital characterizes this misrepresentation as a fraud upon the court compelling a new trial. The Estate concedes that its counsel erroneously informed the court about the provision. However, the Estate contends that its counsel merely made an innocent mistake about the terms of a settlement which had not been finally drafted. The trial court made no finding whether the Estate's misrepresentations about the terms of the settlement agreement were intentional. Nevertheless, it is clear from the record that the trial court relied on those representations when it prohibited the Hospital from introducing portions of Dr. Hawley's deposition. To this extent, the trial court's decision to exclude the deposition was error as it was based on erroneous information.

Page 18



The Estate further argues that the Hospital is not entitled to a new trial on this ground because the exclusion of Dr. Hawley's deposition did not affect the outcome of the case. In response, the Hospital argues that it is not required to show that the excluded evidence affected the outcome of the case. Rather, the Hospital contends that it was only required to show that either it or the court was actually misled by the misrepresentation, with a resultant advantage to one party and an apparent injustice to the other. Hunter v. Hunt, 296 Ky. 769, 774, 178 S.W.2d 609, 612 (1944).

While the Hospital has clearly shown that it and the court were actually misled by the misrepresentation, it must also show that the Estate gained an unfair advantage and that the Hospital's defense of the case was prejudiced. Here, the Hospital does not identify any particular evidence in Dr. Hawley's deposition which it was unfairly prevented from presenting to the jury. Dr. Hawley, a pathologist, testified regarding the cause of Gray's death. For the most part, he agreed with the coroner that Gray's death was caused by the rupture of a duodenal ulcer. He also opined that Gray's past history of drug and alcohol abuse contributed to that condition. This latter evidence came in through the testimony of the coroner and through other evidence, including the lab reports introduced by the Hospital showing that Gray had drugs in his system. We do not excuse the Estate's misrepresentation, whether intentional or inadvertent, about the terms of the settlement agreement. But in the absence of any showing of material prejudice,

Page 19

we cannot say that the trial court abused its discretion by denying the Hospital's motion for a new trial on this basis.

C. Admission of Improper Evidence

Third, the Hospital argues that the verdict was tainted by the introduction of improper evidence and improper argument by the Estate's counsel. Specifically, the Hospital contends that Dr. Munoz's testimony amounted to perjury; that

Dr. Frank Baker, who testified regarding the care provided by the Hospital's nurses, made inflammatory comments which were not supported by the evidence; that the Estate's counsel made repeated reference to matters which were not in evidence; and that the Estate's counsel made improper appeals to jury sympathy. We shall address each in turn.

1. Dr. Munoz's testimony

The Hospital contends that the jury verdict was procured through perjured testimony by the Estate's expert witness, Dr. Munoz. The Hospital points to inconsistencies between Dr. Munoz's deposition testimony and his trial testimony. However, the Hospital cross-examined Dr. Munoz about these inconsistencies, and he explained that his prior responses were due to ambiguous questions at the deposition and that his prior statements had been taken out of context. We find no basis to support the Hospital's assertion that these inconsistencies amount to perjury on the part of Dr. Munoz. Moreover, since the Hospital raised these inconsistencies at trial, the jury had full opportunity to weigh Dr. Munoz's credibility for itself.

Page 20

2. Comments by Dr. Baker

The Hospital next argues that Dr. Baker made inflammatory and unsupported statements about the care provided by the Hospital's nurses. At the first trial, the court excluded Dr. Baker's testimony because the Estate had not designated him as an expert with regard to nursing care. The court also noted that Dr. Baker specifically stated at his first deposition that he did not intend to criticize the nursing care because he had not read the nurses' depositions. At the second trial, the Hospital sought to introduce portions of Dr. Baker's first deposition. The Estate cross-designated other portions of his deposition, including a statement characterizing the nursing care provided to Gray by the Hospital:

fastcase

Flagrant violations of the standard of care, particularly egregious, outrageous, not easily explainable. They are just so out of keeping with what nurses are taught about caring for patients. It is just a bit mind-boggling to figure out why and how it happened.

Deposition of Dr. Frank Baker, February 27, 2002, p. 168.

The Hospital maintains that the trial court erred by allowing introduction of these statements because the Estate still had not designated Dr. Baker as an expert witness with regard to nursing care. As a result, the Hospital contends that his testimony was improper and unfairly inflammatory. The trial court held that the Estate could introduce its designated portions of Dr. Baker's deposition to the extent that it was addressed in Dr. Baker's second deposition made after he had reviewed the nurses' depositions. While Dr. Baker's comments are undoubtedly strong, we cannot find that the Hospital was surprised by his

Page 21

testimony or unfairly deprived of an opportunity to rebut his opinions. Therefore, the trial court did not abuse its discretion by allowing his deposition testimony to be read for the jury.

3. References to Pam Blackwell note

The Hospital further argues that the Estate's counsel improperly referred to matters not in evidence. Prior to Gray's second discharge on April 9, 1999, a hospital social worker, Pam Blackwell (Blackwell), wrote a note on Gray's chart suggesting that the police be called if Gray continued to return. The trial court held that the note was admissible to the extent it was part of the Hospital's records, but the Estate could not assert any negligence claim against Blackwell.

Blackwell did not testify at trial, but members of Gray's family testified that they had been informed about Blackwell's recommendation, and that Gray was afraid to return to the Hospital because he thought he might be arrested. The Estate's counsel also

referred to Blackwell's note in closing argument. The Hospital argues that Blackwell's note was not relevant to the issues presented in this case and that the Estate used this evidence to inflame the jury. While the evidence was not admissible to prove Blackwell's negligence, it was relevant to reflect on the conduct of the Hospital's agents and to explain Gray's actions after he was discharged. Furthermore, we cannot say that the trial court abused its discretion in finding that the probative value of this evidence outweighed its prejudicial effect. Kentucky Rules of Evidence (KRE) 403.

4. Reference to matters not in evidence

Page 22

During voir dire, the Estate's counsel asked prospective jurors if they would be able to use their own knowledge, life experiences, and values in their deliberation process. The Hospital objected, arguing that this question encouraged the jurors to rely on matters and standards outside the record and instructions. The trial court overruled the objection, noting that the jurors would be qualified based upon their abilities to render a verdict based upon the evidence presented at trial and the instructions provided by the court. While an admonishment explaining this to the jury certainly would have been in order, we cannot say that this single statement by counsel during voir dire rendered the entire trial fundamentally unfair.

The Hospital also argues that the Estate's counsel made several references to Gray's past and his relationships with family members which were not supported by any subsequent testimony. Specifically, counsel told the jury Gray had been shot when he was a teenager and had been paralyzed ever since. Counsel also stated that Gray's family had been taking care of him since that time. The Hospital argues that counsel made these statements to evoke sympathy for Gray. Further, the Hospital contends that these statements were not supported by any testimony. The Hospital also asserts that the Estate's counsel represented that



certain witnesses would testify at trial, but that these witnesses were never called.

