Plaintiffs' Response to Memorial Hermann Motion for Summary
Judgment

Exhibit O

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **WENDY GUZMAN, INDIVIDUALLY** | § | |
| **AND AS NEXT FRIEND OF TRISTAN** | § | |
| **GUZMAN, A MINOR** | § | |
| | § | |
| **v.** | § | **C.A. No. 07-03973** |
| | § | |
| **MEMORIAL HERMANN HOSPITAL** | § | |
| **SYSTEM, D/B/A MEMORIAL** | § | |
| **HERMANN SOUTHEAST HOSPITAL** | § | |

### MEMORIAL HERMANN HOSPITAL SYSTEM d/b/a MEMORIAL HERMANN SOUTHEAST HOSPITAL'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' REQUEST FOR PRODUCTION

TO:   Plaintiffs, Wendy Guzman, individually and as next friend of Tristan Guzman, a minor, by and through their attorney of record, Phillip Pfeifer, Phillip A. Pfeifer, P.C., 5216 Jackson Street, Houston, TX 77004.

Defendant Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital ("Memorial Hermann"), pursuant Rule 34 of the Federal Rules of Civil Procedure, serves its Responses and Objections to Plaintiffs' Request for Production.

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

By: _____
Craig Smyser
State Bar No. 18777575
Christina A. Bryan
State Bar No. 03264000
2300 Bank of America Center
700 Louisiana Street
Houston, Texas 77002
Telephone:   713/221-2300
Facsimile:   713/221-2320

ATTORNEYS FOR DEFENDANT
MEMORIAL HERMANN HOSPITAL SYSTEM
d/b/a MEMORIAL HERMANN SOUTHEAST
HOSPITAL

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been mailed postage prepaid, certified mail, return receipt requested to the attorneys of record in the above referenced matter, on this 23rd day of July, 2008.

Christina A. Bryan

## RESPONSES AND OBJECTIONS TO REQUEST FOR PRODUCTION

1. Please produce the original chart of Memorial Hermann Southeast Hospital for Tristan Guzman for his emergency department visits to Memorial Hermann Southeast Hospital for February 12 and February 13, 2006. Please produce this for inspection and copying, as necessary.

**RESPONSE:** It is not the practice of Memorial Hermann Southeast Hospital to allow the whole or any part of the patient's original medical chart be removed from Memorial Hermann Southeast Hospital. However, you may view the original medical chart at the hospital during a mutually agreeable date and time to be arranged through counsel for this Defendant.

2. Please produce the original chart of Memorial Hermann Southeast Hospital for Tristan Guzman for his hospitalization at Memorial Hermann Southeast Hospital for February 13, 2006 until discharge. Please produce this for inspection and copying, as necessary.

**RESPONSE:** It is not the practice of Memorial Hermann Southeast Hospital to allow the whole or any part of the patient's original medical chart be removed from Memorial Hermann Southeast Hospital. However, you may view the original medical chart at the hospital during a mutually agreeable date and time to be arranged through counsel for this Defendant.

3. Please produce a true and correct copy of the contract between Memorial Southeast Emergency Physicians, Inc. and Memorial Hermann Hospital System that was in force and effect during February 2006.

**RESPONSE:** Defendant objects because this request is not limited to a relevant subject matter and seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence.

    Subject to and without waiving these objections, see contract attached and bates numbered MHSE-TG-0036 through 0055.

4. Please produce a true and correct copy of the contract between Memorial Southwest Emergency Physicians, Inc. and Memorial Hermann Hospital System that was in force and effect during February 2006.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope, harassing, unduly burdensome, and is tantamount to a "fishing expedition" prohibited under applicable case law. Defendant further objects because this request is not limited to a relevant subject matter and seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, this request is improper to the extent it seeks discovery from a non-party.

Subject to and without waiving these objections, see contract attached and bates numbered MHSE-TG-0056 through 0075.

5.    Please produce a true and correct copy of the contract between Memorial Northwest Emergency Physicians, Inc. and Memorial Hermann Hospital System that was in force and effect during February 2006.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope, harassing, unduly burdensome, and is tantamount to a "fishing expedition" prohibited under applicable case law. Defendant further objects because this request is not limited to a relevant subject matter and seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, this request is improper to the extent it seeks discovery from a non-party.

Subject to and without waiving these objections, see contract attached and bates numbered MHSE-TG-0076 through 0095.

6.    Please produce a true and correct copy of any contract between Memorial Hermann Hospital System and Memorial City Emergency Physicians, L.L.P., which was in force and effect on or about February 12, 2006.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope, harassing, unduly burdensome, and is tantamount to a "fishing expedition" prohibited under applicable case law. Defendant further objects because this request is not limited to a relevant subject matter and seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, this request is improper to the extent it seeks discovery from a non-party.

Subject to and without waiving these objections, see contract attached and bates numbered MHSE-TG-0096 through 0115.

7.    Please produce a true and correct copy of any policies, procedures, and/or protocols concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February, 2006.

**RESPONSE:** None.

8.    Please produce a true and correct copy of any policies, procedures, and/or protocols concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February, 2006 who were complaining of nausea.

**RESPONSE:** None.

9.    Please produce a true and correct copy of any policies, procedures, and/or protocols

concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February, 2006 who were complaining of cough.

**RESPONSE:** None.

10.     Please produce a true and correct copy of any policies, procedures, and/or protocols concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February, 2006 who were complaining of fever.

**RESPONSE:** None.

11.     Please produce a true and correct copy of any policies, procedures, and/or protocols concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February, 2006 who were complaining of nausea, fever and cough.

**RESPONSE:** None.

12.     Please produce a copy of any documents that would identify the meaning of the letters GLM on the printout of lab results for Tristan Guzman for February 12, 2006.

**RESPONSE:** See document previously produced and bates numbered MHSE-TG-0033, which indicates that in order to print on a patient's chart footnotes must be entered using the general lab or microbiology entry functions.

13.     Please produce a copy of any faxes, emails or other form of communication by which the laboratory results of Tristan Guzman for blood drawn on February 12, 2006 at Memorial Hermann Southeast Hospital were sent by the laboratory at Memorial Hermann Southeast Hospital to the emergency department at Memorial Hermann Southeast Hospital.

**RESPONSE:** None. The lab results were sent by computer interface.

14.     Please produce a copy of any documents that would show the meaning of the notation "8.0*L(c)" for Lymphocytes on the copy of the computer screen printout of the medical record of Tristan Guzman which was printed when the computerized medical record of Tristan Guzman was accessed by Belinda Metts on September 27, 2006.

**RESPONSE:** See documents previously produced and bates numbered MHSE-TG-0009 though 0014.

15.     Please produce a copy of any documents that would show the critical values for lymphocyte tests at Memorial Hermann Southeast Hospital in February 2006.

**RESPONSE:** None. There are no critical values for lymphocyte tests at Memorial Hermann Southeast Hospital.

16.     Please produce a copy of any documents that would show the critical values for results of the white blood cell differential tests at Memorial Hermann Southeast Hospital in February 2006.

**RESPONSE:** None. There are no critical values for white blood cell differential tests at Memorial Hermann Southeast Hospital.

17.     Please produce a copy of any documents that would show the policies and procedures of the emergency department at Memorial Hermann Southeast Hospital in February 2006, concerning discharging patients before all tests that have been ordered for a patient are completed.

**RESPONSE:** See attached policy and procedure bates numbered MHSE-TG-0116 through 0118.

18.     Please produce a copy of any documents that would show the policies and procedures of the emergency department at Memorial Hermann Southeast Hospital in February 2006 concerning reviewing patient files before a patient is discharged to determine if all ordered tests have been completed for the patient.

**RESPONSE:** None known.

19.     Please produce for inspection a computer at the Memorial Hermann Southeast Hospital that would have on it any software packages from Emergency Consultants, Inc. that were on the computer in the emergency department at Memorial Hermann Southeast Hospital on February 12, 2006 at the time Tristan Guzman was present in the emergency room.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope, harassing, unduly burdensome, and is tantamount to a "fishing expedition" prohibited under applicable case law. Defendant further objects because this request seeks documents and/or equipment that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Defendant objects because this request seeks proprietary information and is potentially invasive of HIPAA as this request pertains to patient information maintained on any such computer.

         Subject to and without waiving these objections, none. The computers no longer contain ECI software.

20.     Please produce a copy of any correspondence between Emergency Consultants, Inc. and Memorial Hermann Hospital System concerning emergency department physician staffing at Memorial Hermann Hospital System between January 1, 2002 and February 12, 2006.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope and time, harassing, unduly burdensome, and is tantamount to a "fishing expedition" prohibited under applicable case law. Defendant further objects because this request is not limited to a relevant subject matter and therefore seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, as worded, this request is improper to the

6

extent it seeks discovery from non-parties.

Subject to and without waiving these objections, none.

21.     Please produce a copy of any documents that would show whether or not the hospital
        computer system at Memorial Hermann Southeast Hospital was functioning between 8:30
        a.m. and 11:00 a.m. on February 12, 2006 in such a manner that the manual white blood
        cell differential test that was done on Tristan Guzman would have been available for
        viewing by Dr. Philip Haynes during those times had he attempted to view such results on
        the hospital computers in the emergency department.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope and time,
            harassing, unduly burdensome, and is tantamount to a "fishing expedition"
            prohibited under applicable case law. Defendant further objects because this
            request is not limited to a relevant subject matter and therefore seeks documents
            that are not relevant and not reasonably calculated to lead to the discovery of
            admissible evidence.

            Subject to and without waiving these objections, see computer screen printouts
            attached and bates numbered MHSE-TG-0128 through 0132.

22.     Please produce for inspection a computer at Memorial Hermann Hospital System that
        would permit access on the computer to and ability to print from the entire electronic
        medical records of Tristan Guzman for his emergency department visits of February 12
        and February 13, 2006.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope, harassing,
            unduly burdensome, and is tantamount to a "fishing expedition" prohibited under
            applicable case law. Defendant further objects because this request seeks
            documents and/or equipment that are not relevant and not reasonably calculated to
            lead to the discovery of admissible evidence.

            Subject to and without waiving these objections, there is no computer outside
            Memorial Hermann Hospital System's network on which the computerized
            medical record could be viewed and printed out. Computerized records have been
            previously produced to Plaintiffs.

23.     Please produce any and all correspondence between Emergency Consultants, Inc. and
        Memorial Hermann Hospital System concerning services to be performed by Emergency
        Consultants, Inc. at any of the Memorial System Hospitals for the period between January
        1, 2002 and February 13, 2006.

**RESPONSE:** Defendant objects because this request is vague, overly broad in scope and time,
            harassing, unduly burdensome, and is tantamount to a "fishing expedition"
            prohibited under applicable case law. Defendant further objects because this
            request is not limited to a relevant subject matter and therefore seeks documents
            that are not relevant and not reasonably calculated to lead to the discovery of
            admissible evidence. Furthermore, as worded, this request is improper to the

7

extent it seeks discovery from non-parties.

Subject to and without waiving these objections, none.

