UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY AND AS NEXT FRIEND OF TRISTAN GUZMAN, A MINOR | § § § § | |
| v. | § | C.A. No. 07-03973 |
| MEMORIAL HERMANN HOSPITAL SYSTEM, D/B/A MEMORIAL HERMANN SOUTHEAST HOSPITAL | § § § § | |

### DEFENDANT MEMORIAL HERMANN HOSPITAL SOUTHEAST'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs' EMTALA claims should be dismissed as a matter of law because:

- EMTALA imposes only a limited duty to screen patients for the presence of an emergency medical condition and does not create the expansive "rule out" obligations argued by Plaintiffs;

- EMTALA violations must be based on something more than disparate treatment resulting from negligence or the exercise of medical judgment;

- EMTALA violations require substantial, not *de minimus* deviations from a hospital's medical screening policy;

- EMTALA stabilization claims require actual knowledge of plaintiff's emergency medical condition; and

- The transfer did not violate EMTALA.

### I. Plaintiffs' EMTALA Claims Fail as a Matter of Law

**A. EMTALA imposes limited screening duty, not a broad requirement to rule out all potential conditions**

EMTALA creates limited duties and does not guarantee non-negligent or adequate treatment: "The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate

first response to a medical crisis' for all patients...." *Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir. 1992)(quoting 131 Cong. Rec. S13904 (Oct. 23, 1985)(Statement of Sen. Durenberger)). Plaintiffs' interpretation of EMTALA would impose on hospital emergency rooms the requirement to continue diagnostic testing, regardless of the physician's judgment that further testing is unnecessary, to rule out any potential conditions. Nothing in the language or purpose of the EMTALA statute supports Plaintiffs' position.

### B. A valid EMTALA claim requires material disparate treatment based on something more than the exercise of medical judgment or negligence.

Plaintiffs contend nothing more than mere "different" treatment is required to show an EMTALA violation. If mere different treatment and nothing more established an EMTALA screening violation, the federal courts will be overrun with EMTALA cases. In promulgating EMTALA, Congress intended to prevent patient dumping. *See Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d. 319, 322 (5th Cir. 1998). Congress's purpose in enacting the statute guides the interpretation and application of the statute. *See Griffith v. Mt. Carmel Medical Center*, 831 F.Supp. 1532, 1539 (D. Kan.,1993). ("Accordingly, the standards applied to adjudicate both appropriate medical screening and stabilizing treatment claims have been developed with this congressional purpose in mind.") "There is absolutely no support in EMTALA's legislative history that Congress intended to punish merely negligent failures to perform an appropriate screening." Beverly Cohen, *Disentangling EMTALA From Medical Malpractice: Revising EMTALA's Screening Standard to Differentiate Between Ordinary Negligence and Discriminatory Denials of Care,* 82 Tulane L.Rev. 645, 684 (2007). "[S]omething more than or different from negligence" is necessary to prove an EMTALA

violation. *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996).[1] Furthermore, merely "different" conduct is insufficient to distinguish true EMTALA claims from negligence claims. Cohen, *Disentangling EMTALA, supra* at 679.

The Fifth Circuit, like many courts, has adopted the disparate treatment test for determining whether a medical screening exam complies with EMTALA's appropriate screening requirement. *See Marshall*, 134 F.3d at 323; *Battle v. Memorial Hosp. at Gulfport*, 237 F.3d 633, (5th Cir. 2000). The disparate treatment test developed because many courts realized that "forcing a plaintiff to prove a discriminatory motive would present insurmountable problems of proof due to the difficulty of 'proving the inner thoughts and prejudices of attending hospital personnel.'" Cohen, *Disentangling EMTALA, supra* at 676, (citing *Power v. Arlington Hosp. Ass'n.*, 42 F.3d 851, 858 (4th cir. 1994)). The development of an evidentiary test that relieves the plaintiff of the burden of proving the "inner thoughts of hospital personnel" did not transform statute's intended purpose, the prevention of patient dumping, and so-called "walletectomies," and did not create EMTALA liability for any deviation from any hospital policy. Rather, as in the employment context, the EMTALA "disparate treatment" test requires discriminatory conduct without requiring the plaintiff to prove the discriminatory thoughts. The EMTALA disparate treatment test has been interpreted to require evidence of discriminatory treatment, or treatment that did not result from negligence or the exercise of medical judgment: "While courts have correctly observed that proving an improper motive is not an express requirement of the screening provisions of the statute, defining an inappropriate screening examination as one that deviates from standard protocols for discriminatory reasons is nevertheless consistent with statutory intent." Cohen, *Disentangling EMTALA, supra* at 679.

---

[1] Contrary to Plaintiffs' assertions, the Fifth Circuit has not rejected the reasoning of *Summers* or *Vickers v. Nash Gen'l Hosp., Inc.*, 78 F.3d 139 (4th Cir. 1996), nor called their reasoning into question.

