**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WENDY GUZMAN, INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF T. | § | |
| GUZMAN, A MINOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-3973 |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM,  D/B/A MEMORIAL | § | |
| HERMANN SOUTHEAST HOSPITAL, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This case arises out of medical care provided to a child in a hospital emergency room in February 2006.  Wendy Guzman, individually and on behalf of her son, "T," sued Memorial Hermann Hospital System, d.b.a. Memorial Hermann Southeast Hospital ("Memorial Hermann") in November 2007.  Guzman filed this suit in Texas state court, asserting a claim under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), and Memorial Hermann timely removed on the basis of federal-question jurisdiction.  Guzman amended her complaint to add state-law negligence claims against Memorial Hermann, Philip Haynes, M.D., Ph.D., Memorial Southeast Emergency Physicians, LLP ("MSEP"), and Emergency Consultants, Inc. ("ECI").

Dr. Haynes was the emergency-room physician who saw T. at Memorial Hermann. Dr. Haynes was a partner in MSEP, a limited liability partnership of emergency-room

physicians.  MSEP is a Michigan LLP registered to do business in Texas.  MSEP had a contract with Memorial Hermann to provide emergency-physician staffing to the hospital. ECI, a Michigan corporation with its principal place of business in Michigan, had an administrative services agreement with MSEP to provide administrative and support services. On December 17, 2008, this court granted ECI's motion to dismiss for lack of personal jurisdiction.  (Docket Entry No. 53).

Memorial Hermann has moved for summary judgment on Guzman's EMTALA claims.  (Docket Entry No. 95).  Guzman responded, (Docket Entry No. 100), and moved for a continuance to conduct discovery under Rule 56(f).  (Docket Entry No. 99).  Memorial Hermann replied, (Docket Entry No. 103), Guzman filed a surreply, (Docket Entry No. 106), and Memorial Hermann filed a supplemental reply, (Docket Entry No. 108).  Memorial Hermann also moved to strike the affidavit of Guzman's expert witness, Dr. Stephen Hayden, M.D., (Docket Entry No. 104), and Guzman responded, (Docket Entry No. 107).  After this court heard oral argument on the parties' motions on May 28, 2009, Guzman filed a supplemental response, (Docket Entry No. 110), and Memorial Hermann filed a supplemental reply, (Docket Entry No. 113).

Based on a careful review of the motions, responses, and replies, the parties' submissions, the arguments of counsel, and the applicable law, this court grants Memorial Hermann's motion for partial summary judgment and grants in part and denies in part Memorial Hermann's motion to strike.  Guzman's Rule 56(f) motion is denied.  The reasons for these rulings are explained below.

2

## I.      The Summary Judgment Evidence

### A.      Factual Background

On February 12, 2006, Guzman's son "T," then seven years old, was feeling ill.  His parents took him to the emergency room at Memorial Hermann in Houston, Texas.  They arrived at the hospital at 7:39 a.m. and were taken to the triage area at 7:42 a.m.  Guzman reported that her son had vomited seven or eight times during the night and complained of nausea.  Guzman also stated that the child had been running a fever, but that she had not recorded his temperature with a thermometer.  The triage nurse recorded the child's temperature as 98.1 degrees, his blood pressure as 110/67, and his heart rate as 145.  Under Memorial Hermann policy, all pediatric patients with a heart rate above 140 are categorized as Emergent Level 2.  The triage nurse, April Ganz, placed Guzman's son in this category based solely on his elevated heart rate.  Memorial Hermann policy required all patients categorized as Emergent Level 2 to be seen by a physician.  In accordance with this policy, Nurse Ganz completed triage at 7:47 a.m. and took the child to an examination room to be seen by Dr. Haynes.

At 7:55 a.m., an emergency room nurse, Frank Blain, examined T., who complained of cough and generalized pain.  (Docket Entry No. 95, Ex. A, at MHSE–0013).  Guzman had given T. Motrin at 4:00 a.m. and Tylenol at 6:30 a.m.  (*Id.*).  Nurse Blain noted that the child's respiratory effort was "even, unlabored, relaxed," his respiratory pattern was "regular symmetrical," and his breath sounds were "clear bilaterally."  (*Id.*, at MHSE–0014).

At 8:00 a.m., Dr. Haynes began taking the child's medical history in advance of

3

performing a physical examination.  (*Id.*, at MHSE–0009, MHSE–0010).  Dr. Haynes learned that the child had been coughing, vomiting, and complaining of nausea.  Dr. Haynes then examined "T."  In his deposition, Dr. Haynes testified that the child was "clinically stable, his saturation on room air was normal.  He had clear breath sounds bilaterally, had no retractions, was in no respiratory distress."  (Docket Entry No. 95, Ex. N, Deposition of Philip Haynes, M.D., at 24:4–7).  At this point, Dr. Haynes believed that the child likely had a virus.  At 8:34 a.m., Dr. Haynes ordered several laboratory tests, including a complete blood count (CBC).  A CBC includes a white blood cell differential test, which examines and classifies 100 white blood cells.  One of the classifications is a band count.  A high band count indicates that a patient is fighting off infection.

At approximately 9:10 a.m., the CBC results were made available on the hospital's computer, except for the white blood cell differential test results.  The automated processor for the CBC had generated an abnormality flag, requiring a manual white blood cell differential test.  That manual test was completed and the results available on the hospital's computer system by 9:35 a.m., but Dr. Haynes did not see them that day.  (Docket Entry No. 100, Ex. F, Deposition of Doug Mitchell, at 38:3–13).

Sometime between 8:30 and 10:00 a.m., Dr. Haynes checked back on T. to ask how he was doing and to make sure he was getting fluids and everything he needed.  (Docket Entry No. 95, Ex. N, Deposition of Philip Haynes, M.D., at 79:4–18).  Shortly before 10:00 a.m., Nurse Blain told Dr. Haynes that the Guzmans wanted to know their son's lab values.  Blain said that the family was interested in going home and wanted to know what the doctor

4

planned.  When Dr. Haynes had this conversation with Nurse Blain, he knew that he had the CBC results except for the white blood cell differential test results.  (*Id.*, at 23:8–11).  Dr. Haynes testified that when he looked at the lab values on the computer around 10:00 a.m. the differential count was not on the screen.  (*Id.*, at 20:13–19).

At 10:13 a.m., Dr. Haynes diagnosed viral syndrome.  Nurse Blain had recorded that at 9:58 a.m., T's heart rate had decreased to 105-110.  Dr. Haynes believed that the earlier elevated heart rate had been caused by an albuterol inhaler treatment or slight dehydration from vomiting.  (*Id.*, at 93:20–94:22).   The emergency room staff had given T. a "fluid challenge by mouth to make sure that he was no longer vomiting."  (*Id.*, at 23:21-24:9).  Dr. Haynes believed that the improved heart rate was due to the IV fluids T. received in the emergency room.  Dr. Haynes and the emergency room nurses believed that the child was stable during the entire time he was in the emergency room on February 12, 2006.  Dr. Haynes testified that he made the decision to discharge, knowing that he had not seen the results of the white blood cell differential test, because he had examined T. and interviewed the family, found the child "clinically stable," with an improved heart rate, no respiratory distress, "no longer hurting anywhere other than the place where his IV was," and "the family wanted to go home."  (*Id.*, at 23:17–24:14).  Based on all that information "and on the lab information [he] had available to [him] at that time, [Dr. Haynes] felt [T.] was stable for discharge."  (*Id.*, at 24:17–19).  Because Dr. Haynes believed the child to be "stable for discharge," (*id*. at 20:3–10), he was released from the hospital at approximately 10:15 a.m.

5

The form Dr. Haynes completed to show the differential diagnosis[1] based on the child's symptoms indicated diabetes, diabetic ketoacidosis, gastroenteritis, and "UTI," or urinary tract infection.  (Docket Entry No. 95, Ex. A, at MHSE–0010).  Dr. Haynes testified in his deposition that the circle on the form around "UTI" was a mistake; he had meant to circle "URI," or upper respiratory infection.  (Docket Entry No. 95, Ex. N, Deposition of Philip Haynes, M.D., at 111:3–12).  According to Dr. Haynes, the child's symptoms were not consistent with a urinary tract infection.  (*Id.*, at 111:8–9).  Dr. Haynes believed that T. had a virus that was mostly affecting the upper respiratory system but could have also been affecting the gastrointestinal system.  (*Id.*, at 111:16–24).  Dr. Haynes told the Guzmans that their son's condition should begin to improve within 24 hours but to return to the emergency room if he was not better.

Dr. Haynes did not see the white blood cell differential test results before discharging "T."  As a result, Dr. Haynes did not know that the band count was extremely high, indicating a bacterial infection.  Dr. Haynes testified in his deposition that if he had seen the band count, he would have reevaluated the child, told the family members about the abnormal lab values, admitted the child to the hospital, ordered a blood culture, and spoken with his primary care physician about possibly giving the child antibiotics.  (*Id.*, at 24:20–25:23).

---

[1]  The differential diagnosis is a list of possible diagnoses based on the clinical data.  *See also Harris v. Health & Hosp. Corp.*, 852 F.Supp. 701, 703–04 (S.D. Ind. 1994) (a differential diagnosis is "the determination of which one of two or more diseases a patient is suffering from, by systematically comparing and contrasting their clinical findings") (quoting Dorland's Medical Dictionary, 27th ed., at 461).

The Guzmans brought their son back to the Memorial Hermann emergency room the following morning, February 13, 2006.  They arrived around 7:00 a.m.  The child was complaining of fever, vomiting, diarrhea, and abdominal and chest pain.  A nurse recorded the following vital signs:  blood pressure 110/30; pulse 74; respiratory rate 24, temperature 97.6 degrees.  T. was classified Emergent Level 2 and placed in an exam room.  At 7:59 a.m., Dr. Mohammed Siddiqi performed a physical examination and ordered laboratory tests and a chest x-ray.  Based on the results of these tests, Dr. Siddiqi diagnosed the child with pneumonia between 9:30 and 9:45 a.m.  At that time, T. had a 99.5 degree temperature.

The child's condition worsened while he was in the emergency room.  At 11:15 a.m., he had a pulse of 148, a respiratory rate of 40, and a temperature of 101.2 degrees.  At 11:23 a.m., Dr. Siddiqi ordered T. transferred to the pediatric intensive care unit at Memorial Hermann Children's Hospital, where he could receive a higher level of care.  Dr. Siddiqi also ordered antibiotics and fluids, which were administered to the child at 11:35 a.m.  At 12:03 p.m., Dr. Siddiqi first suspected that the child might have sepsis, an inflammatory process that develops in response to infection but extends beyond the infection site to affect the whole body.  Sepsis is characterized by an elevated heart rate, rapid breathing, abnormal body temperature, and decreased blood pressure.  At 12:03 p.m., the child's pulse was 148, blood pressure was 85/62, and respiratory rate was 48.  Dr. Siddiqi testified in his deposition that the child's drop in blood pressure and increase in respiratory rate from the previous readings caused him to suspect sepsis.

At 12:30 p.m., Memorial Hermann Children's accepted the transfer request but

7

indicated that a "Response in 30 min." would not occur due to the "Extenuating Circumstance[]" of "Bed Control." (Docket Entry No. 100, Ex. L). Dr. Siddiqi arranged for American Medical Response ("AMR"), an ambulance company, to transport T. to Memorial Hermann Children's. At 1:00 p.m., the child's pulse was 162, his respiratory rate was 62, and his temperature was 99.1 degrees. (Docket Entry No. 95, Ex. A, at MHSE–0043).

At 1:20 p.m., Dr. Siddiqi came to reevaluate the child and discuss the transfer process with the Guzmans. He also talked to them about the possible need for intubation. At 1:35 p.m., Dr. Siddiqi decided that T. needed to be intubated to protect his airway and respiratory system. Dr. Siddiqi "thoroughly explained [the] need for intubation to [the] patient's parents [,] who verbalize[d] understanding." (Docket Entry No. 95, Ex. A, at MHSE–0045). At 1:37 p.m., Dr. Siddiqi spoke with Dr. Erickson at Memorial Hermann Children's Hospital. Dr. Erickson accepted the transfer request but told Dr. Siddiqi that he would first have to prepare a bed in the pediatric ICU. (*Id.*, at MHLF–006). Tammy McCrumb, R.N., the nurse attending "T," testified in her deposition that this "usually means it will happen pretty quickly, within an hour." (Docket Entry No. 95, Ex. O, Deposition of Tammy McCrumb, at 92:21–24). Dr. Erickson also told Dr. Siddiqi that he wanted the child to be transported by the Memorial Hermann Children's pediatric transport team instead of by AMR. (Docket Entry No. 95, Ex. A, at MHLF–006). The pediatric transport team could provide a higher level of care during transport than a standard ambulance because the team included a pediatric critical care nurse, a respiratory therapist, a paramedic, and could include a physician. (Docket Entry No. 95, Ex. O, Deposition of Tammy McCrumb, at 93:13–18). Dr.

8

Erickson explained that the pediatric team was currently en route to Beaumont, Texas to pick up another patient. (Docket Entry No. 95, Ex. A, at MHLF–006). Dr. Siddiqi was aware of the time it would take to transfer T. but agreed with Dr. Erickson that the pediatric transport team would be better than a standard ambulance and decided to wait. (*Id.*). Dr. Siddiqi intubated the child at 1:50 p.m. (*Id.*, at MHSE–0047).

At 2:25 p.m., the transport team from AMR arrived. Nurse McCrumb testified in her deposition that no one had called AMR to cancel. Dr. Siddiqi called Dr. Erickson at Memorial Hermann Children's. (*Id.*, at MHSE–0040). Dr. Erickson reiterated that he wanted T. transported by the pediatric transport team, not AMR, and that there was still no available pediatric ICU bed. (*Id.*). At 3:15 p.m., Dr. Siddiqi went to the child's bed to "discuss plan of care with patient's parents and [the] delay of transfer due to Transport team picking up another patient in Beaumont before being able to pick patient up." (*Id.*, at MHSE–0046).

T. had a severe allergic reaction, called "malignant hypothermia," to one of the medications used for the intubation. This allergic reaction caused his body temperature to increase significantly in a short period. At 3:32 p.m., Tammy McCrumb, R.N., recorded that T. had a temperature of 107.9 degrees. Nurse McCrumb tried to locate Dr. Siddiqi but learned that he had left the hospital around 3:30 p.m. because his shift had ended at 3:00 p.m. At 3:52 p.m., Nurse McCrumb notified Dr. David Nguyen, another emergency room physician, of the child's elevated temperature. Dr. Nguyen examined T. and ordered cooling blankets and ice packs applied. This occurred at 4:00 p.m. By 4:05 p.m., the child's

temperature had reached 111.2 degrees.  At 4:13 p.m., Dr. Nguyen and Dr. Erickson spoke by phone and both agreed that the child needed to be transported to Memorial Hermann Children's via Life Flight helicopter.  At 4:20 p.m., Dr. Nguyen finalized the arrangements for Life Flight to transport "T."  The Life Flight helicopter arrived at 4:45 p.m.  T. was transported to Memorial Hermann Children's Hospital, where he received immediate care and was hospitalized in the intensive care unit.

T. remained at Memorial Hermann Children's Hospital for several weeks.  He was diagnosed with septic shock, which caused organ injury.  Although his condition improved, he still requires follow-up medical care and therapy.

Guzman's EMTALA claims against Memorial Hermann include failing to provide T. an appropriate medical screening examination on February 12, 2006, failing to stabilize his condition before discharging him that day, and failing to provide an appropriate transfer on February 13, 2006.  Guzman also asserts a state-law negligence claim against Memorial Hermann for failing to provide adequate procedures for reporting lab results and for recalling patients to the hospital when abnormal lab results are reported.[2]

Guzman sought discovery of the medical records for all pediatric patients who came to Memorial Hermann's emergency room with similar complaints and who were seen by Dr.

---

[2]  Guzman's allegations against Dr. Haynes are that he was negligent in failing to order a chest x-ray and in failing to determine the results of the white blood cell differential count before discharging the child from the hospital, discharging him with neither the results of the count nor antibiotics, and failing to arrange for the emergency room staff to report the white blood cell differential count as soon as it became available so that Dr. Haynes could contact the Guzmans if the count was sufficiently abnormal as to require additional evaluation or treatment.  Guzman alleges that MSEP is liable for the torts of its partner, Dr. Haynes.

Haynes between February 2005 and February 2006.  Guzman asserted that these records were necessary to show disparate treatment to prove her EMTALA claim for failure to conduct an appropriate medical screening examination.  Memorial Hermann argued that as a matter of law,  Guzman was not alleging an EMTALA, as opposed to a negligence, claim.  Guzman did not allege a failure or refusal on the part of the hospital staff to give T. the type of tests given to other patients with similar symptoms.  Instead, Guzman alleged that T. received the usual battery of tests, but the doctor failed to read all the test results.  Memorial Hospital argued that not only did this allegation fail to state a claim under EMTALA, but also that no records would show whether a doctor had failed to read results for tests that had been ordered.  Memorial Hermann also argued that it would be highly burdensome to review the records sought and to redact information required to be kept confidential.  After argument, this court ordered certain documents produced but declined to order Memorial Hermann to produce all the documents Guzman sought before resolving whether the EMTALA claims were viable.  Memorial Hermann's motion for summary judgment, and Guzman's motion under Rule 56(f), followed.

### B.    The Motion to Strike Portions of Dr. Hayden's Affidavit

Memorial Hermann moved to strike portions of the affidavit of Dr. Stephen Hayden, Guzman's expert witness.  Memorial Hermann argues that many of Dr. Hayden's opinions and conclusions are incompetent summary judgment evidence because they are not based on personal knowledge, in violation of Rule 56(e) of the Federal Rules of Civil Procedure.  Memorial Hermann also argues that Dr. Hayden's attempt to interpret the hospital's written

11

policies violates Federal Rule of Evidence 1002 because the best evidence of the content and meaning of a policy is the policy itself.  And Memorial Hermann argues that Dr. Hayden's opinion that certain hospital actions violated EMTALA are legal conclusions, outside the province of an expert witness.[3]

Guzman responds that Dr. Hayden is an expert witness and his opinions need not be based on personal knowledge, but can be based on his review of the medical records, documents, and depositions in this case.  Guzman argues that the affidavit does not violate the best evidence rule because Dr. Hayden is not testifying about the content of Memorial Hermann's policies but instead about what they mean and how they apply to this case. Guzman argues that Dr. Hayden's opinion that Memorial Hermann violated EMTALA is permitted under the Federal Rules of Evidence.

Memorial Hermann's objection that Dr. Hayden lacks personal knowledge of the hospital's policies is unpersuasive.  "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also* FED. R. EVID. 701, 702; CHARLES A. WRIGHT, *ET AL*, 27

_____

[3]  Memorial Hermann also argues that Dr. Hayden's opinion that a urinalysis is an important component of the screening examination is irrelevant because Guzman's son was afebrile when he arrived at the hospital and did not require a fever "work-up."  Guzman responds that Dr. Hayden's testimony about the need for a urinalysis is based on his reading of Memorial Hermann's policies and his expertise in the field of emergency medicine.  The fever work-up and urinalysis Memorial Hermann referred to is found in the Emergency Center Triage Guidelines.  Because this court concludes that these guidelines are not Memorial Hermann's EMTALA screening policy, Memorial Hermann's objection to Dr. Hayden's opinion about urinalysis and fever work-up is moot.