However, we find no indication that the Hospital raised these objections until its post-trial motion for a new trial. Where a party seeks to object to a reference to improper evidence offered in opening statements, it must raise this

Page 23

objection and request a remedy prior to the discharge of the jury. An objection raised for the first time in a motion for a new trial is not timely. See Senibaldi v. Commonwealth, 338 S.W.2d 915, 919-20 (Ky. 1960).

5. Conduct of Trial

The Hospital raises several unpreserved issues regarding the trial court's conduct of the trial. First, the Hospital argues that it was denied an opportunity to cross-examine and impeach several fact witnesses offered by the Estate. However, it provides no citations to the record as to where this issue was preserved for review. CR 76.12(4)(c)(v). Consequently, we are not obliged to scour the record on appeal to ensure that an issue has been preserved. See Phelps v. Louisville Water Co., 103 S.W.3d 46, 53 (Ky. 2003).

Likewise, the Hospital does not identify how it objected to the trial court's scheduling decisions around Thanksgiving 2005. Upon realizing that the trial would continue into Thanksgiving week, the court gave the parties the option of taking off only on Thanksgiving Day and resuming the trial on the Friday and Saturday after Thanksgiving, or taking over a full week off and resuming the trial on December 5. While the Hospital contends that it would have been prejudiced by either option, it apparently agreed to complete its case prior to Thanksgiving. Furthermore, the Hospital did not suggest any other appropriate solution. Given the absence of any showing that the Hospital made a timely objection, the trial court's scheduling decisions during the trial were well within its discretion. Disabled American

Veterans, Dept. of Kentucky, Inc. v. Crabb, 182 S.W.3d 541,

Page 24

550-51 (Ky. App. 2005), citing Robert G. Lawson, The Kentucky Evidence Law Handbook, § 3.20[2], 238 (4th ed. 2003).

6. Juror confusion

In its final argument concerning issues presented at trial, the Hospital notes that the jury sent out three questions regarding the EMTALA instructions during its deliberations. First, the jury asked the court to explain if Instruction #8 pertained to the EMTALA claim. Second, the jury asked if the doctors and nurses are included under the EMTALA claim. And third, the jury asked if Instruction #2, which addressed the Hospital's duty of care, included its duties under EMTALA. After consulting with the parties, the trial court informed the jury that the answer to the first question was "yes"; the answer to the second question was that "doctors and nurses are included to the extent that they are agents or servants of the Hospital"; and the answer to the third question was "no, only negligence." Thereafter, the jury sent out an additional question asking whether the doctors' conduct should be considered when assessing punitive damages. The court answered this question "yes." The Hospital contends that these questions demonstrate the jury was confused by the EMTALA and punitive damages instructions.

The Hospital also points to inconsistencies in the jury's verdicts as demonstrating this confusion. Nine jurors found the Hospital to be negligent, but ten jurors found the Hospital liable under the EMTALA claim. Likewise, ten jurors found the Hospital to be 15% at fault and assessed punitive damages, while

Page 25

only nine found the Hospital negligent. The Hospital also notes that, during the polling of the jury, one juror was unsure of how he had voted on several of the verdicts awarded. Based on



these questions, the Hospital asserts that "[t]he only conclusion that can be drawn from these anomalies is that the jury was so befuddled with confusion that the verdict cannot be the product of objective reason and reflection, but rather uncertainty and misunderstanding as to the issues presented at trial."

Where the instructions are erroneous or substantially misleading, reversal is required upon a showing that there is a substantial likelihood the jury was confused or misled by the instructions. City of Middlesboro v. Brown, 63 S.W.3d 179, 182 (Ky. 2001). However, we have already found that the instructions relating to the negligence and the EMTALA claims were substantially correct. We shall address the issues relating to the punitive damages instructions separately. In any event, the trial court answered the jury's questions about the distinctions between the negligence and EMTALA claims. The Hospital does not directly argue that any of the court's answers were incorrect, and the jury did not indicate that it had any further difficulty reaching a verdict on these claims. Nor does the confusion shown by a single juror during polling demonstrate any significant irregularity with the deliberation process. Finally, no juror disavowed any verdict after being given the opportunity to reflect. Consequently, the Hospital has not shown any substantial likelihood that the jury was confused or misled by the instructions.

Page 26

Furthermore, the jury verdicts were not inconsistent. The fact that only nine jurors found the Hospital to be negligent, but ten agreed with the verdict apportioning fault and assessing punitive damages, is irrelevant. Each special interrogatory to the jury should be treated as a separate verdict which may be reached by any nine or more members of the panel. Young v. J. B. Hunt Transportation, Inc., 781 S.W.2d 503, 505-06 (Ky. 1989). See also Martin v. Mekanhart Corp., 113 S.W.3d 95, 99 (Ky. 2003). Therefore, the trial court did not abuse its discretion by denying the Hospital's motion for a new trial on this basis.

E. Trial Court's Order Sealing Settlement Agreement

After the second trial in this case, the Hospital filed a motion to compel production of the Estate's settlement agreement with the physicians. After the Estate objected on the grounds that the terms of the settlement were confidential, the Hospital moved for an in camera review of the agreement to determine whether the agreement contained any terms restricting the evidence which could be presented at trial, terms precluding the Hospital from presenting the testimony of the settling defendant's experts, or any terms agreeing to indemnify the settling defendants from future claims. After conducting the in camera review, the trial court found that the settlement agreement does not contain any of the objectionable terms identified by the Hospital.

The Hospital now argues that it is entitled to review the settlement agreement for any other provisions which might be improper. However, the Hospital did not object to the court's order sealing the settlement agreement, nor

Page 27

did it request more specific findings addressing any allegedly improper provisions in the agreement. CR 52.04. Consequently, this issue is not preserved for review.

V. PUNITIVE DAMAGES

Both parties raise issues with respect to the Estate's claim for punitive damages. The trial court set aside the jury's verdict for punitive damages, finding that it was clearly excessive. The Hospital argues that the issue of punitive damages should not have been submitted to the jury, or in the alternative, that the jury instructions regarding punitive damages were inadequate. The Estate responds that the issue was properly submitted to the jury, and the Estate further contends that the award of punitive damages was not excessive and therefore the Hospital was not entitled to a new trial on this issue.



Thomas v. St. Joseph Healthcare, Inc., No. 2007-CA-001192-MR (Ky. App. 12/5/2008) (Ky. App., 2008)

A. Instructions on Ratification and Standard of Proof

In its cross-appeal, the Hospital argues that punitive damages could not be assessed against it without a showing that it ratified the grossly negligent conduct of its employees. The Hospital argues that there was no evidence showing that it had ratified the conduct of the physicians and Hospital staff, and therefore it was entitled to a directed verdict on the Estate's claim for punitive damages.