24.    Please produce all policies and procedures concerning nursing personnel duties or
       responsibilities for nurses working in the emergency department at Memorial Hermann
       Southeast Hospital, which were in force and effect in February 2006.

**RESPONSE:** See attached policies and procedures bates numbered MHSE-TG-0119 through
       0127.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **WENDY GUZMAN, INDIVIDUALLY** | § | |
| **AND AS NEXT FRIEND OF TRISTAN** | § | |
| **GUZMAN, A MINOR** | § | |
| | § | |
| **v.** | § | **C.A. No. 07-03973** |
| | § | |
| **MEMORIAL HERMANN HOSPITAL** | § | |
| **SYSTEM, D/B/A MEMORIAL** | § | |
| **HERMANN SOUTHEAST HOSPITAL** | § | |

## MEMORIAL HERMANN HOSPITAL SYSTEM d/b/a MEMORIAL HERMANN SOUTHEAST HOSPITAL'S ANSWERS AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

TO:    Plaintiffs, Wendy Guzman, individually and as next friend of Tristan Guzman, a minor, by and through their attorney of record, Phillip Pfeifer, Phillip A. Pfeifer, P.C., 5216 Jackson Street, Houston, TX 77004.

Defendant Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital ("Memorial Hermann"), pursuant to Rule 33 of the Federal Rules of Civil Procedure, serves its Answers and Objections to Plaintiffs' First Set of Interrogatories.

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

By: _____

Craig Smyser
State Bar No. 18777575
Christina A. Bryan
State Bar No. 03264000
2300 Bank of America Center
700 Louisiana Street
Houston, Texas 77002
Telephone:     713/221-2300
Facsimile:     713/221-2320

ATTORNEYS FOR DEFENDANT
MEMORIAL HERMANN HOSPITAL SYSTEM
d/b/a MEMORIAL HERMANN SOUTHEAST
HOSPITAL

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been mailed postage prepaid, certified mail, return receipt requested to the attorneys of record in the above referenced matter, on this 23rd day of July, 2008.

Christina A. Bryan

## ANSWERS AND OBJECTIONS TO FIRST SET OF INTERROGATORIES

1. State the name, current address, telephone number and job description of each agent servant or employee of Memorial Hermann Hospital System who has knowledge of whether or not the hospital computer system at Memorial Hermann Southeast Hospital was functioning in such a manner that the results of the white blood cell manual differential test for Tristan Guzman would have been available and visible to physicians in the emergency department at Memorial Hermann Southeast Hospital between 8:30 a.m. and 10:30 a.m. on February 12, 2006.

**ANSWER:**   Defendant objects because this interrogatory is overly broad. Defendant further objects because this interrogatory seeks private and confidential information to the extent it seeks the residential addresses and telephone numbers of hospital employees.

> Subject to and without waiving these objections, Memorial Hermann does not know of an individual with personal knowledge and memory of whether the computer system was functioning between 8:30 and 10:30 a.m. on February 12, 2006. See documents produced with Defendant's response to Plaintiffs' Request for Production No. 21, which show that the computer system was functioning between 8:30 and 10:30 a.m. on February 12, 2006.

2. State the name, current address, telephone number and job description of the person who performed the manual white blood cell differential test on blood drawn from Tristan Guzman at Memorial Hermann Hospital System on February 12, 2006.

**ANSWER:**   Mina Suzette Dalmeida. Ms. Dalmeida has been deposed and gave her address in her deposition (see page 4). In the interest of her privacy, Defendant refers Plaintiffs to her deposition.

3. State the name, current address, telephone number and job description of each person who was working as a lab technician, lab technologist, supervisor or physician in the medical laboratory at Memorial Hermann Southeast Hospital on February 12, between the hours of 7:00 a.m. and 3:00 p.m.

**ANSWER:**   Defendant objects because this interrogatory is overly broad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects because this interrogatory seeks private and confidential information to the extent it seeks the residential addresses and telephone numbers of hospital employees.

4. State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning compliance with the requirements of EMTALA at Memorial Hermann Southeast Hospital.

**ANSWER:**   Defendant objects because this interrogatory is overly broad scope, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks

information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. It may be impossible for Defendant to determine every person who reviewed, was consulted or commented on a particular policy and procedure.

Subject to and without waiving these objections, Defendant will produce policies, if any, most of which include the signature of the person approving the policy and procedure.

5.  State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning the nature and extent of medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February 2006.

**ANSWER:**  Defendant objects because this interrogatory is overly broad scope, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. It may be impossible for Defendant to determine every person who reviewed, was consulted or commented on a particular policy and procedure.

Subject to and without waiving these objections, none known.

6.  State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February 2006 complaining of nausea and vomiting.

**ANSWER:**  Defendant objects because this interrogatory is overly broad scope, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. It may be impossible for Defendant to determine every person who reviewed, was consulted or commented on a particular policy and procedure.

Subject to and without waiving these objections, none known.

7.  State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February 2006 complaining of cough.

**ANSWER:** Defendant objects because this interrogatory is overly broad scope, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. It may be impossible for Defendant to determine every person who reviewed, was consulted or commented on a particular policy and procedure.

Subject to and without waiving these objections, none known.

8. State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning the medical screening examinations to be performed on pediatric patients coming to the emergency department at Memorial Hermann Southeast Hospital in February 2006 complaining of fever.

**ANSWER:** Defendant objects because this interrogatory is overly broad scope, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. It may be impossible for Defendant to determine every person who reviewed, was consulted or commented on a particular policy and procedure.

Subject to and without waiving these objections, none known.

9. State the name, current address, telephone number and job description of each agent, servant or employee of Memorial Hermann Hospital System who has knowledge of the policies, procedures and/or protocols for the responsibilities of emergency room nurses in February 2006 at Memorial Hermann Southeast Hospital.

**ANSWER:** Defendant objects because this interrogatory is vague, overly broad, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

10. State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning the reporting of laboratory values from the medical laboratory to the physicians who order lab tests at Memorial Hermann Southeast Hospital in February 2006.

**ANSWER:** Defendant objects because this interrogatory is overly broad and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, see policies and procedures previously produced and bates numbered MHSE-TG-0028 through 0035. The

policies and procedures indicate that they were reviewed/created/revised by the Quality Management Team and approved by Jim Faucett.

11.     State the name, current address, telephone number and job description of each agent, servant or employee of Memorial Hermann Hospital System who has knowledge of the policies, procedures and/or protocols concerning the reporting of laboratory values from the medical laboratory to the emergency room at Memorial Hermann Southeast Hospital in February 2006.

**ANSWER:**     Defendant objects because this interrogatory is overly broad, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

12.     State the name, current address, telephone number and job description of each person who participated on behalf of Memorial Hermann Hospital System in negotiating the contract between Memorial Hermann Hospital System and any of the following entities for providing physician emergency room staffing at various Memorial Hermann hospitals:

   a.     Memorial Southeast Emergency Physicians, LLP;

   b.     Memorial Northwest Emergency Physicians, LLP;

   c.     Memorial Southwest Emergency Physicians, LLP

   d.     Memorial City Emergency Physicians, LLP.

**ANSWER:**     Defendant objects because this interrogatory and its subparts fail to state a time reference. Defendant further objects because this interrogatory is multifarious and contains subparts that are considered separate interrogatories.

        Subject to and without waiving these objections,

   a.     See agreement together with amendments produced with Defendant's response to Plaintiffs' Request for Production No. 3.

   b.     See agreement together with amendments produced with Defendant's response to Plaintiffs' Request for Production No. 5.

   c.     See agreement together with amendments produced with Defendant's response to Plaintiffs' Request for Production No. 4.

   d.     See agreement together with amendments produced with Defendant's response to Plaintiffs' Request for Production No. 6.

13.     State the name, last known address, and telephone number of the physician who was the director of the emergency department at Memorial Hermann Hospital System during

February 2006.

**ANSWER:**   Dr. Derrick Caraway was the medical director of the Emergency Department in February 2006.

14.   State whether or not computer software from Emergency Consultants, Inc. was installed on any computers in the emergency room at Memorial Hermann Southeast Hospital in February 2006.

**ANSWER:**   Defendant objects because this interrogatory is vague as to "software from Emergency Consultants, Inc."

Subject to and without waiving this objection, Defendant believes that in February 2006 computers in the Emergency Department at Memorial Hermann Southeast Hospital contained computer software owned or created by Emergency Consultants, Inc. However, the computers no longer contain ECI software.

15.   If such software was installed on any computers, then state the name, address and telephone number of the person with Memorial Hermann Southeast Hospital who would have personal knowledge of the installation and use of such software.

**ANSWER:**   Defendant objects because this interrogatory is harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Furthermore, this interrogatory is multifarious and considered a separate subpart from No. 14 above. Therefore, this interrogatory is No. 15 making the following interrogatories incorrectly numbered.

15.[sic] State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning call-back procedures for the emergency department at Memorial Hermann Southeast Hospital. (The term "call-back" procedure is any procedure by which a person who is discharged from the hospital before the results of laboratory data are completed and/or reviewed by physicians or nursing staff is notified of abnormal laboratory results and of the need to seek further medical follow-up, including, but not limited to returning to the emergency department.)

**ANSWER:**   Defendant objects because this interrogatory is overly broad in scope, harassing and unduly burdensome. Defendant objects to the term "call back" as defined by plaintiffs. Defendant further objects because as worded, this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, Defendant cannot identify and maintains no records regarding every person who reviewed, consulted or commented on a policy and procedure. The policy and procedure reflects that it was approved by Jim Faucett. See policies and procedures previously produced

and bates numbered MHSE-TG-0028 through 0031 and MHSE-TG-0032 through 0035.

16.[sic] State the name, current address, telephone number and job description of each person who participated in the drafting or approval of the actual policies and procedures of Memorial Hermann Southeast Hospital that were in force and effect in February 2006 concerning what laboratory tests results were considered as "critical values" by Memorial Hermann Southeast Hospital in February 2006.

**ANSWER:**    Defendant objects because this interrogatory is overly broad in scope, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, the laboratory "critical values" are determined by Quality Management Team. The policy and procedure reflects that it was approved by Jim Faucett. See Critical Values List policy and procedure previously produced and bates numbered MHSE-TG-0015 through 0027.

17.[sic] State the name, current address and telephone number of each agent, servant or employee of Memorial Hermann Hospital System who has personal knowledge of the meaning of the notation "(c)" after the lymphocyte count shown on the printout of the computer screen of laboratory values for Tristan Guzman, which is attached to these interrogatories as Exhibit A.

**ANSWER:**    Defendant objects because this interrogatory is vague, overly broad in scope, harassing, unduly burdensome, and is tantamount to a "fishing expedition" prohibited under applicable case law.

Subject to and without waiving these objections, the notation "(c)" is an abbreviation used by the software which means "comment." See computer printout documents previously produced and bates numbered MHSE-TG-0009 through 0014.