3

EMTALA is not a federal medical malpractice statute, in order to separate valid EMTALA claims from those based on negligence or the exercise of physician judgment, courts often require evidence of discrimination without requiring the plaintiff to prove "that discrimination existed in the caregiver's minds." *Id.* at 687. In *Battle*, the Fifth Circuit reversed the lower court's grant of summary judgment because although the lower court based its decision on the physician's belief that the patient "was suffering from pneumonia and an ear infection," the plaintiff presented "equally believable motives for the early discharge," that the patient was "[b]lack, poor, uninsured and presented at the emergency room during the Christmas holidays." Cohen, *Disentangling EMTALA*, *supra* at 684 (citing *Battle*, 228 F.3d at 558). *Battle* supports the proposition that something more than negligence and the exercise of medical judgment is required to support a valid EMTALA claim. *Id.* The *Power* case also presented evidence of discrimination—that the plaintiff was foreign, unemployed and uninsured – that the jury chose to believe was the reason for omitting particular tests rather than the exercise of medical judgment. Plaintiffs have not shown any evidence of discrimination that rebuts Dr. Haynes's exercise of medical judgment in performing the medical screening exam; therefore, the medical screening claim fails as a matter of law.[2]

---

[2] Neither *Roberts v. Galen*, 525 U.S. 249, 253 (1999) nor *Power*, 42 F.3d 851, 858 (4th cir. 1994) changes the analysis in this case. As this Court has recognized, the Supreme Court in *Roberts v. Galen* held that no proof of *bad motive* was required to support an EMTALA stabilization claim. The court expressly stated that is was expressing no opinion on whether proof of bad motive was required to prove an EMTALA screening violation. *See Roberts*, 525 U.S. at 253. In *Power*, as in *Battle*, the differential treatment could have resulted from discrimination as opposed to the exercise of medical judgment. The Fourth Circuit affirmed the jury finding and rejected the hospital's contention that the jury verdict could not stand absent express proof of bad motive on the part of the hospital. Requiring proof of bad motive or "the inner workings of the minds of hospital personnel" differs from requiring disparate treatment sufficient to support an EMTALA claim be based on something other than the exercise of medical judgment or negligence.

## C. EMTALA Requires a Substantial, not *de minimus*, Deviation from a Hospital's Medical Screening policy

"To be actionable under EMTALA, the deviations from a hospital's standard screening must be substantial, amounting to a failure to perform essential elements of the standard screening." Cohen, *Disentangling EMTALA, supra* at 664, internal citations omitted). Mere *de minimus* violations cannot support an EMTALA claim. *See Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 523 (10th Cir. 1994). In *Kilroy v. Star Valley Medical Center*, 237 F.Supp.2d 1298, 1304-05 (D.Wyo. 2002), the plaintiff alleged EMTALA violations based on, among other things, screening procedure violations, the failure to follow procedures for the taking, reassessment and documentation of vital signs, and failure to document vital signs and write a note at discharge. *Id.* The district court found that the hospital's failures to comply did not support an EMTALA claim: "the Court will not view simply any oversight in procedure to be a violation of EMTALA. The deviation from the procedure must be substantial enough to actually implicate EMTALA's policy. A screening that is so cursory that it is not designed to identify *acute and severe symptoms* that alert the physician of the need for *immediate* medical attention to prevent serious bodily injury would violate EMTALA." *Id.* at 1305 (emphasis added). That type of cursory screening did not occur here. The patient was thoroughly examined and tested before being discharged based on the physician's medical judgment that the patient was not sick enough to need hospitalization.

## D. There is No Fact Issue Regarding MHSE's Policies

Plaintiffs' argument that MHSE is required to craft a written screening policy is incorrect. Cohen, *Disentangling EMTALA, supra* at 676 (citing *Summers*, 91 F.3d at 1140). EMTALA "does not require hospitals to promulgate written screening protocols." MHSE's only written medical screening policy is a general policy that applies to physician assistants and nurse

5

practitioners and does not set forth a symptom-specific screening procedure. MHSE is not required to create a symptom-specific policy and has not done so. *See Baber*, 977 F.2d at 879 n. 6.

MHSE admits the authenticity of all the policies produced in the litigation. MHSE and Memorial Hermann Hospital System have no record of the Triage Guidelines being "in effect" in 2007. However, MHSE does not deny the testimony of Tammy McCrumb, the nurse that cared for T. on February 13, nor does it deny that a copy of the document was located in a notebook at the triage desk in the MHSE emergency department. MHSE does not deny that the document was available to staff of the emergency room. For purposes of summary judgment, this Court may assume the policy was a valid *Triage Guideline* in effect at MHSE.