FEDERAL PRACTICE & PROCEDURE: EVIDENCE 2d § 6025 ("By allowing experts to base opinions on facts or data that need not be admissible, Rule 703 permits opinions that are not based on personal knowledge.").  Such a "witness need not have observed or participated in the gathering of the data underlying his opinion.  Rather, the personal knowledge requirement hinges on whether the expert personally analyzed the data that was 'made known' to him and formed an expert opinion based on his own assessment of the data within his area of expertise." *Huber v. Howard County, Md.*, 56 F.3d 61, No. 94-1651, 1995 WL 325644, at *5 (4th Cir. May 24, 1995) (citing *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385-86 & n. 10 (9th Cir. 1992); *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1423 & n. 15 (3d Cir.1991)); *see also Carter v. Massey-Ferguson, Inc.*, 716 F.2d 344, 349–50 (5th Cir. 1983) (rejecting argument that expert's opinion on causation was incompetent for lack of personal knowledge because, under Rule 703, an expert may base opinion testimony on facts or data presented at trial and the plaintiff's expert based his opinion testimony on the plaintiff's account of the incident and disclosed the underlying basis of his testimony); *Marine Polymer Technologies, Inc. v. HemCon, Inc.*, 2009 WL 801826 (D. N.H. Mar. 24, 2009) ("An expert who provides an affidavit with an opinion formed within his area of expertise and based on his own assessment or analysis of the underlying facts or data satisfies the personal knowledge requirement of Rule 56(e).").  Memorial Hermann does not contend that Dr. Hayden, who is board-certified in emergency medicine and has been actively attending to patients and practicing emergency medicine since 1993, lacks the education, credentials, or experience to testify as an expert witness under Rule 702 of the Federal Rules of Evidence,

in the areas covered by his designation under Rule 26(b)(2) of the Federal Rules of Civil Procedure.  Dr. Hayden's affidavit states that he personally reviewed the following: the medical and laboratory records for T.; the depositions of Dr. Haynes, Nurse McCrumb, Dr. Siddiqi, Doug Mitchell, and Tom Flanagan; Memorial Hermann's policies and procedures; and a printout of data relating to 92 pediatric patients seen by Dr. Haynes between February 2005 and February 2006.  The affidavit sets out the factual basis for Dr. Hayden's opinions, his interpretation of Memorial Hermann's policies and procedures, and how the facts garnered from the records and documents led him to conclude that the medical screening, stabilizing care, and transfer in this case violated EMTALA.  Dr. Hayden's affidavit meets the Rule 56(e) personal knowledge requirement for an expert witness.

Nor does Dr. Hayden's affidavit violate Federal Rule of Evidence 1002.  Under that rule, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress."  FED. R. EVID. 1002.  The best evidence rule does not apply to evidence not offered to prove the contents of a writing.  *See*, *e.g.*, *Harris Corp. v. Ericsson*, *Inc.*, 194 F.Supp.2d 533, 540 (N.D. Tex. 2002) (overruling objection to documents based on best evidence rule where documents were offered to demonstrate the parties' intent and not to prove any specific term or content of a writing); 2 SALTZBURG, MARTIN & CAPRA, FEDERAL RULES OF EVIDENCE MANUAL, § 1002.02 (8th ed. 2002) ("If the contents are not sought to be proved, the Best Evidence Rule is inapplicable . . . .").  Nor does the rule apply "when an expert testifies based in part on having reviewed writings . . . because Rule 703 allows an

14

expert to express opinions based on matters not put into evidence." *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534, 579 (D. Md. 2007) (citations omitted); *see also* FED. R. EVID. 1002, Committee Note ("It should be noted, however, that Rule 703, supra, allows an expert to give an opinion based on matters not in evidence, and the present rule must be read as being limited accordingly in its application."). The authenticity of the Memorial Hermann policies is undisputed. (*See* Docket Entry No. 103, at 6 ("MHSE admits the authenticity of all the policies produced in the litigation.")). Dr. Hayden's affidavit is not offered to prove the "contents" of those policies. Dr. Hayden testified in his affidavit about his application of the Memorial Hermann policies to the facts of this case, based on his review of the policies and other documents, including medical records. Memorial Hermann's objection based on the best evidence rule is overruled.

Finally, Memorial Hermann's objection to Dr. Hayden's opinions about whether T. had an emergency medical condition and whether he was stable in the emergency room on the basis that they go to "ultimate issues" is unpersuasive, but the objection to the opinion that EMTALA was violated is valid. "It is well established that Fed. R. Evid. 704 permits a witness to express an opinion as to an ultimate issue that must be decided by the trier of fact." *See United States v. Gold*, 743 F.2d 800, 817 (11th Cir. 1984) (citing *United States v. Miller*, 600 F.2d 498, 500 (5th Cir.), *cert. denied,* 444 U.S. 955 (1979)). Rule 704 states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED. R. EVID. 704(a). Rule 704, however, does not permit expert witnesses to offer conclusions

15

of law.  *C.P. Interests*, *Inc. v. California Pools*, *Inc.*, 238 F.3d 690, 697 (5th Cir. 2001).  To

the extent Memorial Hermann challenges Dr. Hayden's legal conclusions that EMTALA

violations occurred, the objection is well-founded.  *See Martinez v. Porta*, 601 F.Supp.2d

865, 866–67 (N.D. Tex. 2009) (holding that expert opinions as to whether hospital violated

EMTALA were inadmissible legal conclusions).  The motion to strike is granted as to these

legal conclusions but denied as to the remainder of the affidavit.

## II.      The Applicable Legal Standards

### A.      Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant

bears the burden of identifying those portions of the record it believes demonstrate the

absence of a genuine issue of material fact."  *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d

253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy

its initial burden by "'showing' – that is, pointing out to the district court – that there is an

absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.

While the party moving for summary judgment must demonstrate the absence of a genuine

issue of material fact, it does not need to negate the elements of the nonmovant's case.

*Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact

is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit

under governing law."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir.

16

2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v.  Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

Rule 56(f) authorizes a district court to order a continuance to permit additional discovery if the nonmovant shows that she "cannot for reasons stated present by affidavit facts necessary to justify the party's opposition." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 162 (5th Cir. 2006) (citing *Wichita Falls Office Assoc. v. Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992)).  In requesting additional time for discovery under Rule 56(f), the nonmoving party must show why additional discovery is necessary and how that additional discovery will defeat the summary judgment motion by creating a genuine dispute as to a material fact.  *Id.* (citing *Beattie v. Madison County School Dist.*, 254 F.3d 595, 605

17

(5th Cir. 2001)).  The nonmoving party may not "simply rely on vague assertions that additional discovery will produce needed, but unspecified facts." *Id.* (citing *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 333 n.5 (5th Cir. 2002)).

**B.     EMTALA**

Congress enacted EMTALA "to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay." *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998).  "A patient is 'dumped' when he or she is shunted off by one hospital to another, the second being, for example, a so-called 'charity institution.'" *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996).  The Act requires hospitals to provide an "appropriate medical screening examination" to any person who enters the emergency room.  42 U.S.C. § 1395dd(a).  This examination must determine "whether or not an emergency medical condition . . . exists." *Id.*  An "emergency medical condition" is one "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-(i) the placing of the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. . . ." 42 U.S.C. § 1395dd(b)(1)(A).  If the hospital detects an emergency medical condition, the hospital must provide either "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or for transfer of the individual to another medical facility . . . ." 42 U.S.C. §§ 1395dd(b)(1)(A) & (B).  "If an individual at a hospital has an

18

emergency medical condition which has not been stabilized . . . the hospital may not transfer the individual unless" the individual makes a written request for transfer to another hospital or "a physician has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . . and . . . the transfer is an appropriate transfer . . . ."  42 U.S.C. § 1395dd(c)(1).

EMTALA establishes neither a federal medical malpractice cause of action nor a nationalized standard of medical care.  *Marshall*, 134 F.3d at 322.  A hospital does not violate EMTALA if the medical staff treating the patient fails to detect or misdiagnoses an emergency condition.  *See id.* at 332–323 ("a treating physician's failure to appreciate the extent of the patient's injury or illness, as well as a subsequent failure to order an additional diagnostic procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim"); *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) (recognizing that EMTALA is not intended to be a federal malpractice action).  Congress enacted EMTALA "to prevent 'patient dumping,'" not to guarantee proper emergency medical care.  *Marshall*, 134 F.3d at 322.  EMTALA "create[d] a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat," but does not "duplicate preexisting legal protections."  *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991); *see also Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999) ("The core purpose of EMTALA . . . is to prevent hospitals from failing to examine and stabilize uninsured patients who seek emergency treatment."); *Bryan v. Rectors &*

19

*Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) ("[EMTALA's] core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy" because "traditional medical malpractice law affords no claim for failure to treat."); *Brooks v. Maryland General Hospital, Inc.*, 996 F.2d 708, 710 (4th Cir. 1993) ("Under traditional state tort law, hospitals are under no legal duty to provide [emergency] care. Accordingly, Congress enacted EMTALA to require hospitals to continue to provide it."); *Malavé Sastre v. Hosp. Doctor's Ctr., Inc.*, 93 F. Supp. 2d 105, 109 (D.P.R. 2000) (stating that EMTALA "filled a void which state tort law did not address"); *Root v. Liberty Emergency Physicians, Inc.*, 68 F. Supp. 2d 1086, 1091 (W.D. Mo. 1999), *aff'd*, 209 F.3d 1068 (8th Cir. 2000) ("EMTALA has been described as a 'gap-filler' for state malpractice law, giving patients who would otherwise have no claim in state court a forum to redress their injuries."); *Slabik v. Sorrentino*, 891 F.Supp. 235, 237 (E.D. Pa. 1995), *aff'd* 82 F.3d 406 (3d Cir. 1996) (citations omitted) (EMTALA "was designed to create a new cause of action for failure to screen and stabilize patients, not to federalize traditional state-based claims of negligence or malpractice."). "[I]nserting into EMTALA an action for violation of standard medical procedures for patients admitted and treated for several hours would convert the statute 'into a federal malpractice statute, something it was never intended to be.'" *Tank v. Chronister*, 941 F.Supp. 969, 972 (D. Kan. 1996) (quoting *Hussain v. Kaiser Found'n Health Plan*, 914 F.Supp. 1331, 1335 (E.D.Va.1996)).

The three potential EMTALA causes of action against Memorial Hermann in this case are for failing to perform an appropriate medical screening examination, failing to stabilize

an emergency medical condition before transfer or discharge, and failing to conduct an appropriate transfer.  An EMTALA plaintiff is not required to prove an improper or nonmedical motive for a hospital's decisions or actions, such as the plaintiff's indigence, inability to pay, or lack of insurance.  "The language of subsection 1395dd(a) simply refers to 'any individual' who presents to the emergency room."  *Power v. Arlington Hospital Association*, 42 F.3d 851, 857 (4th Cir. 1994).  The Supreme Court has held that proof of an improper motive is not required for a failure to stabilize claim.  *Roberts v. Galen of Virginia*, 525 U.S. 249, 253 (1999).  The Supreme Court in *Roberts* expressly declined to address whether such proof is required for other claims under EMTALA, but the circuit courts have held that there is no improper-motive requirement for any EMTALA cause of action.  *See Burditt v. U.S. Dept. of Health and Human Services*, 934 F.2d 1362 (5th Cir. 1991) ("As written, EMTALA prevents patient dumping without such a requirement."); *Summers*, 91 F.3d at 1137 (holding that an EMTALA plaintiff is not required to show that the hospital's actions or decisions were based on improper, nonmedical considerations); *Correa v. Hospital San Francisco*, 69 F.3d 1184 (1st Cir. 1995) ("Every court of appeals that has considered this issue has concluded that a desire to shirk the burden of uncompensated care is not a necessary element of a cause of action under EMTALA."); *Power*, 42 F.3d at 857 (no proof of improper motive to "dump" is required to prevail on an EMTALA claim); *Collins v. DePaul Hospital*, 963 F.2d 303, 308 (10th Cir.1992) ("[A] plaintiff need not show the hospital's motive was to dump a patient in order to recover under EMTALA."); *Gatewood*, 933 F.2d at 1041 ("[A]ny departure from standard screening procedures constitutes

21

inappropriate screening in violation of the Emergency Act.  The motive for such departure is not important to this analysis, which applies whenever and for whatever reason a patient is denied the same level of care provided others . . . ."); *but see Cleland v. Bronson Health Care Group*, *Inc.*, 917 F.2d 266, 272 (6th Cir. 1990) (requiring proof of improper motive for an EMTALA screening claim; a hospital's decisions must be based on the patient's indigence, lack of insurance, race, sex, politics, education, occupation, AIDS, or inebriated state, or personal dislike or antagonism between the medical personnel and the patient, etc.). Proof that a hospital's inappropriate screening examination, failure to stabilize, or inappropriate transfer was based on the patient's indigence, lack of insurance, race, sex, or other improper considerations is sufficient, but not necessary to make out an EMTALA violation.  *See Summers*, 91 F.3d at 1137 ("We have no doubt that 'dumping' is covered by the statute, and that a refusal to screen a patient because he or she had no insurance would violate the statute, but other practices can violate it as well.").

## III.    Analysis

In the second amended complaint, Guzman alleged that Memorial Hermann committed three EMTALA violations: failing to provide an "appropriate medical screening examination" on February 12, 2006 when her son was examined by Dr. Haynes; failing to stabilize the child's emergency medical condition before discharging him that day; and failing to effect an appropriate transfer on February 13, 2006.  Memorial Hermann has moved for summary judgment on all three EMTALA claims.  Each is analyzed below.

### A.    The "Appropriate Medical Screening" Claim: The First Visit to the Emergency Room

22

EMTALA does not define "appropriate medical screening examination" other than to state that its purpose is to identify an emergency medical condition.[4]   Courts have uniformly held that whether a medical screening is appropriate is determined "by whether it was performed equitably in comparison to other patients with similar symptoms," not "by its proficiency in accurately diagnosing the patient's illness." *See Marshall v. East Carroll Parish Hosp. Serv.*, 134 F.3d 319, 322 (5th Cir. 1998); *see also Reynolds v. MaineGeneral Health*, 218 F.3d 78, 84 (1st Cir. 2000) (the plaintiff must proffer evidence "sufficient to support a finding that she received materially different screening than that provided to others in her condition. It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in the plaintiff's position").   The plaintiff must show that the hospital treated him differently from other patients with similar symptoms. *See Marshall*, 134 F.3d at 324; *see also Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995) (a hospital must provide a screening exam that is "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and [must] provide[] that level of screening uniformly to all those who present substantially similar complaints."). "It is the plaintiff's burden to show that the hospital treated her differently from other patients; a hospital is not required to show that it had a uniform screening procedure." *Marshall*, 134 F.3d at 323–24.  The plaintiff can meet this burden by pointing to differences

---

[4]   Some courts have observed that the word "appropriate" is not self-defining and fails to provide clear guidance. *See, e.g.*, *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir.1990) ("'Appropriate is one of the most wonderful weasel words in the dictionary, and a great aid to the resolution of disputed issues in the drafting of legislation. Who, after all, can be found to stand up for 'inappropriate' treatment or actions of any sort?").

in the screening examination she received as compared to the examinations of other patients at that hospital who presented with similar symptoms, or by providing evidence that the hospital did not follow its own standard screening procedures.  *See Battle v. Memorial Hospital at Gulfport*, 228 F.3d 544, 558 (5th Cir. 2000).  The plaintiff may also meet this burden by showing that the hospital failed to provide any screening or provided such a cursory screening that it amounted to no screening at all, in that it was not designed to detect acute, severe symptoms.  *Correa*, 69 F.3d at 1192–93; *see also Summers*, 91 F.3d at 1139 ("[W]e hold that instances of 'dumping' or improper screening of patients for a discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition, all are actionable under EMTALA.").  "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly."  *Correa*, 69 F.3d at 1192.  A *de minimis* deviation from a hospital's standard screening policy is insufficient to establish an EMTALA violation.  *Repp v. Anadarko Municipal Hospital*, 43 F.3d 519, 523 (10th Cir. 1994).

EMTALA does not require hospitals to provide identical screening to patients presenting with different symptoms and does not require hospitals to provide screenings that are beyond their capabilities.  *Baker v. Adventist Health*, *Inc.*, 260 F.3d 987, 995 (9th Cir. 2001).  Because hospitals are generally in the best position to assess their own capabilities, "a standard screening policy for patients entering the emergency room generally defines which procedures are within a hospital's capabilities."  *Id*; *see also Repp*, 43 F.3d at 522 (finding that a hospital is in the best position to assess its capabilities and thus violates

24

EMTALA when it does not follow its own standard procedures).

Courts have held that the test for satisfying the requirement of uniform treatment is whether the "challenged procedure was identical to that provided [to] similarly situated patients as opposed to whether the procedure was adequate as judged by the medical profession." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995) (citing cases from the D.C., Fourth, and Sixth Circuits).  Negligence in the screening process or providing a faulty screening or making a misdiagnosis, as opposed to refusing to screen or providing disparate screening, does not violate EMTALA, although it may violate state malpractice law. *See Marshall*, 134 F.3d at 322 (citing *Eberhardt*, 62 F.3d at 1258 (holding that "[t]he hospital's failure to detect the decedent's alleged suicidal tendency may be actionable under state medical malpractice law, but not under the EMTALA")); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879–80 (4th Cir. 1992) ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery."); *Summers*, 91 F.3d at 1139; *Correa*, 69 F.3d at 1192-93; *Collins v. DePaul Hosp.*, 963 F.2d 303, 307 (10th Cir. 1992) (holding that the purpose of the screening is "to determine whether an 'emergency medical condition exists.' Nothing more, nothing less.").  "[T]he Act is intended not to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances. Thus, what constitutes an 'appropriate' screening is properly determined not by reference to particular outcomes, but instead by

reference to a hospital's standard screening procedures."  *Gatewood*, 933 F.2d at 1041.

In the second amended complaint, Guzman alleged that Memorial Hermann failed to provide an appropriate medical screening because Dr. Haynes, the treating physician, failed to review all laboratory information and failed to rule out a bacterial infection or administer antibiotics before discharging "T." (Docket Entry No. 90).  Guzman alleged that the medical screening constituted disparate treatment because Dr. Haynes failed to follow the nausea/vomiting protocol set out in Memorial Hermann's Emergency Center Triage Guidelines, which required initiating a fever protocol and a saline lock, as well as performing a CBC, BMP, and urinalysis.  (*Id.*).  Guzman also alleged that Memorial Hermann violated EMTALA's screening requirement because Dr. Haynes failed to follow Memorial Hermann's "monitoring, reassessment, and documentation" policies as well as its aftercare and follow-up policy.  (*Id.*).