Kentucky Revised Statutes (KRS) 411.184(3) limits vicarious liability for punitive damages to instances where the employer authorized, ratified, or should have anticipated the bad conduct of its employee. We disagree with the Estate that the statute does not apply because EMTALA imposes direct liability on the Hospital for the acts of its agents. While EMTALA is a federally-created

Page 28

action, it incorporates substantive state law in determination of damages. Smith v. Botsford General Hospital, 419 F.3d 513, 517 (6th Cir. 2005). Furthermore, in Berrier v. Bizer, 57 S.W.3d 271 (Ky. 2001), the Kentucky Supreme Court held that KRS 411.184(3) applies where a plaintiff seeks punitive damages for employment discrimination premised upon the acts of supervisory employees. Berrier, 57 S.W.3d at 283-84.

In Berrier, the Supreme Court affirmed a dismissal of the plaintiff's claim for punitive damages because the only remaining claim against the employer involved allegations of misconduct on the part of employees and there was no evidence that the employer authorized or ratified the alleged misconduct or should have anticipated the conduct in question. Berrier, 57 S.W.3d at 284. Here, the Hospital has internal policies and procedures to ensure that physicians and staff complied with the duties imposed by EMTALA. Given the evidence, we agree with the trial court that the ratification was an issue of fact for the jury to decide.

In the alternative, the Hospital contends that it was entitled to a jury instruction on ratification as a prerequisite to an award of punitive damages. We agree. Not only did the court fail to provide such an instruction, its answer to the jury's question implied that it could impose punitive damages on the Hospital for the acts of its agents without a finding that it ratified or had reason to know of their conduct. We also agree with the Hospital that the trial court erred in failing to instruct the jury that the Estate must prove its right to punitive damages by clear and convincing evidence. Upon retrial the Hospital will be entitled to the

Page 29

instructions setting out the standard of proof. Sand Hill Energy, Inc. v. Smith, 142 S.W.3d 153, 166-67 (Ky. 2004).

B. New Trial on Punitive Damages

In granting the Hospital's motion for a new trial, the trial court found that the ratio of the award of punitive damages to actual damages "is far in excess of the level to be sanctioned by the appellate courts." In its direct appeal, the Estate argues that the punitive damages award was not constitutionally excessive and, therefore, a new trial was not necessary. Since we have found that the punitive damages instruction was inadequate, a new trial would be necessary in any event. However, we will also address the trial court's decision finding that the award of punitive damages was excessive.

In State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524, 155 L. Ed. 2d 585 (2003), the United States Supreme Court suggested that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." In this case, the jury's award of punitive damages is 60 times the total amount of compensatory damages awarded to the Estate and 400 times the amount of compensatory damages apportioned against the Hospital. Based on this obvious disparity, the trial court concluded that



the award of punitive damages was clearly excessive.

However, the Court in Campbell rejected a bright-line ratio or mathematical formula to determine the reasonableness of a punitive damages

Page 30

award. Campbell, 538 U.S. at 424-25, 123 S. Ct. at 1524. Rather, the Court specified that in order to satisfy due process, punitive damage awards must be evaluated under three factors: "1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Campbell, 538 U.S. at 418, 123 S. Ct. at 1520. See also BMW of North America v. Gore, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). Appellate courts must review a trial court's application of these factors on a de novo basis. Campbell, 538 U.S. at 418, 123 S. Ct. at 1520.

Of the three factors, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Campbell, 538 U.S. at 419, 123 S. Ct. at 1521, quoting Gore, 517 U.S. at 575, 116 S. Ct. at 1599. Campbell instructs courts

to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Campbell, 538 U.S. at 419, 123 S. Ct. at 1521, citing Gore, 517 U.S. at 576-77, 116 S. Ct. at 1599-1600.

Page 31

As previously noted, the purpose of the EMTALA is to protect indigent and uninsured patients from being refused emergency medical treatment. Gray was a member of the vulnerable class which the Act seeks to protect. Furthermore, the harm caused to Gray was not economic. The evidence showed that he suffered extensive pain and ultimately died as a result of the Hospital's actions. The jury could reasonably find that the Hospital's conduct evidenced a reckless disregard for the health and safety of others. On the other hand, the Hospital's conduct over April 8-9, 1999, involved a discrete time period and there is no evidence it engaged in an ongoing course of conduct. While the Hospital's actions may have amounted to a deliberate indifference to Gray's rights, there is no showing that it was inspired by intentional malice or trickery. We also note that the jury apportioned 25% of the fault to Gray himself, thus diminishing the Hospital's overall responsibility for the injury. Under these circumstances, an award of punitive damages may have been appropriate, but the amount awarded in this case appears excessive.

The excessiveness of the award becomes more apparent upon turning to the second factor: the difference between the award of compensatory damages and punitive damages. Admittedly, a higher ratio may be constitutionally appropriate in cases involving a particularly egregious act which resulted in only a small amount of economic damages. Campbell, 538 U.S. at 425, 123 S. Ct. at 1524.

Page 32

While the amount of compensatory damages awarded in this case was comparatively small, it was more than a nominal amount. Consequently, the wide disparity between the awards of compensatory and punitive damages is a much more significant issue. Given the enormous disparity between the compensatory and punitive damages awards, we must conclude that the award of punitive damages was clearly excessive.



Our conclusion in this regard is further bolstered by the third factor under Campbell: a comparison of the punitive damages award with the civil penalties authorized or imposed in comparable cases. As the Estate notes, EMTALAprovides for a civil penalty of up to $50,000.00 for each violation. 42 U.S.C. § 1395dd(d)(1)(A). Even assuming that the Hospital's two discharges of Gray amounted to separate violations of EMTALA, the total punitive damages award is 15 times the maximum civil penalty of $100,000.00. This disparity might have been less significant if the award of compensatory damages were greater. See Steel Technologies v. Congleton, 234 S.W.3d 920, 927 (Ky. 2007). But when considered with the other Campbell factors, the punitive damages award cannot be upheld. Therefore, the trial court properly set aside the award and ordered a new trial.

The trial court expressed some frustration at the lack of a clear standard to determine an appropriate punitive damages award, and expressed the desire that the appellate courts provide some guidance on this issue. Since the trial

Page 33

court ordered a new trial on the issue of punitive damages, we are not at liberty to offer an advisory opinion on what amount of punitive damages would be constitutionally appropriate in this case. On remand, the trial court is not entirely without some guidance on this issue.

At the conclusion of the second trial, the jury was instructed under KRS 411.184 on most of the elements which it must find to award punitive damages. (We have separately found that the Hospital was entitled to an additional instruction on ratification.) However, the court did not instruct the jury on the guidelines to determine the amount of punitive damages. In Campbell and other cases, the United States Supreme Court has recognized that a punitive damages award based upon inadequate instructions may violate a party's due process rights. The jury in the present case was not

instructed as to any factors to consider in calculating the amount of damages. In the absence of any directive from the trial court to consider the culpability of the Hospital's conduct, the jury had no basis to calculate the amount of punitive damages. As a result, the punitive damages award was clearly arbitrary and excessive.