18.[sic] Please describe in detail the manner in which the computerized medical record data for Tristan Guzman is stored at both Memorial Hermann Southeast Hospital and Memorial Hermann Children's Hospital, including but not limited to the following:

**ANSWER:**    Defendant objects to the extent this interrogatory is vague as to how computerized data is "stored." Defendant further objects because this interrogatory is multifarious and contains subparts that are considered separate interrogatories (18a-d). Defendant objects to all subparts to the extent they seek information regarding non-party Memorial Hermann Children's Hospital.

a.    the name of the computer program used by the hospital for accessing the computerized medical record;

8

**ANSWER:**    Defendant objects because this interrogatory is vague as to "hospital for accessing the computerized medical record."

> Subject to and without waiving this objection, Sovera for Health Information Management (HIM).

    b.    where such data is currently being stored;

**ANSWER:**    Defendant objects because this interrogatory is vague, overly broad, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

> Subject to and without waiving this objection, electronic medical records are stored on network servers in Memorial Hermann Hospital System Data Center and on optical disk.

    c.    whether it is possible to make a copy of such data (including the software needed to view the data) that can be accessed on a Microsoft Windows based personal computer;

**ANSWER:**    Defendant objects because this interrogatory is vague, overly broad, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to the extent this interrogatory seeks access to information protected by HIPAA.

> Subject to and without waiving these objections, the data stored on the network services and on the optical disks are unalterable and cannot be copied.

    d.    the location of any computer on which the computerized medical record could be viewed and printed out.

**ANSWER:**    Defendant objects because this interrogatory is vague, overly broad, harassing and unduly burdensome. Defendant further objects because this interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

> Subject to and without waiving this objection, there is no computer outside Memorial Hermann Hospital System's network on which the computerized medical record could be viewed and printed out.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF TRISTAN | § | |
| GUZMAN, A MINOR | § | |
| | § | |
| v. | § | C.A. No. 07-03973 |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM, D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL | § | |

## VERIFICATION

TO THE HONORABLE JUDGE OF SAID COURT:

Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital ("Memorial Hermann"), Defendant in the above-entitled and numbered cause, files its Answers and Objections to Plaintiff's Interrogatories pursuant to Federal Rules of Civil Procedure 33 and states that the Answers to Interrogatories are true and correct to the best of its knowledge.

_____
Barbara Durham
Authorized Representative of
Memorial Hermann Hospital System

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared BARBARA DURHAM, authorized representative of Memorial Hermann Hospital System, by me being duly sworn stated that the answers to the following Interrogatories are true and correct to the best of her knowledge.

SWORN TO AND SUBSCRIBED BEFORE ME by the said BARBARA DURHAM on the _23_ day of July, 2008, to certify which witness my hand and seal of office.

KATHY W. STOCKTON
Notary Public,
State of Texas
Comm. Exp. 02-13-1?

_____
Notary Public in and for
Harris County, T E X A S

My Commission Expires: _02-13-12_

10

Plaintiffs Response to Memorial Hermann Motion for Summary
Judgment

Exhibit P

# SMYSER KAPLAN & VESELKA, L.L.P.

BANK OF AMERICA CENTER
700 LOUISIANA SUITE 2300  HOUSTON, TEXAS 77002
TELEPHONE 713.221.2300  FACSIMILE 713.221.2320

Direct Dial Number:
713 221-2345

Author's E-mail Address:
cbryan@skv.com

April 23, 2009

Mr. Phillip A. Pfeifer
Phillip A. Pfeifer, P.C.
5216 Jackson Street
Houston, TX 77004

Re:  CA No. 07-03973; *Wendy Guzman vs. Memorial Hermann Hospital System; In the United States District Court, Southern District of Texas, Houston Division*

Dear Phil:

Enclosed is Memorial Hermann Hospital System's Responses and Objections to Plaintiffs' Second Set of Interrogatories and Third Requests for Production served pursuant to the Federal Rules of Civil Procedure.

Sincerely,

Chris Bryan

CAB:rg
Encl.
cc:    Mr. Charles Brennig, III
       The Henke Law Firm, LLP
       3200 Southwest Freeway, 34th Floor
       Houston, Texas  77027

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **WENDY GUZMAN, INDIVIDUALLY** | § | |
| **AND AS NEXT FRIEND OF T., A** | § | |
| **MINOR** | § | |
| | § | |
| **v.** | § | **C.A. No. 07-03973** |
| | § | |
| **MEMORIAL HERMANN HOSPITAL** | § | |
| **SYSTEM, D/B/A MEMORIAL** | § | |
| **HERMANN SOUTHEAST HOSPITAL** | § | |

**MEMORIAL HERMANN HOSPITAL SYSTEM d/b/a MEMORIAL HERMANN
SOUTHEAST HOSPITAL'S ANSWERS AND OBJECTIONS TO
PLAINTIFFS' SECOND SET OF INTERROGATORIES AND
THIRD REQUESTS FOR PRODUCTION**

TO:   Plaintiffs, Wendy Guzman, individually and as next friend of Tristan Guzman, a minor, by and through their attorney of record, Phillip Pfeifer, Phillip A. Pfeifer, P.C., 5216 Jackson Street, Houston, TX 77004.

Defendant Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital ("Memorial Hermann"), pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, serves its Answers and Objections to Plaintiffs' Second Set of Interrogatories and Third Requests for Production.

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

By: _Christina A. Bry_

Craig Smyser
State Bar No. 18777575
Fed. ID. 0848
Christina A. Bryan
Federal Bar No. 15042
State Bar No. 03264000
700 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:   713/221-2300
Facsimile:   713/221-2320
ATTORNEYS FOR DEFENDANT
MEMORIAL HERMANN HOSPITAL SYSTEM
d/b/a MEMORIAL HERMANN SOUTHEAST
HOSPITAL

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been mailed postage prepaid, certified mail, return receipt requested to the attorneys of record in the above referenced matter, on this 24th day of April, 2009.

Christina A. Bryan

2

## ANSWERS AND OBJECTIONS TO SECOND SET OF INTERROGATORIES

1.  Describe in detail each policy or procedure of Memorial Hermann Southeast Hospital that was in force and effect as of February 12, 2006 concerning what Memorial Hermann Southeast Hospital considered to be its requirements for an "appropriate medical screening examination" under EMTALA for patients similar to TG.

**ANSWER:**   Defendant objects because this interrogatory is unduly burdensome and duplicative of other discovery requests.  Defendant has produced its policy that is responsive to this interrogatory.

Subject to and without waiving these objections, Defendant Memorial Hermann Southeast Hospital does not have a symptom-specific policy for patients similar to TG.

See policy previously produced bates numbered MHSE-TG-0139 – 0142a.  See also deposition testimony of Tom Flanagan.

2.  As to each such policy and procedure that is described in answer to interrogatory number 1, please state the following:

    a.   whether each such policy or procedure was in writing;

    b.   if such policy was in writing, please identify the document and attach a copy of such document to your answers to interrogatories;

    c.   if such policy or procedure was not in writing, then please state the name, address and phone number of each person who has personal knowledge of the adoption of such an unwritten policy by the hospital;

    d.   if such policy or procedure was not in writing, then please state the name, address and phone number of each person who has personal knowledge of how physicians working in the emergency department as of February 12, 2006 were informed of the existence of such a policy.

**ANSWER:** See answer to No. 1 above.

3.  In February 2006, Did [sic] Memorial Hermann Southeast Hospital have any standard requirement for the types of lab and/or imaging tests that were required during the performance of a medical screening examination for a pediatric patient who presented to the emergency department at Memorial Hermann Southeast Hospital complaining of vomiting?

**ANSWER:**   Defendant objects to answering this interrogatory because it exceeds the number of interrogatories allowed under Rule 33(a) of the Federal Rules of Civil Procedure in that these interrogatories and others previously propounded constitute more that 25 written interrogatories when each discrete subpart of an interrogatory is considered a separate interrogatory.  Defendant further objects because this interrogatory is vague as to "standard requirement" and is overly broad.

3

4.   As to each such policy and procedure that is described in answer to interrogatory number 3, please state the following:

    a.   whether each such policy or procedure was in writing;

    b.   if such policy was in writing, please identify the document and attach a copy of such document to your answers to interrogatories;

    c.   if such policy or procedure was not in writing, then please state the name, address and phone number of each person who has personal knowledge of the adoption of such an unwritten policy by the hospital;

    d.   if such policy or procedure was not in writing, then please state the name, address and phone number of each person who has personal knowledge of how physicians working in the emergency department as of February 12, 2006 were informed of the existence of such a policy.

**ANSWER:**   Defendant objects to answering this interrogatory because it exceeds the number of interrogatories allowed under Rule 33(a) of the Federal Rules of Civil Procedure in that these interrogatories and others previously propounded constitute more that 25 written interrogatories when each discrete subpart of an interrogatory is considered a separate interrogatory.   Defendant further objects to the term "policy and procedure" as vague and ambiguous, and the interrogatory assumes facts not in evidence.

5.   State the name, address and phone number of the "site medical director" who approved the Emergency Center Triage Guidelines that have been identified as Bates Nos. MHSE-TG-0287, 0288 and 0289.

**ANSWER:**   Defendant objects to answering this interrogatory because it exceeds the number of interrogatories allowed under Rule 33(a) of the Federal Rules of Civil Procedure in that these interrogatories and others previously propounded constitute more that 25 written interrogatories when each discrete subpart of an interrogatory is considered a separate interrogatory.   Defendant further objects that the interrogatory assumes facts not in evidence.

6.   Please identify by date and author what "protocols" are referred to in paragraph 3.6 of the Memorial Hermann Healthcare System "Triage Policy", EMC-00005, Bates Nos. MHSE-TG-0290, 0291 and 0292.   Please attach a true and correct copy of all such policies and procedures to your answers to this discovery request, and consider this to be a request for production.

**ANSWER:**   Defendant objects to answering this interrogatory because it exceeds the number of interrogatories allowed under Rule 33(a) of the Federal Rules of Civil Procedure in that these interrogatories and others previously propounded constitute more that 25 written interrogatories when each discrete subpart of an interrogatory is considered

4

a separate interrogatory. Defendant further objects that the interrogatory assumes facts not in evidence.

7.   What does Memorial Hermann Hospital System contend is its corporate policy concerning what was required to provide an "appropriate medical screening examination" that complied with EMTALA in February 2006?

**ANSWER:**   Defendant objects to answering this interrogatory because it exceeds the number of interrogatories allowed under Rule 33(a) of the Federal Rules of Civil Procedure in that these interrogatories and others previously propounded constitute more that 25 written interrogatories when each discrete subpart of an interrogatory is considered a separate interrogatory.

8.   With regard to your answer to interrogatory number 7, state the name, address and telephone number of each person who has personal knowledge of the consideration and/or approval of such policy by the governing body of the Memorial Hermann Hospital System.

**ANSWER:**   Defendant objects to answering this interrogatory because it exceeds the number of interrogatories allowed under Rule 33(a) of the Federal Rules of Civil Procedure in that these interrogatories and others previously propounded constitute more that 25 written interrogatories when each discrete subpart of an interrogatory is considered a separate interrogatory. Defendant further objects to this interrogatory as vague, overly broad, unduly burdensome, and tantamount to a "fishing expedition" prohibited under applicable case law. Defendant further objects because this interrogatory assumes facts not in evidence and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

9.   For each person identified in answer to interrogatory number 8, please state in general what role each such person had in the consideration and/or approval of such policy by the governing body of the Memorial Hermann Hospital System.