However, MHSE *does deny* that the Triage Guidelines constitute a medical screening exam policy. Neither Tammy McCrumb nor April Ganz, the nurse that triaged T. on February 12, testified that the Triage Guidelines were a medical screening policy. In fact, the Triage Guidelines cannot be a medical screening policy because they are implemented only when there is a delay to see the physician. Even if this Court considers the Triage Guidelines to be MHSE's medical screening policy, Plaintiffs have not demonstrated a substantial deviation that would support an EMTALA claim. *See, Kilroy*, 237 F.Supp.2d at 1305. Dr. Hayden never opines, in his conclusory-laden affidavit, that an urinalyis is required to determine the presence or absence of an emergency medical condition.

### E. The Stabilization Claim Requires Actual Knowledge of an Emergency Medical Condition.

EMTALA requires the hospital employees or physician to have actual knowledge of the emergency medical condition before the duty to stabilize arises. *Baber*, 977 F.2d at 883. In this case, *no person* had actual knowledge of T.'s emergency medical condition. Dr. Haynes knew of

6

his physical symptoms, his physical presentation, his total white cell count and the results of his basic metabolic panel. The lab tech, who had never seen the patient and had no medical training, knew of the band count. Knowledge of a band count cannot be equated with knowledge of an emergency medical condition. There is no evidence that any physician or hospital employee had actual knowledge of T.'s emergency medical condition. This situation is no different from those in which a doctor does not see or misreads an x-ray and therefore does not have actual knowledge of the emergency medical condition. *See Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1166-67 (9th cir. 2002).

### F.     The Transfer Did Not Violate EMTALA

"[U]nder EMTALA, a hospital may transfer an unstable patient with an emergency condition if the patient or *a legal representative gives informed consent* or a physician certifies that the benefits expected from the transfer outweigh the risks of effecting the transfer. *See* 42 U.S.C. § 1395dd(c)(1); *Estate of Robbins v. Osteopathic Hosp. Founders Assoc.*, 178 F.Supp.2d 1221 (N.D.Okl.2000). Therefore, under the disjunctive language of the statute, either of these circumstances preclude liability." *Sanchez Rivera v. Doctors Center Hosp., Inc.*, 247 F.Supp.2d 90, 104-05 (D. Puerto Rico, 2003). Wendy Guzman signed the following statement on the Memorandum of Transfer: "I have been informed of the hospital's obligation to individuals with an emergency medical condition.  ... I have been informed of [the individual's] medical condition. The risks and benefits of the transfer have been explained to me and I request the transfer to the receiving hospital." (Ex. L, Plaintiffs' Response to Motion For Summary Judgment, p. MHLF-0009).

7

The affidavit of Plaintiffs' expert, Dr. Hayden[3], criticizes the care provided prior to transfer, such as delay in administering antibiotics. He criticisms address the quality of care, or negligence. EMTALA is not a medical malpractice statute. *Marshall*, 134 F.3d at 322. Thus, quality-of-care criticisms are not relevant to the determination of whether the transfer complied with EMTALA requirements.

As discussed in MHSE's Motion for Summary Judgment, the transfer of T. complied with the EMTALA transfer provisions.

## II. CONCLUSION

This Reply does not attempt to respond to all arguments in Plaintiffs' 57 page Response to MHSE's Motion for Partial Summary Judgment as many of them attempt to raise fact issues irrelevant to the Court's determination of whether, as a matter of law, Plaintiffs' allegations support an EMTALA cause of action. The extensive briefing in this case clearly defines Defendant's and Plaintiffs' positions: MHSE believes that EMTALA imposes a *limited* duty to perform a medical screening exam calculated to determine the presence or absence of an emergency medical condition, while Plaintiffs interpret EMTALA to provide a cause of action for any violation of hospital policy and to require the ruling out all potential medical conditions.

---

[3] See MHSE's Objections and Motion To Strike the Affidavit of Dr. Stephen Hayden filed separately.

For the reasons outlined in MHSE's Motion For Partial Summary Judgment, Plaintiffs' EMTALA claims should be dismissed.

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

By: *Christina A. Bryan*
Craig Smyser
Federal ID No. 848
State Bar No. 18777575
Christina A. Bryan
State Bar No. 03264000
Federal Bar ID: 15042
2300 Bank of America Center
700 Louisiana Street
Houston, Texas 77002
Telephone: 713/221-2300
Facsimile: 713/221-2320
ATTORNEYS FOR DEFENDANT
MEMORIAL HERMANN HOSPITAL SYSTEM
d/b/a MEMORIAL HERMANN SOUTHEAST HOSPITAL

**CERTIFICATE OF SERVICE**

This pleading was served in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 15th day of May, 2009.

*Christina A. Bryan*
Christina A. Bryan