### 1.    A Screening Reasonably Calculated to Determine the Existence of an Emergency Medical Condition

Guzman argues that the summary judgment evidence shows that the medical screening examination Dr. Haynes ordered and that Memorial Hermann staff performed in this case was not completed and therefore not reasonably calculated to determine the existence of an emergency medical condition.  According to Guzman, the examination was not completed because Dr. Haynes did not see the white blood cell differential test results before deciding to discharge T. and, as a result, could not and did not rule out a bacterial infection.  Guzman cites *Battle v. Memorial Hospital at Gulfport*, 228 F.3d 544, 558 (5th Cir. 2000), and *Hoffman v. Tonnemacher*, 425 F.Supp.2d 1120 (E.D. Cal. 2006), for the proposition that

26

EMTALA required Dr. Haynes to rule out a bacterial infection in order to determine whether an emergency medical condition existed.

Memorial Hermann argues that the allegations and summary judgment evidence that Dr. Haynes failed to read all the CBC test results, including the result that showed an elevated white blood count, taken as true, would support a claim for negligent care, but not a violation of EMTALA's requirement to provide an appropriate medical screening. Citing *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139, 144 (4th Cir. 1996), and *Summers*, 91 F.3d at 1138, Memorial Hermann argues that Guzman's claim based on the failure to rule out a bacterial infection ignores the fact that under EMTALA, the actual diagnosis made by the treating physician is taken as a given. Dr. Haynes diagnosed T. with viral syndrome based on his medical history, the physical examination conducted, the vital signs, and the test results he did review. Memorial Hermann argues that because Dr. Haynes perceived the child to have viral syndrome, EMTALA did not require Dr. Haynes to obtain further test results or take other steps to rule out a bacterial infection. Guzman responds that the diagnosis cannot be taken as a "given" because it resulted from Dr. Haynes's failure to complete the screening examination, not from a negligent misdiagnosis. Guzman cites *Battle*, 228 F.3d at 558, for the proposition that the Fifth Circuit has implicitly rejected the rule from *Vickers* and *Summers* that the doctor's actual diagnosis is taken as a given in an EMTALA case. Guzman argues that there is a fact issue as to whether Dr. Haynes intentionally discharged her son "without seeing the results of the white cell manual differential," which could violate EMTALA, or whether he "simply [forgot] to look," which

27

would be a negligent act that would not violate EMTALA.  (Docket Entry No. 100, at 4).

In determining whether a screening examination is appropriate under EMTALA, the touchstone is "whether, as § 1395dd(a) dictates, the procedure is designed to identify an 'emergency medical condition' that is manifested by 'acute' and 'severe' symptoms." *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1255 (9th Cir. 2001); *see also Correa*, 69 F.3d at 1192.  A screening that is "so cursory" that it is "not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury" violates EMTALA.  *Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1166 n.3 (9th Cir. 2002).  But an emergency room physician is only "required by EMTALA to screen and treat the patient for those conditions the physician perceives the patient to have."  *Hunt v. Lincoln Cty. Memorial Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003).

It is undisputed that T. was taken to triage within a few minutes after he arrived at the Memorial Hermann emergency room hospital complaining chiefly of fever and vomiting. Nurse Ganz noted his complaints and the fact that his parents had given him Tylenol and Motrin.  She took the child's temperature and heart rate and determined that he was afebrile with a heart rate of 145.  Nurse Ganz recorded that the child appeared distressed and uncomfortable, that his breath sounds were clear bilaterally and that his abdomen was soft and not tender.  Based on his elevated heart rate, the child was categorized as Emergent Level 2 and taken to an examination room to be seen by a physician.

Nurse Blain further assessed the child's condition in the examination room.  He noted that Guzman's son complained of generalized pain and cough.  Nurse Blain's evaluation

notes continue:

> Appears uncomfortable, well developed, well nourished, well groomed. Behavior is anxious, appropriate for age, cooperative, crying.  Neuro: Level of consciousness is awake. alert, obeys commands.  Oriented to person, place, time.  EENT: Tympanic membrane clear on right ear and left ear.  Ear canal clear on right ear and left ear. Oral mucosa is moist.  Good dentition noted. Throat is clear.  Cardiovascular: Capillary refill < 3 seconds.  Hear tones S1 S2. Edema is absent. Pulses are all present. Rhythm is regular sinus tachycardia Chest pain is denied. Respiratory: Respiratory effort is even, unlabored, relaxed. Respiratory pattern is regular symmetrical.  Airway is patent.  Sputum is non verbalized.  Breath sounds are clear bilaterally. GI: Abdomen is flat, Non-distended.  Bowel sounds present x 4 quads.  GU: No deficits noted. Derm: No deficits noted.  Musculoskeletal: No deficits noted.  Injury description: atraumatic.

(Docket Entry No. 95, Ex. A, at MHSE-0013–0014).

After Nurse Blain's evaluation, Dr. Haynes arrived.  He interviewed T. and his parents about the complaints and took a medical history.  He conducted a thorough physical examination and concluded that the child was clinically stable and likely had some type of virus.  Dr. Haynes ordered a CBC and a basic metabolic panel, which were done.  He also ordered that the child be given fluids through an IV.  At 9:58 a.m., the child's heart rate had decreased to 105-110.  Dr. Haynes looked at the CBC results, but at that time, according to Dr. Haynes, the white blood cell differential results were not posted on the computer system with the other results.  Dr. Haynes then returned to reevaluate the child's condition. He determined that the child was no longer in pain or dehydrated, his heart rate had gone down, he was not in respiratory distress, and he felt comfortable going home.  Based on all this information collected at the hospital between 7:45 a.m. and 10:15 a.m., Dr. Haynes

29

concluded that T. was stable for discharge.

The undisputed facts in the record show that two nurses and one doctor examined T. and assessed his physical condition.  They inquired about his symptoms, took a medical history, physically examined him, ordered a CBC, reviewed all the results except the white blood manual differential, and provided treatment.  The case law makes it clear that such a screening examination is reasonably calculated to identify the existence of an emergency medical condition, even if the examination does not accurately reveal the patient's actual medical condition.  In *Hoffman v. Tonnemacher*, 425 F.Supp.2d 1120 (E.D. Cal.  2006), the plaintiff presented to the emergency room complaining of fever, chills with hyperventilation, nasal congestion, cough, chest pain, and numbness in her hands.  The doctor took a medical history, performed a physical examination, and ordered x-rays and a urinalysis.  No other tests were administered.  *Id.* at 1123–24.  Based upon the medical history, examination, and test results, the doctor diagnosed fever and bronchitis with a differential diagnosis of possible pneumonia.  *Id.*  The doctor did not believe the patient was suffering from an emergency medical condition and decided that discharge with medication was appropriate.  The patient, however, was actually suffering from a severe bacterial infection that ultimately led to sepsis and severe complications.  She sued under EMTALA and her expert witnesses opined that the screening examination she received was not calculated to identify an emergency medical condition because "an acceptable and appropriate medical screening had to include, at a minimum, a CBC, blood differential, blood culture, and echocardiogram."  *Id.*  at 1134.  The court rejected the plaintiff's argument, holding that the expert's opinion was phrased in terms

30

of medical negligence, not EMTALA liability.  *Id.* at 1135.  "The criticisms of Dr. Tonnemacher for failure to order additional tests are simply criticisms of violating the applicable medical standard of care, they do not show a screening so cursory that it was not designed to detect emergency conditions that may have been afflicting Hoffman."  *Id.*  The court held that the examination the plaintiff received was reasonably calculated to identify an emergency medical condition, even though the condition was not actually identified.  *Id.*[5]; *see also del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 20–21 (1st Cir. 2002) (finding that the screening examination was sufficiently calculated to identify emergency condition when the patient "was triaged, [had] some vital signs done, had a physical exam by the doctor, and chest x-rays [and] laboratory tests were ordered," medication was prescribed, and the patient was told to return in the morning for x-rays); *Feighery v. York Hospital*, 59 F.Supp.2d 96, 108–09 (D. Me. 1999) (finding that the screening examination was sufficiently calculated to identify emergency condition when the hospital interviewed the patient about his symptoms, inquired into whether he was experiencing chest pain, conducted an EKG and blood work, and placed him on a heart monitor).

The examination T. received was more thorough than the examination the patient received in *Hoffman,* who, like T., was misdiagnosed with a viral infection when he was suffering with a bacterial infection that escaped detection.  Unlike that patient, however, T. received a CBC.  Despite the absence of the tests that T. received, which the plaintiff's expert

---

[5]   Although the court in *Hoffman* did hold that the screening examination was sufficiently calculated to identify an emergency medical condition, the court found a material fact issue precluding summary judgment on the screening claim as to whether the hospital followed its policy to rule out a bacterial infection.

in *Hoffman* argued were essential to an adequate screening examination, the court in *Hoffman* found no EMTALA violation, as a matter of law. The screening examination T. received was not so cursory that it constituted no screening whatsoever. The facts of this case do not show a screening procedure so woefully inadequate as to amount to a "failure to treat." *See Gatewood*, 933 F.2d at 1041.

Guzman's reliance on *Battle* and *Hoffman* is misplaced. In those cases, the hospital's screening policies and procedures expressly required the medical staff to "rule out" a bacterial infection, and the staff failed to do so. *See Battle*, 228 F.3d at 558 (hospital's protocol provided that "[i]nfants and elderly are usually hospitalized if no definitive source for fever/infection is determined"); *Hoffman*, 425 F.Supp.2d at 1139 (hospital policy required doctor to "confirm or rule out a bacterial process/infection"). There is no evidence in the record of a Memorial Hermann policy or procedure that required Dr. Haynes to rule out a bacterial infection before discharging a patient. As explained in more detail below, Memorial Hermann does not have a symptom-specific screening policy that required Dr. Haynes to completely review all parts of the CBC or other test results before concluding that no emergency medical condition was present.

Contrary to Guzman's argument, the Fifth Circuit in *Battle* did not implicitly reject the rule from *Vickers* and *Summers* that the doctor's actual diagnosis is taken as a given. The hospital policy at issue in *Battle* stated that infants were usually hospitalized if a definitive source of their fever or infection was not determined. 228 F.3d at 558. The hospital argued that the doctor's diagnosis of pneumonia and ear infection meant that the source of the

32

child's fever and infection had been determined.  *Id.*  The court held that the evidence in the record was conflicting as to whether the doctor had followed the hospital policy.  *Id.*  The doctor's diagnoses of pneumonia and an ear infection, as well as a seizure disorder, did not allow the court to conclude that, as a matter of law, the source of fever or infection had been determined.  The Fifth Circuit did not reject the rule that the actual diagnosis is taken as a given under EMTALA, but instead held that the evidence in *Battle* was conflicting as to whether the actual diagnosis was reached through a failure to follow the hospital's policy.

Moreover, the Fifth Circuit in *Battle* relied on its previous opinion in *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d  319, 322 (5th Cir. 1998), for the EMTALA legal standard.  The *Marshall* court, in turn, had relied heavily on the decisions in *Vickers* and *Summers*:

> Therefore, a treating physician's failure to appreciate the extent of the patient's injury or illness, as well as a subsequent failure to order an additional diagnostic procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening.  *See Summers*, 91 F.3d at 1138-39 ("'faulty' screening . . . does not come within EMTALA"); *Vickers*, 78 F.3d at 143-44 (citation omitted) (EMTALA "does not impose any duty on a hospital requiring that the screening result in a correct diagnosis").
> . . . .
> Most of the courts that have interpreted the phrase have defined it as a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms.  *See Summers*, 91 F.3d at 1138 ("An inappropriate screening examination is one that has a disparate impact on the plaintiff"); *Vickers*, 78 F.3d at 144 (emphasis in original) ("EMTALA is implicated only when individuals who are *perceived* to have the same medical condition receive disparate treatment");  . . . .

*Marshall*, 134 F.3d at 323.  These statements in *Marshall* were not overruled in *Battle* and remain good law in the Fifth Circuit.

In the present case, there is no conflicting evidence as to what the actual diagnosis of viral syndrome meant or as to whether the diagnosis resulted from a failure to follow any Memorial Hermann policy.  There is no conflict between Dr. Haynes's diagnosis of viral syndrome and the fact that he did not see the band count before discharging "T."  *Battle* provides no support for Guzman's argument that there is a disputed fact issue material to determining the reason for Dr. Haynes's diagnosis of viral syndrome before he saw the results of the white blood cell differential test.

The facts of this case are similar to those in *Summers*, 91 F.3d at 1138, which involved an alleged physician failure to obtain a certain test.  In that case, like *Hoffman,* the test was not even ordered, as opposed to being ordered and conducted but not fully read.  The plaintiff in *Summers* came to the emergency room complaining of snapping and popping noises in his chest.  The hospital acknowledged that a patient making this complaint typically would be given a chest x-ray, but the plaintiff was not.  The plaintiff's medical condition of a broken vertebra, sternum, and rib was missed and he brought an EMTALA claim for failure to provide an appropriate medical screening.  The court stated that the plaintiff's argument that the nonuniform screening amounted to an EMTALA violation had "a surface appeal" but concluded that the claim was  "nothing more than an accusation of negligence." *Id.*  "It would almost always be possible to characterize negligence in the screening process as non-uniform treatment, because any hospital's screening process will presumably include a non-negligent response to symptoms or complaints presented by a patient."  *Id.* at 1138–39.

As in *Summers*, the hospital physician's failure to view the white blood cell

34

differential test results that were part of the CBC before reaching a diagnosis of viral syndrome and deciding to discharge the patient is a negligence claim. Whether Dr. Haynes exercised his medical judgment and decided not to wait for the test results because he felt the child was stable for discharge or whether he simply forgot to look to see if the differential test results had been posted before discharging the child is irrelevant to whether the failure to read these results amounts to an EMTALA claim. The fact that Dr. Haynes did not see the results is important to the Guzman's negligence claim and the reasons he gave for the failure are relevant to the medical malpractice claim, but do not allege or create a fact issue as to whether there was a failure to provide an "appropriate medical screening" under EMTALA.

Dr. Hayden's opinion that T. did not receive an appropriate medical screening examination does not raise a fact issue precluding summary judgment dismissing this EMTALA claim. Dr. Hayden stated that, in his opinion, "the hospital cannot provide such an examination if the appropriate test, although ordered, is not seen and reviewed by the emergency physician." (Docket Entry No. 100, Ex. J). According to Dr. Hayden, if Dr. Haynes had seen the results of the white blood cell differential test, he would have ordered "further workup," which "would have, in all reasonable probability, resulted in a diagnosis of pneumonia, prompt treatment with antibiotics, and avoided the sepsis completely." (*Id.*). Dr. Hayden also opined that "the minimum 'appropriate' medical screening examination should have included a chest x-ray and a urinalysis, and therefore the exam given by Memorial Hermann Southeast was not an appropriate medical screening examination." (*Id.*). Additionally, in Dr. Hayden's opinion "a urinalysis is an essential component of medical

35

screening in a patient like TG, and the failure to perform the urinalysis is not a minor omission." (*Id.*).

Dr. Hayden opines as to what Dr. Haynes and Memorial Hermann should have done to provide treatment that met the reasonable standard of medical care.  Dr. Hayden equates the applicable standard of care with an appropriate medical screening examination.  Evidence of what a hospital's screening procedure should be, while relevant to a malpractice claim, is not relevant to Guzman's claim under EMTALA.  "It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in the plaintiff's position." *Reynolds v. Maine General Health*, 218 F.3d 78, 83 (1st Cir. 2000).  EMTALA does not create a national standard of care and is not a medical malpractice statute. *Marshall*, 134 F.3d at 322.  A "treating physician's failure to appreciate the extent of the patient's injury or illness . . . may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening." *Id.* at 323; *see also Hoffman v. Tonnemacher*, 425 F.Supp.2d 1120, 1135 (E.D. Cal. 2006) ("The criticisms of Dr. Tonnemacher for failure to order additional tests are simply criticisms of violating the applicable medical standard of care, they do not show a screening so cursory that it was not designed to detect emergency conditions that may have been afflicting Hoffman.").

Guzman's allegations and the summary judgment evidence, taken in the light favorable to her, do not as a matter of law support a claim under EMTALA that the screening examination was not appropriate because it was not calculated to identify an emergency medical condition.  Summary judgment on this theory is appropriate.

36

### 2.     Memorial Hermann's Screening Policy

### a.     The "Triage Guidelines"

The summary judgment evidence includes a document titled "Memorial Hermann Hospital System: Emergency Center Triage Guidelines."  (Docket Entry No. 95, Ex. G) ("Triage Guidelines").  These guidelines were "developed to expedite patient flow."  (*Id.*). They "assist the staff in ordering appropriate studies which expedites evaluation by the physician or physician extender."  (*Id.*).  The Triage Guidelines specify certain tests or measures for the staff to take before the patient is seen by a physician.  The Guidelines only apply to what hospital staff should do before a physician sees a patient.  Under the category "Vomiting/Diarrhea: Pediatric (2 Months to 18 yr)," the Guidelines call for, among other things, a saline lock, a CBC, and a urinalysis if there have been 3 or more episodes of vomiting or if urinary tract infection symptoms are present."  (*Id.*).  The pediatric fever protocol calls for administration of Tylenol and Motrin.  (*Id.*).

In the second amended complaint, Guzman alleged that Memorial Hermann failed to provide T. an appropriate screening examination under EMTALA because"not having the results of the CBC reviewed by a physician, . . . not instituting the fever protocol, and . . . not performing a voided urinalysis," violated the Triage Guidelines.  (Docket Entry No. 90, at 7).  Memorial Hermann argues that Guzman cannot rely on any deviation from the Triage Guidelines because they do not apply in this case.  Memorial Hermann admits that the Guidelines were in effect and stored at the triage nurse's desk in February 2006, but denies that they constitute a medical screening policy.  Memorial Hermann asserts that the Triage

Guidelines cannot be a "screening policy" under EMTALA because they only apply to what staff does when there is a delay before the patient sees a physician.  According to Memorial Hermann, T. saw Dr. Haynes promptly on February 12, 2006.  Staff did not need to rely on the Triage Guidelines because there was no delay, and the Guidelines did not apply to a physician such as Dr. Haynes.  Memorial Herman argues that because the Triage Guidelines did not apply to this case, any deviation from them is not a failure to provide an appropriate medical screening under EMTALA.

Guzman argues that the record raises a fact issue as to whether the Triage Guidelines are in fact Memorial Hermann's medical screening policy.  Guzman cites *Battle*, 228 F.3d at 558, for the proposition that Memorial Hermann's explanation for why the Triage Guidelines do not apply requires a credibility determination by the factfinder that precludes summary judgment.