KRS 411.186(2) sets out the standards which a jury should consider in determining the amount of punitive damages. Pursuant to the statute, the jury is to consider the following factors:

(a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;

(b) The degree of the defendant's awareness of that likelihood;

Page 34

(c) The profitability of the misconduct to the defendant;

(d) The duration of the misconduct and any concealment of it by the defendant; and

(e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.

On remand, the Hospital may be entitled to a separate instruction setting out any of these factors which are applicable to this case. As thus instructed, both the jury and the trial court will have an adequate framework in which to assess the appropriate amount of punitive damages.

Page 35

CONCLUSION

Accordingly, the judgment of the Fayette Circuit Court is affirmed in all respects except for the award of punitive damages. While we also affirm the trial court's order granting a new trial on the issue of punitive damages, we also find that the Hospital was entitled to instructions



properly setting out the law as to ratification and the standard of proof. Therefore, we remand this matter for a new trial in accord with this opinion.

CLAYTON, JUDGE, CONCURS.

DIXON, JUDGE, CONCURS IN RESULT ONLY.

---------------

Notes:

1. The Hospital filed a motion to dismiss the Estate's appeal from the order granting a new trial on punitive damages, arguing that this issue was not appealable. This Court denied the Hospital's motion in an order entered on July 30, 2008.

---------------



Plaintiffs' Response to Memorial Hermann Motion for Summary Judgment

Exhibit N

Mohammad I. Siddiqi, M.D.
Guzman vs Memorial Herman                                    03/26/09

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


WENDY GUZMAN, INDIVIDUALLY  *
AND AS NEXT FRIEND OF T.G., *
A MINOR                     *
                            *
VS.                         *   CIVIL ACTION NO.
                            *    04:07-3973-CV
MEMORIAL HERMANN HOSPITAL   *   JURY DEMANDED
SYSTEM, D/B/A MEMORIAL      *
HERMANN SOUTHEAST HOSPITAL  *


**************************************************
        ORAL AND VIDEOTAPED DEPOSITION OF
            MOHAMMAD I. SIDDIQI, M.D.
               MARCH 26, 2009
               VOLUME 1 OF 1
**************************************************


          ORAL AND VIDEOTAPED DEPOSITION OF

MOHAMMAD I. SIDDIQI, M.D., produced as a witness at

the instance of the Plaintiffs, and duly sworn, was

taken in the above-styled and numbered cause on the

26th day of March, 2009, from 10:15 a.m. to 3:52 p.m.,

before Linda G. Boyko, CSR in and for the State of

Texas, reported by stenographic means, at The Henke

Law Firm, 3200 Southwest Freeway, 34th Floor, Houston,

Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Mohammad I. Siddiqi, M.D.

Guzman vs Memorial Herman                                    03/26/09

---

Page 42

1  that manner and sent to the lab?
2  A  You basically will have signs -- or a dipstick
3  portion, where it will have measurements for ketones,
4  for bilirubin, DPH of the urine.  And then there will
5  be a second part of the urinalysis, called a
6  microscopic part, where they'll actually look at the
7  specimen under the microscope and you may get
8  information regarding what kind of cells are present,
9  if any, in the urine, and if any bacteria are present
10  in the urine, if any.
11  Q  Is a urinalysis a test that is routinely used in
12  emergency departments to try to screen for urinary
13  tract infections?
14         MS. BRYAN:  Objection, form.
15  A  That is something that I personally in my personal
16  experience would use.
17  Q  (By Mr. Pfeifer)  You would?  I'm sorry.  I didn't
18  hear you.
19  A  I would use that urinalysis to help me aid in a
20  diagnosis of a urinary tract infection.
21  Q  And would you also use a urinalysis to attempt to
22  rule out a urinary tract infection as a source of an
23  infectious process in a patient?
24         MS. BRYAN:  Objection, form.
25         MR. BRENNIG:  Objection, vague,

---

Page 43

1  ambiguous, overly broad, calls for speculation.
2  A  It depends on the specific patient encounter.
3  Q  (By Mr. Pfeifer)  But in general, can urinalysis
4  tests be used in an emergency department to help rule
5  out a urinary tract infection in a patient?
6         MS. BRYAN:  Objection, form.
7  A  Not in every case.  Again, I would say it would be
8  safer or better to say in every specific encounter.
9  Q  (By Mr. Pfeifer)  I'm sorry.  I didn't understand
10  the last part of your answer.
11  A  It would be better to say that a urinalysis would
12  be used appropriately in every specific patient
13  encounter, not to overly or generally state that.
14  Q  All right.  You talked about the urinalysis test,
15  including two parts, the dipstick test and also the
16  microscopic test?
17  A  Yes.
18  Q  Okay?  If a microscopic test came back and showed
19  the evidence of bacteria within the urine, what would
20  that indicate to you as an emergency physician?
21         MS. BRYAN:  Objection, form.
22         MR. BRENNIG:  Objection, vague,
23  ambiguous, overly broad and calls for speculation.
24  A  Again, it would depend on the patient encounter.
25  Q  (By Mr. Pfeifer)  Well, if there's no bacteria in

---

Page 44

1  the urine, and that's all the information you have,
2  what does that suggest to you about whether or not
3  this patient has a urinary tract infection?
4         MS. BRYAN:  Form.
5         MR. BRENNIG:  Object, vague, ambiguous,
6  overly broad, calls for speculation.
7  Q  (By Mr. Pfeifer)  You can answer.
8  A  Again, it depends on the specific patient
9  encounter.
10  Q  Well, do you know what the test does?
11  A  The urinalysis test?
12  Q  Do you know why you order it?
13  A  You order it exactly to help you aid or come up
14  with a diagnosis.
15  Q  A diagnosis of what?
16  A  In some instances, a bladder infection or a
17  urinary tract infection.
18  Q  Okay.  And that's what it's routinely used to
19  screen for, is it not?
20         MS. BRYAN:  Objection, form.
21  A  Again, I think that's overgeneralized.
22  Q  (By Mr. Pfeifer)  What else would a urinalysis be
23  used for other than to screen for a bacterial
24  infection?
25         MS. BRYAN:  Objection, form.