**ANSWER:**   Defendant objects to answering this interrogatory because it exceeds the number of interrogatories allowed under Rule 33(a) of the Federal Rules of Civil Procedure in that these interrogatories and others previously propounded constitute more that 25 written interrogatories when each discrete subpart of an interrogatory is considered a separate interrogatory. Defendant further objects to this interrogatory as vague, overly broad, unduly burdensome, and tantamount to a "fishing expedition" prohibited under applicable case law. Defendant further objects because this interrogatory assumes facts not in evidence and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

5

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF TRISTAN | § | |
| GUZMAN, A MINOR | § | |
| | § | |
| v. | § | C.A. No. 07-03973 |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM, D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL | § | |

### VERIFICATION

TO THE HONORABLE JUDGE OF SAID COURT:

Memorial Hermann Hospital System d/b/a Memorial Hermann Southeast Hospital ("Memorial Hermann"), Defendant in the above-entitled and numbered cause, files its Answers and Objections to Plaintiff's Second Set of Interrogatories pursuant to Federal Rules of Civil Procedure 33 and states that the Answers to Interrogatories are true and correct to the best of its knowledge.

Barbara Durham
Authorized Representative of
Memorial Hermann Hospital System

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared BARBARA DURHAM, authorized representative of Memorial Hermann Hospital System, by me being duly sworn stated that the answers to the following Interrogatories are true and correct to the best of her knowledge.

SWORN TO AND SUBSCRIBED BEFORE ME by the said BARBARA DURHAM on the 23 day of April, 2009, to certify which witness my hand and seal of office.

F. KAY SANDIFER
Notary Public,
State of Texas
Comm. Exp. 01-17-12

Notary Public in and for
Harris County, T E X A S

My Commission Expires: _01-17-12_

Plaintiffs Response to Memorial Hermann Motion for Summary
Judgment

Exhibit Q

Tammy McCrumb

Guzman vs Memorial Hermann                                03/12/09

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
                             HOUSTON DIVISION

WENDY GUZMAN, INDIVIDUALLY:
        NEXT FRIEND OF       :
        ███████ GUZMAN, A MINOR  :
                             :
V.                           : CIVIL ACTION NO. 07-3973
                             :
MEMORIAL HERMANN HOSPITAL :
SYSTEM, D/B/A MEMORIAL    :
HERMANN SOUTHEAST HOSPITAL:


*   *   *   *   *   *   *   *   *   *   *   *   *   *


              ORAL AND VIDEOTAPED DEPOSITION OF
                        TAMMY McCRUMB
                       March 12, 2009


*   *   *   *   *   *   *   *   *   *   *   *   *   *


        ORAL/VIDEOTAPED DEPOSITION OF TAMMY McCRUMB,

produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 12th day of

March, 2009, from 10:10 a.m. to 12:55 p.m, before

Gretchen C. Dowda, CSR in and for the State of Texas,

reported by machine shorthand, at the law offices of

Smyser, Kaplan & Veselka, L.L.P., 700 Louisiana

Street, Suite 2300, Houston, Texas 77002 pursuant to

the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

---

Page 10

1   a triage nurse, of course.
2       Q.  Obviously.  Now, what would the name be
3   used -- what would the terminology be for the nurse
4   that is in the room with the patient, taking care of
5   a particular patient or a couple of patients?
6       A.  Probably just be a primary nurse.
7       Q.  Primary nurse?
8       A.  Uh-huh.
9       Q.  Primary care nurse?
10      A.  Primary care nurse.
11      Q.  Okay.  Have you done both of those kinds of
12  jobs there at Memorial Southeast by February of 2006?
13      A.  Yes.
14      Q.  So were you familiar then with both the
15  triage process and also what were the
16  responsibilities of an E.R. nurse as a primary care
17  nurse in the E.R. at Memorial Southeast back at that
18  time?
19      A.  Yes.
20      Q.  Okay.  Have you met with Ms. Bryan prior to
21  the deposition?
22      A.  Yes.
23      Q.  Have you reviewed any documents in
24  preparation for your deposition?
25      A.  Yes, I have.

---

Page 11

1       Q.  And did you bring those with you?
2       A.  Yes, I did.
3       Q.  May I see what you brought with you,
4   please.  Looks to me that what you have reviewed is
5   the emergency room chart from February the 12th of
6   '06, the emergency room chart from February the 13th
7   of '06, and the Life Flight record with regard to
8   February 13th of '06.
9       A.  Correct.
10      Q.  Have you reviewed any policies and
11  procedures of Memorial?
12      A.  Yes.
13          MS. BRYAN:  I just realized that I had
14  them in my hand.
15      Q.  (By Mr. Pfeifer)  Okay.  All right.  Very
16  good.
17      A.  Okay.
18      Q.  Thank you.  I will give that to you.
19          Now, that last document that you had,
20  is that the same document as what I have marked as
21  Exhibit 4 except for the transmittal letter that's on
22  the front?
23      A.  Yes, sir.
24      Q.  Are you familiar with that document, which
25  is Exhibit 4?

---

Page 12

1       A.  Yes, sir.
2       Q.  When did you first encounter that document
3   in connection with this case?  That's Exhibit 4.
4       A.  Well, I have -- that document is in a
5   notebook in the triage area at Southeast.
6       Q.  Okay.  Did you have some role in locating
7   that document?
8       A.  Yes, sir, I did.
9       Q.  And did you basically at someone's request
10  go into the E.R. in the triage area and look through
11  the notebook that is contained there to try to
12  identify that document?
13      A.  Yes, sir.
14      Q.  Okay.  How long ago was it that you did
15  that?
16      A.  Less than a month ago.
17      Q.  Okay.  We'll talk about this in detail
18  sometime later in the course of this deposition.  But
19  is Exhibit 4 a true and correct copy of the document
20  that is entitled Emergency Center Triage Guidelines?
21      A.  Yes, sir.
22      Q.  Okay.
23          MS. BRYAN:  Well, she would have to
24  review it line by line; but there is no reason to
25  suspect that it's not.

---

Page 13

1           It appears to be the same document.
2   Has the same Bates numbers.
3       Q.  (By Mr. Pfeifer)  All right.  Is there a
4   title to the book that you looked in to find Exhibit
5   4?
6       A.  No, sir.
7       Q.  What is otherwise contained in that book
8   besides Exhibit 4?
9       A.  It has just some other basic information as
10  far as our treatment of fevers.  It has the policies
11  as far as the five-tier triage system.  And then I
12  believe that there is just some other random magazine
13  articles and what not in there as far as related to
14  different CDC guidelines.
15      Q.  I'm sorry, did you say "CBC"?
16      A.  CDC.
17      Q.  Centers for Disease Control Guidelines?
18      A.  Correct.
19      Q.  And do you know what they relate to?
20      A.  I believe there is something in there
21  related to tuberculosis, SARS, that kind of things,
22  just as far as signs and symptoms to watch out for.
23      Q.  Okay.  To your knowledge was Exhibit 4 a
24  set of guidelines that were in force and effect back
25  in February of 2006?

GRETCHEN DOWDA REPORTING
(713) 521-1117

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

Page 14

1        MS. BRYAN:  Objection, form.  This
2   witness can testify that these guidelines were on the
3   premises at the hospital.  As you know, we do not
4   believe that they were.  They certainly didn't come
5   up as being in our policies and guidelines that were
6   in force and effect, but I'm happy for her to testify
7   to the fact that they were in the notebook, she
8   referred to them, whatever -- whatever route you want
9   to take but...
10       Q.  (By Mr. Pfeifer)  All right.  Were the
11   documents, Exhibit 4, in the notebook at the hospital
12   in February of '06?
13       A.  To my best recollection, yes.
14       Q.  Okay.  Had you received any kind of
15   training at Memorial Southeast with regard to what I
16   would call "protocols"?
17       MS. BRYAN:  Objection, form.
18           You can answer if you understand the
19   question.  I just make my objections for the record.
20       A.  Okay.  No specific training, I wouldn't
21   say.
22       Q.  (By Mr. Pfeifer)  Okay.  Well, then tell
23   me, if it was not specific training --
24       A.  Okay.
25       Q.  -- how you became familiar with the concept

Page 15

1   of protocols out there at the hospital.
2       A.  As part of --
3       MS. BRYAN:  Objection, form.
4       A.  As part of my orientation process there
5   whenever I became a nurse, it was just, you know, in
6   your discussion with your preceptor, you know, we
7   have set protocols, these are the protocols.  I mean,
8   it wasn't specifically education as far as, with this
9   particular complaint, we do this.  It was just noted
10   that they were there.
11       Q.  All right.  So as part of your orientation
12   at Memorial Southeast with your preceptor -- that is,
13   the person who was instructing you or training you to
14   be an E.R. nurse -- there was discussion about
15   protocols?
16       A.  Yes.
17       Q.  Okay.  And in that discussion about
18   protocols did they bring up Exhibit 4?
19       A.  Not that I can recall.
20       Q.  Okay.  But on prior occasions before
21   ██████ Guzman came into the emergency department,
22   did you have occasion to refer to protocols in the
23   E.R.?
24       A.  Yes, sir.
25       Q.  And when you would refer to those

Page 16

1   protocols, would the protocols that are contained in
2   Exhibit 4 be the ones you were looking at?
3       A.  I may not specifically always look at the
4   protocols.  It becomes a memory, you know, part of
5   your education and your -- you know, I may not
6   specifically go back to look at the protocols every
7   time I needed to think about them or to apply the
8   protocols to a patient.
9       Q.  Okay.  Was the book from which you obtained
10   Exhibit 4 a book that was available for all of the
11   nursing staff at the emergency department at Memorial
12   Southeast to refer to?
13       A.  Yes, sir, it was located in triage.
14       Q.  Was there someone who was in charge of the
15   contents or update of the book?
16       A.  I cannot answer that question.  I don't
17   know.
18       Q.  If I were to go out to Memorial Southeast
19   right now, where would I find the book?
20       A.  The last I saw it, it was located in
21   triage.
22       Q.  Okay.  And the last you saw it, was Exhibit
23   4 still in the book?
24       A.  Yes, sir.
25       Q.  Do you know Frank Blain?