In *Battle*, the plaintiffs claimed that the hospital violated EMTALA by breaching a "Nursing Care Standard" that was the hospital's medical screening policy.  The Standard stated: "'[i]nfants and elderly are usually hospitalized if no definitive source for fever/infection' is determined."  228 F.3d at 558.  On arriving at the emergency room, the patient, the plaintiffs' infant son, was diagnosed with febrile seizures, pneumonia, and an ear infection.  He was prescribed antibiotics and discharged.  After he continued to have seizures, the plaintiffs returned to the emergency room the next day.  The child's mother wrote "self-pay" on the emergency room paper work.  The doctor prescribed additional seizure medication and instructed the mother "not to bring that child right back here because

[the medication] takes time to work." *Id.* at 548.  The child's condition worsened.  The next

he was admitted to the hospital and diagnosed with herpes simplex encephalitis, a rare and

serious disease.  Despite extensive treatment, when he left the hospital one month later, he

was "in a near vegetative state" and required "24-hour-a-day care for the rest of his life." *Id.*

at 549.  The EMTALA and negligence claims were tried to a jury.  At the close of the

plaintiff's case, the court entered a directed verdict on the EMTALA claim, finding judgment

as a matter of law appropriate.  The jury returned a verdict in favor of the plaintiffs on the

negligence claim.  On appeal, the hospital argued that the district court correctly entered a

directed verdict on the EMTALA claim because the evidence showed that the doctors had

determined a definitive source for the fever and infection by diagnosing the patient with

pneumonia and an ear infection.  *Id.* at 558.  The hospital also argued that the "Nursing Care

Standards" did not embody the hospital's screening procedures because the Standards were

written for nurses, who lack authority to decide whether to hospitalize a patient.  The

plaintiffs argued that there was evidence showing that the hospital medical staff had

discharged the baby without determining a definitive source for his fever and infection.  The

court found that the hospital's explanations for why it failed to "follow its own published

standards, while perhaps persuasive to a jury, require[d] credibility determinations that

preclude[d] judgment as a matter of law." *Id.*  The court held that a rational jury could have

concluded that the source of the patient's fever and infection had not been definitively

determined when he was discharged  from the emergency room.  The court noted that the

jury also heard evidence of the reason for the allegedly disparate and inadequate treatment;

39

the child was "[b]lack, poor, uninsured, and presented at the emergency room during the Christmas holidays." *Id.* Because the record evidence was conflicting as to whether the hospital had followed or deviated from its medical screening procedure, the court reversed the grant of summary judgment in favor of the defendants and remanded the case to the district court. *Id.*

In the present case, unlike *Battle*, Memorial Hermann's explanation for why the Triage Guidelines were not followed in this case does not create a fact issue precluding summary judgment. Nothing in the nursing protocol in *Battle* indicated that it did not apply to the screening of the plaintiffs' infant. By contrast, the Triage Guidelines in this case clearly do not apply to the screening examination Dr. Haynes performed on T. The Guidelines state as follows:

> These guidelines have been developed to assist in patient flow. These orders are substantiated based on the patient's chief complaint and the documented nursing assessment. They are meant to assist the staff in ordering appropriate studies which expedites evaluation by the physician or physician extender. The patient is to be brought directly to a room if one is available. They are not intended to delay physician evaluation. Triage guidelines may be initiated by the appropriate provider in the triage area or by the nurse assigned to the patient room if the patient is brought directly back. These protocols should not in any way delay the physician or physician extender evaluation, not to be interpreted as a standard of care.
> . . .
>
> In the event that a patient leaves prior to evaluation by the practitioner, the nursing staff must present all triaged labs, EKGs, and/or X-rays to the attending ED physician.

(Docket Entry No. 95, Ex. G, at MHSE–TG–0287).

On their face, these Triage Guidelines only apply before a physician's examination is conducted.  They allow a nurse to initiate medication and testing, including laboratory testing, appropriate for the patient's symptoms and chief complaints, before a physician examines the patient.  Nurse McCrumb testified in her deposition that a triage nurse can decide to initiate these protocols "based on that nurse's clinical judgment."  (Docket Entry No. 95, Ex. O, Deposition of Tammy McCrumb, R.N., at 45:1–11).  She testified that the protocols were initiated at Memorial Hermann primarily for patients complaining of abdominal pain or shortness of breath, stroke patients, and pregnant patients with vaginal bleeding, for whom any delay at all may be critical.  (*Id.*, at 45:20–24).  The steps under the Triage Guidelines are to be taken *before* a patient is evaluated by a physician or physician extender, to assist in "patient flow," and to expedite the physician's evaluation when it occurs.  The Guidelines on their face do not apply when the patient sees a doctor promptly on arrival at the emergency room or after the patient is examined by a physician.  *See Fraticelli-Torres v. Hospital Hermanos*, 300 Fed. App'x 1, 3 (1st Cir. 2008) (finding no violation of screening requirement for failure to follow a requirement of the hospital's ICU protocol because that protocol was "by its very terms, not expressly applicable to patients in its ER").

It is undisputed that Guzman's son arrived in triage at 7:42 a.m. and that the triage assessment was completed at 7:47 a.m.  At that point, the child was taken to an examination room and examined by Nurse Blain at 7:55 a.m.  Dr. Haynes began his examination of Guzman's son at 8:00 a.m.  There was no delay before T. saw the doctor.  Neither the triage

nurse, April Ganz, R.N., nor Nurse Blain initiated any tests or protocols under the Triage Guidelines.  Based on the undisputed evidence in the record, the Triage Guidelines did not apply to the screening examination of T.  There is no disputed fact issue material to determining why the Guidelines were not followed or whether the failure to do so made the medical screening T. received inappropriate under EMTALA.

Not only is there a difference between the protocol at issue in *Battle* and the Triage Guidelines present in this case, there are also important differences between the evidence in *Battle* and in the present case.  The court in *Battle* cited conflicting evidence about the hospital's explanation for its failure to follow the nursing protocol as a basis for reversing the directed verdict.  The hospital asserted that a definitive source of the child's fever and infection had been determined, but the court found that the evidence as to the diagnoses  – pneumonia, an ear infection, and febrile seizures – did not as a matter of law establish a source for the fever and infection.  In addition, the court noted the evidence that the patient was "[b]lack, poor, uninsured, and presented at the emergency room during the Christmas holidays."  Summary judgment was not appropriate based on all of this evidence.  There is no comparable evidence in the present case.  Memorial Hermann's explanation for why the Triage Guidelines do not apply does not conflict with other evidence in the record and does not require a credibility determination.  There is no evidence suggesting an improper motive for the medical screening T. received.

Summary judgment is granted on Guzman's EMTALA screening claim based on the alleged failures to follow the protocols in the Triage Guidelines, including the CBC and

urinalysis.

### b.    The "Medical Screening Criteria"

EMTALA requires that a hospital develop a policy that is "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Correa*, 69 F.3d at 1192. Memorial Hermann asserts that its policy for the medical screening examination under EMTALA is a document titled "Medical Screening Criteria To Timely Identify Patients Not Presenting With An Emergency Medical Condition." (Docket Entry No. 95, Ex. C) ("Medical Screening Criteria"). This document does not present different protocols or procedures based on symptoms. Instead, it identifies what "criteria are to be used as a guideline for screening purposes for non-physician medical personnel authorized to perform a Medical Screening Exam." (*Id.*). Memorial Hermann asserts that this is a general policy designed to "screen out" patients who do not have an emergency medical condition. Tom Flanagan, Director of Emergency Services for Memorial Hermann in 2006, testified in his deposition that the policy was developed for the purpose of "sort[ing] through the masses of people presenting to the emergency department, those that did not potentially have an emergency medical condition that could be screened and be referred to an alternative setting for their healthcare needs." (Docket Entry No. 95, Ex. K, Deposition of Tom Flanagan, at 15:16–21). The policy sets out vital-sign categories to distinguish between patients who do not have an emergency medical condition and patients who might have an emergency medical condition and require physician attention. (Docket Entry No. 95, Ex. C).

The policy includes a screening examination to be performed by a physician assistant or nurse practitioner. (*Id.*). Memorial Hermann asserts that the content of the screening exam is not binding on its staff doctors, like Dr. Haynes, in part because Texas law prohibits the corporate practice of medicine. (*Id.*). Nevertheless, according to Memorial Hermann, the content of the policy "evidences a routine medical screening exam at Memorial Hermann emergency rooms." (Docket Entry No. 95, at 19).

The screening examination described in the document consists of an assessment of the patient's chief complaint, medical history, vital signs, mental status, skin, and ability to walk, and a physical exam of the appropriate organ system and the patient's general appearance. (Docket Entry No. 95, Ex. C). For example, patients who complain of an earache will have their ears examined; patients who complain of a sore throat will have their throat examined. (*Id.*). This document does not include a symptom-specific set of directions that requires specific laboratory or other tests or specific medical procedures to be performed for all patients presenting with certain symptoms. Memorial Hermann denies that it has a symptom-specific medical screening examination policy. (Docket Entry No. 95, Ex. K, Deposition of Tom Flanagan, at 95:2–9). Memorial Hermann argues that EMTALA does not require such a symptom-specific policy; Guzman argues that EMTALA does impose such a requirement and that this requirement preempts any state-law restrictions on corporate practice of medicine.

Guzman cites *Matter of Baby K*, 16 F.3d 590, 597 (4th Cir. 1994), for the proposition that EMTALA preempts state-law restrictions on the corporate practice of medicine.

44

Guzman's preemption argument is unpersuasive.  In *Matter of Baby K*, the plaintiff argued that the hospital failed to provide stabilizing treatment as required by EMTALA.  The hospital argued that the doctors were not required to provide the stabilizing treatment the plaintiffs alleged EMTALA required because the doctors had medical objections to providing such treatment.  The hospital cited an applicable state law that allowed doctors to refrain from providing care they determined to be medically or ethically inappropriate.  The court held that EMTALA preempted the state law because it "directly conflicts with the provisions of EMTALA that require stabilizing treatment to be provided."  *Id.*  In the present case, the state-law restriction on the corporate practice of medicine does not conflict with EMTALA.

Contrary to Guzman's argument, EMTALA does not require hospitals to impose detailed or symptom-specific screening-exam protocols or procedures on its physicians.  A hospital may choose to tailor its medical screening examination policy to specific types of symptoms or patients, but a hospital is not required to do so.  Instead, the cases make clear that a general screening policy is sufficient under EMTALA.  *See*, *e.g.*, *Baber v. Hospital Corp. of America*, 977 F.2d 872, 879 n.6 (4th Cir. 1992) (holding that it is sufficient if a hospital develops a general screening policy designed to detect the existence of an emergency medical condition and uniformly applies that policy, whatever its contents, to all patients); *Correa*, 69 F.3d at 1192 (there must be "some screening procedure" and it must "be administered even-handedly").

Guzman cites *Power v. Arlington Hospital Association*, 42 F.3d 851, 857 (4th Cir. 1994), for the proposition that EMTALA requires a hospital to have substantive, symptom-

45

specific protocols to detect emergency medical conditions.  Guzman argues that because the Medical Screening Criteria do not apply and if, as Memorial Hermann argues, the Triage Guidelines do not apply, Memorial Hermann lacks any protocol for detecting emergency medical conditions and therefore violates EMTALA.  Contrary to Guzman's argument, the court in *Power* did not deviate from this approach.  In *Power*, the court recognized that a "hospital may have one general procedure *or* tailored screening procedures, depending on the exhibited symptoms."  42 F.3d at 858 n.4 (emphasis added).  The court rejected the argument that the mere availability of doctors and services was sufficient to comply with EMTALA, but did not hold that detailed or symptom-specific procedures were required.  *Id.* at 859.  "Rather, compliance with EMTALA requires that hospitals ensure that screening procedures are uniformly applied."  *Id.*

The cases show that EMTALA requires a hospital to develop a policy or procedures for medical screening examinations, but leaves it to the hospital to decide whether to adopt a detailed or broad approach, a symptom-specific or general approach.  EMTALA does require that whether the hospital adopts a general or a symptom-specific approach, it must be consistently applied.  If a hospital chooses to have substantive, detailed protocols, it must administer the content of those protocols uniformly.  If a hospital chooses not to have substantive protocols but rather a general screening policy that leaves the detailed content of an examination to the medical judgment of a physician, the hospital must follow that general policy for all patients.

Memorial Hermann's Medical Screening Criteria do not contain specific protocols

46

applicable to physicians on the hospital staff.  This does not, however, mean that the Criteria are inapplicable to this case, as Guzman argues.  Guzman argues that T. was not examined by a physician assistant or nurse practitioner and that the Medical Screening Criteria are "for non-physician personnel to use to determine that low-priority patients do not have an emergency medical condition."  (Docket Entry No. 100, at 40).  Guzman also argues that the Medical Screening Criteria do not apply because that document "does not set forth criteria for a medical screening exam for a patient like" her son, "does not even mention any laboratory tests, and therefore does not even contemplate the use of 'ancillary facilities' available to the emergency department," and does not "describe the content of the medical screening exam performed by a physician."  (*Id.*).

The summary judgment evidence shows that Memorial Hermann's screening policy and procedure applies to all patients who present to the emergency room.  Although T. was promptly seen by Dr. Haynes, he was also seen by the triage nurse and by other medical staff, before and after the physician examination.  The Medical Screening Criteria applied to "T." The summary judgment evidence also shows that T. received the type of examination called for under the Medical Screening Criteria:  an initial assessment by the triage and other staff of the patient's chief complaint, medical history, vital signs, mental status, skin, and ability to walk, and a physical exam of the appropriate organ system and the patient's general appearance.  Consistent with the Criteria, Dr. Haynes ordered the tests that were administered as well as the IV fluids.

Guzman argues that Flanagan testified in his deposition that the Medical Screening

47

Criteria document is not Memorial Hermann's "medical screen."  Guzman argues that because the Medical Screening Criteria are not Memorial Hermann's policy for medical screening examinations conducted by physicians, Memorial Hermann does not have a screening policy and is therefore in violation of EMTALA.  Guzman has taken Flanagan's deposition testimony out of context.  Flanagan testified that he did not want someone to get the impression that the Medical Screening Criteria was the "end all and be all in itself." (Docket Entry No. 100, Ex. I, Deposition of Tom Flanagan, at 84:8–9).  Flanagan did not testify that the Medical Screening Criteria document is not Memorial Hermann's policy for how to screen patients to determine the existence of an emergency medical condition.  He testified that these are criteria Memorial Hermann developed to help medical providers "get to the point of making decisions" about the existence of an emergency medical condition. (*Id.*, at 84:10–13).  Flanagan explained:

> Medical screening is not a – a recipe cookbook in the emergency department at all.  Medical screen is based upon multiple, multiple factors, all related to the patient in front of you.  And based upon your education, your experience, your expertise, there is many more – that's how these decisions are made.  It's not just every patient that comes in with a cough we will do this, this, this and this and this, and if that's all negative, then they can go home.  No.  It's all — it's based upon experience, education, training, age, maturity.

(*Id.*, at 86:24–87:10).  In Flanagan's testimony, he made a distinction between the content of the Medical Screening Criteria and the actual screening examination performed by a physician.  The Criteria contain detailed requirements for staff to perform "screening in and out" and describe an appropriate medical screening examination in general terms, while

48

allowing physicians to exercise their independent medical judgment in deciding what tests or procedures should be used to determine whether a patient has an emergency condition and what it is.  As the court in *Baber* recognized, any EMTALA screening procedure "necessarily requires the exercise of medical training and judgment.  Hospital personnel must assess a patient's signs and symptoms and use their informed judgment to determine whether a critical condition exists."   977 F.2d at 879. The record shows that Memorial Hermann's policy is to screen patients in or out based on vital signs and other indicators.  If that initial screen shows that a patient may have an emergency medical condition, the policy calls for a doctor, physician assistant, or nurse practitioner to perform a more thorough screening examination to determine the existence of an emergency medical condition.  The Medical Screening Criteria provide guidance to assist these medical care providers in determining whether a patient has an emergency medical condition.  This policy satisfies EMTALA's requirement that a hospital have *some* screening procedure designed to identify those patients with emergency medical conditions.  *See Correa*, 69 F.3d at 1192.  The Medical Screening Criteria satisfy EMTALA's requirement that a hospital develop a policy that is "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients."  *See id.*

### c.   A General Screening Policy

Even assuming that the written "Medical Screening Criteria" document is not Memorial Hermann's screening policy or procedure, that does not provide evidence of, or create a fact issue as to, an EMTALA violation.  The record contains undisputed evidence

as to the general policy Memorial Hermann required its staff to follow in screening emergency room patients.  The case law shows that EMTALA permits a hospital to have a general, as opposed to a symptom-specific, screening policy or procedure.  The case law also permits a hospital to have a policy or procedure that is not written.  *See*, *e.g.*, *Nolen v. Boca Raton Community Hospital*, *Inc.*, 373 F.3d 1151, 1154 (11th Cir. 2004) (holding that EMTALA does not require hospitals to have a written screening procedure);  *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1140 (8th Cir. 1996) (en banc) (finding no EMTALA violation because "the hospital did have a screening procedure, even if unwritten in part, and the statute makes no additional requirement").

A hospital is not required to have a policy or procedure that directs doctors on the content of the screening examinations they perform.  A general screening policy or procedure is sufficient if it is reasonably calculated to determine the existence of an emergency condition.  Courts have recognized that such general screening policies and procedures are valid under EMTALA.  In *Richmond v. Community Hosp. of Roanoke Valley*, 885 F.Supp. 875 (W.D. Va. 1995), the plaintiff came to the emergency room complaining of left rib pain. The triage nurse checked his vital signs, took a verbal medical history, and made a nursing assessment, which she documented.  A physician examined the plaintiff and ordered chest x-rays.  Based on his examination and the x-ray results, the physician diagnosed the plaintiff with intercostal neuralgia, prescribed medication for inflammation, and told him to return if his symptoms worsened.  The plaintiff returned to the hospital two days later.  The same procedure was followed, but a different doctor diagnosed the plaintiff with left lower lobe

pneumonia, prescribed an antibiotic, and told him to return in four days for follow-up.  The plaintiff subsequently went to a different hospital, where he underwent additional testing, had lung surgery, and remained in the hospital for twenty-one days.  He sued the first hospital under EMTALA, alleging that it failed to provide him an appropriate medical screening on both of his emergency room visits.  The hospital's general screening procedure was "1. triage-to quickly ascertain the immediacy of the patient's need for treatment. 2. history and physical-to obtain information concerning the nature of the patient's problem. 3. physician examination- to explore the precise nature of the patient's problems, in order to lead to an appropriate course of treatment."  The court held that as a matter of law, the procedure satisfied EMTALA.  *Id.* at 879.  The court also held that the undisputed evidence that the hospital staff had followed this same general screening requirement on both of the plaintiff's visits to the emergency room precluded finding an EMTALA violation.  *Id.*

Similarly, in *Hutchinson v. Greater Southeast Community Hospital*, 793 F.Supp. 6 (D. D.C. 1992), the hospital did not have "policies, protocols, or procedures specifying any required content of an emergency screening exam, or describing what comprises an adequate screening exam."  *Id.* at 8.  The hospital did have a general screening policy that triage personnel were to make the initial patient evaluation.  If that evaluation showed that the patient was "routine," uninsured, and had made no cash deposit, the policy provided that the patient would be "seen by an emergency physician for a screening exam to determine if a medical emergency exists. Those patients whom the physician determines may have a medical emergency will be treated. Those patients whom the physician determines do not

51

have a medical emergency will be denied care but will be offered transportation to other treatment sites." *Id.*  The court held that the hospital's general screening policy did not violate EMTALA.  *Id.* at 10.  And the court found no EMTALA violation in the actual screening.  The patient, who lacked insurance, had presented to the emergency room complaining of pains to the back of his head, foam in his mouth, weakness, and headaches. *Id.* at 7.  The emergency room doctor performed a physical examination and assessed the patient's condition as "non-emergent."  He was placed in a taxicab and transferred to another hospital.  A CT scan at that hospital revealed a subarachnoidal hemorrhage, which caused the patient's death four days later.  *Id.*  The court held that the first hospital met EMTALA's requirement to provide an appropriate medical screening because the hospital followed its standard screening procedure when it performed the plaintiff's screening examination.  *Id.* at 10.