---

Page 45

1  A  Again, it depends on the specific patient that you
2  would order it on.
3  Q  (By Mr. Pfeifer)  Well, forget patients.  Just
4  tell me what your knowledge of the test can screen
5  for, okay?
6         MS. BRYAN:  Objection, form.
7  Q  (By Mr. Pfeifer)  I'm not asking you about any
8  particular patient.  I'm asking you, as an emergency
9  physician, know the different kinds of conditions a
10  urinalysis can be used to test for.  Do you understand
11  that question?
12  A  Correct.
13  Q  Now, tell me the different kinds of conditions a
14  urinalysis test can be used to screen for.
15  A  Well, certainly it can be used to screen for
16  bladder infections.  But again, every patient that
17  comes in will have something specific or can have
18  something specific to their own diagnosis or their own
19  condition.
20         And so that's why I feel it's a
21  generalization to say that it's routinely used for
22  screening in or screening out.
23  Q  You have told us about bladder or urinary tract
24  infection.  I was asking you in the question what
25  other conditions, besides bladder and urinary tract

---

LINDA G. BOYKO, CSR    (713) 521-1117

Mohammad I. Siddiqi, M.D.

Guzman vs Memorial Herman                                          03/26/09

Page 54

1   A  Yes.
2   Q  After you had completed the history and physical,
3   you didn't know what was going on in his abdomen, did
4   you?
5   A  I did not.
6   Q  So you needed to rely on the lab results and the
7   results of the CT scan to tell you what was going on
8   in his abdomen, correct?
9            MS. BRYAN:  Objection, form.
10           MR. BRENNIG:  Objection, overly broad,
11  vague, ambiguous.
12  Q  (By Mr. Pfeifer)  For you to be able to reach
13  reasonable conclusions about whether it would be safe
14  to send this patient home without any treatment, you
15  needed in your mind on this particular patient to have
16  the results of the lab work that you ordered and also
17  the results of the CT scan that you had ordered,
18  correct?
19  A  No.
20           MS. BRYAN:  Objection, form.
21  A  No.
22  Q  (By Mr. Pfeifer)  No?
23  A  No.  I didn't need that.  Not on this patient.
24  Q  In this patient you didn't need to know that?  Why
25  not?

Page 55

1   A  I didn't need to know that -- your question, if I
2   am understanding you correctly, was I needed to know
3   that information before I could send him home.  I did
4   not need to know that information because I was not
5   going to send him home.
6            MR. PFEIFER:  All right.  This is a good
7   time to take a break.
8            THE VIDEOGRAPHER:  We're off the record.
9   It's 11:27.
10           (Recess from 11:27 a.m. to 12:18 p.m.)
11           THE VIDEOGRAPHER:  We're back on the
12  record.  It's 12:18.
13  Q  (By Mr. Pfeifer)  We have just had a break.  Ready
14  to proceed?
15  A  Yes.
16  Q  Would you go back to the order sheet that you made
17  for this patient on February the 13th of '06.  I am
18  now looking in the column where it says "Pertinent Lab
19  Values."  And I'm trying to find out how -- what your
20  practice was with regard to recording pertinent lab
21  values.
22  A  I'm not sure where you see "pertinent lab values."
23  Q  I'm looking at the order sheet right here and the
24  typewritten order --
25  A  Oh, okay.

Page 56

1   Q  -- "Pertinent Lab Values."
2   A  Yes.
3   Q  And in speaking to Dr. Haynes about this, we had
4   some discussion about his method of charting.
5            And what I'm trying to find out now is
6   what your practice was with regard to charting.  What
7   kind of data would you record within this box?
8            MS. BRYAN:  Form.
9   A  What I typically do is record all the data that's
10  available to me.
11  Q  (By Mr. Pfeifer)  And does that include data that
12  is normal as well as data that is abnormal?
13  A  Yes.
14  Q  And why is it that you try to record all the data
15  that is available to you?
16           MS. BRYAN:  Objection, form.
17  A  Typically I do that so that -- I don't like to
18  look at isolated bits and pieces of information.  I
19  like to look at everything so I can get a better
20  mental picture in my mind.  That works for me.
21  Q  (By Mr. Pfeifer)  Okay.  I want to go over some of
22  this data with you.  First of all, there appears to be
23  some handwritten notation on the right area of that
24  box under the word "WNL except."  First of all, what's
25  your understanding of "WNL?"

Page 57

1   A  I take that to mean abbreviations for within
2   normal limits.
3   Q  And then the word "except" means that basically
4   what would be recorded would be those items that are
5   not within normal limits?
6   A  Agreed, yes.
7   Q  But you've told me that really what you're
8   recording here is attempting to record all of the
9   laboratory material that you have available to you at
10  the time?
11  A  Correct.
12  Q  It looks like there is something that is written
13  large.  And then I can't make out what you have
14  written there.
15  A  I believe what I have written there is "large
16  right-sided infiltrates."
17  Q  And what is written underneath that?
18  A  Underneath that is a notation of "band count of
19  56" with an arrow going to "32."
20  Q  Okay.  I'm going to give you a red pen.  Would you
21  circle on the exhibit where you wrote "bands 56 going
22  to 32."
23  A  (witness complies.)
24  Q  Okay.  Have you done that?
25  A  Yes.

15 (Pages 54 to 57)

Mohammad I. Siddiqi, M.D.

Guzman vs Memorial Herman                                    03/26/09

---

Page 58

1   Q   Is it true that at the time that you made the
2   notation of "bands 56 to 32," that you had access to
3   the previous chart of the patient?
4   A   That wouldn't be true.
5   Q   Where did you get the 56?
6   A   More than likely, this is computerized data.  And
7   when I would have looked this up on the computer, I
8   would have been able to see the day prior values.
9   Q   Okay.  So sometime on the morning of the 13th, you
10  were able to look onto the hospital computer under the
11  lab values and you were able to determine what the lab
12  values had been for the day before?
13  A   Correct.  Some of them.  That's not to say I
14  looked at the entire lab picture, but that would mean
15  I had looked at some of them.
16  Q   And in this particular situation then, one of the
17  things that you looked at from the computer and
18  recorded in this box was the fact that the bands had
19  been 56 the previous day?
20  A   Yes.
21  Q   And the 32 was the measure of what?
22  A   That was the measure of the current band value at
23  my encounter with the patient.
24          (Whereupon, Siddiqi Exhibit Number 3 was
25  marked for identification.)

---

Page 59

1   Q   (By Mr. Pfeifer) I'm going to show you what's
2   been marked as Exhibit 3.  And ask you if the band
3   count of 32 is on that page.  And I will give you the
4   red pen, if you'll highlight that.
5   A   (witness complies.)
6   Q   Now, is the band count of 32 the result of the
7   differential that was done on the CBC of the morning
8   on February 13th of '06?
9   A   I would assume so.
10          (Whereupon, Siddiqi Exhibit Number 7 was
11  marked for identification.)
12  Q   (By Mr. Pfeifer) I'm going to show you also
13  Exhibit 7.  And see if the number 56 shows up in the
14  band count for that particular date.
15  A   Yes.  It shows up.
16  Q   Would you highlight that again with the red pen.
17  A   (witness complies.)
18  Q   Okay.  So would it be accurate to say then that
19  when you looked at the hospital computer on the
20  morning of the 13th of February, you were able to see
21  that the band count from the previous day had been 56
22  bands?
23  A   It would be fair to say that.
24  Q   In your mind, what did that indicate to you about
25  the condition of this patient the day before?