Page 17

1       A.  Yes.
2       Q.  How is it that you know Frank Blain?
3       A.  I know him on a professional level from
4   working with him.
5       Q.  Did he sometimes work in the E.R.?
6       A.  Yes, sir.
7       Q.  Did he work in other areas of the hospital
8   as well?
9       A.  I believe he also worked in the cardiac
10   cath lab.
11       Q.  Do you know whether or not Frank Blain had
12   ever received any training about protocols in the
13   E.R.?
14       A.  I do not know.
15       Q.  Did you ever have to take any continuing
16   education or in-service updates at Memorial Southeast
17   as an emergency nurse?
18       A.  Yes.
19       Q.  And in those in-services did it come up to
20   discuss protocols about different patient conditions
21   or complaints?
22       A.  Not that I can recall.
23       Q.  I want to shift gears now and ask you if at
24   any time after ██████ Guzman was in the E.R. on
25   February the 13th of '06 you ever filled out any kind

5 (Pages 14 to 17)

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

<table>
<tr><td>

**Page 18**

1  of an incident report.
2      A.  No, sir.
3      Q.  Did you ever initiate any kind of complaint
4  with anyone about what happened in the E.R. with
5  regard to ▓▓▓ Guzman?
6      A.  No, sir.
7      Q.  Were you personally upset about what
8  happened to ▓▓▓
9          MS. BRYAN:  Objection, form.
10     A.  What exactly are you asking?
11     Q.  (By Mr. Pfeifer)  Well, were you
12  emotionally upset about his condition at the
13  emergency department?
14     A.  Yes, I was upset at how critical, how sick
15  he was.
16     Q.  Did you ever cry about it?
17     A.  After the fact, yes.
18     Q.  Did you ever ask yourself the question
19  after the fact, "Could I have done more"?
20     A.  Of course.
21     Q.  Did you ever make any kind of complaint to
22  anyone at the hospital, your immediate supervisor, or
23  up the chain of command of the nurses about what
24  happened to ▓▓▓▓ in the E.R. there on the 13th?
25     A.  No, sir.

</td><td>

**Page 20**

1  without giving him any antibiotics on the 12th?
2      A.  No, sir.
3      Q.  Did it get that detailed at all?
4      A.  No, sir, not at all.
5      Q.  Okay.  How about the discussion with
6  Dr. Siddiqi?  How did that come about?
7      A.  I believe I worked with Dr. Siddiqi the
8  next day and he was informed as to -- you know, I'm
9  not sure who he spoke to; but he initiated I believe
10  a conversation just asking, you know, what exactly
11  had happened as far as his transfer.
12     Q.  Okay.  Who is Dr. Nguyen?
13     A.  Dr. Nguyen is another E.R. physician who
14  had come on duty that evening.
15     Q.  Was Dr. Siddiqi still on duty at the time
16  that ▓▓▓ temperature spiked?
17     A.  I apologize.  Let me correct my statement
18  from earlier.  Dr. Nguyen had been on duty from
19  around -- earlier that day.  He was -- he and
20  Dr. Siddiqi were on duty at the same time.  I just
21  recalled that.
22          Can you repeat your question for me?
23  I'm sorry.
24     Q.  Okay.  I'm trying to find out about why it
25  was that Dr. Nguyen got involved and whether or not

</td></tr>
<tr><td>

**Page 19**

1      Q.  Did you ever discuss with anyone after
2  ▓▓▓ left the hospital on February 13th how he
3  could have gotten so ill?
4      A.  I had a discussion -- I couldn't tell you
5  how it -- within a week or so afterwards with
6  Dr. Haynes and Dr. Siddiqi both as far as how his --
7  if they had heard how he was doing.
8      Q.  How did that come up?
9      A.  Just in seeing them and, you know, just
10  randomly asking if -- you know, if they had heard how
11  he was doing.
12     Q.  In your discussion with Dr. Haynes, was
13  Dr. Siddiqi also present?
14     A.  I don't believe so.
15     Q.  Was this just a chance encounter where you
16  were working the same shift as Dr. Haynes and you
17  brought up the issue about ▓▓▓ Guzman's
18  condition?
19     A.  I believe we worked together shortly after
20  that and he -- he and I just had -- I mean, it was
21  just a chance conversation, you know, just asking,
22  have you heard how he's doing.  I can't recall the
23  specifics as to what exactly was said.
24     Q.  Was there any discussion with Dr. Haynes
25  about Dr. Haynes' decision to send ▓▓▓ home

</td><td>

**Page 21**

1  Dr. Siddiqi was still present in the E.R. when
2  ▓▓▓ fever spiked.
3          MR. BRENNIG:  Object to speculation.
4      Q.  (By Mr. Pfeifer)  Go ahead.
5      A.  Dr. Siddiqi had gone off duty, I believe.
6      Q.  Okay.  And when you say "gone off duty,"
7  had he left the premises or --
8      A.  Yes, sir.
9      Q.  Okay.  In other words, it was the end of
10  his shift and he just left?
11     A.  Yes, sir.
12     Q.  And Dr. Nguyen was to take over as the E.R.
13  physician?
14     A.  I can't really answer that.  I don't know
15  how he had turned the patient over, if he had
16  specifically spoken with Dr. Nguyen.
17     Q.  Well, when you talked to Dr. Nguyen, what
18  was it that caused you to try to talk to Dr. Nguyen?
19     A.  I had gone in to recheck vital signs and
20  retake a temperature.  And his temperature was
21  elevated.  And I had walked out of the room.  The
22  charge nurse's desk is right there just as I walked
23  out of the room.  And I told her that I needed
24  Dr. Siddiqi because the patient's temperature was
25  elevated.

</td></tr>
</table>

6 (Pages 18 to 21)

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

---

Page 30

1  something that has to be done by the nurse actually
2  measuring the pulse rate?
3      A.  The monitor will generate it.
4      Q.  Okay.  How about the respiratory rate?  Is
5  that something that the monitor will generate or is
6  that something that the nurse measures?
7      A.  It's the nurse measurement.
8      Q.  Okay.  And with regard to respiration rate,
9  how would a nurse measure the rate of respiration?
10     A.  Routinely, you look at the time on your
11 watch and you count respirations over a 15-second
12 period and then multiply them times four.
13     Q.  Okay.  And that's what would be recorded
14 within the column under respirations?
15     A.  Yes.
16     Q.  Okay.  Next column is temperature.  Tell me
17 how temperature would be measured.
18     A.  With a thermometer.
19     Q.  Is that part of the monitor?
20     A.  No, sir.
21     Q.  Is that a digital thermometer?
22     A.  Yes.
23     Q.  And if one is using the digital
24 thermometer, can you use it to obtain a rectal
25 temperature?

---

Page 32

1      A.  That is a patient's subjective -- I'm
2  sorry, yes, subjective view of pain score.  So the
3  patient themselves usually tells you the pain score,
4  unless it is a preverbal child or a child that
5  doesn't understand the pain score.  And then we use
6  the Wong -- Wong Basic Pain Score.
7      Q.  Okay.  Can you tell me how many -- I guess
8  we can just count to find the number of times that
9  the vital signs were taken while ████ was in the
10 emergency department on the 13th, correct?
11     A.  Yes.
12     Q.  Okay.
13         MS. BRYAN:  Objection, form.
14     Q.  (By Mr. Pfeifer)  With regard to the taking
15 of the vital signs, what is it that dictates how
16 frequently the vital signs are supposed to be taken
17 with regard to a particular patient?
18         MS. BRYAN:  Objection, form.
19     A.  The guidelines are roughly every two hours
20 for vital signs to be taken.  If a patient is more
21 critical, then you would take them more frequently
22 based on your nursing judgment.
23     Q.  (By Mr. Pfeifer)  Okay.  What guidelines
24 are you referring to?
25     A.  Most emergency rooms operate off of the

---

Page 31

1      A.  You use a different thermometer set for
2  it.
3      Q.  Okay.  Would that also be a digital
4  thermometer for a rectal temperature?
5      A.  Yes.
6      Q.  So each time there is a record made of
7  temperature in this column on this page, that would
8  be a temperature that is manually obtained by the
9  nurse by measurement with a thermometer?
10     A.  Yes.
11     Q.  Okay.  Pulse ox is a readout that is
12 generated by a monitor?
13     A.  Yes.
14     Q.  Basically a clip is put over the end of the
15 finger that shines a light through the finger?
16     A.  Yes.
17     Q.  And there is a measure of the oxygenation
18 that comes into the monitor, correct?
19     A.  Correct.
20     Q.  Okay.  Weight.  Is the patient initially
21 weighed?
22     A.  Yes.
23     Q.  Okay.  Pain.  How is it that one would
24 obtain an assessment of pain of ten over ten or eight
25 over ten, or four over ten, whatever it may be?

---

Page 33

1  ENA, the Emergency Nursing Association standard
2  guidelines.
3      Q.  Okay.  Did they have the Emergency Nurses
4  Association guidelines present out there at Memorial
5  Southeast?
6      A.  I do not know.
7      Q.  Okay.  Your understanding, though, was that
8  the Memorial Southeast Emergency Department also
9  followed those Emergency Nursing Association
10 guidelines?
11     A.  It's my assumption, yes.
12     Q.  Okay.  And that's based on your having
13 worked out there for many years?
14     A.  Correct.
15     Q.  Do you know where I could find a copy of
16 these guidelines if I wanted to go look at them with
17 regard to how frequently vital signs should be taken?
18     A.  You may be --
19         MS. BRYAN:  Form.
20     A.  -- able to go to the ENA website and find
21 them.
22     Q.  (By Mr. Pfeifer)  Do you know what it is
23 called?  ENA Guidelines for?
24     A.  I honestly couldn't -- wouldn't know where
25 to specifically look for them.

GRETCHEN DOWDA REPORTING
(713) 521-1117

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

---

Page 34

1      Q.  Okay.  In one of the policies and
2   procedures that I previously reviewed in this case,
3   there was some document or book that was called
4   Standards of Care for Emergency Practice.
5      A.  Okay.
6      Q.  I took the deposition of a Mr. Flanagan.
7   Do you know who Tom Flanagan is?
8      A.  Yes.
9      Q.  Okay.  I took the deposition of Mr.
10  Flanagan and he was referring in his deposition as I
11  recall to like a three-ring binder of standards of
12  care that was present in the E.R.  Are you familiar
13  with any such binder?
14          MS. BRYAN:  Objection, form.
15     A.  I am not specifically familiar with the
16  binder.  I am sure it does exist with the charge
17  nurse.  The charge nurse's desk has several binders
18  there.
19     Q.  (By Mr. Pfeifer)  Okay.  Did you attempt to
20  find any policies or procedures related to how
21  frequently vital signs should be taken?
22     A.  No.
23     Q.  What is your understanding of the policy of
24  the emergency department at Memorial Southeast about
25  vital signs prior to discharge?

---

Page 35

1      A.  That the guidelines are for them to be
2   taken within one hour of the patient being
3   discharged.
4      Q.  Okay.  And what are the guidelines with
5   regard to the documentation of the vital signs?  The
6   discharge vital signs?
7          MS. BRYAN:  Form.
8      A.  I mean, I would think that they would be
9   documented.  But specifically, you know, I mean, most
10  patients are on the monitor and the nurse may not --
11  I mean, they may be taken, but they may not be
12  remembered to -- you know, to be documented after the
13  fact.
14     Q.  (By Mr. Pfeifer)  And when it says to take
15  vital signs, would vital signs include all of those
16  things that are contained under the topic vital signs
17  that we discussed, the time, the blood pressure, the
18  pulse, the respiration, the temperature, the pulse ox
19  and the pain?
20          MS. BRYAN:  Form.  Objection, form.
21     A.  Some nurses may not document or obtain all
22  of the vital signs, you know, dependent upon what the
23  patients are in the emergency for -- what they are in
24  the emergency room for, you know, based on their
25  complaint.