In the present case, Flanagan testified in his deposition about Memorial Hermann's general screening policy:

> [T]he patient comes into the ER and presents.  And the first place they go to is what we call triage.  Triage is to sort patients based upon – to sort for acuity based upon their chief complaint. The . . . nurse at triage gets vital signs . . . [and the patient receives] clinical assessment by a nurse.  Based upon that information, then the patient is then categorized into one of three categories. . . . No emergent . . . condition exists, okay?  And so they go to the [qualified medical provider] for medical screen evaluation and referral.  Two, yes, or possible may have an EMC, emergency medical condition. . . . So they go to a bed.  In the E.D. for M.D. screening, just like here, and evaluation and treatment.  Or the triage nurse can determine absolutely without a doubt there is an EMC, so they also will go to a bed for the M.D. to continue to screen.  And the exam, the medical

screening exam, and treatment.

(Docket Entry No. 95, Ex. K, Deposition of Tom Flanagan, at 19:19–20:13).  Flanagan testified that this general screening policy applied to Memorial Hermann's emergency room patients.  (*Id.*, at 93–94).  He testified that all patients are "screened in or . . . screened out based on the triage assessment."  (*Id.*).  If a patient is "screened in," "the nurse comes in the room and does an assessment, the doctor is called comes in and does an exam.  Based upon the results of those orders, the decision is made whether to admit or discharge."  (*Id.*).  It is undisputed that this procedure was followed on February 12, 2006 when the Guzmans brought T. to the emergency room.  This procedure was also followed on February 13, 2006 when T. returned.  As in *Richmond* and *Hutchinson*, this general screening policy, which applies to all patients and was followed on both occasions when T. came to the emergency room, satisfies EMTALA's screening-policy requirement.

### 3.    Disparate or Consistent Treatment

#### a.    Dr. Haynes's failure to review all the lab test results and either rule out a bacterial infection or prescribe antibiotics

Guzman alleges that Memorial Hermann failed to provide an appropriate medical screening because before the treating physician decided on discharge, he failed to review all the laboratory test results and failed to rule out a bacterial infection or administer antibiotics.  These allegations, and the summary judgment evidence as to the tests ordered, the results reviewed, and the discharge decision, do not give rise to a fact issue as to whether T. received disparate treatment that violated EMTALA.  There is no evidence in the summary judgment record that Memorial Hermann's screening policy required that before one of its emergency

room physicians discharges a patient who presented with a fever and other symptoms similar to T.'s, the physician must order certain lab tests, review all the results, and rule out a bacterial infection or administer antibiotics, either under the Medical Screening Criteria or the general policy.  Nor is there summary judgment evidence that the medical screening examination T. received differed from the type of screening examination generally provided.

An emergency room physician is only "required by EMTALA to screen and treat the patient for those conditions the physician perceives the patient to have." *Hunt v. Lincoln Cty. Memorial Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003).  Based on the medical history, examination, and symptoms, Dr. Haynes diagnosed T. with viral syndrome.  Dr. Haynes testified that he considers the white blood cell differential count, when it is available, as part of evaluating a patient.  (Docket Entry No. 95, Ex. N, Deposition of Philip Haynes, M.D., at 151:9–12).  He testified that whether a doctor reviews all laboratory information before a patient's discharge is a case-by-case determination,  (*Id.*, at 153:4–14).  Specifically, Dr. Haynes testified that whether he waits for the white blood cell differential test results before discharging a patient "depends on the circumstances of that particular patient, [his] judgment, the patient's clinical presentation and many other factors. . . ."  (*Id.*, at 159:11–17).  Dr. Haynes testified that he did not treat T. differently than any other patient with similar symptoms.  (*Id.*, at 146:5–7).  Dr. Haynes's failures to review the band count and either rule out a bacterial infection or prescribe antibiotics before discharging T. does not give rise to a fact issue as to disparate treatment under Memorial Hermann's screening policies.

The allegations and evidence may give rise to liability for negligence for Dr. Haynes's

failure to follow up on the white blood cell differential test result.  But there is, as a matter of law, no reasonable basis for a factfinder to impose liability under EMTALA on Memorial Hermann for Dr. Haynes's failures to review that test result and either rule out a bacterial infection, or prescribe antibiotics to "T."

### b.    Deviation from the screening policy

It is undisputed that T. received an assessment of his chief complaints, medical history, vital signs, mental status, and skin, as well as an examination of his gastrointestinal system and his general appearance.  It is also undisputed that after triage, T. saw a physician, who did a more thorough examination, ordered IV fluids, and ordered lab tests.  The undisputed evidence shows that T. received the type of screening examination required by the Memorial Hermann Medical Screening Criteria and the policy Flanagan described.

The evidence in the record showed that as soon as T. came to the emergency room, he was seen by the triage personnel.  T. was initially assessed by Nurse Ganz as Emergent Level 2 based on the elevated heart rate.  T. was "screened in" as potentially having an emergency medical condition.  Nurse Ganz took T. to an examination room, where Nurse Blain further assessed the child's condition and determined that he was clinically stable and had no respiratory issues.  Dr. Haynes then interviewed T. and his parents about his chief complaints and took a medical history.  Dr. Haynes conducted a physical examination and ordered IV fluids and lab tests.  Dr. Haynes concluded that the child likely suffered from viral syndrome.  After reevaluating the child and determining that he was still clinically stable, Dr. Haynes determined that no emergency medical condition existed and decided to

discharge him.  There is no evidence that T. received a screening examination that was different from what was required under the Medical Screening Criteria or the general screening policy.

### c.        The aftercare and follow-up policy

Memorial Hermann argues that aftercare and follow-up are different from screening and that its aftercare and follow-up policy is not part of its screening examination policy.  On its face, the aftercare and follow-up policy applies when "the physician determines a need for change in follow up care and treatment in regards to final diagnostic results (to include culture and x-ray reports) after the patient has been discharged."  (Docket Entry No. 95, Ex H, at MHSE-TG-0303).  According to Memorial Hermann and the deposition testimony of Nurses Ganz and McCrumb, this policy only applies to lab results that the hospital knows will not be ready before the patient is discharged, such as blood or urine cultures.  (Docket Entry No. 95, at 21–22).  Memorial Hermann asserts that its aftercare and follow-up policy is not part of the policy for screening examinations that are required to identify an emergency medical condition so that the patient can be treated or stabilized before discharge or transfer to another hospital.

Guzman responds that Dr. Hayden's opinions preclude summary judgment on the allegation that Dr. Haynes's failure to follow-up on the white blood cell differential count violated EMTALA.  Dr. Hayden stated in his affidavit that Dr. Haynes "should have initiated" a follow-up form and his failure to do so was a "deviation from Memorial Hermann policies and procedures."  (Docket Entry No. 100, Ex. J).

The summary judgment evidence and the case law show that, as a matter of law, Dr. Haynes's failure to follow-up on the white blood cell differential lab result after T. was discharged did not violate the hospital's screening examination policy and therefore violated EMTALA. The aftercare and follow-up policy is not an EMTALA screening policy. The evidence shows that the aftercare and follow-up policy applies when a physician knows that she needs to review test results that are not going to be available until some time after the patient's discharge and determines to change the patient's follow-up care or treatment based on those results. The aftercare and follow-up policy is not used to determine the existence of an emergency medical condition as part of an emergency room medical screen. Rather, this policy is intended to help physicians meet the standard of care and make changes to treatment based on lab results that the physician knows will not be available for some time. This policy is not relevant to an EMTALA medical screening examination. Evidence of a violation of the aftercare and follow-up care policy does not raise a fact issue as to an EMTALA violation. *See Fraticelli-Torres v. Hospital Hermanos*, 300 Fed. App'x 1, 3 (1st Cir. 2008) ("[T]hrombolysis is not a diagnostic tool which would implicate EMTALA's 'screening' criterion, but a treatment option for incipient myocardial infarction, and therefore, defendants' threshold decision in the ER not to order thrombolysis for Bonilla would implicate only the 'stabilization' criterion."); *Feighery v. York Hospital*, 59 F.Supp.2d 96, 106 n.10 (D. Me. 1999) (holding that because the administration of oxygen was not used to determine the existence of an emergency medical condition, hospital's failure to administer oxygen was not material to and would not support EMTALA claim).

57

The evidence in this case is that Dr. Haynes did not review the white blood cell differential test result, even though it was available before T. was discharged, and did not make any change in the follow-up care.   The evidence does not give rise to a fact issue as to a violation of an EMTALA screening examination policy.  Dr. Hayden's opinion that Dr. Haynes "should have initiated" follow-up care faults Dr. Haynes for failing to initiate aftercare and follow-up procedures, failing to review the last part of the CBC test results to be analyzed and posted on the hospital computer system, and for failing to make the determination that T. required additional treatment.  These opinions criticize Dr. Haynes for breaching the applicable standard of care.  Although Dr. Hayden testified that in his opinion, Dr. Haynes's failure violated Memorial Hermann's aftercare and follow-up policy, nothing in that policy requires a physician to make a follow-up determination based on additional lab results that the doctor knows will not be available for some time after the discharge decision is made.  To the contrary, the policy states "when" a physician makes this determination, the physician must initiate the form.  The policy does not cover a medical screening examination under EMTALA.

Summary judgment is granted on this asserted basis for an EMTALA violation.

### d.    Documentation and vital signs

Guzman argues that the screening her son received was not appropriate under EMTALA because Memorial Hermann's emergency room staff failed to take and document T.'s vital signs every two hours.  The summary judgment evidence shows that Memorial Hermann's policy required that a patient's vital signs be taken every two hours.  Guzman

58

cites *Romo v. Union Memorial Hosp.*, *Inc.*, 878 F.Supp. 837, 842 (W.D.N.C. 1995), for the proposition that when a hospital's medical staff fails to take vital signs as policy requires, and those vital signs are arguably necessary for the doctor to determine whether an emergency medical condition exists, the hospital fails to provide an appropriate medical screening under EMTALA.  Guzman contends that because one of T.'s chief complaints was fever, "which had been suppressed by Motrin Tylenol," it was important to recheck his temperature after he had spent time in the emergency room and those drugs had worn off.  Dr. Hayden opined in his affidavit that rechecking the child's temperature was "an essential component of his medical screening" and that it was "not a minor deviation from the required screening to fail to obtain a follow up assessment of his temperature."  (Docket Entry No. 100, Ex. J, Affidavit of Dr. Stephen Hayden).  Guzman also argues that because T. "possibly had a bacterial infection," it was very important to monitor his blood pressure.  (Docket Entry No. 100, at 30).  Dr. Hayden opined in his affidavit that "given the severity of the vomiting and the possibility of his having a severe infection, it would have been very important to monitor his blood pressure."  (Docket Entry No. 100, Ex. J, Affidavit of Dr. Stephen Hayden).  Dr. Hayden stated that a change in blood pressure is often the first sign of a bacterial infection.  (*Id.*).  Dr. Hayden also stated that the screening examination was not appropriate because Memorial Hermann emergency room staff failed to document reassessments of the child's vital signs.  (*Id.*).

Memorial Hermann responds that the alleged failures to follow its "monitoring, reassessment, and documentation" policies were all *de minimis* violations of the screening

policy that were not material to determining the existence of an emergency medical condition.  Memorial Hermann contends that EMTALA requires such a substantial deviation from a hospital's policies as to make the screening examination provided so cursory that it amounts to no screening at all.  Memorial Hermann asserts that the only written guideline it has on taking patients' vital signs is a general policy, not specific to the emergency room, that requires reassessment of vital signs every four hours.

Nurse McCrumb testified that, in practice, the emergency room "guidelines are roughly every two hours for vital signs to be taken."  (Docket Entry No. 95, Ex. O, Deposition of Tammy McCrumb, at 32:19–22).  Nurse McCrumb testified that although the written guidelines call for rechecking and documenting vital signs within one hour before discharge, this does not always happen because some nurses only document certain vital signs, depending on the patient's chief complaint.  (*Id.*, at 35:4–25).  Memorial Hermann argues that there was no material deviation from the guidelines, emphasizing the undisputed evidence that when T. was triaged at 7:45, his vital signs were taken, and that he was discharged at 10:15 a.m., after two and one-half hours in the emergency room.  During the time T. was in the emergency room, his heart rate – the only abnormal vital sign when he was initially seen –  was reassessed at 9:58 a.m., within one hour before discharge.  Temperature and blood pressure were not retaken within one hour before discharge.  Memorial Hermann argues that the monitoring and documentation of T.'s vital signs met the EMTALA requirements for an appropriate screening examination.

The fact that T.'s vital sign reassessments were not documented is not, as a matter of

law, an EMTALA violation. EMTALA does not require any particular documentation of the screening examination. Deviance from the documentation required in a hospital's screening policy does not, by itself, give rise to a cause of action under the statute. *Hutchinson v. Greater S.E. Comm. Hosp.*, 793 F.Supp. 6, 9–10 (D.D.C. 1992).

With respect to the taking of vital signs, only a substantial deviation from a hospital's medical screening policy can violate EMTALA. In *Kilroy v. Star Valley Medical Center*, 237 F.Supp.2d 1298 (D. Wyo. 2002), the plaintiff argued that the hospital failed to provide an appropriate screening because his daughter's vital signs were taken only when she arrived in the emergency room, despite the hospital's policy requiring reassessment of vital signs periodically as well as before discharge. *Id.* at 1304. The plaintiff also argued that the screening requirement was violated because the hospital staff took his daughter's heart rate only before a nebulizer therapy treatment, although hospital policy required a heart rate reading before and after such treatment. *Id.* at 1305. Notwithstanding these deviations, the court held that the hospital's compliance with its screening procedures was adequate under EMTALA. *Id.* The court noted that EMTALA was enacted to prevent patient dumping and provide redress for what amounts to a failure to treat, not to provide a federal medical malpractice statute. The court held that the "variations from standard procedure were minor and did not rise to the level of being 'so cursory' as to fail to alert the physician of the need for medical attention." *Id.* In light of EMTALA's purpose, the court would "not view simply any oversight in procedure to be a violation of EMTALA. The deviation from procedure must be substantial enough to actually implicate EMTALA's policy." *Id.*

61

The facts in *Correa v. Hospital San Francisco*, 69 F.3d 1184 (1st Cir. 1995), illustrate a substantial variation from hospital policy sufficient for an EMTALA violation.  In that case, the hospital failed to provide an appropriate medical screening because there was no written record at all of the patient's emergency room visit.  *Id.* at 1193.  The hospital's policy required emergency room staff promptly to take vital signs, make written records of all visits, and refer critical cases to a doctor.  *Id.*  The patient arrived at the emergency room complaining of chest pain.  At trial, her son testified that he and his mother were in the waiting room for over two hours before she received any treatment.  During that time, he pleaded with the receptionist to have someone "take care of my mother, because she feels sick and has chest pains."  *Id.* at 1188.  After the patient grew weary of waiting, she went to see a doctor at his office.  While there, she died of hypovolemic shock.  *Id.* at 1189.  The court held that based on this evidence, "and the Hospital's utter inability to produce any records anent Ms. Gonzalez's visit," the jury could have reasonably concluded that the hospital failed to follow its own policies requiring a medical screening examination for an emergency room patient.  *Id.* at 1193.  This substantial deviation from policy was sufficient to show an EMTALA violation.

Some courts have held that a hospital's failure to follow its policy for checking and documenting vital signs is not a minor violation if the vital signs would be helpful to determining the existence of an emergency medical condition.  In *Bode v. Parkview Health System, Inc.*, 2009 WL 790199 (N.D. Ind. Mar. 23, 2009), the hospital's policy required nurses to take a patient's blood pressure unless the patient was under six.  The policy also

required a nurse to take a patient's vital signs every two hours and before discharge.  The

nurse did not take the patient's blood pressure because she thought he was under six.  He

could not talk, was wearing a diaper, and weighed only 32 pounds.  The birth date, however,

was on each page of his medical records, and showed that he was six years old.  The nurse

did not reassess the child's vital signs every two hours or before his discharge.  The child

died of dehydration the day after discharge due to vomiting and diarrhea.  The parents sued

under EMTALA, arguing that the hospital failed to provide an appropriate screening because

the blood pressure could have shown dehydration and reassessing the vital signs could have

helped the doctor detect the child's emergency medical condition.  The court held that the

hospital's failure to take the child's blood pressure and reassess his vital signs before

discharge were substantial deviations from hospital policy.  *Id.* at *10.  The court refused to

grant the hospital's motion for summary judgment because of evidence showing that "similar

patients with similar symptoms would have had their blood pressure taken" and "[b]lood

pressure is information that could help in forming a diagnosis." *Id.*; *see also Romo*, 878

F.Supp. at 842 (fact issue existed as to "whether the medical screening provided to Romo

was 'appropriate' under EMTALA" because "the failure to record these vital signs is

arguably necessary in order for the physician to make the determination of whether an

emergency medical condition exists").

Other courts have held that a emergency room staff's failure to follow the hospital's

policy for checking and documenting vital signs is a minor violation when the failure did not

affect the treatment or diagnosis given or the hospital's ability to detect an emergency

medical condition.  *See Sanchez Rivera v. Doctors Center Hosp.*, *Inc.*, 247 F.Supp.2d 90, 100

(D. P.R. 2003) (holding that the failure to take vital signs every fifteen minutes, as required

by hospital's procedure, was not an EMTALA violation; "the taking of the vital signs was

not exactly complied with, but was sufficient to meet EMTALA requirements"); *Tank v.*

*Chronister*, 941 F.Supp. 969, 974 (D. Kan. 1996) (the hospital's failure to obtain vital signs

before discharge was a minor violation because the "policy providing for follow-up readings

[was] designed to exclude false first readings of a serious medical emergency" and it was

undisputed that the patient's vital signs upon intake were accurate).  If reassessing vital signs

would not be helpful in alerting the doctor of the need for immediate medical attention, the

failure to do so is a minor deviation from hospital policy.  *See Kilroy*, 237 F.Supp.2d at 1305.

The undisputed evidence in the summary judgment record shows that, as a matter of

law, the failure to recheck T.'s temperature within an hour of discharge was not a substantial

violation of Memorial Hermann's vital-sign policy.  The evidence shows that a temperature

reassessment within one hour of discharge – which would have satisfied both the "every two

hours" rule and the "one hour before discharge" rule due to the short period T. spent in the

hospital – would not have alerted Dr. Haynes that T. had an emergency medical condition

requiring immediate attention.  T. did not have an elevated temperature when he presented

to the emergency room.  Guzman and Dr. Hayden assert that his temperature was being

controlled by Tylenol and Motrin and that it was important to check the temperature after

those medications wore off.  But there is no evidence in the record that T. exhibited any signs

of a fever during his time in the emergency room, including within one hour of discharge.