---

Page 60

1          MR. BRENNIG:  Objection.
2          MS. BRYAN:  Objection, form.
3          MR. BRENNIG:  Calls for speculation,
4   vague, ambiguous, overly broad.
5   A   I couldn't tell you anything specific exactly
6   because I didn't see the patient on that day.
7   Q   (By Mr. Pfeifer) Without seeing the patient,
8   generally speaking, did you know what bands were that
9   day?
10  A   Yes.  I knew what bands were.
11  Q   Did you know on the 13th that bands were a portion
12  of the white cell differential?
13  A   Yes.
14  Q   Did you know that a band count of 56 was an
15  abnormal band count?
16  A   On the day of the 13th, I did know a band count of
17  56 would be abnormal.
18  Q   Did you also know that a band count of 32 would be
19  abnormal?
20  A   Yes.
21  Q   And can you explain to me your understanding of
22  the physiologic process by which bands are released
23  into the bloodstream of a patient?
24  A   Basically the way I understand it is that this is
25  a nonspecific indication of inflammation in the body.

---

Page 61

1   Q   Where do bands come from?
2   A   They come from a group of the white blood cells,
3   known as neutrophils.  And those are immature forms of
4   neutrophils.
5   Q   And immature neutrophils, are neutrophils,
6   immature neutrophils produced in the bone marrow of
7   people?
8   A   Yes.
9   Q   And what is it that causes there to be an
10  elevation of bands in patients?
11  A   Usually an inflammatory condition.
12  Q   And an inflammatory condition can be -- what kinds
13  of things can be an inflammatory condition?
14  A   You have various things.  It could be marrow
15  processes themselves, like leukemias, inflammatory
16  conditions, pain, and certainly infections.
17  Q   Have you ever heard the term "left shift?"
18  A   Yes.
19  Q   What is your understanding of the definition of a
20  left shift?
21  A   My understanding of left shift is exactly that if
22  you would put bands and neutrophils on a timeline per
23  se, you would have a shift towards the left, meaning
24  there's more bands that are normally -- than are
25  normally seen.  So it would be a left shift.

---

16 (Pages 58 to 61)

Mohammad I. Siddiqi, M.D.
Guzman vs Memorial Herman                                          03/26/09

Page 62

1  Q  When you saw that the bands were at 56 percent,
2  did you ask yourself the question gee, I wonder why
3  the bands were 56 percent the day before?
4  A  It did raise interest.
5  Q  And did you do anything to try to determine from
6  the previous day's chart why the bands were 56
7  percent?
8  A  No.  I didn't look at the previous day's chart.
9  Q  Did you talk to anybody about the bands being 56
10 percent the previous day?
11 A  I may have mentioned that to the accepting
12 physician at Hermann Hospital.
13 Q  And that would be?
14 A  On the records it's noted that I had talked with
15 Dr. Smith.  I have also -- I also talked with Dr.
16 Erickson, who I'm assuming was probably a resident.
17 Q  In your conversation with Dr. Smith or Dr.
18 Erickson, the resident, can you summarize for me the
19 discussion of what you had about the bands?
20 A  I can't give you verbatim a discussion, but it
21 would have typically been somewhat to the effect that
22 this is a child that I have here today, who has a low
23 blood pressure, is not breathing well, will require
24 hospitalization and further care in the hospital.
25 Q  But you do recall specifically discussing the band

Page 63

1  count with the people who were going to accept the
2  care of the patient at Hermann?
3         MR. BRENNIG:  Objection.  I believe that
4  misstates his prior testimony.
5  A  Yes.  I can't specifically tell you if I talked
6  about the band count.  It's certainly possible that I
7  would have, if I had it.  But see, I'm not sure if I
8  had this information when I talked to the accepting
9  physician.  So I'm not sure if this information was
10 found out later or if it was found out prior to him
11 calling.  But if it was, I imagine I may have told him
12 that.
13 Q  (By Mr. Pfeifer)  Would you agree with me that
14 very often an elevated band count is associated with a
15 bacterial infection?
16        MS. BRYAN:  Objection, form.
17        MR. BRENNIG:  Objection, overbroad.
18 A  Again, I think it would depend on specific
19 encounters.
20 Q  (By Mr. Pfeifer)  Would a band count of 56 bands
21 be a left shift?
22        MS. BRYAN:  Form.
23 A  Yes.  You could interpret it as that way.
24 Q  (By Mr. Pfeifer)  Okay.  Did you ever speak to Dr.
25 Haynes about the fact that his patient had a 56

Page 64

1  percent band count and the patient was discharged from
2  the hospital emergency department on the 12th?
3  A  I may have spoken to him.  But again, I can't
4  recall specifics of a conversation.  I certainly -- I
5  think we were all aware that he was transferred to the
6  accepting hospital.  But again, I can't specifically
7  state if I told him what the band count was.
8  Q  In general, not speaking about this patient
9  specifically, but if someone were to tell you in
10 general I have a sick patient, and the patient has a
11 left shift, would you consider the possibility that
12 the patient might have a bacterial infection?
13        MS. BRYAN:  Form.
14 A  Bacterial infection is a consideration.
15 Q  (By Mr. Pfeifer)  And I guess how high up in the
16 checklist of considerations would it be for there to
17 be a bacterial infection, if a band count is 56?
18        MR. BRENNIG:  Objection, vague,
19 ambiguous, overly broad.
20        MS. BRYAN:  Form.
21        MR. BRENNIG:  Calls for speculation.
22 A  Again, I have to have a patient in front of me to
23 make that kind of remark.
24 Q  (By Mr. Pfeifer)  Then let's talk, just generally
25 speaking, about the band part of a white cell

Page 65

1  differential.  Can you tell me what kinds of
2  conditions can cause a band elevation to 56?
3        MS. BRYAN:  Form.
4  A  I have personally not encountered those specific
5  numbers.  But as talked about earlier, inflammatory
6  processes, pain, disease processes, such as cancers,
7  and infection, you would think of those things.
8  Q  (By Mr. Pfeifer)  Can you give me any literature
9  that you know of that would suggest that pain alone
10 can cause a band count to increase?
11 A  I haven't read anything specific that I can direct
12 you to, but in my training and education, that is a
13 source.
14 Q  In any discussions that you've ever had with Dr.
15 Haynes, have you ever asked him, Dr. Haynes, were you
16 aware that the patient had 56 percent bands when you
17 sent him home?
18 A  I think discussions that I've had with him have
19 been after the fact.  And my assumption is by the time
20 I had had discussions with him that he was already
21 aware of it.
22 Q  All right.
23 A  Because I had discussions with him maybe a week or
24 maybe two weeks later after this presentation.
25 Q  Let me see if I understand.  Are you saying that

                                      17 (Pages 62 to 65)

LINDA G. BOYKO, CSR     (713) 521-1117

Mohammad I. Siddiqi, M.D.