---

Page 36

1      Q.  (By Mr. Pfeifer)  Let me ask you this:  Did
2   you document the vital signs that were taken with
3   regard to ███████ Guzman?
4          MS. BRYAN:  Objection, form.
5      A.  The vital signs that I documented that I
6   took, I took.
7      Q.  (By Mr. Pfeifer)  Okay.  Let me reask it,
8   then.  With regard to the vital signs that you
9   recorded in the chart did you believe that you were
10  following hospital documentation policy when you
11  recorded these items in the chart?
12     A.  Yes.
13     Q.  And are all the items that you recorded in
14  the chart items that were based on your measurements
15  and observations of vital signs?
16          MS. BRYAN:  Form.
17     A.  Yes.
18     Q.  (By Mr. Pfeifer)  Okay.  I wanted to cover
19  a couple of these vital signs with you.  Look at
20  14:30.
21     A.  Yes.
22     Q.  It looks like you're the person that
23  obtained the vital signs.
24     A.  Yes.
25     Q.  Is that right?

---

Page 37

1      A.  Yes.
2      Q.  There is a 110 and a slash and there is not
3   a second number there.  What do you mean by 110 slash
4   and not a second number?
5      A.  If I recall, we weren't able to get a true
6   diastolic reading on him whenever we were obtaining
7   the blood pressure.  And his heart rate was -- was
8   fast, so that could have been the reason why.
9      Q.  Same thing true at 15:32?
10     A.  Yes.
11     Q.  Okay.  Systolic blood pressure was 82?
12     A.  Yes.
13     Q.  But you were unable to obtain a reliable
14  diastolic blood pressure?
15     A.  Yes.
16     Q.  Okay.  When ██████ was on the monitor on
17  February the 13th and you were taking care of him,
18  was the monitor set up in a fashion where it would
19  signal some sort of an alert with regard -- or an
20  alarm with regard to any of his vital signs?
21     A.  Yes.
22     Q.  And what sort of alarms were set up to be
23  triggered?
24     A.  I don't specifically recall what alarms,
25  what the parameters of the alarms were; but there are

---

GRETCHEN DOWDA REPORTING
(713) 521-1117

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

---

Page 42

1       A.  Yes.
2       Q.  Does it say "Protocols may be implemented
3  based on patient acuity and available resources"?
4       A.  Yes.
5       Q.  Do you have an understanding of what is
6  meant by the concept of "protocols"?
7       A.  Yes.
8       Q.  Okay.  What is your understanding as an
9  E.R. nurse of protocols?
10      A.  My understanding on protocols is initiating
11  testing to be done if there is a delay to be seen by
12  the physician to expedite care.
13      Q.  Okay.  Ordinarily if someone is going to
14  have lab testing done, you would need a physician
15  order, correct?
16      A.  Routinely yes.  But based upon our
17  protocols that we have instituted, there is a
18  standing order for certain tests to be done based on
19  complaints.
20      Q.  Okay.  So for an example, suppose somebody
21  with a lot of gray hair like me and who has a past
22  history of having -- taking Lipitor, smoker, comes
23  into the ER sweating, complaining of crushing chest
24  pain radiating down into the left arm and jaw --
25      A.  Yes.

---

Page 43

1       Q.  -- would there be a protocol for that kind
2  of patient hypothetically?
3       A.  Yes.
4           MS. BRYAN:  Form.
5       Q.  (By Mr. Pfeifer)  Okay.  Was there in fact
6  a protocol for that kind of patient?
7       A.  Yes.
8       Q.  And is that protocol contained within
9  Exhibit 4 that we previously gave you?
10      A.  Yes.
11      Q.  Okay.  And what it means is, that from the
12  moment the patient gets there, if a nurse determines
13  that she wants to initiate the protocol, the nurse
14  can begin the work-up that has been approved in the
15  protocol even before a physician sees the patient?
16          MS. BRYAN:  Objection, form.
17      Q.  (By Mr. Pfeifer)  Is that right?
18      A.  The nurse can start it based upon her
19  clinical judgment of the patient.
20      Q.  Okay.  So for example, in my hypothetical
21  about the elderly white male smoker with chest pain,
22  even before a doctor sees the patient, if a nurse
23  sees that patient at triage and the patient fits that
24  set of complaints and physical findings, the nurse
25  without further order of the doctor can begin to draw

---

Page 44

1  blood for labs, correct?
2       A.  Yes.
3       Q.  Can begin to administer oxygen to that
4  patient, correct?
5       A.  Yes.
6       Q.  Can obtain immediately a 12-lead
7  electrocardiogram on the patient?
8       A.  Yes.
9       Q.  Correct?  And do such other things as are
10  contained within the protocol, correct?
11          MS. BRYAN:  Objection, form.
12      A.  Yes.
13      Q.  (By Mr. Pfeifer)  And all of that has been
14  approved in advance by the medical director of the
15  hospital, correct?
16      A.  Yes.
17      Q.  What is your understanding of the idea
18  behind protocols?
19      A.  My understanding, excuse me, is that they
20  are standards -- that most of the protocols are
21  standards that are done throughout emergency rooms
22  across the country.  You know, they are routine -- I
23  shouldn't say routine.  They are standard routine
24  laboratory testings they would do based on
25  complaints.

---

Page 45

1       Q.  And is the idea that if the physician is
2  tied up and can't come see the patient right away,
3  that the nurse can initiate the required work-up so
4  that the data will be there as soon as possible for
5  the physician to review to make his judgments and
6  diagnosis about the patient?
7           MS. BRYAN:  Objection, form.
8       A.  Based on that nurse's -- a nurse's clinical
9  judgment, if they feel they should initiate the
10  protocols, yes, they are there for the nurse to do
11  so.
12      Q.  (By Mr. Pfeifer)  Okay.  If -- have you
13  ever initiated protocols?
14      A.  Yes.
15      Q.  Have you ever initiated protocols about
16  heart attacks, for example?
17      A.  Yes.
18      Q.  What other kinds of protocols have you
19  initiated?
20      A.  I have initiated protocols on abdominal
21  pain patients, on patients complaining of shortness
22  of breath, on patients -- pregnant patients with
23  vaginal bleeding.  Those are the primary ones that we
24  obtain protocols on.
25      Q.  Stroke patients?

GRETCHEN DOWDA REPORTING
(713) 521-1117

Tammy McCrumb

Guzman vs Memorial Hermann                                          03/12/09

Page 46

1      A.  Stroke patients, yes, sir.
2      Q.  Okay.  Now, with regard to Exhibit 4 is it
3  your understanding that this is the set of protocols
4  that may be initiated by the triage nurses at
5  Memorial Southeast --
6          MS. BRYAN:  Objection.
7      Q.  (By Mr. Pfeifer) -- if the patient comes in
8  with sufficient complaints to trigger those
9  protocols?
10          MS. BRYAN:  Objection, form.  Asking
11  patient flow issues absent any delay in being able to
12  see the physician?
13      A.  Can you rephrase that for me, your
14  question.  I'm sorry.
15      Q.  (By Mr. Pfeifer)  What is your
16  understanding of of what Exhibit 4 does in terms of
17  protocols?
18      A.  It provides the routine standard testing
19  that can be obtained based upon a nurse's clinical
20  judgment to initiate testing on a patient when there
21  is a delay to be seen be the doctor -- by a physician
22  or provider.
23      Q.  Okay.  So let me give you an example.
24  Suppose the doctor is tied up and the patient comes
25  in --

Page 47

1      A.  Uh-huh.
2      Q.  -- and meets one of the profiles that is
3  covered in those protocols.
4      A.  Okay.
5      Q.  And the doctor is busy dealing with some
6  stroke patient or heart attack patients and the nurse
7  has reason to believe that the doctor's going to be
8  tied up for some time.
9      A.  Okay.
10      Q.  In that circumstance if the nurse in their
11  clinical judgment decides to implement a protocol,
12  they can do so, correct?
13      A.  Yes.
14      Q.  And when you implement a protocol, how
15  would that be charted?
16      A.  Uhm -- I'm trying to think if we -- how we
17  charted it in 2006.  You would document when you --
18  on the order sheet that we had, you would circle what
19  orders you initiated and then you would usually at
20  the bottom sign your name and document per protocol.
21  Most nurses did that.  Or they just -- or the nurses
22  just sign their name and then the time that it was --
23  had the time that they were initiated.
24      Q.  Okay.  And if there has been a preapproved
25  protocol, when the nurse signs off on entering those

Page 48

1  orders, that's just as good as a doctor's signature
2  in terms of whether or not the lab has the authority
3  to process whether or not someone has the ability to
4  draw blood, whether or not the x-ray department has
5  the right to x-ray the patient?
6      A.  Yes.
7      Q.  Correct?
8          MS. BRYAN:  Form.
9      A.  We have to enter in the physician who is
10  approving the orders.
11      Q.  (By Mr. Pfeifer)  Yes.  And all that can be
12  done in the appropriate circumstances by the nurse
13  even before the doctor even knows about the patient?
14          MS. BRYAN:  Objection, form.
15      A.  It's dependent upon the nurse's clinical
16  judgment and whether or not -- and what the patient's
17  complaint is as to whether or not I'm going to
18  present the patient to the physician first.
19      Q.  Okay.  Now, if you look at Exhibit 4 up at
20  the top, there is a bunch of stuff in -- a bunch of
21  writing that is in very small type, but
22  nevertheless --
23          MR. BRENNIG:  When you get to a good
24  stop, can we take a break?
25          MR. PFEIFER:  Let's stop right now.

Page 49

1  Good time.
2          THE VIDEOGRAPHER:  We're off the
3  record.  It's 11:05.
4          (Recess taken.)
5          THE VIDEOGRAPHER:  Back on the
6  record.  It's 11:14.
7      Q.  (By Mr. Pfeifer)  I want you to look at the
8  page that has 0287 down on the bottom right corner.
9  You with me?
10      A.  Yes.
11      Q.  Okay.  And then up at the top, in the left
12  column at the very top it discusses generally the
13  guidelines.  First of all, I want to ask you, do you
14  see in the guidelines the statement that these
15  "Triage guidelines may be initiated by the
16  appropriate provider in the triage area or by the
17  nurse assigned to the patient room if the patient is
18  brought directly back." Do you see that?
19      A.  Yes.
20      Q.  Do you agree that either the triage nurse
21  or the primary care nurse can implement a protocol if
22  they believe that it is appropriate to do so?
23      A.  Yes.
24      Q.  Okay.  Do you see at the bottom of that
25  paragraph "they," meaning these protocols "have been

13 (Pages 46 to 49)

Tammy McCrumb

Guzman vs Memorial Hermann                                      03/12/09

---

Page 58

1       A.   Part of nursing school we had a course
2  related to documentation in a professional -- it was
3  our professional role class and then -- and I was in
4  an internship at UTMB whenever I graduated.  And then
5  part of that -- part of that three-month orientation
6  program was, you know, my preceptor at that time
7  would discuss documentation with me.
8       Q.   Okay.  On the corporate policy with regard
9  to documentation do you see down at part 3.4.2 where
10 it says "Reassessments and vital signs will be
11 documented as directed in the assessment and
12 reassessment policy"?
13      A.   Yes.
14      Q.   Does that lead you to believe that
15 documentation is required of the discharge vital
16 signs of the patient?
17           MS. BRYAN:  Objection, form.
18      A.   I mean, it is the guideline as far as
19 documentation of discharge vital signs.
20      Q.   (By Mr. Pfeifer)  Okay, I'm finished with
21 that one.
22           Are you familiar with something that I
23 will call aftercare or follow-up?
24      A.   Yes.
25      Q.   Have you ever been in a situation where a

---

Page 59

1  patient comes to the emergency department and they
2  are seen by the E.R. physician and lab tests are
3  ordered on the patient, but for whatever reason the
4  patient has to leave the emergency department before
5  all the lab work is back?
6       A.   Yes.
7       Q.   Okay.  And in that circumstance what
8  happened with regard to that lab work that was to be
9  obtained after the patient left?
10           MS. BRYAN:  Form.
11      A.   If something out of the value of that lab
12 work comes back and it's an abnormal level, then it's
13 routinely -- the lab routinely notifies the E.R.
14 charge nurse and then the E.R. charge nurse follows
15 up with what the disposition of the patient is.  And
16 if they have to contact the patient, then they
17 contact them.
18      Q.   (By Mr. Pfeifer)  In dealing with E.R.
19 physicians at Memorial Southeast, have you ever
20 received a verbal request from an E.R. doctor to go
21 inquire about the status of lab tests?
22      A.   Related to a patient that's present in the
23 emergency room?
24      Q.   Yes.
25      A.   Yes.