64

Neither the child nor his parents complained that he felt feverish.  Nurse Blain reassessed and reexamined the child at 9:58 a.m.  Dr. Haynes visited the child and reevaluated his condition shortly thereafter.  All these encounters showed that the child was clinically stable.  If the child's temperature was significantly elevated, that would have been evident during one of these encounters without the need for a thermometer.  Even assuming that T. had a fever at 10:15 a.m. that the staff failed to detect by not taking his temperature, that does not raise a fact issue precluding summary judgment.  Dr. Haynes knew that T. had complained of fever when he arrived at the hospital a little over two hours earlier.  The parents told Dr. Haynes that T. had run a fever before he came to the emergency room.  Dr. Haynes knew that a fever could reoccur without taking T.'s temperature within an hour before discharge.  The discharge notes state that Dr. Haynes instructed the Guzmans to administer ibuprofen as needed for fever and pain.  (Docket Entry No. 95, Ex. A, at MHSE–0016).  An elevated temperature is consistent with both viral and bacterial infection and Dr. Haynes had diagnosed viral syndrome.  There is no basis to conclude that an elevated temperature within one hour of discharge would have been helpful to alert Dr. Haynes of an emergency medical condition or of the need for immediate medical attention.

The undisputed summary judgment evidence also shows that the failure to recheck blood pressure within one hour of discharge was not a substantial violation of Memorial Hermann's vital-sign policy.  The child's blood pressure was normal when he was triaged.  Guzman's argument that it was important to recheck his blood pressure in the two and one-half hours he was in the emergency room because he "*possibly* had a bacterial infection"

ignores Dr. Haynes's evaluation and diagnosis. Similarly, Dr. Hayden's opinion that rechecking the child's blood pressure because of the "*possibility* of his having a severe infection" relies on the benefit of hindsight and ignores Dr. Haynes's physical examination, diagnosis, and determination that the child was clinically stable. Dr. Haynes did not suspect a bacterial infection. Dr. Haynes reexamined T. between 10:00 and 10:15 a.m. T. reported that he was no longer hurting anywhere but the IV site. His heart rate was no longer elevated. Dr. Haynes attributed the initial elevated heart rate to dehydration or the child's albuterol inhaler. Dr. Haynes determined that Guzman's son was hydrated, not in respiratory distress, and no longer vomiting. The family felt that he was ready to go home. In the face of all this information, even if the blood pressure reading had been done within an hour of discharge and had shown some elevation, that would not have alerted Dr. Haynes of the need for immediate medical attention.

Unlike the facts *Bode* and *Romo*, in which the vital signs arguably would have alerted the doctor of an emergency, the facts of the present case do not give rise to an inference that retaking T.'s vital signs would have been helpful to determining an emergency medical condition. The record does not support an inference that retaking T.'s temperature or blood pressure within one hour before discharge would have alerted Dr. Haynes of the need for immediate medical attention to stabilize an emergency medical condition. Like the patient in *Kilroy*, T.'s vital signs were taken when he arrived in the emergency room and, with the exception of his heart rate, were not reassessed before discharge. The emergency room policy and practice at Memorial Hermann is to reassess vital signs roughly every two hours

66

and to check vital signs that are related to the patient's chief complaint within one hour before discharge. T. was discharged two and one-half hours after he arrived and his heart rate was reassessed 20 minutes before his discharge. As in *Kilroy*, the evidence in the record does not show a substantial deviation from Memorial Hermann's policy or practice. Nor does it show that other patients would have had their vital signs reassessed more often than T. There is no basis to conclude that the deviation from Memorial Hermann's vital sign policy was a failure to provide an appropriate medical screening under EMTALA.

Summary judgment on this theory is appropriate.

### B.     The Failure to Stabilize Claim: The First Visit to the Emergency Room

Under EMTALA, if a hospital detects an emergency medical condition, it must take measures to stabilize that condition before transferring or discharging the patient. "Stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . ." 42 U.S.C. § 1395dd(e)(3)(A). The Fifth Circuit has defined "to stabilize" as "[t]reatment that medical experts agree would prevent the threatening and severe consequence of the patient's emergency medical condition while in transit." *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991). Stabilization is determined in reference to a patient's diagnosis, not what in hindsight a patient "turns out to have," and is evaluated at the time of discharge. *Vickers*, 78 F.3d at 145; *Bergwall v. MGH Health Servs.*, 243 F.Supp.2d 364, 374–75 (D. Md. 2002).

67

"The duty to stabilize does not arise unless the hospital has actual knowledge that the patient has an unstabilized medical emergency."  *Battle*, 228 F.3d at 558; *see also Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776 (6th Cir. 2003) (finding that every circuit to consider the question has required actual knowledge of the patient's emergency condition as a precondition to an EMTALA duty to stabilize); *Baker*, 260 F.3d at 992–93 (the duty to stabilize "arises only when [the hospital] actually detects an emergency medical condition"); *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1257 (9th Cir. 2001) (adopting the "actual detection" rule, under which a condition precedent to the stabilization requirement is that the hospital staff had actual knowledge of an emergency medical condition); *Summers*, 91 F.3d at 1140 ("A hospital must have had actual knowledge of the individual's unstabilized emergency medical condition if a claim under § 1395dd(c) is to succeed."); *Vickers*, 78 F.3d at 145 ("On its face, this provision takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect."); *Baber v. Hospital Corp. of America*, 977 F.2d 872, 883 (4th Cir. 1992) ("[T]he plain language of the statute dictates a standard requiring actual knowledge of the emergency medical condition by the hospital staff."); *Gatewood*, 933 F.2d at 1041 (holding that the duty to stabilize applies only after a hospital determines that an emergency medical condition exists); *Hoffman*, 425 F.Supp.2d at 1130 (there is no violation of EMTALA when a hospital "fails to detect or misdiagnoses an emergency condition, and the remedy of a person so injured is through a state law medical malpractice claim"); *Stringfellow v. Oakwood Hosp. and Medical Center*, 409 F.Supp.2d 866, 871 (E.D. Mich. 2005) ("If the emergency nature of the condition is not detected, the

hospital cannot be charged with failure to stabilize a known emergency condition."). EMTALA does not "hold hospitals accountable for failing to stabilize conditions of which they were not aware, or even conditions of which they should have been aware . . . . EMTALA would otherwise become coextensive with malpractice claims for negligent treatment." *Gerber v. Northwest Hosp. Center*, *Inc.*, 943 F.Supp. 571, 577 (D. Md. 1996) (citing *Vickers*, 78 F.3d at 145). The stabilization requirement "takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions they actually detect." *Vickers*, 78 F.3d at 145. "[A]nalysis by hindsight is not sufficient to impose liability under EMTALA." *Holcomb v. Humana Medical Corp.*, *Inc.*, 831 F.Supp. 829, 835 (M.D. Ala. 1993).

Memorial Hermann argues that as a matter of law, no duty to stabilize arose because the undisputed evidence shows that the emergency room staff did not know that T. had any emergency medical condition. Dr. Haynes perceived the child to be stable at all times and diagnosed him with viral syndrome, a nonemergency condition. Memorial Hermann argues that there is no evidence in the record that the child was "unstable, in relation to a diagnosis of viral syndrome, at the time of discharge or that Dr. Haynes knew that he had an emergency medical condition." (Docket Entry No. 95, at 26). Memorial Hermann argues that whether Dr. Haynes should have known of the potential for a bacterial infection because he knew he had not reviewed the band count is a question of negligence, not EMTALA liability. According to Memorial Hermann, EMTALA is not concerned with what Dr. Haynes could or should have known, but only what he actually knew. And Memorial Hermann argues that

69

the hospital laboratory technician's knowledge that a CBC for a patient showed a high band count does not mean that the technician knew that the patient had an emergency medical condition.

In response, Guzman argues that the hospital's "corporate knowledge," not the doctor's diagnosis, determines whether the hospital had actual knowledge of a patient's emergency medical condition.  (Docket Entry No. 100, at 45).  Guzman relies on *Roberts v. Galen of Virginia*, *Inc.*, 325 F.3d 776 (6th Cir. 2003), for the proposition that "any hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA."  *Id.* at 788.  Guzman argues because the laboratory technician and the hospital computer knew T.'s band count result – even though Dr. Haynes did not – the hospital knew of the band count result, and that "[t]he hospital also knew, through Dr. Haynes, that a person can have a bacterial infection if the band count is abnormal."  (Docket Entry No. 100, at 45).  Guzman contends that "[a]ll of this knowledge is the hospital's corporate knowledge of [the child's] emergency condition, and it is this corporate knowledge that would have required Memorial Hermann Southeast to provide stabilizing treatment unless the likelihood of bacterial infection could be ruled out." (*Id.*, at 50).  Guzman also argues that it is the existence of symptoms of sufficient acuteness and severity that could lead to a material deterioration if not treated that trigger the duty to stabilize, not the actual diagnosis of an emergency condition.  Guzman contends that the evidence in the record shows that T. was suffering from a potential infection that, if untreated, could lead to a material deterioration, and that this gave rise to a duty to stabilize

70

at the time he was discharged.  Guzman asserts that "if Dr. Haynes had this information [about the band count], which the hospital knew, he would have done further work-up on [the child] to evaluate his condition and [would have] contacted his pediatrician."  (*Id.*).

When an emergency medical condition is readily apparent, EMTALA liability attaches for failing to stabilize.  For example, in *Smith v. Botsford General Hosp.*, 419 F.3d 513, 515 (6th Cir. 2005), a hospital transferred a 33-year-old man weighing approximately 600 pounds who had fractured his left leg in a rollover car accident.  The leg break was a comminuted  femur fracture, a type of break that causes the bone to pierce the skin.  The hospital did not stabilize the break before transferring the patient by ambulance.  The patient died from blood loss during the transfer.  *Id.*  The jury found the hospital liable for failure to stabilize an emergency medical condition, and the appellate court affirmed the district court's denial of the hospital's motion for a new trial.  *Id.*   In *Heimlicher v. Steele*, 2007 WL 2384374, *1 (N.D. Iowa Aug. 17, 2007), the court denied summary judgment to a hospital that transferred a woman who had arrived at the emergency room eight months pregnant, having pain, bleeding vaginally, after her water had broken.  During the ambulance transfer to another hospital, the vaginal bleeding continued and the pain increased.  The baby was stillborn.  The court found "[t]here is substantial evidence in the record [the patient] was having contractions while at the Hospital, so she could not have been 'stabilized' for purposes of the EMTALA. . . ." *Id.*

Some cases rely on evidence of a difference of opinion within the hospital staff on whether a patient requires stabilization in denying summary judgment on an EMTALA

71

claim.  For example, in *Thomas v. Christ Hosp. and Medical Center*, 328 F.3d 890, 896 (7th Cir. 2003), the court held that the different opinions held by the doctor who ordered the discharge of a patient threatening suicide and the social worker who saw the patient about whether that patient needed stabilizing treatment before discharge required denial of the hospital's motion for summary judgment on the EMTALA claim.  In *Roberts*, 325 F.3d at 778, the court held that evidence from nurses that the medical staff knew that the patient had an elevated white blood-cell count and temperature, cloudy urine, and expiratory wheezes before transfer was sufficient to present the case to a jury on a failure to stabilize claim. Similarly, summary judgment was denied when a nurse described the patient's condition as "code blue" before an emergency room doctor sent him home, despite the doctor's affidavit that he saw no emergency condition.  *Griffith v. Mt. Carmel Medical Center*, 831 F.Supp. 1532, 1535 (D. Kan. 1993).

In contrast to the above cases, courts have found no EMTALA liability if there is "no dispute as to the hospital's lack of knowledge" of a need for stabilization.  In *Urban By and Through Urban v. King*, 43 F.3d 523, 524–25 (10th Cir. 1994), the plaintiff was pregnant with twins and had been diagnosed as having a high-risk pregnancy.  She went to the hospital for a routine stress test.  The test was nonreactive, meaning that it showed no fetal movement, but the fetal heart tones were in the 150s for each twin and the plaintiff's vital signs were normal.  The nurse who conducted the test consulted with a doctor but did not inform the plaintiff of the results.  The nurse instructed the plaintiff to come back the next morning for another stress test.  During the repeat test, a different nurse realized that something was

72

wrong and called a different doctor, who ordered a biophysical profile. The profile revealed no movement or breathing in either fetus and the absence of a fetal heart rate in one of the fetuses. One baby was delivered stillborn and the other was born with brain damage. The plaintiff sued, alleging that the hospital violated EMTALA's requirement to stabilize an emergency medical condition by sending her home after the first nonreactive stress test. Relying on the statutory definition, the court held that no duty to stabilize arose because "an emergency medical condition had not manifested itself. She was not in pain, and she had not displayed acute symptoms of severity at the time she was sent home from the obstetrics department." *Id.* at 526. There was no "manifestation of acute symptoms so the hospital would know of the condition." *Id.*

Whether a patient is in fact suffering from an emergency medical condition is "irrelevant for purposes of [EMTALA]." *Harris v. Health & Hosp. Corp*, 852 F.Supp. 701, 703 (S.D. Ind. 1994). The statutory language makes clear that "what matters is the hospital's determination of the patient's medical status. The standard is a subjective one." *Id.* at 703–04. In *Harris*, a patient came to the emergency room complaining of severe left chest pain. The patient was discharged but was back within two hours, in cardiac arrest, and died shortly thereafter. The emergency room doctor had diagnosed the patient with costochondritis and hyperventilation syndrome. The doctor concluded that the patient was not suffering from an emergency medical condition, listing her condition on release as "stable," and discharged her with a prescription for Ibuprofen. The family sued, arguing that the duty to stabilize arose because the "differential diagnosis included myocardial infarction

73

and pulmonary embolus, both potentially fatal conditions." *Id.* at 703.  The court rejected this argument, holding that the standard for EMTALA liability for failure to stabilize "is not whether the hospital fails to properly stabilize or transfer a patient after the hospital determines that the individual *potentially* has an emergency medical condition, it is whether it does so after determining that the individual *has* an emergency medical condition." *Id.* (emphasis in original); *see also Garrett v. Detroit Medical Center*, 2007 WL 789023, at *6 (E.D. Mich. Mar. 14, 2007) (rejecting the plaintiff's argument that because pulmonary embolism was a part of the differential diagnosis, the defendants knew that the patient was suffering from an emergency medical condition because "[i]nclusion in a differential diagnosis, which is a list of *possible* diagnoses, does not equate to a *determination* that a patient actually has a particular condition sufficient to support liability under EMTALA") (emphasis in original).

Similarly in *Hoffman v. Tonnemacher*, 425 F.Supp.2d 1120 (E.D. Cal. 2006), the court held that when a doctor diagnosed an emergency room patient with viral bronchitis, the hospital did not have actual knowledge of an emergency medical condition, even though the patient was in fact suffering from a severe bacterial infection that ultimately led to septic shock and a lengthy hospitalization.  *Id.* at 1141–42.  The doctor made a differential diagnosis of viral pneumonia but testified that he could not rule out a bacterial infection. The doctor concluded that the patient was stable for discharge and prescribed an  antibiotic. The plaintiff argued that the duty to stabilize arose because of the patient's fever and high pulse, the fact that the doctor could not rule out a bacterial process, and the doctor's

testimony that discharging a patient with a known, uncontrolled, ongoing bacterial process would be the discharge of an unstable patient. The plaintiff's expert witnesses opined that a doctor who could not rule out a bacterial process had to assume that it was present and should have recognized that a patient with the plaintiff's medical history and presentation could be suffering from a bacterial infection. The court rejected these arguments as a basis for EMTALA liability based on a duty to stabilize. The fact that the doctor "could not rule out a bacterial process, or that he should have assumed a bacterial process is not the same as actual knowledge or determining that [the patient] had those conditions." *Id.* at 1142. The court held that "[t]he duty to stabilize is determined in reference to the diagnosis, not in hindsight for what [the patient] 'turned out to have.'" *Id.* (citing *Vickers*, 78 F.3d at 145). Summary judgment was granted in favor of the defendant hospital on the failure to stabilize claim because there was no evidence that the doctor had actually determined that an emergency medical condition existed. *Id.*

In this case, the undisputed facts in the record show that on February 12, 2006, the only indication that T. might have a severe bacterial infection requiring stabilization for an emergency medical condition was one part of one laboratory test. It was only the band count result from the CBC Dr. Haynes ordered that showed a possible underlying severe bacterial infection. It is undisputed that Dr. Haynes did not know this lab result when he discharged the child. The history, physical examination, and other results from the CBC led Dr. Haynes to diagnose a viral syndrome that was not an emergency medical condition and did not require stabilization before discharge. At discharge, T. was not in acute distress. He had no

75

difficulty in breathing and had normal blood gases, and had stopped vomiting.  Nothing in the history, examination, and the CBC (absent the band count) showed that the absence of immediate additional medical treatment would put the patient's health in "serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." The symptoms presented were typical of patients with a routine viral syndrome or routine bacterial infection.  They did not manifest the existence of an emergency medical condition. The child's alleged emergency medical condition was the underlying severe bacterial infection, which was evidenced by the high band count that Dr. Haynes did not see.  Dr. Haynes did not know and did not determine that T. had an emergency medical condition.

Guzman's argument that the hospital's "corporate knowledge" shows actual knowledge of the child's emergency medical condition is unpersuasive.  EMTALA requires actual knowledge of an emergency medical condition; knowledge of symptoms that could indicate the potential for such a condition is insufficient to trigger the duty to stabilize. Courts require "actual detection" or "actual knowledge" to trigger the duty to stabilize because a hospital cannot be held liable for failing to stabilize a condition of which it was unaware.  Guzman's reliance on *Roberts* is misplaced.  The language Guzman quoted clearly states that "any hospital employee or agent that has knowledge of a patient's *emergency medical condition* might potentially subject the hospital to liability under EMTALA." *Roberts*, 325 F.3d at 778 (emphasis added).  Dr. Haynes was not aware of an emergency medical condition.  The lab technician in this case, Suzette Dalmeida, was aware of the abnormal band count in the white blood cell differential, but that does not equate to

76

knowledge of an emergency medical condition.  Dalmeida had not seen or evaluated T.; had

no knowledge of his symptoms, complaints, or history; and lacked the medical training to

determine the existence of an emergency medical condition.  Dalmeida, who has an

associate's degree in medical technology, testified in her deposition that she does not know

what an elevated band count means in terms of whether a patient's condition is likely to be

viral or bacterial in origin.  (Docket Entry No. 95, Ex. J, Deposition of Suzette Dalmeida, at

36:18–37:5).  The test result alone was insufficient for Dalmeida to know that the child was

suffering from a condition "manifesting itself by acute symptoms of sufficient severity

(including severe pain) such that the absence of immediate medical attention could

reasonably be expected to result in-(i) the placing of the health of the individual . . . in

serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of

any bodily organ or part . . ."[6]

Guzman's reliance on *Battle* is also misplaced.  In that case, the Fifth Circuit

remanded the failure to stabilize claim because there was evidence from which a jury could

conclude that the hospital released the patient "even though the doctors knew he was

suffering from seizures that had not been stabilized and were of an unknown etiology."