Guzman vs Memorial Herman                                    03/26/09

Page 78

1   A  For T.G. that day, I believe on my visit he
2   complained of -- well, without even going that far, he
3   had an oxygen saturation of 88 percent on room air,
4   which is low.  So that in and of itself would warrant
5   a chest x-ray.
6   Q  All right.  Do the CBC's assist in the diagnosis
7   of any of these four conditions that you included
8   within your differential diagnosis?
9   A  They can assist.
10  Q  For which of the conditions would the CBC assist?
11  A  Mainly for infectious conditions or inflammatory
12  conditions.
13  Q  And so would it be true that the CBC would assist
14  with regard to the diagnosis of bladder infection,
15  kidney infection, intra-abdominal inflammatory
16  condition or pneumonia?
17  A  It would be of assistance, but very low or low
18  assistance.  I would put it -- I'm sorry, not to
19  interrupt you, I would put it more in the sense of it
20  would help confirm or not confirm what you already
21  thought.
22  Q  Would the presence or absence of a left shift help
23  you in ruling in or ruling out any of these conditions
24  that you had in your differential diagnosis?
25  A  On the day of the 13th, it would be helpful.

Page 79

1   Q  And for which of the conditions would it be
2   helpful for diagnosing?
3   A  Basically any infectious condition it would be
4   helpful on this day.
5   Q  Now, again, looking at your order sheet, it looks
6   to me like you also ordered a blood culture?
7   A  Yes.
8   Q  And when was it that you ordered the blood
9   culture?
10  A  I think I would have to defer to the nursing notes
11  here.  And it looks like, based on their nursing
12  notes, it looks at 9:49 is when it was entered into
13  the computer.  I may have ordered it a little prior to
14  that, but by the time it entered into the computer, it
15  was 9:49.
16  Q  What was it that caused you to order the blood
17  culture?
18  A  It may have been a combination of things.  It may
19  have been now armed with the band results on that day.
20  And it may have been after looking at his chest x-ray
21  also.  And blood cultures may have been ordered at
22  that time.
23  Q  What are you looking for when you order a blood
24  culture?
25  A  I'm really not looking for anything, because when

Page 80

1   I order it, I know I won't get the results back on
2   that day.
3   Q  Then what are you trying to achieve by ordering a
4   blood culture at that time?
5   A  Mainly information for subsequent care for the
6   patient so that the subsequent doctors will have
7   information.
8   Q  When you order a blood culture, are you basically
9   saying I think there is a possibility that the patient
10  has a bacterial infection in the blood, I think that
11  it is possible that the patient may need to have
12  antibiotics administered, and I want to allow further
13  care providers down the line to be able to determine
14  the particular bacteria that is infecting this patient
15  and to be able to prescribe antibiotics that cover
16  that bacteria?
17  A  In this case, exactly.  That would be correct.
18  Q  So do you believe that it is probable that you had
19  the band count back by the time you made the decision
20  to order the blood culture on T.G. on February 13,
21  '06?
22           MR. BRENNIG:  Objection, speculation.
23  A  Yes.  Again, I think that would be speculation.
24  Because we have more than one test that would prompt
25  me to order a blood culture.  And that being the other

Page 81

1   testing, the chest x-ray.  So again, it would be
2   speculation, if it was the band count solely or
3   only -- or if it was even the band count at all.
4   Q  (By Mr. Pfeifer)  If you have a chest x-ray that's
5   suggestive of pneumonia, do you know as a physician
6   that in the event that there is pneumonia that that
7   infection can be spread through the bloodstream of the
8   patient?
9   A  It can be.
10  Q  If they have a bacterial pneumonia.
11  A  Correct.
12  Q  And so once you know that there is a probability
13  of pneumonia, you want to make sure that if it is
14  bacterial in origin, you are able to get good
15  antibiotic coverage on it later down the line by other
16  health care providers?
17  A  Exactly.  In this case, exactly.
18  Q  So we know that at about 9:39 or 9:49 --
19  A  9:49 is what is ordered.  Could have been slightly
20  before that.
21  Q  If the draw sheet for the blood, for the blood
22  culture shows 9:37 as the time that the blood was
23  drawn, would you think that that fits into the overall
24  time frame here?
25  A  Certainly.  And if the blood was drawn at 9:37,

21 (Pages 78 to 81)

Mohammad I. Siddiqi, M.D.

Guzman vs Memorial Herman                                     03/26/09

Page 82

1   that means the order would have been written prior to
2   9:37.
3   Q  Do you know what "SIRS" is?
4   A  I have a generalized idea.  I think, if I recall
5   correctly, it's systemic inflammatory response
6   syndrome.
7   Q  Do you know what is included within SIRS?
8           MR. BRENNIG:  Objection, vague.
9   Q  (By Mr. Pfeifer)  In order to make a diagnosis of
10  SIRS, what would one need?
11  A  I'm not sure if SIRS is actually a diagnosis.
12  Q  Then to conclude that a patient has SIRS at a
13  particular point in time, what would one need to know?
14  A  My understanding of SIRS is that it's basically
15  criteria that kind of helps you determine how severe
16  an infection is.
17  Q  At any point in time on the 13th, did you try to
18  assess whether or not T.G. had SIRS?
19  A  I don't think I made a formal mental note of that.
20  And I would only do that if there was a question in my
21  mind, if there was an infection going on.
22          And in this setting, I think it was not
23  really anything I would use that was going to help me
24  with my treatment of T.G.
25  Q  When you decided to do the blood culture on T.G.,

Page 83

1   did you believe that you had a sufficiently high index
2   of suspicion of a bacterial infection that the blood
3   culture was indicated?
4   A  I believe the blood culture was indicated because
5   of a positive chest x-ray finding.  And that, coupled
6   with his low oxygen saturation, was enough for me.
7   Q  Did you ever consider, during the time you were
8   taking care of T.G. on the 13th of February, that T.G.
9   might have sepsis?
10  A  I think that was, during his stay, at some point
11  during his stay that was a consideration.
12  Q  Are you able to tell me at what point during the
13  stay that it became a consideration?
14  A  I think it -- let's see --
15  Q  And feel free to look at either your notes or the
16  nurse's notes or whatever else you may have reviewed.
17  A  Okay.  I think these notes are good, but I think
18  there is --
19  Q  Do you want to see the charts you reviewed?
20  A  Not the chart.  However, I think that there was a
21  nice summary of nursing notes --
22          MR. BRENNIG:  Life Flight?  I can get a
23  copy, if you want.  It's the Life Flight stuff.  These
24  are my originals.  You're talking about -- I think
25  this is what you used in McCrumb's deposition.