---

Page 60

1       Q.   For example, suppose you've got a patient
2  in there and the doctor has ordered blood tests on a
3  patient and the doctor is busy, doesn't have the time
4  to look at the computer himself, and says to you,
5  "Nurse Tammy, would you please go check on the labs
6  on my patient" that I'm taking care of here?
7           MS. BRYAN:  Form.
8       Q.   (By Mr. Pfeifer)  Ever had that happen?
9       A.   Are you asking if I looked at the results
10 specifically and interpreted them for him?
11      Q.   (By Mr. Pfeifer)  No, not interpret --
12      A.   Okay.
13      Q.   -- but simply report back to him the values
14 of the --
15      A.   Yes.
16      Q.   -- lab tests?
17      A.   Yes, I have done that before.
18      Q.   Okay.  Has that happened on few or many
19 occasions?
20      A.   It happens frequently in that we -- you
21 know, if they're busy, we will go in and print off
22 the results and place them on the chart for the
23 physician.
24      Q.   Okay.  Is that something you routinely or
25 customarily will do, is go print out the lab results

---

Page 61

1  for the physician?
2           MS. BRYAN:  Objection, form.
3       A.   I don't routinely do it.
4       Q.   (By Mr. Pfeifer)  Okay.  What would bring
5  you to do that with regard to a particular patient?
6       A.   If I have been notified by the lab of a
7  critical value, I will go in and specifically print
8  out the results, so that way I have the whole part of
9  the lab report, such as a basic metabolic panel, that
10 they have called regarding one of the levels being
11 elevated or low, print out the whole report and then
12 give it to the physician.
13           Or if I have physician -- I mean a
14 patient that has been waiting for a disposition, you
15 know, I can see based on the computer that all of
16 their results are back.  I would print the results
17 off and put it in front of the physician to notify
18 them that the patient's ready for disposition.
19      Q.   And when you say "disposition," what are
20 you talking about?
21      A.   Disposition of the patient being whether
22 the patient is discharged or -- needs to be
23 discharged or admitted to the hospital.
24      Q.   Okay.  And that disposition is something
25 that the physician decides on?

16 (Pages 58 to 61)

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

---

Page 78

1    participated in peer review --
2         MR. PFEIFER: No.
3         MS. BRYAN: -- cause analysis or
4    outside that context?
5         MR. PFEIFER:  Outside that context.
6    A.   No.
7    Q.   (By Mr. Pfeifer) Okay.  Do you know
8    April Ganz?
9    A.   Yes.
10   Q.   Have you ever spoken to April Ganz about
11   ███████
12   A.   Not that I can recall other than -- she is
13   aware of just the deposition, because I did ask her
14   just about the triage guidelines.
15   Q.   You asked April Ganz about the triage
16   guidelines?
17   A.   April is the current clinical educator at
18   Southeast.  And after you and I had met --
19        MS. BRYAN:  Okay, everybody stop.  We
20   don't tell --
21        THE WITNESS:  Okay.
22        MS. BRYAN:  Those are attorney-client
23   conversations.
24        THE WITNESS:  Okay.
25        MS. BRYAN:  And Phil, I'm not going to

---

Page 79

1    let her talk about what she talked to me about or --
2         MR. PFEIFER:  Oh, I understand.
3         MS. BRYAN: -- in helping locate
4    documents or anything else.  That's all part of
5    attorney-client communication and preparation for the
6    lawsuit.  She's welcome to talk about discussions
7    about the facts of the case or care that she's had
8    with people, but she's not going to talk about the
9    work for preparing for this lawsuit.
10        MR. PFEIFER:  Okay.
11        MS. BRYAN:  Or her conversation --
12   obviously, you know that's privileged.
13   Q.   (By Mr. Pfeifer) I guess what I'm trying to
14   find out, with regard to your conversation with
15   April Ganz, was an attorney present?
16   A.   No.
17   Q.   And why were you talking -- were you
18   talking to April on instructions from counsel?
19   A.   No, not specifically.
20        MS. BRYAN:  Before you -- if you're
21   going to go down this line, I need to go find out
22   what it is because there -- I was the person trying
23   to find these guidelines, so I need to find out what
24   it is.  And then I will know whether I have to object
25   and instruct her not to answer.

---

Page 80

1         MR. PFEIFER:  That's fine.  Go ahead.
2         VIDEO TECHNICIAN:  We're off the
3    record. It's 11:55.
4         (Recess taken.)
5         MS. BRYAN:  We took a break so I could
6    figure out if we have any attorney-client privilege
7    issues that I should instruct the witness not to
8    answer.  I think there is certainly some -- there is
9    an argument that this would be covered by
10   attorney-client privilege.  I am willing to let
11   Mr. Pfeifer ask this question in the interest of not
12   having to argue about this in front of the Court.  I
13   am certainly only going to allow that if there is an
14   agreement that this is not any waiver of
15   attorney-client privilege or work product, party
16   communication, et cetera, because this is a
17   conversation about retrieving a document for a
18   lawsuit.
19        With that agreement, I am willing to
20   let her answer the question.
21        MR. PFEIFER:  Okay.  Sure.  I agree.
22        MS. BRYAN:  All right.  There will be
23   no further argument that we have waived anything?
24        MR. PFEIFER:  No waiver.
25        THE VIDEOGRAPHER:  We're back on the

---

Page 81

1    record.  It's 12:07.
2    Q.   (By Mr. Pfeifer) Okay.  We were talking
3    about your conversation before the break with
4    April Ganz, okay --
5    A.   Yes.
6    Q.   -- recently?
7    A.   Yes.
8    Q.   Tell me about how that came about.
9    A.   The conversation was only to clarify that
10   the triage guidelines were the correct guidelines
11   that were in place in 2006.
12   Q.   And did she confirm that to you?
13   A.   Yes.
14   Q.   Okay.  And what is April's current
15   position?
16   A.   She is one of the clinical educators of the
17   hospital.
18   Q.   To your knowledge what did she do to verify
19   that they were current guidelines as of '06?
20   A.   I don't know off the top of my head what
21   she did to verify it.
22   Q.   Okay.  Was this something that was a
23   face-to-face conversation with her or --
24   A.   Yes.
25   Q.   -- telephone?

---

GRETCHEN DOWDA REPORTING
(713) 521-1117

Tammy McCrumb
Guzman vs Memorial Hermann                                03/12/09

Page 90

1    A.  I did not have a direct role.  That was
2  done by Dr. Siddiqi and the unit secretary.
3    Q.  Okay.  What indirect role did you have with
4  regard to that?
5    A.  After it was decided that -- preparing him
6  for tran -- you know, doing what necessary to --
7  tests needed to be done as far as what was deemed by
8  Dr. Siddiqi.  But the only time that I ever came --
9  had anything to do with the transfer was when we were
10  discussing intubation with them and Dr. Siddiqi
11  decided that he needed a higher level of care,
12  meaning that he needed an ICU bed.  I notified the
13  unit secretary at that time to -- to call the
14  Transfer Center and notify them of the change in
15  status, that he needed an ICU bed.
16    Q.  Let me see if I understand that.  From my
17  review of the records it looks like the decision to
18  transfer ███ was originally made sometime between
19  11 and 12 in the morning?
20    A.  Yes.
21    Q.  Okay.  And that transfer originally was
22  going to be simply from Memorial Southeast to
23  Memorial Hermann Children's but not with regard to a
24  specific ICU bed?
25    A.  Correct.

Page 91

1    Q.  Okay.  And that transfer was going to be
2  a -- do you know how that transfer was going to be
3  effectuated in terms of the vehicles or agency
4  involved?
5    A.  We were going to use an ambulance service,
6  a contracted ambulance service to provide
7  transportation.
8    Q.  Okay.  And with regard to that transfer
9  then, the requested transfer changed because of the
10  intubation of ███?
11    A.  Yes.
12    Q.  And Dr. Siddiqi made the request for the
13  change?
14    A.  I believe it was communicated between
15  Dr. Siddiqi and the accepting physician at -- in the
16  ICU as to the change in transfer.  The mode of
17  transfer, I should say.
18    Q.  Okay.  To your knowledge did anyone at
19  Memorial Southeast ever call Texas Children's
20  Hospital or contact them with regard to transferring
21  ███?
22    A.  Not that I'm aware of.
23    Q.  Is there some kind of standing policy that
24  you know of about transfer of patients between
25  hospitals in the Memorial System?