*Battle*, 228 F.3d at 559.  The patient had been diagnosed with, among other things, a seizure

disorder.  The plaintiffs' expert witnesses testified that a "seizure disorder" is an emergency

---

[6]  Moreover, even if Dr. Haynes had known the results of the white blood cell differential, that would not
have automatically amounted to detection or knowledge of an emergency medical condition.  Dr. Haynes
testified in his deposition that had he known the band count, he would have done further evaluation and
contacted the child's pediatrician.  Dr. Hayden, Guzman's expert witness, "concur[red] that the presence of
56% bands on the white cell differential would have required further evaluation to identify a likely source
of infection."  (Docket Entry No. 100, Ex. J, at 11).

medical condition. *Id.* Unlike *Battle*, in this case there is no evidence that Dr. Haynes diagnosed Guzman's son with any emergency medical condition, either in the actual diagnosis or as part of the differential diagnosis. The duty to stabilize does not arise where there is no actual knowledge of an emergency medical condition.

Guzman argues that this court should not be "unduly influenced" by Dr. Haynes's diagnosis because viral syndrome is a "diagnosis of exclusion." Guzman contends that an unresolved fact issue exists as to whether Dr. Haynes knew he had ruled out a bacterial infection even though he diagnosed viral syndrome. But this argument ignores the fact that, in the EMTALA context, the actual diagnosis is taken as a given, "only obligating hospitals to stabilize conditions they actually detect." *Vickers*, 78 F.3d at 145. Dr. Haynes diagnosed viral syndrome, which is not an emergency medical condition. As in *Hoffman*, the fact that Dr. Haynes did not rule out a bacterial infection is not the same as actual knowledge or detection of an emergency medical condition. No duty to stabilize was triggered. The position Guzman advances would make EMTALA liability for failure to stabilize "coextensive with malpractice claims for negligent treatment."

There is no dispute as to the hospital's actual lack of knowledge of an emergency medical condition. T.'s emergency medical condition was not readily apparent or visible to the naked eye, as in *Smith* or *Heimlicher*, and Guzman has not presented any evidence of a difference of opinion within the hospital staff as to his condition. Like the plaintiff in *Urban*, T. had no "acute symptoms of severity" showing the existence of an emergency medical condition. Dr. Haynes diagnosed T. with viral syndrome. As in *Hoffman*, the diagnosis of

78

viral infection, even without ruling out bacterial infection, did not mean that the hospital staff had actual knowledge that an emergency medical condition existed requiring stabilizing.

Memorial Hermann's motion for partial summary judgment on the EMTALA failure to stabilize claim based on the initial visit to the emergency room is granted.

### C.     The Transfer Claim: The Second Visit to the Emergency Room

Under EMTALA, a hospital may not transfer an individual who has an emergency medical condition that has not been stabilized unless-

> (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,
>
> (ii) a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual; *or*
>
> (iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; *and*
>
> (B)  the transfer is an appropriate transfer.

42 U.S.C. § 1395dd(c)(1)  (emphasis added).  An appropriate transfer is defined as one:

> (A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health . . ;
>
> (B) in which the receiving facility-
>
> > (i) has available space and qualified personnel for the treatment of the individual, and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(C)   in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer . . ;

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required[,] including the use of necessary and medically appropriate life support measures during the transfer; and

(E) which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

42 U.S.C. § 1395dd(c)(2).

Memorial Hermann argues that summary judgment should be granted on Guzman's transfer claim because the record does not raise a fact issue as to whether the transfer was "appropriate," as defined by EMTALA.  Memorial Hermann contends that the record evidence shows that before the transfer, T. received care to "treat his condition, to protect his airway, to treat his pain, his nausea, and to hydrate him."  (Docket Entry No. 95, at 29).  Memorial Hermann also argues that Guzman's expert witness affidavit only addresses "the quality of care, or negligence" which is "not relevant to . . . whether the transfer complied with EMTALA requirements."  (Docket Entry No. 104, at 8).  Memorial Hermann contends that Guzman's allegation in the second amended complaint – that Memorial Hermann failed to coordinate the transfer "in an appropriate and timely manner, resulting in an extensive delay" – does not allege an EMTALA violation because there is no duty to complete a transfer within a certain period of time.  Instead, according to Memorial Hermann, Guzman alleges a negligent delay of transfer, which is not actionable under EMTALA.  Memorial

Hermann also argues that the transfer did not violate EMTALA because Guzman signed an informed consent.

Guzman argues that the transfer was inappropriate on several levels.  She contends that there was no physician "summary of the risks and benefits upon which the certification [of transfer] was made," in violation of 42 U.S.C. § 1395dd(c)(1)(B).  Guzman contends that there was no space available at Memorial Hermann Children's at 11:30 a.m., 2:00 p.m., and 2:24 p.m. and that the transfer efforts were deficient because no attempt was made to send T. to another local children's hospital with a pediatric ICU.  Guzman contends that the transfer was not effected through qualified personnel and equipment because the pediatric transport team was en route to Beaumont, Texas and was therefore unavailable.  Guzman points to Dr. Hayden's report, which faults the hospital for delaying giving T. antibiotics and failing to initiate aggressive fluid hydration or ventilatory support.  According to Guzman, Dr. Hayden's opinion creates a fact issue as to whether Memorial Hermann provided "medical treatment within its capacity which minimize[d] the risks" to the child's health.

Under EMTALA, if a patient is not stabilized, a hospital may only transfer that patient if the patient requests transfer in writing or a physician certifies that the medical benefits to be gained by the transfer outweigh the risks.  *See* 42 U.S.C.A. § 1395dd(c)(1)(A)(ii).  If the hospital meets the request or certification requirement, the transfer must also be "appropriate," as defined by EMTALA.  If a patient is stabilized, however, the hospital may transfer without the limitations imposed under EMTALA.  The elements of a claim under EMTALA's transfer provisions are that: (1) the patient had an emergency medical condition;

(2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) the transferring hospital did not obtain the proper consent or certification before transfer and failed to follow appropriate transfer procedures. *See Baber v. Hospital Corp. of America*, 977 F.2d 872 (4th Cir. 1992); *see also Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994).

It is undisputed that on February 13, 2006, T. suffered from an emergency medical condition of which the hospital had actual knowledge.  Dr. Siddiqi determined that T. had pneumonia and probable sepsis, potentially life-threatening conditions.  Memorial Hermann does not dispute that T. was not stable when he was transferred by Life Flight helicopter on February 13, 2006.  Under EMTALA, Memorial Hermann could not transfer T. to another hospital unless: (1) the parents requested in writing to be transferred to another hospital (42 U.S.C. § 1395dd(c)(l)(A)(i)); or (2) a physician signed a certification that the medical benefits reasonably expected from medical treatment at another hospital outweighed the risks from the transfer (42 U.S.C. § 1395dd(c)(l)(A)(ii)).  *See Baker*, 260 F.3d at 993 (citing 42 U.S.C. § 1395dd(c)(1)) ("If the patient's condition has not been stabilized, the hospital may not transfer the patient to another medical facility unless (1) the patient or her proxy requests a transfer in writing, or (2) a physician or other medical professional certifies that the medical benefits available at the other facility outweigh the risks of transfer.").  EMTALA also required the transfer to be "appropriate."  Memorial Hermann, the transferring hospital, had to provide treatment within its capacity to minimize the risk to the child's health; Memorial Hermann Children's Hospital, the receiving facility, had to have available space and

qualified personnel for the treatment and agree to the transfer; and the transfer had to be effected through qualified personnel and transportation equipment.   42 U.S.C. § 1395dd(c)(2).

### 1.   A written transfer request

Guzman signed a subsection of the "Memorandum of Transfer" with the heading "Transfer of Individual With an Emergent or Unstable Medical Condition."  (Docket Entry No. 95, Ex. B).  Above her signature line, the form states: "I have been informed of the hospital's obligation to individuals with an emergency medical condition/women in labor. I have been informed of my [the individual's] medical condition.  The risks and benefits of the transfer have been explained to me and I request transfer to the Receiving Hospital." (*Id.*).

The fact that a patient or proxy signs an informed-consent-to-transfer form does not satisfy the statutory requirement of a written request for the transfer.  In *Estate of Robbins v. Osteopathic Hospital Founders Assoc.*, 178 F.Supp.2d 1221 (N.D. Okla. 2000), the patient signed a "multi-part form applicable to a patient for whom transfer is recommended by the hospital."  *Id.* at 1225.  The patient did not sign the specific part of the form for a transfer at the patient's request.  *Id.*  The hospital argued that this was a clerical error and that patient had been "adamant" in requesting a transfer.  *Id.*  The court observed that although the patient had signed an informed-consent form, EMTALA "actually describes the requirement as a patient *requesting* a transfer in writing."  *Id.* (emphasis in original).  The court held that under the circumstances, whether the transfer was at the patient's request was

a fact question, precluding summary judgment.  *Id.*; *see also Heimlicher v. Steele*, 2009 WL

1361164, at *11 (N.D. Iowa May 14, 2009) ("Under subsection (c)(1)(A)(i) of the Act, a

written request for transfer authorizes a hospital to transfer a patient with an emergency

medical condition that has not been stabilized to another hospital.  A consent to transfer does

not give a hospital this authority.").

Guzman signed a form stating that she gave informed consent to the transfer after

receiving an explanation of its risks and benefits.  The form also indicates that Guzman

"request[ed] transfer to the Receiving Hospital."  The evidence shows that the transfer was

initiated by Dr. Siddiqi at 11:20 a.m. after he determined that the child's condition had

worsened and that he needed a hospital with a pediatric ICU.  The transfer was accepted at

12:30 p.m.  Guzman signed the form at 1:05 p.m.  Guzman signed the consent form – which

included the statement, "I request transfer to the Receiving Hospital" – after Dr. Siddiqi had

initiated the transfer and it had been accepted by Memorial Hermann Children's Hospital.

The evidence is insufficient to conclude that, as a matter of law, the transfer was conducted

at the patient's request.

The evidence also gives rise to a fact issue as to whether Dr. Siddiqi or another

member of the Memorial Hermann medical staff told Guzman about the hospital's EMTALA

obligations before she signed the form.  The provision allowing for transfer of an unstabilized

patient on the request of the patient or proxy requires that "the individual (or a legally

responsible person acting on the individual's behalf) *after being informed of the hospital's*

*obligations under this section* and of the risk of transfer, in writing requests transfer to

84

another medical facility." 42 U.S.C. § 1395dd(c)(1)(A)(i) (emphasis added). The medical records indicate that Dr. Siddiqi discussed the "transfer process" with the Guzmans. The evidence is insufficient to conclude that Dr. Siddiqi explained Memorial Hermann's EMTALA obligations before Guzman signed the form. Absent such evidence, a signed transfer request cannot exempt a hospital from the stabilization requirement. *Smithson v. Tenet Health System Hospitals*, *Inc.*, 2008 WL 2977361, at *6 (E.D. La. July 30, 2008) (finding disputed fact issue material to determining whether the plaintiff and his mother were informed of the hospital's EMTALA obligations when the doctor "testified that he informed plaintiff of the risks of transfer, [but] he did not state that he also informed plaintiff of the hospital's EMTALA obligations").

These fact issues, however, do not preclude summary judgment if the hospital meets the physician-certification requirement of § 1395dd(c)(1)(A)(i). The language is disjunctive; either a patient's written request or a physician's certification allows transport of an unstabilized patient if the transfer is otherwise appropriate under § 1395dd(c)(2).

## 2.    Physician certification

At 1:05 p.m. on February 13, 2006, Dr. Siddiqi signed a "Memorandum of Transfer" form under the section titled "Transfer of Individual With an Emergent or Unstable Medical Condition." (Docket Entry No. 95, Ex. B, at MHLF–0009). Above the doctor's signature line, the form states: "I have evaluated, determined, and explained to the individual/individual's legal guardian or next of kin, based on the information available at the time of transfer: 1) that the benefits of obtaining medical treatment at another medical

facility and the risks of not being transferred to another medical facility are: _____ and 2) that the medical benefits reasonable and expected from the provisions of appropriate medical treatment or another medical facility outweigh the increased risks to the individual . . . from effecting the transfer.   Further, the transfer to the Receiving Hospital is appropriate." (*Id.*).

A hospital does not comply with the certification provision if the signing physician "has not actually deliberated and weighed the medical risks and the medical benefits of transfer before executing the certification." *Burditt v. United States Department of Health and Human Services*, 934 F.2d 1362, 1371 (5th Cir. 1991).   A hospital also violates the EMTALA transfer provision "if the signer actually concludes in the weighing process that the medical risks outweigh the medical benefits of transfer, yet signs a certification that the opposite is true." *Id.*   The signing physician, however, "need not be correct in making a certification decision; the statute only requires a signed statement attesting to an actual assessment and weighing of the medical risks and benefits of transfer." *Id.*   Whether "a reasonable physician would have considered different medical factors than those considered by the signer, or would have weighted factors differently in reaching a certification decision, need not be considered in determining whether a hospital has violated . . . §1395dd(c)(1)(A)(ii)." *Id.*

In *Vargas v. Del Puerto Hospital*, 98 F.3d 1202 (9th Cir. 1996), the plaintiff argued that the certification was deficient because the certifying doctor failed to include an accurate summary of the benefits and risks.   During a bench trial, the district court rejected that

argument, concluding that the doctor weighed the risks and benefits to the child before

deciding to transfer her.  Affirming that decision, the appellate court observed:

> The certification requirement is part of a statutory scheme with
> an overarching purpose of ensuring that patients, particularly the
> indigent and underinsured, receive adequate emergency medical
> care.  The purpose of the certification requirement in particular
> is to ensure that a signatory physician adequately deliberates and
> weighs the medical risks and medical benefits of transfer before
> effecting such a transfer.
>
> Congress surely did not intend to limit the inquiry as to whether
> this deliberation process in fact occurred to an examination of
> the transfer certificate itself. While such a contemporaneous
> record may be the best evidence of what a physician was
> thinking at the time, we cannot accept the proposition that the
> only logical inference to be drawn from the absence of a written
> summary of the risks is that the risks were not considered in the
> transfer decision. Other factors might account for the absence of
> such a summary, such as the time-pressure inherent in
> emergency room decision-making. Although a contemporaneous
> record is certainly preferable, we believe it would undermine
> congressional intent to foreclose consideration of other evidence
> surrounding the transfer decision.

*Vargas*, 98 F.3d at 1205 (internal citations omitted).  The court held the hospital was not

entitled to prevail simply because a doctor signed a certificate.  *Id.*  The factfinder was not

limited to considering only the transfer certificate but could consider other evidence as well.

The court held that "[i]t is the failure to undertake [a risk/benefit] assessment that results in

EMTALA liability, not merely the partial failure to summarize the risks and benefits in

writing."  *Id.*

The court in *Alvarez v. Vera*, 2006 WL 2847376, at *8 (D.P.R. Oct. 2, 2006), followed

*Vargas* in granting summary judgment in favor of the defendant hospital.  In that case, the

87

physician's certification form was filled out to state one benefit of the transfer but the space for stating the risks was left blank.  The court concluded that the information on the certification was sufficient evidence that "the doctor had considered the totality of the circumstances and found the benefits as indicated outweighed the risks, if any."  *Id.*  In *Kilcup v. Adventist Health*, *Inc.*, 57 F.Supp.2d 925, 931 (N.D. Cal. 1999), the court held that the certification requirement was met even in the absence of a written certification.  The summary judgment evidence showed that the doctor had discussed the risks and benefits of transfer with the patient's next of kin and the patient had signed an informed-consent form.  The hospital had "remed[ied] the failure to summarize in writing the specific risks of transfer by establishing that the risk/benefit assessment was in fact performed."  *Id.* at 930.  The court granted summary judgment on the EMTALA transfer claim.  *But see Romo v. Union Memorial Hosp., Inc.*, 878 F.Supp. 837, 844 (W.D.N.C. 1995) (holding that when "no physician signed a certification as required," the issue of "whether a risk/benefit analysis was ever properly made is one which must be decided by the jury").

These cases show that if there is evidence that the doctor actually weighed the risks and benefits of transfer, EMTALA's certification requirement is met even if the written certification form is either absent or in some way deficient.  Guzman argues that the certification in this case is deficient because it does not include a written summary of the risks and benefits of transfer.  Yet there is ample evidence in the record showing that Dr. Siddiqi actually and repeatedly weighed the risks and benefits of transferring T. to Memorial Hermann Children's Hospital, even though he did not specifically list those risks and benefits

88

on the Memorandum of Transfer.   After the child's condition began to worsen around 11:00

a.m., Dr. Siddiqi decided that transfer to Memorial Hermann Children's would be beneficial

because it has a pediatric ICU that could provide a higher level of care than Memorial

Hermann.   In *Burditt*, 934 F.2d at 1371 n.9, the Fifth Circuit held that "a physician's belief

that others are more competent to perform a required procedure is a medical reason for

transfer" that would meet the requirements of EMTALA.   In the present case, the undisputed

evidence is that Dr. Siddiqi decided to transfer T. to another hospital because he believed its

pediatric ICU was more capable of treating the child's condition.   Dr. Siddiqi initially

decided that transportation by standard ambulance would be appropriate.   Dr. Siddiqi then

spoke with Dr. Erickson, the attending physician at Memorial Hermann Children's, about the

child's condition and the appropriate mode of transportation for the transfer.   Dr. Siddiqi

explained the child's symptoms, diagnosis, and the timeline of his condition.   After

consulting with Dr. Erickson, Dr. Siddiqi agreed that the pediatric transport team, which

offered a higher level of care during transport than a regular ambulance, would be more

appropriate.   Dr. Siddiqi was aware of the potential for a lengthy delay in the transfer because

the pediatric transport team was en route to Beaumont, but agreed with Dr. Erickson that the

pediatric transport team would provide T. better care than a standard ambulance and decided

to wait.   The child's medical records show that Dr. Siddiqi discussed the transfer process

with the Guzmans and explained to them the risks and the benefits of transfer to Memorial

Hermann Children's.   The record evidence shows that Dr. Siddiqi weighed the risks of

transfer by an ambulance and by a pediatric transport team against the benefits of being

treated in a pediatric ICU and, after that deliberation, determined to go forward with the transfer.  The record evidence also shows that Dr. Siddiqi weighed the risks of transfer by an ambulance against the risks of waiting for the pediatric transport team and decided that the benefits were worth the risks of waiting and the risks of the lower level of care available in the regular ambulance.  The purpose of the certification requirement, ensuring that the physician deliberation occurs, was fulfilled.  As in *Alvarez* and *Kilcup*, the physician certification requirement was met in this case by undisputed evidence of actual deliberation.