Page 84

1   Remember that typed up -- it was an exhibit to
2   McCrumb's deposition.  Let me get the notes from her
3   deposition.  Give me one second.  It was an exhibit
4   that you had, Phil.
5           THE VIDEOGRAPHER:  We're off the record.
6   It's 1:02.
7           (Recess from 1:02 p.m. to 1:12 p.m.)
8           (Whereupon, Siddiqi Exhibit Number 8 was
9   marked for identification.)
10          THE VIDEOGRAPHER:  We're back on the
11  record.  It's 1:12.
12  Q  (By Mr. Pfeifer)  Now, we've just had marked an
13  exhibit -- what number?
14  A  Number 8.
15  Q  And you reviewed that prior to the deposition?
16  A  Correct.
17  Q  And by reference to that particular document, is
18  there a point at which you believe that you considered
19  sepsis as part of the diagnosis for this child?
20  A  I think that point in time would have been
21  somewhere around 12:03 of the Document 0062 under
22  "vital signs."
23  Q  And what is it about the vital signs at 12:03 that
24  caused you to begin to suspect sepsis?
25  A  His blood pressure at that time, the systolic

Page 85

1   dropped to 85.
2   Q  Is that it?
3   A  That's primarily it.  And then also, if you look
4   under the column of respirations, his respiratory rate
5   increased at that time also.
6   Q  Okay.  Prior to 12:03, do you see anything in the
7   vital signs that suggests to you that he was beginning
8   to experience such a systemic response to his
9   infection that it would be characterized as sepsis?
10  A  Well, prior to that, if you notice under the pulse
11  column, he had a fast heart rate.  And initially there
12  were other conditions that could have caused his
13  tachycardia or his fast heart rate.  And that mainly
14  was his symptoms of vomiting and nausea.  And so
15  certainly dehydration was a pertinent thought that was
16  entertained.
17  Q  So what makes the difference to you really is the
18  blood pressure reading and the respiratory rate at
19  12:03?
20  A  Correct.
21  Q  And it's that point in time that you would begin
22  to consider sepsis as a part of the diagnosis on this
23  patient?
24  A  I would say that would be the general time frame,
25  yes.

22  (Pages 82 to 85)

Mohammad I. Siddiqi, M.D.

Guzman vs Memorial Herman                                      03/26/09

---

Page 86

1  Q  At the time you did the blood culture, did you
2  have a differential diagnosis?
3  A  I think at the time of the blood culture I had a
4  definite diagnosis.
5  Q  And what was that?
6  A  Pneumonia.
7  Q  So that would have been somewhere between 9:37 and
8  9:49, depending upon the particular document that
9  we're looking at, whether it's the lab report of when
10  the blood was drawn for the blood culture, or other
11  notes about when the order was actually entered in the
12  chart.  But somewhere around 9:30 to 9:45 is the time
13  when you diagnosed that the patient had pneumonia.
14  Fair enough?
15  A  Fair enough.
16  Q  Now, given that, did you consider at 9:00 -- at
17  that time, 9:30 to 9:45, with a diagnosis of
18  pneumonia, that T.G. had a serious condition?
19  A  Yes.
20  Q  And that his condition was such that if you didn't
21  treat him, that that condition could deteriorate, and
22  he could suffer permanent bodily injury or harm?
23         MS. BRYAN:  Form.
24  A  He was being treated as soon as he was seen by me
25  in the emergency room.

---

Page 87

1  Q  (By Mr. Pfeifer)  Well, I understand.  But did you
2  consider at that point in time -- do you know what I
3  mean by "emergency medical condition?"
4  A  Yes.
5  Q  Did you consider at 9:30 that he had an emergency
6  medical condition?
7         MR. BRENNIG:  Objection.  Just a second.
8  That may call for speculation.  I don't think the
9  proper predicate has been laid, but go ahead.
10  Q  (By Mr. Pfeifer)  Go ahead.
11  A  I think his potential for an emergency medicine
12  condition was considered.  And that's why treatment
13  was implemented as soon as I saw him.
14  Q  So did you think that he had an emergency medical
15  condition from the very get-go, when you first saw
16  him, in your initial history and physical examination
17  and your first encounter with the patient?
18         MR. BRENNIG:  Objection.  Vague and
19  ambiguous.
20         MS. BRYAN:  Form.
21  A  You have to give me a bit more specifics and tell
22  me what do you mean by that.
23  Q  (By Mr. Pfeifer)  What I mean by that is that did
24  you believe that his condition from the time you first
25  saw him was sufficiently bad that he could

---

Page 88

1  substantially deteriorate and suffer permanent injury
2  or death, if he weren't treated?
3         MS. BRYAN:  Form.
4  A  Well, he was treated.  He was treated.
5  Q  (By Mr. Pfeifer)  Well, I understand that, but
6  what I'm trying --
7         MR. BRENNIG:  Phil, let him finish his
8  answer, please, if you don't mind.
9  Q  (By Mr. Pfeifer)  Go ahead, sure.
10  A  He was treated right from the very start.  Now, in
11  terms of when I became more concerned about his
12  condition, that would have been around noontime.
13  Q  When did you first order antibiotics?
14  A  The time here is not documented.  But looking at
15  this chart, it looks like Rocephin was given at 11:35.
16  That would be 00065.
17         MR. BRENNIG:  Page 65.
18  Q  (By Mr. Pfeifer)  Was it the doctors at Hermann
19  that told you that the patient should be given
20  antibiotics?
21  A  No.
22  Q  Was it your idea to give the antibiotics?
23  A  Yes.
24  Q  Are you the person who decided to order the
25  Rocephin?

---

Page 89

1  A  Yes.
2  Q  If the order for the Rocephin was made after 11:00
3  o'clock in the morning, can you give me an explanation
4  of why there would be that delay?
5  A  First of all, I'm not sure if that's a correct
6  assumption.  Again, it's not documented when the order
7  was written.  As far as I can see it's just documented
8  when it was given.
9         And typically, in the hospital setting,
10  the ER setting, depending on how busy the nurse is and
11  how busy the emergency room is, it's typically an
12  average of an hour before the order is written, it's
13  actually seen by the nurse, the nurse actually goes to
14  the fixes, mixes it up, puts the appropriate tubing on
15  and hangs it on the patient.  For all that to expire
16  usually is an hour.
17  Q  Can it be done faster?
18         MS. BRYAN:  Objection, form.
19  A  Again, you would have to take every specific
20  encounter.  There's a lot of variables.
21  Q  (By Mr. Pfeifer)  Did he already have an IV going?
22  A  I believe so.  He would have had an IV going
23  already.
24  Q  When was it that you decided that you wanted to
25  order a transfer on the patient?

---

LINDA G. BOYKO, CSR      (713) 521-1117