Page 92

1    A.  We usually start the transfer process
2  within our own system hospital first.
3    Q.  Do you know of any time when patients have
4  ever been transferred from Memorial Southeast to
5  Texas Children's?
6    A.  In the event that Memorial Hermann
7  Children's Hospital doesn't have a bed available or
8  they're not able to provide the service that the
9  patient needs.
10    Q.  Were you able -- I'm sorry.  Were you ever
11  personally aware that Memorial Children's did not
12  have an ICU bed available for ███
13        MS. BRYAN:  Objection, form.
14    A.  Yeah, you would have to rephrase that.
15    Q.  (By Mr. Pfeifer) Did you ever become aware
16  that Memorial Children's did not have a bed, an ICU
17  bed available for ███?
18        MS. BRYAN:  Objection, form.
19    Q.  (By Mr. Pfeifer) Okay.  Were you ever told
20  that by anybody?
21    A.  I was told that they did not have a bed
22  immediately available but that they would be making a
23  bed for him.  And that usually means it will happen
24  pretty quickly, within an hour.
25    Q.  Can you explain to me what is going on with

Page 93

1  regard to this ambulance in Beaumont?
2    A.  The -- between Dr. Siddiqi and the
3  accepting ICU physician, they wanted the -- they
4  wanted ███ transported by the pediatric transport
5  team.  They felt that that would be the best capable
6  team to transfer him from our hospital to Hermann
7  Children's.
8        And I believe that that particular
9  team was transporting -- I don't know if they were in
10  route to Beaumont to transport a patient back from
11  Beaumont or to Beaumont.  I'm not quite sure.  And
12  the accepting physician wanted him transported by
13  that particular transport team because they -- they
14  have a different level of care that they can provide
15  for pediatric patients.  They have more team members,
16  such as primary pediatric critical care nurse, they
17  have a respiratory therapist, a paramedic and at
18  times a physician travels with them.
19    Q.  And is that with the AMR group?  Is that
20  the people we're talking about?
21    A.  This is Children's Memorial Hermann
22  Pediatric Transport Team.  AMR is a separate
23  contracted ambulance company that we use to provide
24  transportation for our patients.
25    Q.  Okay.  So what was the situation?  Was the

24  (Pages 90 to 93)

Tammy McCrumb

Guzman vs Memorial Hermann                                        03/12/09

---

Page 94

1  situation that the Pediatric Transport Team was sent
2  to Beaumont by mistake or that the Pediatric
3  Transport Team was attending to another patient who
4  was in Beaumont and therefore was not available to
5  come get ▊
6          MS. BRYAN: Objection, form.
7      A. It is my understanding that the Pediatric
8  Transport Team was in route to Beaumont to take care
9  of another pediatric patient.
10     Q. (By Mr. Pfeifer) And therefore was
11 unavailable at that time?
12         MS. BRYAN: Objection, form.
13     A. I'm not understanding exactly what you want
14 me -- what your question is.
15     Q. (By Mr. Pfeifer) What was your
16 understanding that day about why the Pediatric
17 Transport Team did not come get ▊ based upon
18 what you were told by other people?
19         MS. BRYAN: Objection, form.
20     A. They were in the process of transporting a
21 patient from Beaumont.
22     Q. (By Mr. Pfeifer) Okay. Did you ever
23 receive any information about when they were expected
24 to arrive?
25     A. I don't remember what their estimated time

---

Page 95

1  of arrival was.
2      Q. At some point in time did people from a
3  company called AMR show up?
4      A. Yes.
5      Q. Why did AMR show up?
6          MR. BRENNIG: Objection, speculation.
7      A. They were called to provide transportation
8  for him prior to his level of care being increased.
9  When I called report and told -- and it was decided
10 that he was ready for transport, then AMR was
11 called.
12         Then he was reassessed by myself and
13 then also by Dr. Siddiqi and it was decided that his
14 status had changed. And somewhere in the middle of
15 us preparing and getting him intubated, a call was
16 never placed to AMR to cancel the transport. And
17 that is why they showed up.
18     Q. Okay. See if I understand that. Between
19 11 and noon the decision is made to transport ▊
20 from Memorial Southeast to Memorial Children's in the
21 Medical Center.
22         MS. BRYAN: Objection, form.
23     Q. (By Mr. Pfeifer) Correct?
24     A. Yes.
25     Q. Okay. And once that decision was made to

---

Page 96

1  transfer, did you have things that you needed to do
2  as a nurse to prepare for the transport?
3      A. Yes.
4      Q. And what were you required to do as the
5  nurse to prepare for the transport?
6      A. Make sure that all of the records are
7  completed, make sure that any outstanding orders are
8  completed, they are done. Call report to the
9  accepting facility. Call whoever the transfer
10 company is to get the patient transferred, provide
11 them with a report. And then, you know, continue to
12 reassess the patient until the transport team
13 arrives.
14     Q. So are you the person who was on the
15 telephone with AMR?
16     A. I don't recall if I specifically called
17 AMR.
18     Q. Okay. Did you have telephone conversations
19 between yourself and someone at Memorial Children's?
20     A. I called report to the accepting nurse at
21 Memorial Children's.
22     Q. Okay. When you say you called report,
23 explain that.
24     A. I called a nursing report to the accepting
25 nurse and explained to her what -- you know, what

---

Page 97

1  ▊ had been there for, his chief complaint, my
2  assessment of him, what orders we had done, what
3  testing we had done, medications that were done. You
4  know, his vital signs. All of those are included in
5  the nursing report.
6      Q. Is that someone who is indicated in the
7  record as being T-A-M-A-R?
8      A. Yes.
9      Q. All right. And that looks like you noted
10 that at 1:15 in the afternoon?
11     A. Yes.
12     Q. Okay. And then it was shortly after that
13 that ▊ condition seemed to change?
14     A. Yes.
15     Q. And that he required intubation?
16     A. Yes.
17     Q. Okay. You also noted at 13:16, I believe,
18 transfer approved at 12:27?
19     A. Correct.
20     Q. What did you mean by that?
21     A. That the transfer was approved at 12:27,
22 that he was officially accepted at Hermann
23 Children's.
24     Q. Okay. In this entire process did you ever
25 speak to a physician at Hermann Children's?

25 (Pages 94 to 97)

Tammy McCrumb

Guzman vs Memorial Hermann                                    03/12/09

---

Page 98

1      A.   No.
2      Q.   That afternoon between the time that
3   ▓▓▓▓▓ was intubated and the time that you
4   discovered that his temperature was elevated at
5   107.9, did you ever speak to Dr. Siddiqi?
6      A.   Yes.  It's documented in my note that I
7   have spoken to him.
8      Q.   Okay.  When was it that you spoke to him?
9      A.   There is documentation in the note that I
10  spoke to him, that he was restless, and I received
11  orders from him to sedate the patient, and also that
12  Dr. Siddiqi was at the bedside, it says, at 14:55 and
13  then at 15:15.
14           MS. BRYAN:  Now, when you are looking
15  at the record, I would prefer you to use this because
16  there are clearly things in the second exhibit that
17  are not in the original record.
18           THE WITNESS:  Okay.
19      A.   Let's see.  At 14:25 Dr. Siddiqi is -- it's
20  in the -- in the official record that he is -- AMR is
21  at bedside and he is to be transferred by Hermann
22  Children's ground ambulance, that he's aware of the
23  potential length of delay due to the transport team
24  traveling to Beaumont to pick up another patient.
25           And then at 14:55, that he is

Page 99

1   restless, breathing over the vent.  I spoke to him
2   and orders received to sedate him.
3           And then again at 15:15 is when
4   Dr. Siddiqi is at the bedside to discuss the plan of
5   care and explain the delay in transfer.
6      Q.   Between 15:15 and the time that the fever
7   went up which was, what, 15:32?
8      A.   I believe so.
9      Q.   So that's a period of about 17 minutes,
10  right?
11     A.   Correct.
12     Q.   Okay.  During that period of time, did
13  Dr. Siddiqi ever notify you that he was going off
14  shift?
15     A.   I don't remember him doing so.
16     Q.   Who was it -- well, let me ask you this:
17  Did anyone contact Hermann Children's and request
18  Life Flight?
19     A.   I believe Dr. Nguyen did.
20     Q.   And did Life Flight respond to that
21  request?
22     A.   Yes.
23     Q.   At any time during this care that you were
24  giving to ▓▓▓▓ Guzman, did anyone indicate to you
25  that ▓▓▓▓ had sepsis?

Page 100

1      A.   Yes, Dr. Siddiqi did.
2      Q.   And when was it during the course of the
3   day that he told you that ▓▓▓▓ had sepsis?
4      A.   I can't recall the exact time.
5      Q.   At any point in time did Dr. Siddiqi ever
6   tell you that ▓▓▓▓ had septic shock?
7      A.   I don't recall that term ever being used.
8      Q.   Okay.  Are you able to narrow it down at
9   all in terms of a time frame when Dr. Siddiqi told
10  you that ▓▓▓▓ had sepsis?
11           MR. BRENNIG:  Objection, speculation.
12           MS. BRYAN:  Form.
13      A.   It was, I'm guessing, probably around
14  12:30-ish, one o'clock.
15      Q.   And what is it that leads you to that
16  belief?
17           MR. BRENNIG:  Object to form.
18           MS. BRYAN:  You don't guess.
19           MR. BRENNIG:  Speculation.
20      A.   It was just prior -- I mean, it was during
21  the discussion with his parents prior to him being
22  intubated.
23      Q.   All right.  Are you able to tell me from
24  looking at the chart, the official chart, when it was
25  that the first set of CBC values on ▓▓▓▓ came back

Page 101

1   on the 13th?  By that I mean were available and
2   reported.
3      A.   I -- according to the chart, the time
4   that -- they are timed at 8:10 in the morning, but
5   that's the time that they were drawn.  I don't
6   know -- it doesn't say what time they were actually
7   reported.
8      Q.   Okay.  Is there a notation on the chart
9   concerning the CBC about manual differential being
10  performed?
11     A.   Yes, there is.
12     Q.   What is the time?
13           MS. BRYAN:  What's the Bates number
14  there?
15           THE WITNESS:  Okay.  0067.
16     Q.   (By Mr. Pfeifer)  And what is the time?
17     A.   It has manual differential performed
18  2-13-06 at 08:55.
19     Q.   Would you look at the medication
20  administration record, please.
21           MS. BRYAN:  Bates number when you get
22  it.
23           THE WITNESS:  47.  0047.
24     Q.   (By Mr. Pfeifer)  By looking at the
25  medication administration record, are you able to

26 (Pages 98 to 101)

Plaintiffs Response to Memorial Hermann Motion for Summary Judgment

Exhibit R

IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF TRISTAN | § | |
| GUZMAN, A MINOR | § | |
| | § | |
| | § | CIVIL ACTION NO. 04:07-CV-03973 |
| V. | § | |
| | § | JURY DEMANDED |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM, D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL | § | |

**AFFIDAVIT OF PHILLIP A. PFEIFER**

STATE OF TEXAS

COUNTY OF HARRIS

### AFFIDAVIT

Before me, the undersigned authority, on this day personally appeared Phillip A. Pfeifer, who is known to me, who after being by me duly sworn, did depose as follows:

My name is Phillip A. Pfeifer. I am over the age of twenty-one years; I am of sound mind; I have never been convicted of a felony or a crime of moral turpitude; and I am competent to make this affidavit. I have personal knowledge of the facts stated in this affidavit, and such facts are true and correct.

I am counsel of record for the Plaintiffs in the above styled and captioned case. Attached to Plaintiffs' Response to Defendant Memorial Hermann Hospital System's Motion for Partial Summary Judgment are multiple discovery materials that have not been filed in this case. I hereby swear and affirm that the attachments to this Response are true and correct copies of the actual discovery materials, including policies and procedures from Memorial Hermann, depositions that have been taken in this case, a copy of a legal opinion, and the affidavit with attachments or Dr. Stephen A. Hayden.

Further, affiant saieth not.

_Phillip A Pfeifer_
Phillip A. Pfeifer

Sworn to and subscribed before me, the undersigned notary public, on the 29th day of April, 2009.



Notary Public, State of Texas

My commission expires on ___3- 28- 2010___.

Rick L. Mesecher
Notary Public
State of Texas
My Commission Expires
**March 28, 2010**