### 3.    The Transfer

Memorial Hermann argues that based on the undisputed summary judgment evidence, as a matter of law, the transfer was appropriate under EMTALA.  Before the transfer, Dr. Siddiqi provided medical treatment to minimize the risks to T.'s health, including administering antibiotics, fluids by IV, and medicine for pain and nausea, as well as intubating him to protect his airway after his respiratory status declined while awaiting transfer.  The transfer was delayed so that Guzman's son would be transported by the pediatric transport team, which are clearly qualified personnel and transportation equipment as required by EMTALA.  Dr. Siddiqi and the nurses continued to provide medical care to T. while awaiting transfer.  After his temperature rapidly and severely increased as a result of an allergic reaction to the intubation medication, Dr. Nguyen decided that T. needed to be transported via Life Flight helicopter.  Memorial Hermann asserts that it took active and vigorous steps to effect an appropriate transfer.  According to Memorial Hermann, although Guzman alleges and provides evidence that may support claims for negligent delay in

transfer and negligent medical care while awaiting transfer, these claims are not actionable under EMTALA.

Guzman argues that the transfer was not appropriate under EMTALA. She notes that there were no pediatric ICU beds available at Memorial Hermann Children's at 11:30 a.m., that the pediatric transport team was unavailable because it was en route to Beaumont to pick up another patient, and that there were still no beds available at Memorial Hermann Children's pediatric ICU at 2:00 p.m. and 2:25 p.m. Guzman argues that given the unavailability of a pediatric ICU bed at Memorial Herman Children's and of the pediatric transport team, if Memorial Hermann intended to transfer T., it had an obligation under EMTALA to find another local hospital with a pediatric ICU. Guzman argues that the lack of a bed at Memorial Hermann Children's violated EMTALA's requirement that the receiving hospital have available space, and that the unavailability of the pediatric transport team is "either a violation of subsection (D) (qualified personnel and transportation equipment) or (B) has available space." (Docket Entry No. 100, at 55). Guzman also argues that before the transfer, Memorial Hermann did not provide medical treatment within its capacity to minimize the risks to T.'s health. Dr. Hayden, Guzman's expert witness, opined in his report that Memorial Hermann failed in this respect because of the delay in giving antibiotics after pneumonia was diagnosed and the failure to initiate aggressive fluid hydration or ventilatory support. (Docket Entry No. 100, Ex. J).

Guzman's argument that the evidence of the unavailability of the pediatric transport team creates a fact issue as to an EMTALA violation is unpersuasive. It is undisputed that

91

the pediatric transport team ordered by Dr. Erickson and Dr. Siddiqi was qualified and provided a higher level of care and equipment for unstable pediatric patients such as T. than a standard ambulance team.  The statute is clear that the requirement for available space and personnel pertains to the receiving hospital, not the transportation crew.  *See* 42 U.S.C. § 1395dd(c)(2)(B)(i) ("An appropriate transfer to a medical facility is a transfer . . . in which the receiving *facility* – has available space and qualified personnel for the treatment of the individual.") (emphasis added).  The transport in this case was effected by Life Flight helicopter.  Guzman does not dispute that Life Flight provided qualified personnel and transportation equipment.

The fact that Memorial Hermann Children's did not have available space at 11:23 a.m., 2:00 p.m., or 2:25 p.m. does not create a fact issue as to whether the transfer was inappropriate.  EMTALA states that an appropriate transfer is one in which the receiving hospital "(i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreed to accept the transfer of the individual and to provide appropriate medical treatment." 42 U.S.C. § 1395dd(c)(2)(B).  Both requirements must be met.  EMTALA was intended to prevent an emergency room from refusing to treat an unstabilized patient with an emergency medical condition and instead sending that patient to another hospital that is either full or has not agreed to care for the patient or both.  It is undisputed that Memorial Hermann Children's agreed to accept the transfer and to provide appropriate treatment in the pediatric ICU.  It is also undisputed that Memorial Hermann Children's pediatric ICU had qualified personnel for treating T. and was better equipped to provide the care T. needed than

Memorial Hermann.   Dr. Erickson agreed to accept the transfer and told Dr. Siddiqi that he would make a bed available for T. in the pediatric ICU.   After T. was transported to Memorial Hermann Children's via helicopter, Dr. Erickson and the staff at that hospital assumed responsibility for his care and placed him in the pediatric ICU.   This is not a situation in which a patient was transferred by an emergency room to a hospital that could not or did not want to treat him.   Keeping in mind EMTALA's purpose of  preventing patient-dumping, the unavailability of a bed at Memorial Hermann Children's pediatric ICU did not violate the "available space" requirement of § 1395dd(c)(2)(B)(i).   EMTALA does not require transfer within a certain time.   It does require a hospital to provide an "adequate first response to a medical crisis," which "means the patient must be evaluated and, at a minimum, provided with whatever medical support services and/or transfer arrangements that are consistent with the capability of the institution and the well-being of the patient." 131 Cong. Rec. 28569 (1985).

"A hospital's negligent medical decision not to transfer a critical patient promptly to another hospital to receive necessary treatment might trigger state-law medical malpractice liability, but it could not constitute an EMTALA . . . violation." *Fraticelli-Torres v. Hospital Hermanos*, 300 Fed. App'x 1, 6 (1st Cir. 2008).  In *Fraticelli-Torres*, the plaintiff's husband went to the emergency room complaining of chest pain on June 25.  *Id.* at 1.  The ER doctors placed him on cardiac monitoring, performed a "battery of diagnostic tests," and determined that he had likely suffered a myocardial infarction within the prior two days.  *Id.*  The husband was admitted to the hospital's intensive care unit for further observation.  On July

93

1, after six days in the hospital and after a procedure that confirmed his need for an angioplasty or stent implementation, the doctors decided that the husband needed to be transferred to another facility capable of performing those procedures. *Id.* The hospital did not immediately effect the transfer, but continued to provide care and observation in the ICU. Two days later, on July 3, the husband began to exhibit signs of congestive heart failure. The hospital stabilized his condition, and with his consent, transferred him that same day to another hospital to undergo angioplasty or stent implementation. He received those procedures but died on July 16 while awaiting a heart transplant. The wife sued, arguing that the hospital violated EMTALA's appropriate transfer requirement by delaying the transfer. *Id.* at 5. The plaintiff contended that EMTALA imposed a duty on a hospital that cannot provide necessary medical treatments the obligation promptly to transfer the patient to a hospital that can do so. *Id.* The court rejected this argument as the basis for an EMTALA violation. The court held that EMTALA "does not impose any positive obligation on a covered hospital to transfer a critical patient under particular circumstances to obtain stabilization at another hospital. Rather, EMTALA merely restricts the conditions under which a hospital may transfer an unstabilized critical patient." *Id.* at 6. The court noted that if the plaintiff's husband was unstable and had an emergency medical condition, EMTALA prohibited transferring him without the patient's informed written request or a doctor's certification that the benefits of transfer outweighed the risks. Because EMTALA does not impose a standard of care, it did not require the hospital to transfer the husband within a certain period of time. *Id.*

The undisputed record evidence shows that Guzman's claim that Memorial Hermann failed to coordinate T.'s transfer in an "appropriate and timely manner, resulting in extensive delay" is outside the scope of EMTALA's transfer provision. *See* 42 U.S.C. § 1395dd(c)(2). Like the hospital in *Fraticelli-Torres*, Memorial Hermann's alleged failure to transfer T. to Memorial Hermann Children's faster or to find another local hospital with a pediatric ICU after learning that no beds were then available at Memorial Hermann Children's may constitute negligence under state medical malpractice law but do not violate EMTALA. *See also Pina Figueroa v. Hospital Metropolitano*, 2009 WL 1108700, at *2 (D. P.R. Apr. 23, 2009) (granting summary judgment on an EMTALA transfer claim in which the patient came to the emergency room at 4:00 a.m., a doctor diagnosed his condition, ordered treatment and laboratory tests, and arranged for transfer later that afternoon because no specialist was available to treat the condition, the hospital provided continuous care throughout that day and into the next morning, but the patient died before the transfer occurred).

Nor does the summary judgment evidence give rise to a disputed fact issue material to determining whether T. received appropriate care under EMTALA while awaiting transfer. EMTALA required Memorial Hermann to provide "medical treatment within its capacity which minimizes the risks to the individual's health." 42 U.S.C. § 1395dd(c)(2)(A). The appropriateness of medical treatment under the transfer provision, like a medical screening, is determined by whether patients are treated uniformly, according to the capacity and procedures of the hospital, not by whether the treatment met the standard of care set by the applicable medical malpractice law. For example, in *Ingram v. Muskogee Regional Medical*

*Center*, 235 F.3d 550 (10th Cir. 2000), the plaintiff's daughter was taken to the hospital after being shot in the chest. The on-call surgeon determined that she needed cardiovascular surgery. Because the hospital did not have any surgeons qualified to perform the necessary procedure, the on-call surgeon arranged for transfer to another hospital. The daughter died soon after she was transferred. The plaintiff argued that by failing to insert a chest tube before the transfer, the hospital failed to minimize the risks to the patient's health, in violation of § 1395dd(c)(2)(A). The Tenth Circuit rejected the claim, reasoning that the medical screening requirement and the requirement to provide "medical treatment within its capacity which minimizes the risks to the individual's health" should be analyzed under the same standard. *Id.* at 552. EMTALA requires a hospital to provide an "appropriate medical screening examination within the *capability* of the hospital's emergency department." 42 U.S.C. § 1392dd(a) (emphasis added). With respect to an "appropriate" transfer, the Act requires a hospital to provide "medical treatment within its *capacity* which minimizes the risks to the individual's health." 42 U.S.C. § 1395dd(c)(2)(A). The court noted the use of "appropriate" in both requirements and saw no distinction between the terms "capacity" and "capability." *Ingram*, 235 F.3d at 552. The court applied to EMTALA's requirement of an appropriate transfer the test used for an appropriate screening examination: that "each hospital determines its own capabilities by establishing a standard procedure, which is all the hospital needs to follow to avoid liability under EMTALA." *Id.* (citing *Repp v. Anadarko Mun'l Hosp.*, 43 F.3d 519 (10th Cir. 1994)); *see also Lemons v. Board of County Com'rs of County of Brown*, 2001 WL 1717856 (D.Kan. Aug. 08, 2001) (following *Ingram* to hold that

the sufficiency of treatment for purposes of transfer should be measured by whether the hospital followed its own policies and procedures).  The court held that the hospital's "capacity to provide medical treatment to minimize the risks of transfer should be measured by its standard practices."  *Id.*  Under that test, a plaintiff is required to produce evidence that the hospital failed to follow an existing policy or procedure to show that the transfer was not appropriate.  *Id.*  The narrow interpretation of the duty to provide care as part of a transfer "ties the statute to its limited purpose, which was to eliminate patient-dumping and not to federalize medical malpractice."  *Id.*  The *Ingram* court held that summary judgment was appropriate because the plaintiff failed to identify or present evidence that the doctor "violated an existing hospital procedure or requirement by failing to insert the chest tubes."  *Id.*  The court rejected the plaintiff's argument that a difference of opinion between the medical experts created a fact issue precluding summary judgment.  A difference of medical opinion on the care provided, while relevant to a medical malpractice action, was irrelevant to the appropriateness of a transfer.  *Id.*

In the present case, Guzman has not identified or presented evidence that Memorial Hermann violated its policies or procedures in caring for T. before he was transferred.  There is no evidence that Memorial Hermann treated T. differently from other pediatric patients with similar symptoms awaiting transfer to another hospital.  Dr. Siddiqi testified that he diagnosed the child T. with pneumonia at approximately 9:45 a.m. and ordered antibiotics, which were administered at 11:35 a.m.  Dr. Siddiqi testified that in the emergency room, "depending on how busy the nurse is and how busy the emergency room is, it's typically an

97

average of an hour before the order is written, it's actually seen by the nurse, the nurse actually . . . mixes it up, puts the appropriate tubing on and hangs it on the patient. For all that to expire is usually an hour." (Docket Entry No. 100, Ex. N, Deposition of Mohamed Siddiqi, M.D., at 89:10–16). Dr. Siddiqi also ordered fluids to hydrate the child. These were administered by IV at 8:36 a.m., 9:48 a.m., 11:35 a.m., 12:00 p.m., 2:00 p.m., 4:05 p.m., 4:35 p.m., and 4:38 p.m.   (Docket Entry No. 95, Ex. A, at MHSE–0047).   T. also received medication for pain and nausea. And Dr. Siddiqi intubated T. at 1:50 p.m. to protect his airway. This undisputed evidence shows that as a matter of law, there was no violation of EMTALA's transfer provision during the period before the transfer.

Dr. Hayden's report and opinion concerning the care given on February 13, 2006 do not raise a fact issue as to the appropriateness of the transfer under EMTALA. Dr. Hayden asserts that the hospital should have administered antibiotics sooner and should have administered aggressive fluid hydration and ventilatory support before intubation became necessary. These opinions speak to negligence, not EMTALA liability. Memorial Hermann provided medical treatment within its capacity which minimized the risks to T.'s health while he awaited transfer. *See Vargas v. Del Puerto Hosp.*, 1996 WL 684501, at *5 (E.D. Cal. Nov. 7, 1996) (holding that the hospital "provided medical treatment within its capacity which minimized the risks to the child's health" because "no treatment was intentionally withheld or refused" and "any other child would have been similarly treated"). "[I]nserting into EMTALA an action for violation of standard medical procedures for patients admitted and treated for several hours would convert the statute into a federal malpractice statute,

98

something it was never intended to be." *Tank v. Chronister*, 941 F.Supp. 969, 972 (D. Kan. 1996) (quotation omitted).

The record evidence shows that the transfer in this case was appropriate as a matter of law.  The presence of an expert affidavit stating that in his opinion, more should have been done earlier, does not create a fact issue as to an EMTALA violation.  Memorial Hermann's motion for partial summary judgment on Guzman's EMTALA claim for failure to provide an appropriate transfer is granted.

## IV.    Guzman's Motion for a Continuance to Conduct Discovery

Guzman moved under Rule 56(f) for a continuance to take additional discovery. (Docket Entry No. 99).   Guzman asserts that it is "impossible" to "fully respond to Defendant's summary judgment motion" because she does not have the medical records and files of pediatric patients with similar symptoms who presented to Memorial Hermann's emergency room during the relevant period.  (*Id.*, at 1).  Guzman also asserts that Memorial Hermann has been evasive in responding to discovery requests about its medical screening policy.  According to Guzman, Memorial Hermann has never answered fully and in writing just what its EMTALA policy and procedures are."  (*Id.*, at 4).   Guzman cites *Ortiz v. Mennonite Gen. Hosp.*, 106 F.Supp.2d 327, 331 (D.P.R. 2000), for the proposition that summary judgment can be denied if a hospital gives evasive answers to interrogatories about medical screening policies and procedures.  Guzman asks for a continuance to seek discovery into the records of other patients.  (Docket Entry No. 99, at 3).  Guzman also seeks additional information about the Triage Guidelines, such as the name of the medical director who

99

approved them.  Guzman also seeks discovery as to whether there are any other symptom-specific protocols besides the Triage Guidelines.

The discovery Guzman seeks — patient files and "definitive" information about Memorial Hermann Triage Guidelines — would not raise a fact issue precluding summary judgment on the EMTALA screening claim.  As stated above, Memorial Hermann has presented undisputed evidence of its general medical screening examination policy and procedure.  This court has rejected Guzman's argument that this general policy is insufficient to satisfy EMTALA.  Further discovery into the Triage Guidelines would not produce evidence raising a fact issue as to whether Memorial Hermann followed its EMTALA screening policy in the medical screening examination given to T. on his first emergency room visit.

Guzman's proposed discovery requests seek additional information about screening policies or procedures for patients with specific symptoms.  Memorial Hermann has responded that there are no documents responsive to this request.  It has produced all responsive policies and procedures.  The record does not show that Memorial Hermann has been evasive in responding to discovery requests about screening policies and procedures.

With respect to discovery of other patient files, a similar argument was rejected by the court in *Richmond v. Community Hosp. of Roanoke Valley*, 885 F.Supp. 875 (W.D. Va. 1995).  In that case, the plaintiff sought to discover "the medical records of other patients who have presented themselves to the emergency department in the same or similar condition as plaintiff." *Id.* at 879.  The court held that "[i]rrespective of what such discovery might or

100

might not reveal, the results cannot salvage plaintiff's EMTALA claim." *Id.* The court reasoned that because the hospital did not have "specialized screening procedures," and it was undisputed that its general procedures were followed, "[a]ny discrepancies that might surface in the treatment of patients presenting with similar symptoms would be relevant, if at all, to whether Community Hospital had met the requisite standard of care." *Id.* In the present case, Memorial Hermann does not have a symptom-specific screening policy. Memorial Hermann's general screening policy and procedure satisfy EMTALA. The evidence showed that this policy and procedure was followed in this case. The files of other pediatric patients with similar symptoms seen at Memorial Hermann by Dr. Haynes between February 2005 and February 2006 are not relevant to Guzman's EMTALA claim.

The patient files that Guzman seeks raise an additional problem, not present in *Richmond,* which provides an additional reason that the files she seeks would not raise a fact issue as to an EMTALA violation. Guzman seeks files on other pediatric patients of Dr. Haynes, with symptoms similar to T.'s. Guzman alleges that Dr. Haynes's treatment violated EMTALA because he discharged T. without reviewing the results of the white blood cell differential test, one part of the CBC he had ordered. The evidence is undisputed that Dr. Haynes ordered the test. Guzman alleges that Dr. Haynes's failure to review the white blood cell differential test results was an EMTALA screening violation because Dr. Haynes treated other patients differently. But the records of other patients with symptoms similar to the child's are not likely to produce information relevant to this claim. The records Guzman seeks are not likely to contain information as to whether Dr. Haynes read the test results.

Although the records might show what tests Dr. Haynes ordered, the issue is not whether Dr. Haynes ordered a particular test but whether he read all the test results for patients with similar symptoms.  The doctors at Memorial Hermann do not indicate on an emergency room patient's chart whether they have or have not reviewed a particular lab result.  The charts typically only include abnormal lab values and only indicate those values when the doctor actually records them on the charts.  Dr. Haynes testified that he did not record the lab values for T. on the patient chart.  (Docket Entry No. 100, Ex. E, Deposition of Philip Haynes, M.D., at 39:19–41:6).  If abnormal white blood cell differential test results are recorded on a patient's chart, the file would show that the doctor actually reviewed those test results.  But the absence of a white blood cell differential test result on a chart does not mean that the doctor failed to read the result.

Guzman's allegation that the hospital is liable because Dr. Haynes failed to complete the CBC by reviewing all of the results before discharge "is nothing more than an accusation of negligence," not of liability under EMTALA.  *Summers*, 91 F.3d at 1138.  Dr. Haynes's failure to read the white blood cell differential test results in this case, is the basis for a medical malpractice suit, not an EMTALA violation.

Guzman has not met her burden to show how the patient files and other discovery she seeks could raise a material fact issue as to whether T. received an appropriate medical screening under EMTALA.  The Rule 56(f) motion is denied.

## V.    Conclusion

The allegations and evidence in this case involve negligence and medical malpractice,

not EMTALA liability.  Memorial Hermann's motion to strike Dr. Hayden's affidavit is granted as to the legal conclusions concerning EMTALA but denied as to the remainder of the affidavit.  Guzman's motion for a continuance to conduct discovery is denied.  Memorial Hermann's motion for partial summary judgment is granted.  A status conference is set for **June 23, 2009 at 10:30 a.m.**

SIGNED on June 16, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

103